# EXHIBIT 1

THE STATE OF NEW HAMPSHIRE

HILLSBOROUGH, SS.                                    SUPERIOR COURT
NORTHERN DISTRICT                                   Docket No.

**Scottsdale Capital Advisors Corp.**
**and**
**John Hurry**

**v.**

**The Deal, LLC and William Meagher**

**COMPLAINT AND DEMAND FOR JURY TRIAL**

COMES NOW Plaintiffs Scottsdale Capital Advisors Corp. ("SCA") and John Hurry

("Mr. Hurry") (collectively "Plaintiffs") with Complaint against Defendants The Deal, LLC

("The Deal") and William Meagher ("Mr. Meagher") (collectively, "Defendants") and shows the

Court the following:

**PARTIES**

1.      Plaintiff SCA is an Arizona corporation, having its principal place of business at

7170 E. McDonald Dr. #6, Scottsdale, Arizona  85253. At all relevant times, SCA was and is a

securities broker dealer engaged in the business of holding and trading in securities and was and

is a registered member firm of the Financial Industry Regulatory Authority, Inc. ("FINRA"), a

private corporation which regulates the securities industry.

2.      Plaintiff Mr. Hurry is an individual residing in Glenbrook, Nevada who maintains

a business office in Glenbrook, Nevada.  At all relevant times, Mr. Hurry was and is an executive

officer of SCA.  Mr. Hurry and SCA do substantial business in the micro-cap and small cap

securities sector.

3.      On information and belief, Defendant The Deal is a Delaware limited liability

company, having its address and principal place of business at 14 Wall St., 15th Floor, New

York, NY 10005.  On information and belief, The Deal publishes print and electronic publications concerning the financial sector, including *The DealFlow Report* ("DealFlow") and *The Deal Pipeline* ("Pipeline").  On information and belief, The Deal's publications are physically and electronically distributed to subscribers by The Deal and its parent/affiliate, TheStreet.com.  On information and belief, The Deal's publications, including DealFlow and Pipeline, enjoy a substantial circulation, especially to members of and those with an interest in the financial sector (especially the micro-cap and small cap securities sector), and are distributed to paid subscribers in New Hampshire.

4.      On information and belief, Defendant Mr. Meagher is an individual residing in California who is employed as a writer by The Deal and TheStreet.com.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this action pursuant to N.H. R.S.A. 491:7.

6.      The Court has personal jurisdiction over Defendants because they committed tortious acts in New Hampshire.  On information and belief, Defendants publish online content for distribution to paid subscribers within the state of New Hampshire, thereby availing themselves of New Hampshire law and the benefit of conducting activities in the forum state.

7.      New Hampshire has a strong interest in this litigation, as the tortious acts caused injury in New Hampshire.

8.      Having the case heard in New Hampshire provides the Plaintiffs with an effective and convenient forum to obtain relief, and the acts of the Defendants are intertwined, such that interstate judicial efficiency is served by avoiding multiple lawsuits.

## FACTUAL BACKGROUND

9.     On December 6, 2013, an article written by Mr. Meagher appeared in Deal Pipeline entitled "FBI, securities officials investigating Scottsdale Capital, Alpine Securities, source says" ("December 6 Article"). See Exhibit A.  The December 6 Article falsely stated that Plaintiffs and their affiliated companies were being criminally investigated and being investigated by securities regulators.  The December 6 Article further falsely stated that Plaintiffs engaged in favoritism towards shareholders of a company named Biozoom, including by allowing them to trade in violation of SCA policies and giving them special perks. The December 6 Article also falsely stated that Plaintiffs ignored "red flags" with respect to Biozoom transactions.

10.     On March 20, 2014, an article written by Mr. Meagher appeared in Deal Pipeline entitled "SEC requests default judgment in $34M Biozoom pump-and-dump case" ("March 20 Article").  See Exhibit B.  The March 20 Article falsely stated that Plaintiffs and their affiliated companies were being investigated by the FBI, and were the targets of criminal and securities investigations.  The March 20 Article also falsely stated that Plaintiffs were involved in a "pump and dump" scheme with Biozoom.  (According to Wikipedia, "'[p]ump and dump' (P&D) is a form of microcap stock fraud that involves artificially inflating the price of an owned stock through false and misleading positive statements, in order to sell the cheaply purchased stock at a higher price".)  See https://en.wikipedia.org/wiki/Pump_and_dump.

11.     On April 16, 2014, an article written by Mr. Meagher appeared in Deal Pipeline entitled "Finra focusing on money-laundering violations" ("April 16 Article").  See Exhibit C. The April 16 Article repeated the false claim that Plaintiffs and their affiliated companies were under FBI investigation.

12.     The statements in the December 6, March 20, and April 16 Articles are false and defamatory. Mr. Hurry and his companies, including SCA, enjoy an excellent reputation, and at all times conduct themselves in accordance with high ethical standards, and had not been under any criminal or regulatory investigation at the time that Mr. Meagher's articles were published. Plaintiffs were not involved in any "pump and dump" scheme and never gave special treatment to Biozoom shareholders.

13.     The defamatory statements made by Defendants have substantially harmed Plaintiffs' business relationships. Plaintiffs and their affiliated companies have seen brokerage and bank accounts closed, longstanding banking relationships severed, proposed business transactions halted, and investments hampered, delayed, or declined as a result of the defamatory statements made by Defendants. In addition to causing actual damages, the defamatory statements constituted defamation per se because they were the type that would tend to injure Plaintiffs in their trade or business.

## COUNT I – DEFAMATION

14.     Plaintiffs incorporate by this reference Paragraphs 1 through 13 of this Complaint as though fully set forth herein.

15.     Defendants have published false and defamatory statements of fact about Plaintiffs.

16.     The false and defamatory statements were made without the privilege to do so and concern the personal, professional and business reputations of SCA and Mr. Hurry.

17.     As a direct and proximate result of Defendants' conduct, SCA and Mr. Hurry have suffered economic losses in an amount that will be established at trial.

## COUNT II – INVASION OF PRIVACY, FALSE LIGHT

18.     Plaintiffs incorporate by this reference Paragraphs 1 through 17 of this Complaint as though fully set forth herein.

19.     Defendants published private information that portrayed Plaintiffs in a false light.

20.     The false light in which Defendants placed Plaintiffs would be highly offensive to a reasonable person.

21.     Defendants knew that the assertions they published were false and/or acted in reckless disregard as to the falsity of the publicized matter and the false light in which Plaintiffs would be placed by those assertions.

22.     As a direct and proximate result of Defendants' conduct, SCA and Mr. Hurry have suffered economic losses in an amount that will be established at trial.

## COUNT III – INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

23.     Plaintiffs incorporate by this reference Paragraphs 1 through 22 of this Complaint as though fully set forth herein.

24.     Defendants knew that Plaintiffs, being securities broker dealers engaged in the business of holding and trading in securities, had business relationships which would have been completed had it not been for Defendants' unlawful acts.

25.     Defendants, through the misconduct alleged herein, intended to harm Plaintiffs by intentionally and unjustifiably interfering with their actual business relationships.

26.     On information and belief, as a direct result of Defendants' publication of defamatory statements about Plaintiffs, Plaintiffs have lost business relationships and/or Plaintiffs' existing business relationships have been harmed.

27. As a direct and proximate result of Defendants' conduct, SCA and Mr. Hurry have suffered economic losses in an amount that will be established at trial.

## COUNT IV -- TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

28. Plaintiffs incorporate by this reference Paragraphs 1 through 27 of this Complaint as though fully set forth herein.

29. Defendants knew that Plaintiffs, being securities broker dealers engaged in the business of holding and trading in securities, had a reasonable expectation of entering into valid business relationships, which would have been completed had it not been for Defendants' unlawful acts.

30. Defendants, through the misconduct alleged herein, intended to harm Plaintiffs by intentionally and unjustifiably interfering with their prospective business relationships.

31. On information and belief, as a direct result of Defendants' publication of defamatory statements about Plaintiffs, Plaintiffs have lost business relationships and/or Plaintiffs' prospective business relationships have been harmed.

32. As a direct and proximate result of Defendants' conduct, SCA and Mr. Hurry have suffered economic losses in an amount that will be established at trial.

WHEREFORE, Plaintiffs SCA and Mr. Hurry, respectfully request:

A. An award of general, special, and enhanced compensatory damages within the jurisdictional limits of the Court;

B. An injunction enjoining the further publication of the false statements in Defendants' articles;

C. An award of attorneys' fees in connection with this matter;

D.   An award of interest and all costs incurred in connection with this matter; and

E.   Such other and further relief as may be appropriate based on the allegations

herein.

## JURY DEMAND

**PLAINTIFFS SCOTTSDALE CAPITAL ADVISORS CORP. AND JOHN HURRY**

**DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted,

SCOTTSDALE CAPITAL ADVISORS CORP.
AND JOHN HURRY
By their attorneys
DEVINE, MILLIMET & BRANCH, P.A.

Dated:  11/18/16                     By: _____
                                          George R. Moore, Esquire
                                          NH Bar No. 1791
                                          111 Amherst Street
                                          Manchester, NH   03101
                                          603-669-1000


HARDER, MIRELL & ABRAMS, LLP

Dated:  11/18/16                     By: _____
                                          Charles J. Harder (CAB # 184593)
                                          *Pro Hac Vice* to be filed
                                          Jordan Susman (CAB # 246116)
                                          *Pro Hac Vice* to be filed
                                          132 South Rodeo Drive, 4th Floor
                                          Beverly Hills, CA   90212
                                          424-203-1600

# EXHIBIT A

FBI, securities officials investigating Scottsdale Capital, Alpine Securities, source says - Deal Pipeline

# The Deal Pipeline

[RETURN TO ARTICLE]

## PIPEs

Share     Reprint    Save to My Articles

## FBI, securities officials investigating Scottsdale Capital, Alpine Securities, source says

By Bill Meagher   Updated 09:05 PM, Dec-06-2013 ET

The FBI, the Securities and Exchange Commission and the Financial Industry Regulatory Authority have opened investigations into the involvement of Scottsdale Capital Advisors and Alpine Securities in the trading of Biozoom Inc., according to a person familiar with those investigations.

Investors in Biozoom lost some $300 million after the SEC halted trading in the stock in June. The commission cited "a lack of current and accurate information" about the stock and suspicions that the company and some shareholders may have illegally sold unregistered shares to the public.

Before it allowed trading in Biozoom to resume in July, the SEC obtained an emergency order from the U.S. District Court in Manhattan, freezing almost $16 million in cash in U.S. brokerage accounts.

Another $17 million in trading revenues connected to sales of Biozoom shares was wired overseas before the court order, the SEC claimed in its court filing. Another $8 million in wire transfers requested by Biozoom shareholders were halted by the broker-dealers before they could go overseas.

The SEC also ordered the broker-dealers involved in the transactions, Arizona-based Scottsdale Capital, Salt Lake City-based Alpine and Legend Securities Inc. of New York, to preserve all of their records connected to the Biozoom transactions.

The regulator charged eight Argentine citizens with illegal sales of unregistered shares of Biozoom. The complaint also named two other Argentines who owned shares of Biozoom but did not sell them prior to the asset freeze. ·

Biozoom, which lists Kassel, Germany, as its headquarters, purports to manufacture a "biofeedback device" that consumers can use to monitor and analyze data related to their health. The company went public in February through a reverse merger with registered shell company Entertainment Art Inc. and raised $1.15 million in a private placement to an investor whose identity was not disclosed.

The stock was the subject of an unusual promotion four months later. Recommendations for Biozoom stock appeared in at least 13 e-mail newsletters, according to Hotstocked.com, a website that tracks stock promotions. Legal disclaimers that accompanied the promotions claimed that no compensation had been paid

FBI, securities officials investigating Scottsdale Capital, Alpine Securities, source says – Deal Pipeline

for the stock-friendly hype. Legal disclaimers in penny stock newsletters often identify the companies that pay for stock promotions and sometimes provide details of the compensation, as is required under securities law. Some stock promotion budgets run as high as $3 million.

One of the promotions claimed that Biozoom's "hand held device for the non-invasive transdermal analysis of antioxidants and other biomarkers in the human body... replaces expensive, time consuming and invasive blood tests."

"Future applications, future roll-out markets and applications are even more impressive," another newsletter stated. "Relevant biomarkers can and will be identified and analyzed for things such as cholesterol, alcohol, various illegal drugs, smoke, poisons, and blood pressure - to name a few. The unit is being further developed to measure blood sugar levels, tapping into a staggering $220 billion a year diabetes market in the U.S. and 350 million people with diabetes around the world."

Biozoom stock was also promoted in an unusual advertising campaign that made use of mainstream media outlets, including the New York Times and USA Today. In June, ads that took up most of a full page were placed in those newspapers that ostensibly promoted a London-based publication called Global Financial Insights. But, while the ads included subscription information and other details about the publication, most of their space was taken up with the magazine's recommendation of Biozoom stock.

A full-page black and white ad in USA Today could have cost $125,000, according to information that the newspaper distributes to advertisers. A similar New York Times ad would run $80,000 to $100,000, according to a newspaper spokesperson.

Both ads featured a headline that read, "Innovative Technology Company Invents Real 'Star Trek' Medical Scanner that Diagnoses Patient Health in Seconds."

A recommendation for Biozoom stock also featured prominently in an advertisement for a newsletter called TheStockReport.com that ran on the Rush Limbaugh radio show.

Previously, TheStockReport.com had produced a 24-page publication about Biozoom, which was distributed May 16, the day that Biozoom began trading at $1.10. The report valued the shares at $10.30.

Biozoom started trading with a thin volume of about 10,000 shares a day. The $1.10 share price implied a market value of $108.6 million for the company.

But when the promotion began to pick up speed, the shares rose to $1.50 on their way to an intraday high of $4.50 and a market cap of $421.5 million. Trading volume jumped as high as 11.7 million shares.

When the stock was halted, the shares were at $3.45. When trading resumed, they plunged to 13 cents, giving Biozoom a market capitalization of just $9.56 million. Investors lost more than $300 million.

Finra and SEC officials declined to comment for this story. An FBI spokesman would neither confirm nor deny the existence of a criminal probe tied to Biozoom trading.

But a source who has spoken to investigators said the investigations are ongoing. The probes by Finra and the SEC began in May, prior to the trading halt.

The brokerage firm Scottsdale Capital is owned by Scottsdale Capital Advisors Holdings LLC and the Hurry Family Irrevocable Trust. Alpine is owned by SCA Clearing LLC. Both Scottsdale and Alpine are controlled by John Hurry, who is a director of both companies. Hurry's wife Justine is a director with Scottsdale and a minority owner.

The home pages of both Scottsdale Capital's and Alpine's websites feature the same motto, "At the top of the Small Cap Market," along with a photo of a mountain peak. For Scottsdale, it is a desert mountain. For Alpine, it's a snow capped peak.

The SEC complaint alleges that six of the shareholders named in the action, Magdalena Tavella, Adriana Bagattin, Daniela Goldman, Mariano Graciarena, Fernando Loureyro and Mariano Ferrari, opened accounts at Scottsdale between May 10 and June 14. The other shareholders named by the SEC — Andres Ficicchia, Gonzalo Blaya, Lucia Hernando and Cecilia De Lorenzo — opened trading accounts at Legend Securities from January through March, according to the SEC. Ficicchia also had an account at Scottsdale.

In all, the Biozoom shareholders deposited 20.1 million shares in the trading accounts which represented 100% of the share float that did not carry a trading restriction. Those shares represented about 33% of the total shares in the company.

None of the Biozoom shareholders, contacted by e-mail, responded to a request for comment from The Deal.

Legend Securities is owned by Stocktrade Network Inc., Chris Cacace, Salvatore Caruso, **Anthony** Fusco and Mark Sulavka, according to Finra records.

The SEC claims that when the Argentine shareholders opened their trading accounts at Scottsdale and Legend, they provided documents and sales receipts purporting to show that they had bought their shares between Feb. 19 and March 15 from the original shareholders of shell company Entertainment Art. But the SEC states in its complaint that all of the Entertainment Art shareholders sold their shares to Medford Financial Ltd. in 2009. Medford in turn was purchased by Le Mond Capital, a British Virgin Islands-based firm, for $430,000 last year. Le Mond was controlled by Sara Deutsch, who became CEO of Entertainment Art.

When the reverse merger took place in February, Deutsch paid $50,000 and 39 million shares to complete the transaction with four German entities for intellectual property that became the basis for Biozoom. The deal left her with 20.1 million shares. Deutsch became a director and assistant secretary for Biozoom, and in doing so, became what the SEC considers to be a control person.

The commission alleges that the shares Deutsch controlled were the shares that were actually distributed to the Argentine shareholders and that the stock sale agreements they used to help open the trading accounts at Scottsdale and Legend were fakes. Since Deutsch was a control person, any shares she distributed would be restricted and not free trading.

Deutsch ran a restaurant in Buenos Aires along with Magdalena Tavella called Magdalena's Party, according to the SEC complaint. Tavella was one of the Biozoom shareholders who traded through Scottsdale.

Miller Place, N.Y.-based securities attorney Randall Goulding supplied a legal opinion for all of the Biozoom shareholders, based in part on the stock sale documents portraying the transactions with original Entertainment Art shareholders, the SEC claimed in a court filing requesting the asset freeze. His opinion letter stated that the share certificates could be deposited without restrictions based on an exemption from registration provided by Rule 144 of the Securities Act. He said that the sellers were not affiliates of the company and had held the shares for more than four years and that the account holders were not individually or collectively the beneficial owner of more than 10% of the common shares of the company.

On June 19, Goulding e-mailed the general counsel for Legend saying, "I hereby withdraw all of my opinions issued for the securities of Biozoom, formerly Entertainment Art. Be advised that none of these opinions should be relied upon," according to the SEC

**San Antonio**-based securities lawyer David Wise, who had supplied a similar legal opinion letter to Scottsdale for Tavella and Goldman on May 20, withdrew his letter June 26. Wise sent an e-mail to Scottsdale that in part read, "It has been brought to our attention that the SEC recently suspended trading in Biozoom. It has also been brought to our attention that Tavella and Goldman may have provided inaccurate or misleading information and documentation to Scottsdale and to this firm."

A number of factors make it appear that the Biozoom shareholders were connected in an organized effort.

FBI, securities officials investigating Scottsdale Capital, Alpine Securities, source says - Deal Pipeline

A person who has spoken with investigators said that the six shareholders who held Scottsdale accounts opened them within the same week. The SEC complaint states that all of the shareholders live in Buenos Aires.

A person familiar with the investigative documents said the handwriting on the account applications for the Biozoom shareholders was the same, the answers to questions on their foreign due diligence packages were very similar and they held accounts at the same banks in Cyprus, Switzerland and Panama.

Moreover, the e-mail addresses they furnished for their trading accounts were opened within a week of each other, according to Whosis.com, a website that furnishes information on domain registrations. The addresses are also similar, all containing the account holders' last names

The shareholders with accounts at Legend were also from Buenos Aires.

According to a declaration filed with the court by Ricky Sachar, an assistant director of enforcement for the SEC, all of the shareholder's e-mail accounts were opened with the same regional Internet registry. All of the Biozoom trades were made from May 16 to June 17 and no other stocks were deposited or traded through the accounts at either Scottsdale or Legend. Also, all of the Biozoom trades were ordered using either e-mail or instant messaging accounts.

"These shareholders were brought in for this. It's as simple as that," said a person with knowledge of the investigations. "They are retired teachers, a deli owner, but they come in with millions of shares of stock. They only trade Biozoom and they are directing trades using traders' lingo, telling them which market makers to use for the trades? Come on. They were straw men for whoever is behind this whole thing."

That same person said the Biozoom shareholders who opened accounts with Scottsdale enjoyed perks that were not available to other Scottsdale clients.

Typical clients pay 4% per transaction, or 4.5% if their transactions are cleared through Alpine. Longtime clients who do a heavy volume of business may occasionally receive a discount of one percentage point. But Biozoom clients paid just 2%, the person said.

They were also allowed to place orders using instant messaging, which is generally forbidden under Scottsdale's internal policies. A person with knowledge of Scottsdale's operations said the policy was changed for the Biozoom shareholders by the broker-dealer's management after Biozoom shareholders complained.

A standing Scottsdale policy only allows clients to wire funds from their accounts to banks in the U.S. or to institutions in the country where they live. But the person said that Biozoom shareholders were allowed to send funds to Cyprus, Switzerland, Panama and Belize, despite the fact that all of them live in **Argentina** and all of them had signed documents agreeing to abide by Scottsdale's wire policy.

The same person said that several red flags were raised regarding the Biozoom trades at Scottsdale: They were large trades in a microcap stock with relatively little liquidity. Also, foreign nationals were wiring large sums out of the U.S., raising potential concerns about money laundering. Still, no follow-up occurred at the broker-dealer, the person said.

Finra, who has worked with the SEC on the probe, has had several "on-the-record" conversations with Scottsdale staff regarding the trading of Biozoom shares, the process by which the accounts were opened for the Argentine nationals and how assets were moved offshore, according to a person who has spoken with investigators. "OTRs", as they are known in the brokerage industry, are sessions in which Finra staff ask specific questions of registered representatives who must answer them or face disciplinary actions.

A source who has spoken to investigators said Scottsdale staff members who have talked with Finra regarding Biozoom trades are Timothy Scarpino, Tim Diblasi, Liz Arndt, Henry Diekmann, Jay Noiman, Michael Cruz, Adam Flandaca and Ted Ashton.

Finra also talked with John Hurry, that same source said.

Scarpino, who processed the Argentine accounts connected to the Biozoom trades, resigned from his position at Scottsdale. He declined comment for this story. Ashton, who was a compliance analyst, also is no longer with the firm. Efforts to reach him failed.

Arndt is the office manager and oversees trading. Noiman and Diekmann are in compliance, and Diblasi is chief operating officer. Cruz is chief counsel, and Flandaca handles wiring of funds.

Diekmann denied he participated in the OTRs with Finra in a very brief phone interview.

None of the other Scottsdale staff questioned by Finra returned phone calls from The Deal seeking comment regarding the OTR's about Biozoom.

Gerald Russello, a partner at the law firm of **Sidley Austin LLP** in New York, said that Scottsdale and Alpine would have no comment regarding Biozoom trading or the investigations by Finra, the SEC and the FBI. Russello is a securities lawyer and former SEC enforcement branch chief.

Richard Kirby, a partner with **K&L Gates LLP** in Washington who represents Legend Securities, said he does not know if the SEC is concerned with how Legend conducted itself with regards to the Biozoom trades, but he said that Legend had not filed any notice with Finra regarding an SEC investigation.

Kirby also said that Legend alerted the SEC to its concerns regarding Biozoom and that the broker-dealer had acted on its own to freeze accounts tied to the Argentine nationals prior to the SEC action July 7.

While Legend did complete a June 13 $600,000 wire transfer for Luciana Hernando to Hellenic Bank Public Co. in Lemesos, Cyprus, it refused Hernando's request to move $2 million to the same bank on June 17. Legend also refused a wire request from Blaya June 14 to transfer almost $3.5 million to a bank in Geneva, according to the SEC complaint.

Meanwhile, John Hurry, who controls both Scottsdale and Alpine, is in negotiations to buy Salt Lake City-based broker-dealer **Wilson-Davis & Co.**, according to a person with knowledge of the deal.

Representatives of Wilson-Davis did not return phone calls from The Deal seeking comment. Scottsdale representatives declined to comment.

Share    Reprint    Save to My Articles

---

Privacy  |   Terms and Conditions  |   My Account  |   Contact Us

@Copyright 2013, The Deal, LLC. All rights reserved. Please send all technical questions, comments or concerns to the Webmaster.

# EXHIBIT B

SEC requests default judgment in $34M Biozoom pump-and-dump case By Bill Meagher Updated 04:10 PM, Mar-20-2014 ET

The **Securities and Exchange Commission** plans to request a default judgment against the 10 Argentine residents who have been named as defendants in the $34 million Biozoom Inc. pump-and-dump case after two law firms representing the Argentines asked to withdraw from the case.

The SEC filed a letter Tuesday, March 18, with Judge Naomi Buchwald in the U.S. District Court in Manhattan, stating that it planned to request the judgment because the defendants had failed to respond to the lawsuit by court ordered deadlines.

Four days earlier, attorney Marc Agnifilo had informed the court that his firm, New York-based Brafman & Associates PC, would withdraw as counsel to the Argentines.

Brafman is the second firm that has represented the group charged with selling 20.3 million shares of Biozoom without proper registration. In September, **McLaughlin & Stern LLP** also withdrew.

Brafman is a high-profile criminal defense firm that has counted crime boss Salvatore "Sammy the Bull" Gravano, rapper Sean Combs and former International Monetary Fund chief Dominique **Strauss**-Kahn among its clients.

Agnifilo declined to comment on the firm's withdrawal from the Biozoom case. In his letter to the court, he said that Brafman had been told by the Argentines that it would be retained, but that a retainer agreement was never signed.

Those named as defendants are Magdalena Tavella, Andres Horacio Ficicchia, Gonzalo Garcia Blaya, Lucia Mariana Hernando, Cecilia De Lorenzo, Adriana Rosa Bagattin, Daniela Patricia Goldman, Mariano Pablo Ferrari, Mariano Graciarena and Fernando Loureyro.

None of them responded to e-mails requesting comment.

A person familiar with the case said that Buenos Aires-based lawyer Juan Ignacio Prada has been seeking representation for the group. Prada did not respond to a request for comment.

Patrick Bryan, assistant chief litigation counsel for the SEC, said the commission will file paperwork to pursue the default judgment in the next month. He declined to comment further.

The SEC filed the lawsuit last July, claiming that the Argentines had opened brokerage accounts at Arizona-based Scottsdale Capital Advisors and New York-based Legend Securities Inc., depositing shares and providing paperwork stating that the stock was purchased from shareholders in Entertainment Arts Inc., the registered shell company that had merged with Biozoom to bring it public in February 2013.

Biozoom, which lists Kassel, Germany, as its headquarters, claims to produce a "biofeedback device" that consumers can use to monitor and analyze data related to their health.

In its complaint, the SEC alleges that the stock purchase agreement documents were false and that the Entertainment Art investors had sold all of their stock in 2009.

The account documents furnished by the Biozoom shareholders led to speculation that members of the group were not the real investors, but instead were simply nominees. None of the Argentines listed investor as their profession, and none of them deposited or traded in any other stocks, according to a person familiar with the investigation.

The Argentine group is said to have included retired teachers and the owner of a delicatessen.

Scottsdale Advisors is said to have given the Biozoom shareholders perks that were not available to other clients. They submitted trade orders by e-mail or instant messaging, which the firm did not allow for most clients. The Biozoom shareholders were also charged commissions of just 2%, while other clients paid 4% to 4.5%.

The Biozoom shareholders were also allowed to wire funds from their accounts to banks in Cyprus, Switzerland, Panama and Belize, despite a standing policy at Scottsdale that usually only allows clients to wire funds to U.S. banks or to institutions in the country where they live.

The SEC halted trading in Biozoom on June 25 and, in July, asked the court for an emergency order freezing the defendants' assets. That kept $16 million in stock sale proceeds in the U.S. Another $17 million had already been wired overseas prior to the freeze.

The SEC alleges says that, from March 2013 through June, the Argentines received 20 million shares of Biozoom, which was about one-third of the company's stock. In May, they sold 14 million shares reaping almost $34 million.

The shares were sold into a promotion that started May 16, as the company issued a series of press releases, and continued into June. Biozoom's share price tripled, reaching an intraday high of $4.50, implying a valuation of $421.5 million.

As of June 30, Biozoom owned assets valued at only $1.05 million, according to its last filing with the SEC. In the quarter ending June 30, the company had no revenue and a loss of $328,671.

When the stock was halted, the shares were at $3.45. When trading resumed, they plunged to 13 cents, cutting more than $300 million from Biozoom's market value.

The promotion was unusual in the form it took. It included advertising in mainstream media outlets, including the New York Times and **USA Today**. In June, ads that took up most of a full page were placed in those newspapers that ostensibly promoted a London-based publication called Global Financial Insights. But, while the ads included subscription information and other

details about the publication, most of their space was taken up with the magazine's recommendation of Biozoom stock.

Both ads featured a headline that read, "Innovative Technology Company Invents Real 'Star Trek' Medical Scanner that Diagnoses Patient Health in Seconds."

A recommendation for Biozoom stock also featured prominently in an advertisement for a newsletter called TheStockReport.com that ran on the Rush Limbaugh radio show.

Previously, TheStockReport.com had produced a 24-page publication about Biozoom, which was distributed May 16, the day that Biozoom began trading at $1.10. The report valued the shares at $10.30.

The FBI and the Financial Industry Regulatory Authority have been investigating the involvement of Scottsdale and Alpine Securities, its Salt Lake City-based clearing firm, in connection with the Biozoom stock sales since May, according to a person with knowledge of the probe.

The firms have provided securities officials with documents pertaining to the Biozoom trades and shareholders, including those sought under an unusual request from the SEC and Finra that employees turn over all personal notes regarding Biozoom. Scottsdale and Alpine were also forbidden from destroying any Biozoom records.

Finra has scheduled an audit of Scottsdale at the end March, according to a person familiar with the investigation.

Representatives of the SEC, Finra, Scottsdale and Alpine declined to comment. An FBI spokesman said the agency will neither confirm nor deny the existence of an investigation.

Read more: http://pipeline.thedeal.com/tdd/ViewArticle.dl?id=10007955861#ixzz2wbopcwyV

# EXHIBIT C



[RETURN TO ARTICLE]

## Law

Share    Reprint   Save to My Articles

# Finra focusing on money-laundering violations

By Bill Meagher   Updated 07:00 PM, Apr-16-2014 ET

On March 10, the staff at Scottsdale Capital Advisors was startled when their receptionist called out into the office, "Finra is here!"

While representatives from the Financial Industry Regulatory Authority were expected at the end of the month for a scheduled two-week exam, this visit had nothing to do with that appointment. Rather, the investigators asked for files relating to overseas clients and omnibus accounts, which are owned in the names of other brokerage firms, according to a person familiar with the raid.

That person said that a group of Finra investigators hauled away copies of documents regarding omnibus accounts at Scottsdale that included those owned in the names of Belize-based Titan International Securities Inc. and Cayman Islands-based Caledonian Global Financial Services Inc., and a Cayman account linked to Scottsdale owner John Hurry.

Gerald Russello, a partner with the law firm of Sidley Austin LLP who represents Scottsdale, declined to comment. Representatives of Titan International did not return a phone call seeking comment.

Caledonian Global CEO Kobi Dorenbush said his firm had not been contacted by any U.S. regulators.

The action at Scottsdale's Arizona offices came a month after brokerage firm Brown Brothers Harriman & Co. was fined a record $8 million by Finra in a settlement over alleged violations of anti-money laundering regulations. Finra also levied a $25,000 fine and a one-month suspension from the securities industry against Harold Crawford, the New York-based firm's former anti-money-laundering compliance officer.

Finra said that, from January 2009 to June 2013, Brown Brothers executed trades or delivered securities in transactions involving at least 6 billion penny stock shares, with many of those transactions made through omnibus accounts on behalf of clients that the firm could not identify. Some of the $845 million in proceeds were allegedly wired to Switzerland, Guernsey and Jersey, countries with strong bank secrecy laws. Those locations and transactions should have raised red flags with Brown Brothers and prompted the firm to file suspicious activity reports under federal anti-money-laundering regulations, according to Finra.

Brown Brothers agreed to the settlement without admitting or denying Finra's findings. The firm also issued a statement saying it had changed its procedures for handling low-priced securities and for surveillance of

activity in low-priced securities to "mitigate a possible recurrence of this matter." Brown Brothers also said that the activity covered by the settlement represented a small part of its investor services business and did not involve its investment management or private banking business.

Some violations of anti-money-laundering regulations have been closely linked with stock manipulation and pump-and-dumps of microcap stocks, both of which have been identified as priority areas for enforcement action by Finra and the Securities and Exchange Commission.

Finra's action against Brown Brothers has gotten the attention of broker-dealers, anti-money laundering consultants and lawyers for two reasons. The fine, the largest ever handed down for an anti-money-laundering violation by Finra, has served notice that the regulator is serious about firms cleaning up their anti-money-laundering programs. And the fact that Crawford was fined for the company's alleged failure to create an effective anti-money-laundering program is seen by some as unfair.

"Finra has served notice that there is personal responsibility for a company failing to implement an adequate program," said Kevin Petrasic, a partner in the Washington office of law firm Paul Hastings LLP, whose practice includes anti-money-laundering litigation.

"It is a no-win situation and a bit draconian," he said. "AML compliance officers are in a barbell on this. They want to put a program in place, and Finra expects that program to work, but sometimes the senior management doesn't want to pay for the resources, so they choose not to implement the program, and the AML officers are in the middle between management and the regulators. Who wants that job?"

In Crawford's case, he went to Brown Brothers' management and proposed changes that would affect the anti-money-laundering program, according to documents that Finra staff filed in their administrative action. In November 2011, Crawford and other Brown Brothers compliance staff are said to have recommended that the firm stop executing trades for penny stocks below a certain threshold value. They are also said to have recommended that the firm require omnibus account clients that wished to offer brokerage services to their own customers to set up a disclosed subaccounts.

Brown Brothers did not change how it handled penny stocks until last June, according to Finra.

Omnibus accounts are often held in the name of foreign financial intermediaries who, in turn, are handling stocks for clients that might not be known to the U.S. broker-dealer. Finra has told broker-dealers that it is important to know who are the actual investors behind the omnibus accounts.

Anti-money laundering regulations are designed to keep money made in illegal activities from being made to look as if it is the product of legitimate endeavors. With Finra, they center on Rule 3310. It requires each brokerage firm to implement a compliance plan that is approved by a member of senior management in writing. The plan must be designed to detect and assure the reporting of suspicious transactions. The plan must also comply with the Bank Secrecy Act and include an annual independent compliance test. Firms are also required to identify to Finra an individual or group responsible for the day-to-day operation of the anti-money-laundering program.

Each year in January, Finra issues its Regulatory and Examination Priorities Letter which details issues where the regulator plans to devote resources. In 2012, the letter named microcap stock fraud as an enforcement priority.

"As a part of their anti-money laundering responsibilities, member firms are obligated to monitor suspicious activity and to file Suspicious Activity Reports where warranted," the 2012 letter stated.

Last year, efforts against money laundering received their own paragraph in the letter.

"Finra examiners continue to focus on AML compliance, particularly at firms with higher-risk business models due to their clients, products and service mix or location in which they operate."

This year, Finra doubled the space in its letter devoted to efforts against money laundering. The regulator said it planned to focus on institutional business, as well as a trend of broker-dealers not pursing the identities of some shareholders in transactions disposing of large volumes of low-priced stocks.

"I think what is going on is obvious," said a former Finra official who now consults on anti-money-laundering issues. "Finra feels like these regulations have been on the books for what, 11, 12 years? The firms have had a chance to put AML programs in place, hire good people, and still there are problems. So Finra jumps the fines to get their attention. They are saying, 'We are serious and unless you take care of this, it is going to cost you some real money.'"

Paul Tyrrell, of counsel in the Boston office of law firm Sidley Austin LLP, said that some in the brokerage industry have been rattled by Finra's targeting of individuals for enforcement of anti-money-laundering rules.

"Where is the line being drawn?" he said. "I don't know and nobody else does either. What we are seeing in the [anti-money-laundering] exams is that Finra is being more robust, running it down to the end. They are asking what you did, and when you did it, and people are worried that Finra is now looking at AML officers, branch managers and even individual representatives."

For example, in March 2013, the regulator accused James Pilla, a registered representatives of Ameriprise Financial Services Inc., of failing to report red flags raised by penny stock trades in 26 of his client accounts and failing to meet face-to-face with 59 of his clients to verify their identities before opening their accounts. His actions allegedly violated Ameriprise's anti-money-laundering procedures. Finra suspended him for three months and fined him $15,000.

Finra filed 36 anti-money-laundering actions last year, down from 45 in 2012 and 38 in 2011. The regulator did not make anyone available to comment for this story.

Among its actions was a $1.4 million fine against **Oppenheimer Holdings Inc.** last August for alleged violations that included a failure to conduct due diligence on foreign financial intermediaries. Finra claims that from August 2008 through September 2010, Oppenheimer sold 1 billion unregistered penny stock shares on behalf of 13 clients, without performing due diligence on the status of the shares. The firm also allegedly failed to probe suspicious trading by a Bahamas-based broker-dealer. Oppenheimer agreed to pay the fine without admitting or denying Finra's allegations.

In December, Finra fined COR Clearing LLC of Omaha, Neb., $1 million over allegations that, for three years beginning in 2009, the firm failed to establish and implement anti-money-laundering policies and for a time in 2012, its anti-money-laundering program had almost collapsed. COR accepted the penalty without admitting or denying the allegations.

Both COR and Oppenheimer were required to hire independent consultants to monitor and evaluate their anti-money-laundering programs.

World Trade Financial Corp., a San Diego-based brokerage firm, was the subject of a $250,000 fine after Finra alleged it violated anti-money-laundering regulations by not setting up and enforcing supervisory procedures. From March 2009 to August 2011, World Trade bought and sold 27.5 billion shares of a dozen different penny stocks on behalf of one client. Those shares were unregistered and not eligible for an exemption from registration requirements, according to Finra. The transactions generated $61 million in proceeds for the client. The business generated by those transactions was the lion's share of World Trade's business.

The firm accepted the fine without admitting or denying the allegations.

The link between anti-money-laundering regulations involving omnibus accounts and penny stock trading is a growing topic of conversation in the brokerage industry.

"It is what everybody is talking about, and the recent Brown Brothers bust has really made it obvious that's what Finra is worried about as well," said one brokerage firm executive.

The connection was brought into sharp focus by the SEC's recent lawsuit and emergency asset freeze order against John Babikian, a Canadian national who the commission claims is behind the now defunct stock promoter Awesome Penny Stocks.

At the SEC's request, the federal court in Manhattan froze assets belonging to Babikian including two homes in Los Angeles, farm and vineyard land in Oregon and a fractional interest in a corporate jet.

In its lawsuit filed last month, the SEC alleged that Babikian sold 1.3 million shares of coal mining company **America West Resources Inc.** on Feb. 23, 2012, in 90 minutes, after first promoting the stock to 700,000 subscribers to Awesome Penny Stocks' e-mail newsletters. He allegedly made $1.9 million, selling the shares through an omnibus account with Swiss bank Frankfurter Bankgesellschaft (Schweiz) AG maintained by Brown Brothers.

In a set of Finra internal records from 2012 and 2013 obtained by The Deal, the regulator said it has initiated probes of suspicious trading activity involving offshore entities tied to pump and dumps in **Toron Inc.**, U.S. Highland Inc., Bioflamex Corp., **Goff Corp.** and **Marine Drive Mobile Corp.** Those reports were furnished to the SEC.

The offshore brokerage firms cited by Finra in those reports include Caledonian Global, Caledonian Bank Ltd., Caledonian Securities Ltd., Clearwater Securities Inc., Legacy Global Markets SA, Argus Stockbrokers Ltd., CBH Compagnie Bancaire Helvetique SA, Bank Gutenberg AG, Sherman Capital, Rigi Capital and Verdmont Capital SA.

The regulator obtained trading records regarding the omnibus accounts from Scottsdale Capital, Brown Brothers, **Vertical Group**, Knight Execution and Clearing Services LLC, OC Securities Inc. and Ascendiant Capital Markets LLC, according to the Finra records.

Scottsdale is already the subject of investigations by Finra, the SEC and the FBI pertaining to an unusual $34 million pump and dump involving a German company known as Biozoom Inc., according to a person familiar with the situation. Scottsdale's clearing agency and related entity, Salt Lake City-based Alpine Securities is also a part of those probes.

The firms have provided securities officials with documents pertaining to the Biozoom trades and shareholders, including those sought under a request from the SEC and Finra that employees turn over all personal notes regarding Biozoom. Scottsdale and Alpine were also forbidden from destroying any Biozoom records.

The SEC filed a lawsuit last July, claiming that a group of 10 Argentine nationals had opened brokerage accounts at Scottsdale and New York-based Legend Securities Inc., depositing shares and providing paperwork stating that the Biozoom stock was purchased from shareholders in Entertainment Art Inc., the registered shell company that had merged with Biozoom to bring it public in February 2013.

Biozoom, which lists Kassel, Germany, as its headquarters, claims to produce a "biofeedback device" that consumers can use to monitor and analyze data related to their health.

The SEC alleges that the stock purchase agreement documents were false and that the Entertainment Art investors had sold all of their stock in 2009.

The account documents furnished by the Biozoom shareholders led to speculation that members of the group were not the real investors, but instead were simply nominees. None of the Argentines listed investor as their profession, and none of them deposited or traded in any other stocks, according to a person familiar with the investigation. The Argentine group is said to have included retired teachers and the owner of a delicatessen.

Scottsdale Advisors is said to have given the Biozoom shareholders perks that were not available to other clients. They submitted trade orders by e-mail or instant messaging, which the firm did not allow for most clients. The Biozoom shareholders were also charged commissions of just 2%, while other clients paid 4% to 4.5%.

The Biozoom shareholders were also allowed to wire funds from their accounts to banks in Cyprus, Switzerland, Panama and Belize, despite a standing anti-money-laundering policy at Scottsdale that usually only allows clients to wire funds to U.S. banks or to institutions in the country where they live.

The SEC halted trading in Biozoom on June 25 and, in July, asked the court for an emergency order freezing the defendants' assets. That kept $16 million in stock sale proceeds in the U.S. Another $17 million had already been wired overseas prior to the freeze.

The SEC alleges says that, from March 2013 through June, the Argentines received 20 million shares of Biozoom, which was about one-third of the company's stock. In May, they sold 14 million shares reaping almost $34 million.

The shares were sold into a promotion that started May 16, as the company issued a series of press releases, and continued into June. Biozoom's share price tripled, reaching an intraday high of $4.50, implying a valuation of $421.5 million.

As of June 30, Biozoom owned assets valued at only $1.05 million, according to its last filing with the SEC. In the quarter ending June 30, the company had no revenue and a loss of $328,671.

When the stock was halted, the shares were at $3.45. When trading resumed, they plunged to 13 cents, cutting more than $300 million from Biozoom's market value.

Share     Reprint   Save to My Articles

Privacy  |  Terms and Conditions  |  My Account  |  Contact Us

@Copyright 2013, The Deal, LLC. All rights reserved. Please send all technical questions, comments or concerns to the Webmaster.