**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | | |
|---|---|---|
| SCOTTSDALE CAPITAL ADVISORS CORP, AND JOHN HURRY, | ) ) ) | |
| Plaintiffs, | ) ) | CASE NO. 1:16-CV-00545 |
| v. | ) ) | Hon. Joseph Normand Laplante |
| THE DEAL, LLC AND WILLIAM MEAGHER, | ) ) | |
| Defendants. | ) ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION
TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(2)**

SHAHEEN & GORDON, P.A.
Steven M. Gordon
NH Bar No. 964
107 Storrs Street
P.O. Box 2703
Concord, NH 03302-2703
(603) 225-7262
sgordon@shaheengordon.com

DAVIS WRIGHT TREMAINE LLP
Elizabeth A. McNamara (*pro hac vice*)
John M. Browning (*pro hac vice*)
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
(212) 489-8340
lizmcnamara@dwt.com
johnbrowning@dwt.com

*Attorneys for Defendants The Deal, LLC
and William Meagher*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................ 1

STATEMENT OF JURISDICTIONAL FACTS ............................................................. 3

    A.    Plaintiffs' Lack of Contacts with New Hampshire ................................. 3

    B.    Defendants' Lack of Contacts with New Hampshire ............................ 3

    C.    The Deal's Editorial Products, including *The Deal Pipeline* ................. 4

    D.    Availability of the Articles in New Hampshire ..................................... 5

    E.    History of Litigation between the Pgordyarties ..................................... 6

ARGUMENT .................................................................................................................. 9

    I.    DEFENDANTS' MINIMAL CONTACTS WITH NEW HAMPSHIRE
         ARE NOT SUFFICIENTLY RELATED TO THE CLAIMS IN THIS
         LAWSUIT TO SATISFY DUE PROCESS ........................................ 11

    II.    DEFENDANTS' MEAGER DISTRIBUTION OF THE ARTICLES DOES
         NOT CONSTITUTE PURPOSEFUL AVAILMENT ......................... 14

         A.    The Allegedly Harmful Effects of the Articles Were Not Felt in New
              Hampshire ................................................................................ 15

         B.    Defendants' Publication and Distribution of the Articles Does Not
              Satisfy the Purposeful Availment Test ...................................... 18

    III.    IT IS NOT REASONABLE TO EXERCISE PERSONAL JURISDICTION
         OVER DEFENDANTS IN NEW HAMPSHIRE ................................. 23

CONCLUSION .............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A Corp. v. All Am. Plumbing, Inc.*,
  812 F.3d 54 (1st Cir. 2016)..............................................................................*passim*

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985).............................................................................................10

*Calder v. Jones*,
  465 U.S. 783 (1984)......................................................................................*passim*

*Chaiken v. VV Publ'g Corp.*,
  119 F.3d 1018 (2d Cir. 1997)..............................................................................20

*Christian v. Barricade Books, Inc.*,
  No. 02-408-B, 2003 U.S. Dist. LEXIS 8555, DNH 078 (D.N.H. May 15,
  2003) ............................................................................................................12, 13, 19

*Farquharson v. Metz*,
  No. 13-10200-GAO, 2013 U.S. Dist. LEXIS 106374 (D. Mass. July 30, 2013)...................15

*Fielding v. Hubert Burda Media, Inc.*,
  415 F.3d 419 (5th Cir. 2005) ..............................................................................20

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
  564 U.S. 915 (2011).............................................................................................10

*Gordy v. Daily News, L.P.*,
  95 F.3d 829 (9th Cir. 1996) ................................................................................21

*Hugel v. McNeill*,
  886 F.2d 1 (1st Cir. 1989).....................................................................................21

*Int'l Shoe Co. v. Washington*,
  326 U.S. 310 (1945)........................................................................................10, 11

*Keeton v. Hustler Magazine, Inc.*,
  465 U.S. 770 (1984)......................................................................................*passim*

*Medicus Radiology, LLC v. Nortek Med. Staffing, Inc.*,
  No. 10-cv-300-PB, 2011 U.S. Dist. LEXIS 249 (D.N.H. Jan. 3, 2011) .................................24

*ouaDevices, Inc. v. Neomed, Inc.*,
  No. 08-cv-375-SM, 2009 U.S. Dist. LEXIS 19987, DNH 020 (D.N.H. Mar.
  12, 2009) .....................................................................................................13, 14

*Noonan v. Winston Co.*,
  135 F.3d 85 (1st Cir. 1998) ........................................................................... *passim*

*Ouazzani-Chahdi v. Greensboro News & Record, Inc.*,
  No. CIV.A. H-05-1898, 2005 U.S. Dist. LEXIS 4126 (S.D. Tex. Sept. 27,
  2005) ..........................................................................................................................20

*Phillips Exeter Acad. v. Howard Phillips Fund*,
  196 F.3d 284 (1st Cir. 1999) ................................................................................10, 14

*R&R Auction Co. v. Johnson*,
  No. 15-cv-199-PB, 2016 U.S. Dist. LEXIS 67273, DNH 195 (D.N.H. May 23,
  2016) ..........................................................................................................................25

*Revell v. Lidov*,
  317 F.3d 467 (5th Cir. 2002) ...........................................................................17, 22

*Reynolds v. International Amateur Athlete Fed'n*,
  23 F.3d 1110 (6th Cir. 1994) ...................................................................................17

*Reynolds v. InVivo Therapeutics Holdings Corp.*,
  No. 16-cv-384-JL, 2016 U.S. Dist. LEXIS 166774 (D.N.H. Nov. 30, 2016)
  (Laplante, J.) ..................................................................................................... *passim*

*Rodriguez Salgado v. Les Nouvelles Esthetiques*,
  218 F. Supp. 2d 203 (D.P.R. 2002) ..........................................................................20

*Scherr v. Abrahams*,
  No. 97 C 5453, 1998 U.S. Dist. LEXIS 8531 (N.D. Ill. May 29, 1998) ................................20

*Schnapp v. McBride*,
  64 F. Supp. 2d 608 (E.D. La. 1998) ..........................................................................20

*Ticketmaster-New York, Inc. v. Alioto*,
  26 F.3d 201 (1st Cir. 1994) ........................................................................... *passim*

*Trump v. Tarpley*, 424492-V (Md. Cir. Ct. Feb. 1, 2017) ........................................22

*United States v. Swiss Am. Bank*,
  274 F.3d 610 (1st Cir. 2001) ...............................................................................11, 13, 15

*Walden v. Fiore*,
  134 S. Ct. 1115 (2014) ...................................................................................16, 18

*Young v. New Haven Advocate*,
  315 F.3d 256 (4th Cir. 2002) ...................................................................................17

*Zippo Mfg. Co. v. Zippo Dot Com*,
  952 F. Supp. 1119 (W.D. Pa. 1997) ..........................................................................22

**Statutes**

28 U.S.C. § 1332 ...................................................................................................................9

Defendants The Deal, LLC ("The Deal") and William Meagher (collectively, "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Complaint ("Complaint" or "Compl.") filed by Plaintiffs Scottsdale Capital Advisors Corp. ("Scottsdale") and John Hurry (collectively, "Plaintiffs") for lack of personal jurisdiction.

## INTRODUCTION

This lawsuit must be dismissed for lack of personal jurisdiction because there is no meaningful connection between any of the parties and the state of New Hampshire. In an effort to enjoy New Hampshire's strategically advantageous statute of limitations, Plaintiffs have filed this lawsuit in New Hampshire despite the fact that they are based in Nevada and Arizona, respectively, with no contacts to speak of in this state. Plaintiffs do not—and cannot—establish that a sufficient nexus with New Hampshire exists to allow this case to go forward. Put simply, this is forum shopping and nothing more.

The genesis of this lawsuit has nothing to do with New Hampshire. Plaintiffs are stock brokers, who are active in the small cap and micro-cap markets. In 2013, regulators investigated Plaintiffs for their part in a multimillion stock market fraud perpetrated by Scottsdale clients, who were Argentinian shareholders in a company named Biozoom. Defendant Bill Meagher, who is an experienced financial journalist based in California, learned about these investigations and wrote a series of articles reporting on Plaintiffs' role in the Biozoom fraud that appeared in *The Deal Pipeline*. The *Deal Pipeline* is an online financial journal published by The Deal, which is based on Wall Street in New York City. The first of Mr. Meagher's articles was published on *The Deal Pipeline's* subscribers-only website on December 6, 2013 (the "December 6 Article"), with follow-up articles appearing on March 20 and April 16, 2014 (the "March 20 Article" and "April 16 Article," respectively, and collectively with the December 6 Article, the "Articles). None of the Articles mention New Hampshire, directly or indirectly. Nor

do they rely on any sources located in New Hampshire.  Rather, the Articles were researched, written and edited by Mr. Meagher in California and bear no relationship to New Hampshire.

Nearly three years later, Plaintiffs filed suit in New Hampshire because it is one of only two states in the nation with a statute of limitations for defamation long enough to cover the Articles.  However, this action is just the latest in a series of lawsuits commenced by Plaintiffs, none of which concern New Hampshire. Plaintiffs are currently suing the Financial Industry Regulatory Authority ("FINRA") in federal court in Arizona for discriminatory treatment.  That case turns on Plaintiffs' allegation that a FINRA agent was Mr. Meagher's confidential source for the Articles and illicitly provided Defendants with sensitive information about Scottsdale allegedly uncovered during FINRA's investigation into the Biozoom fraud.  Accordingly, Plaintiffs have a pressing motivation to discover the identity of Mr. Meagher's source because they believe this information might substantiate their claims against FINRA.

In an effort to coerce Defendants into giving up their source, Plaintiffs filed a libel suit against them in New York state court.  That lawsuit was based on an innocuous article Mr. Meagher wrote in May 2015 (which is not at issue here) because the May 2105 article was not time-barred by New York's one-year statute of limitations for libel, unlike the Articles now in suit.  When Defendants steadfastly refused to reveal the identity of their source, Plaintiffs voluntarily dismissed their New York action the day before Defendants were to file a motion to dismiss, knowing full well that Defendants wasted time and money on preparing unnecessary motion papers.  Plaintiffs' next gambit was to file suit here because New Hampshire's three-year statute of limitations allows Plaintiffs to challenge the older Articles.

For the reasons set forth more fully below, this Court does not have jurisdiction over Defendants and must dismiss Plaintiffs' opportunistic lawsuit.  The meager contacts between Defendants and New Hampshire are not sufficient to satisfy due process.  Mr. Meagher has

absolutely no connection to New Hampshire.  The Deal's only connection with this state is a single New Hampshire-based subscriber to *The Deal Pipeline*. But a solitary subscription to a nationally distributed publication is precisely the kind of "random, isolated, or fortuitous" contact that is categorically insufficient to establish personal jurisdiction.  *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984).  Since Defendants have no other contacts with New Hampshire, this case does not meet the requirements of due process and must be dismissed accordingly.

## STATEMENT OF JURISDICTIONAL FACTS

### A.    Plaintiffs' Lack of Contacts with New Hampshire

Plaintiff Scottsdale is an Arizona corporation with its principle place of business in Scottsdale, Arizona.  Compl. ¶1.  Plaintiff Hurry, who is an executive and officer of Scottsdale, resides in Nevada.  *Id*. ¶2.  Plaintiffs "do substantial business in the micro-cap and small cap securities sector" (*id*.), but the Complaint lacks any allegations that Plaintiffs conduct business in New Hampshire or have even a single New Hampshire resident as a client.

### B.    Defendants' Lack of Contacts with New Hampshire

Defendant The Deal is a Delaware limited liability company with its main offices located on Wall Street in New York.  Declaration of Eric Lundberg ("Lundberg Decl.") ¶¶2-3.  The corporate parent and sole member of The Deal—The Street, Inc. ("The Street")—is a Delaware corporation with its principle office also located in New York.  *Id.* ¶5.  Neither The Deal nor The Street maintains any offices in New Hampshire.  *Id*. ¶¶4-5.  No reporters, editors or other employees of The Deal are New Hampshire residents.  *Id*. ¶4.  The Deal owns no property in New Hampshire, holds no bank accounts and does not pay any taxes in that state.  *Id*.

Defendant William Meagher, who works as a reporter for The Deal, is a resident of California and is based in The Deal's Petaluma, California office.  Declaration of William Meagher ("Meagher Decl.") ¶2.  Mr. Meagher has never set foot in New Hampshire.  *Id*.  All of

the reporting and editing of the Articles at issue occurred by telephone from Mr. Meagher's California office.  No reporting occurred in New Hampshire; nor did any source reside there.

**C.      The Deal's Editorial Products, including *The Deal Pipeline***

The Deal sells paid subscriptions to a suite of editorial publications, including *The Deal Flow* and *The Deal Pipeline*.  Lundberg Decl. ¶6.  *The Deal Pipeline* is an online business journal that reports on the financial industry, including the small cap and micro-cap securities markets and the financial services companies (like Scottsdale) that work in those markets.  *Id*. The target audience for *The Deal Pipeline* consists of large law firms and financial institutions that need market information to evaluate business deals or conduct due diligence.  *Id*. ¶7. Accordingly, virtually all of The Deal's subscribers are institutional clients, primarily located in major financial markets like New York, who in turn authorize multiple employees to access content from *The Deal Pipeline* through their corporate subscriptions. *Id*. ¶¶7, 10-11.

Although *The Deal Pipeline* is supported by advertising revenue in addition to subscription revenue, The Deal has never solicited advertising from businesses or individuals in New Hampshire and does not make use of advertising algorithms that target New Hampshire residents with local ads.  *Id.* ¶9.  The Deal also does not advertise or directly market any of its products in New Hampshire, including *The Deal Pipeline*. *Id.* ¶8.

*The Deal Pipeline* uses a paywall to ensure that its content is available exclusively to paying subscribers.  *Id*. ¶11.  Authorized users can locate articles directly through *The Deal Pipeline's* online portal—pipeline.thedeal.com—by using a login name and password provided to the institutional subscriber.  *Id*.  Authorized users may also sign up to receive an email newsletter, which contains short article summaries and hyperlinks to the full articles hosted behind the paywall on pipeline.thedeal.com.  *Id*. ¶12.  *The Deal Pipeline* is not distributed in paper form.  *Id*.

The three Articles at issue in this lawsuit were made available to subscribers through *The*

*Deal Pipeline*'s online portal. *Id.* ¶13. None of the Articles contain any reference—direct or indirect—to New Hampshire. Meagher Decl. ¶¶5, 11. Rather, the Articles report *inter alia* that law enforcement agencies based in Washington D.C. investigated Scottsdale, an Arizona stock broker-dealer, over its alleged involvement in the multimillion dollar Biozoom stock market fraud perpetrated by certain of Scottsdale's Argentinian clients, who were ultimately found guilty by a federal court sitting in New York. *Id.* ¶5-10, Exs. A, B & C.

**D.    Availability of the Articles in New Hampshire**

Dartmouth College is the only subscriber to The Deal based in New Hampshire. Lundberg Decl. ¶14. An employee of The Deal located in New York negotiated the initial subscription with Dartmouth over the phone and by email. *Id.* ¶16. All client service work relating to Dartmouth's subscription continues to be performed remotely from an office in Wisconsin by telephone and email. *Id.*

Since Dartmouth College is the only New Hampshire subscriber, New Hampshire residents accounted for roughly 0.15% of all the subscriptions to *The Deal Pipeline* nationwide at the time the Articles were published. *Id.* ¶14. Dartmouth College has authorized 40 individuals to read *The Deal Pipeline*, which amounts to approximately 0.08% of the total number of authorized users worldwide in 2013. *Id.* ¶15. In terms of revenue, Dartmouth's subscription contributed about 0.15% of the total amount The Deal received from all the subscribers to its editorial products between 2013 and 2014. *Id.* ¶17. Moreover, since Dartmouth makes its subscription payments through a Georgia address, The Deal receives no revenue directly from New Hampshire. *Id.* By contrast, New York subscribers paid 45% of The Deal's revenue from its editorial products, while California provided 14%. *Id.*

The Deal's internal tracking data also shows that no user of the Dartmouth College subscription has ever accessed any of the three Articles. Lundberg Decl. ¶19-22. Since Dartmouth is

the only subscriber to The Deal based in New Hampshire and since The Deal's clients tend to be localized around major financial centers, it does not appear that *any* New Hampshire resident has ever read the Articles through *The Deal Pipeline's* online portal.  *Id.* ¶19.

One of the Articles—the December 6 Article—also appears on thestreet.com, the free news website operated by The Deal's parent company, The Street.  *Id.* ¶24.   The Street's editorial website is advertised as "Free" to all internet users and does not require a subscription to access, unlike *The Deal Pipeline*.  *Id.* ¶25.  Neither the March 20 Article nor the April 16 Article was posted on thestreet.com, and both remained behind *The Deal's* paywall.  *Id.* ¶24.

Google geographical tracking data shows that a grand total of 21 internet users in New Hampshire viewed the December 6 Article on thestreet.com a total of 37 times before this action was filed, which means that approximately 0.24% of the 15,199 page views by 8,599 readers around the world were attributable to readers located in New Hampshire.  *Id.* ¶27.  The New Hampshire readership was dwarfed by the 1,125 readers in California (13.08%), who were responsible for 2,015 of the total page views (13.26%).  Likewise, in New York, 1,153 readers (13.41%) contributed 1,936 page views (12.74%), demonstrating that the focal point for readership is in major financial markets.  *Id.* ¶26.  Although advertising appears alongside the December 6 Article on thestreet.com, The Street has never solicited advertisements from businesses or individuals in New Hampshire and it has never placed local advertisements targeting New Hampshire residents.  *Id.* ¶25.[1]

## E.     History of Litigation between the Parties

New Hampshire is the latest and most distant outpost for Plaintiffs' wide-ranging legal

---

[1] Although Plaintiffs had access to thestreet.com and could have joined The Street to this action, they elected not to.  However, even if Plaintiffs now sought to amend the Complaint to name The Street, such an amendment would be futile.  Just as there are not sufficient contacts to justify haling The Deal into New Hampshire courts, due process will not tolerate bringing an action against The Street in New Hampshire on the basis of a single article posted to a free news website visible to all in the United States and around the world.  *See infra* 22-23.

campaign against Defendants and the financial regulatory authorities more generally.

On November 10, 2015, Plaintiffs Scottsdale and Hurry "brought a $50 million lawsuit" against FINRA. Meagher Decl. ¶14. In that Arizona lawsuit (which is ongoing), Scottsdale alleged that the FINRA investigations into Scottsdale's activities were part of a pattern "of harassment through defamatory statements, press leaks [and] interference with Hurry's business relationships." *Id.* Ex. E at ¶6. Plaintiffs have further claimed in their Arizona complaint that FINRA illicitly leaked to Mr. Meagher confidential information obtained from Scottsdale during its investigation of the illicit sale of Biozoom shares. *See id.* Ex. E at ¶176-202. Mr. Meagher included that information, the Arizona Complaint alleges, in the December 6 Article and subsequently repeated it in follow up articles. *Id.* At bottom, Plaintiffs' case against FINRA depends in large part on their unproven belief that a FINRA employee acted as a confidential source for Mr. Meagher and improperly conveyed information that FINRA had gathered from Scottsdale during the Biozoom investigation.[2]

Although Plaintiffs were made aware of the Articles in December 2013 (*id.* ¶9), they elected not to sue for two and a half years. Indeed, Plaintiffs did not file suit until May 2016, when a summons with notice was filed in New York State Supreme Court naming The Deal and Mr. Meagher as Defendants. Declaration of John M. Browning ("Browning Decl.") ¶2. After the Defendants demanded a complaint, in September, Plaintiffs filed a complaint alleging that an article by Mr. Meagher published on May 28, 2015 (the "May 28 Article") was defamatory (the "New York Complaint"). *Id.* ¶3. The May 28 Article reported that FINRA had filed a lawsuit alleging Plaintiffs had used a Cayman Islands subsidiary to launder money. Meagher Decl. ¶13-14, Ex. D. The New York Complaint does not challenge or dispute the accuracy of the May 28 Article's

---

[2] Proceedings before the District of Arizona were recently held up after counsel for Mr. Hurry and Scottsdale withdrew after determining that they were "ethically required to terminate their representation" for undisclosed reasons. *See id.* ¶16 However, it appears that Plaintiffs' counsel in the action before this Court has taken up the case in Arizona as well as this one. *Id.*

reporting on FINRA's money laundering complaint.  *See* Browning Decl. Ex. A.  Instead, Plaintiffs alleged that they were defamed by statements attributed to an anonymous source reporting that Scottsdale offered the Biozoom shareholders certain perks.  *Id.* Ex. A at ¶22.

It is clear from the New York Complaint that Plaintiffs' primary strategic purpose was to coerce Defendants into revealing the identity of Mr. Meagher's confidential source in the hopes that this information would bolster their case against FINRA in Arizona.  To this end, Plaintiffs alleged—without any identified factual or legal basis whatsoever—that Mr. Meagher's confidential source were individuals "within FINRA or government regulatory agencies that have discussed confidential information involving Plaintiffs" and that "the identity of such sources would not be protected by the NYS 'Shield' laws" protecting the anonymity of confidential sources.  *Id.* ¶5.

Defendants steadfastly refused to reveal the identity of Mr. Meagher's confidential source and notified Plaintiffs that they would file a motion to dismiss the New York Complaint for failure to state a claim for defamation.  *Id.* ¶4.  Apparently frustrated by their inability to ferret out the confidential source, Plaintiffs turned instead to litigation gamesmanship.  Although they were fully aware that Defendants were filing a motion to dismiss, Plaintiffs waited to voluntarily dismiss the New York action, without warning, on the eve of Defendants' filing deadline. *Id.* ¶6. By doing so, Plaintiffs sandbagged Defendants into spending considerable time and money on drafting motion papers that Plaintiffs had to know would be unnecessary.  *Id*.

Less than a month later, on November 18, 2016, Plaintiffs filed the Complaint in this action with the Superior Court of New Hampshire alleging four claims based on the Articles: (1) defamation, (2) false light invasion of privacy, (3) intentional interference with contractual relations and (4) tortious interference with prospective economic advantage.  Compl. ¶¶14-32. Because New Hampshire offers a three year statute of limitations, Plaintiffs were able to bring in

8

the Articles now in suit, which were time-barred under New York's one year statute of limitations.  These Articles variously contain statements that the FBI was involved in the Biozoom investigations against Scottsdale and that the Biozoom trades raised "red flags" at Scottsdale, which were not included in the May 28 Article about FINRA's money laundering charges against Scottsdale.  *Id.* ¶¶9-12.  Defendants duly removed the case to this Court on December 22, 2016 pursuant to 28 U.S.C. § 1332.

Nothing in the Articles or Plaintiffs' tortured litigation history has anything to do with New Hampshire.  Accordingly, as their sole basis for asserting jurisdiction in this state, Plaintiffs allege that the Court has personal jurisdiction over Defendants because "Defendants publish online content for distribution to paid subscribers within the state of New Hampshire" and because the Articles allegedly "caused injury in New Hampshire."  *Id.* ¶¶6-7.

To review, the sum total of Defendants' contacts with New Hampshire are that (1) one subscriber to *The Deal Pipeline* out of nearly 700 was based in New Hampshire, amounting to 0.15% of the total subscriber base, (2) 40 authorized users out of approximately 50,000 (or 0.08% of the total) could use the Dartmouth College subscription to access *The Deal Pipeline* but not a single Dartmouth user read the Articles on that platform, and (3) after one article was made available to internet users in New Hampshire (along with everyone else worldwide), 21 New Hampshire users looked at that Article.  For the reasons set forth below, the exercise of specific jurisdiction based on these meager contacts would violate due process, and the case must therefore be dismissed.

## ARGUMENT

Plaintiffs bear the burden of demonstrating that personal jurisdiction exists over Defendants.  *A Corp. v. All Am. Plumbing, Inc.*, 812 F.3d 54, 58 (1st Cir. 2016).  To establish personal jurisdiction in a diversity case, a plaintiff must satisfy "the requirements of both the forum state's long-arm statute and the [Due Process clause of the] Fourteenth Amendment."

*Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 204 (1st Cir. 1994).  Here, since the New Hampshire "long-arm statute is coextensive with federal dues process, the court proceeds directly to the due process inquiry."  *Reynolds v. InVivo Therapeutics Holdings Corp.*, No. 16-cv-384-JL, 2016 U.S. Dist. LEXIS 166774, at *3 (D.N.H. Nov. 30, 2016) (Laplante, J.) (*quoting Phillips Exeter Acad. v. Howard Phillips Fund*, 196 F.3d 284, 287 (1st Cir. 1999)).

Due process requires that Defendants possess sufficient "minimal contacts" with New Hampshire "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citation omitted).  "Consistent with those requirements a court may exercise either general or specific jurisdiction" over Defendants.  *Reynolds*, 2016 U.S. Dist. LEXIS 166774, at *3.[3]  Specific jurisdiction exists only when "the defendant ha[d] 'purposefully directed' his activities at residents of the forum and the litigation results from alleged injuries that 'arise out of or relate to' those activities."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (citation omitted).

The constitutionally mandated test for specific jurisdiction has three prongs: "relatedness, purposeful availment, and reasonableness."  *A Corp.*, 812 F.3d at 59.  "An affirmative finding on each of the three elements of the test is required to support a finding of specific jurisdiction."  *Phillips Exeter*, 196 F.3d at 288.  In determining whether each of the elements has been met, the relevant "'inquiry is whether [Plaintiffs have] proffered evidence which, if credited, is sufficient to support findings of all facts essential to personal jurisdiction.'"  *A Corp.*, 812 F.3d at 58

---

[3] Although Plaintiffs do not specify whether they assert specific or general jurisdiction, it appears from the Complaint that Plaintiffs rely on specific jurisdiction as the sole basis for jurisdiction. In any event, general jurisdiction is self-evidently lacking.  General jurisdiction exists only when a defendant's "affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State."  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).  Mr. Meagher is a resident of California and The Deal is considered a resident of Delaware and New York, so they are not "at home" in New Hampshire.  Moreover, neither Defendant engages in the kind of "continuous and systematic" business activity required to justify general jurisdiction.  Accordingly, "[t]he criteria for general jurisdiction over the defendants are not satisfied here."  *Reynolds*, 2016 U.S. Dist. LEXIS 166774, at *3 n.1.

(citation omitted).   In attempting to shoulder their burden, it does not suffice for Plaintiffs to "'rely on unsupported allegations in [their] pleadings.'"  *Id*. (citation omitted).  Instead, Plaintiffs must "put forward 'evidence of specific facts' to demonstrate that jurisdiction exists."  *Id*. (citation omitted).  The Court views "'this evidence, together with any evidence proffered by the defendant[s], in the light most favorable to the plaintiff and draw[s] all reasonable inferences therefrom in the plaintiff's favor,' albeit without 'credit[ing] bald allegations or unsupported conclusions."  *Reynolds*, 2016 U.S. Dist. LEXIS 166774, at *4 (citation omitted).

Since Plaintiffs do not—and cannot—satisfy any of the three required elements, haling Defendants into court in New Hampshire would manifestly "offend 'traditional notions of fair play and substantial justice.'"  *Int'l Shoe Co.*, 326 U.S. at 316 (citation omitted).

## I.   DEFENDANTS' MINIMAL CONTACTS WITH NEW HAMPSHIRE ARE NOT SUFFICIENTLY RELATED TO THE CLAIMS IN THIS LAWSUIT TO SATISFY DUE PROCESS

The relatedness prong of the tri-partite test requires Plaintiffs to "show a nexus between [their] claims and [Defendants] forum-based activities."  *A Corp.*, 812 F.3d at 59; *see also Ticketmaster-NY*, 26 F.3d at 206 ("We know to a certainty…that the requirement focuses on the nexus between defendant's contacts and the plaintiff's cause of action.").   For personal jurisdiction to lie, "the action must arise out of specific contacts between the defendant and the forum."  *United States v. Swiss Am. Bank*, 274 F.3d 610, 621 (1st Cir. 2001).  The First Circuit has specifically cautioned against conflating the relatedness requirement with the effects test for purposeful availment, finding "[t]hat the plaintiff felt the effects of the defendants' activities in the forum does not, alone, qualify as related contacts."   *Reynolds*, 2016 U.S. Dist. LEXIS 166774, at *9 (*citing Swiss Am. Bank*, 274 F.3d at 622-23).

Instead, courts must "hone in on the relationship between the defendant and the forum." *Id*. (citation and quotation marks omitted).  Moreover, since the purpose of the relatedness prong

is to ensure "that the element of causation remains in the forefront of the due process investigation," the "relatedness requirement…authorizes the court to take into account the strength (or weakness) of the plaintiff's relatedness showing in passing upon the fundamental fairness of allowing the suit to proceed." *Ticketmaster-NY*, 26 F.3d at 207.

The only relevant allegation of a relationship between Plaintiffs' tort claims and Defendants' contacts with New Hampshire is that "Defendants publish online content for distribution to paid subscribers within the state of New Hampshire." Compl. ¶6. However, honing in on the facts, it is clear that Defendants' minimal distribution of content in New Hampshire is not sufficient to establish that Plaintiffs' claims "arise out of, or [are] related to, the [D]efendants' in-forum activities." *Ticketmaster-NY*, 26 F.3d at 206. In an analogous libel case, the District of New Hampshire held that personal jurisdiction did not exist over a New York publisher who "shipped one copy of the [allegedly defamatory] book to the Dartmouth Book Store, an independent book store located in Hanover, New Hampshire." *Christian v. Barricade Books, Inc.*, No. 02-408-B, 2003 U.S. Dist. LEXIS 8555, at *4, 2003 DNH 078 at 3 (D.N.H. May 15, 2003). In that case, "the store was not able to sell the book [] and later returned it to [the publisher]." *Id*.; 2003 DNH 078 at 3-4. In finding that the relatedness requirement was not satisfied, the court determined that "shipment of a single book to the Dartmouth Book Store [could not] satisfy the relatedness requirement because the book was unsold, uncirculated, and ultimately was returned to" the publisher. *Id*. at *9-10; 2003 DNH 078 at 9.

Here, Defendants distributed the Articles in suit to one New Hampshire subscriber, Dartmouth College. However, The Deal's internal tracking data shows that none of the Dartmouth users actually read the Articles on *The Deal Pipeline* portal, despite the fact that the Articles were available in theory through the Dartmouth subscription. *See* Lundberg Decl. ¶19-22. Just as an unsold book distributed in New Hampshire was not sufficient to establish

12

relatedness in *Barricade*, the unused Dartmouth College subscription does not demonstrate an actionable nexus between Plaintiffs' claims and The Deal's contacts with New Hampshire.[4]

Even assuming *arguendo* that the unused Dartmouth College subscription to *The Deal Pipeline* somehow gave rise to Plaintiffs' New Hampshire tort claims, the subscription relationship provides only the most tenuous of contacts between The Deal and New Hampshire. Since Dartmouth pays for its subscription out of a Georgia bank account, The Deal receives no revenue directly from New Hampshire and thus has no cognizable financial contact with New Hampshire. Lundberg Decl. ¶17. Indeed, the First Circuit has found that the relatedness prong cannot be satisfied by the receipt of revenue that "came not directly from the [forum state], but from 'other foreign locations.'" *Swiss Am. Bank*, 274 F.3d at 622 (citation omitted). Moreover, The Deal has no property, offices, employees, editors or reporters in New Hampshire and pays no New Hampshire taxes. *Id.* ¶4. It does not actively solicit business or advertising in New Hampshire and no employee of The Deal has ever set foot in New Hampshire in a business capacity. *Id.* ¶¶8, 16. The only business contact that The Deal has had with anyone in New Hampshire has been intermittent out-of-state phone calls and emails with Dartmouth College regarding its subscription. *Id.* ¶16. Given that "most of the relevant interactions" in this case occurred in California—

---

[4] Although no reference is made in the Complaint to the posting of the December 6 Article on thestreet.com, the fact that The Deal made the Article available nationwide on a free website also cannot satisfy the relatedness prong. The First Circuit has held that an out-of-state defendant does not fulfill the relatedness prong simply by maintaining a website that is available in the forum state. *A Corp.*, 812 F.3d at 60. Moreover, since Defendants must actively create the contacts with the forum state for there to be relatedness, allegations that Plaintiffs were "injured in New Hampshire by the effects of the [D]efendants' conduct" do not create the required nexus "between the [D]efendants' activities and the forum." *Reynolds*, 2016 U.S. Dist. LEXIS 166774, at *8-9. Plaintiffs cannot, therefore, establish relatedness on the ground that their reputation, privacy, or business interests may be harmed in New Hampshire if its citizens read the December 6 Article on thestreet.com. *See also id.* ("That the plaintiff felt the effects of the defendants' activities in the forum does not, alone, qualify as related contacts."); *NeoDevices, Inc. v. Neomed, Inc.*, No. 08-cv-375-SM, 2009 U.S. Dist. LEXIS 19987, at *10, 2009 DNH 020, at 10 (D.N.H. Mar. 12, 2009) ("The court of appeal for this circuit has repeatedly held, when conducting relatedness inquiries, that the 'in-forum effects of extra-forum activities [do not] suffice to constitute minimum contacts.'") (*quoting Swiss Am. Bank*, 274 F.3d at 625).

including the writing, editing and publication of the Articles at issue (Meagher Decl. ¶¶8, 11)—Plaintiffs' claim to jurisdiction based entirely on a handful of phone calls and emails to its single New Hampshire subscriber "appears [to be] untenable." *Phillips Exeter*, 196 F.3d at 291.

Plaintiffs have also failed to establish that Defendant Meagher has the necessary contacts with the State of New Hampshire to justify forcing him into litigation before a New Hampshire court. The Supreme Court has stated that an out-of-state reporter's contacts with the forum state "are not to be judged according to their employer's activities there." *Calder v. Jones*, 465 U.S. 783, 790 (1984). Rather, "[e]ach defendant's contacts with the forum state must be assessed individually." *Id.* The Complaint does not allege any contacts whatsoever between Mr. Meagher and New Hampshire. Nor could it: Mr. Meagher has never been to New Hampshire. Meagher Decl. ¶2. He is a California resident, who researched and wrote the Articles from The Deal's offices in California. *Id.* Although Mr. Meagher spoke to sources for the Articles on the telephone, none of those sources were in New Hampshire and none of the Articles refer to New Hampshire. *Id.* ¶¶8-11. Simply put, since there are "no allegations, and is no evidence, that [Mr. Meagher] contacted New Hampshire residents to communicate false statements," Plaintiffs have "failed to satisfy the relatedness prong." *NeoDevices, Inc.*, 2009 U.S. Dist. LEXIS 19987, at *13, 2009 DNH 020, at 12.

In sum, Plaintiffs failure to establish a sufficient nexus between Defendants' activities and the claims set forth in the Complaint under New Hampshire law requires dismissal.

## II.    DEFENDANTS' MEAGER DISTRIBUTION OF THE ARTICLES DOES NOT CONSTITUTE PURPOSEFUL AVAILMENT

Even if Plaintiffs had satisfied the relatedness requirement (they have not), the Court still cannot exercise specific personal jurisdiction because Plaintiffs cannot demonstrate that Defendants' publication of the Articles constituted the purposeful availment of the benefits and protections afforded by New Hampshire's laws.

The First Circuit has adopted the *Calder* "effects test for determining purposeful availment

in the context of defamation cases." *Noonan v. Winston Co.*, 135 F.3d 85, 90 (1st Cir. 1998).  The effects test requires Plaintiffs to demonstrate that Defendants "aimed an act at the forum state, knew the act would likely have a devastating effect, and knew the injury would be felt in" New Hampshire.  *Id.*  Accordingly, to establish purposeful availment under a two-part *Calder* test articulated by the First Circuit, "a plaintiff must show '(1) that it felt the injurious effects of a defendant's tortious act in the forum, and (2) that the defendant's act was calculated to cause injury to the plaintiff there.'"  *Farquharson v. Metz*, No. 13-10200-GAO, 2013 U.S. Dist. LEXIS 106374, at *4-5 (D. Mass. July 30, 2013) (*quoting Swiss Am. Bank*, 274 F.3d at 632-33 (Lipez, J., dissenting)). Both prongs are fatal to personal jurisdiction in this case.

A.    **The Allegedly Harmful Effects of the Articles Were Not Felt in New Hampshire**

Plaintiffs' fall short on the first purposeful availment hurdle because they cannot satisfy the "injurious-effects part of the *Calder* test," which requires Plaintiffs to show that they "felt a tortious effect" in New Hampshire.  *Noonan*, 135 F.3d at 90.   "This test, unlike that for relatedness, focuses on the location at which the effects of the alleged defamation are directed and where they are felt." *Reynolds*, 2016 U.S. Dist. LEXIS 166774, at *10-11.

In *Calder*, the *National Enquirer*, based in Florida, published an allegedly defamatory story about the actress Shirley Jones.  *Calder*, 465 U.S. at 784.  Jones sued in California, and the Supreme Court held that personal jurisdiction extended to the journalists who wrote the story because their "intentional, and allegedly tortious, actions were expressly aimed at California." *Id*. at 789.  As the Court explained:

> The allegedly libelous story concerned the California activities of a California resident.  It impugned the professionalism of an entertainer whose television career was centered in California.  The article was drawn from California sources, and the brunt of the harm, in terms both of [Jones'] emotional distress and the injury to her professional reputation, was suffered in California.  In sum, California is the focal point of both the story and of the harm suffered. Jurisdiction over petitioners is therefore proper in California based on the 'effects' of their Florida conduct in California.

15

*Id*. at 788-89.  The Court also found it significant that the *Enquirer* had its largest circulation (600,000 copies) in California, and reported extensively on the entertainment industry based in that state.  *Id.* at 789-90.  Ultimately, "[t]he crux of *Calder* was that the reputation-based 'effects' of the alleged libel connected the defendants to California, not just to the plaintiff."  *Walden v. Fiore*, 134 S. Ct. 1115, 1123-24 (2014).

Here, nothing in the Articles remotely indicates that Defendants were targeting New Hampshire.  In fact, Plaintiffs cannot meet a single *Calder* benchmark that would indicate that Defendants intended for New Hampshire to be "the focal point both of the [Articles] and of the harm suffered."  *Id*. at 789.  Taking those benchmarks in turn, the Articles make no direct or indirect reference to New Hampshire or New Hampshire residents.  Meagher Decl. ¶5, 11.  To the extent Plaintiffs appear in the Articles, they appear in the context of regulatory investigations into financial malfeasance that were conducted entirely outside of New Hampshire.  *Id*. ¶6.  Plaintiffs are residents of Arizona and Nevada, respectively, and have not alleged the existence of any business activities in New Hampshire or relationships with New Hampshire clients.  Compl. ¶¶1, 2, 13.  Plaintiffs' reputations are thus "centered" in Nevada and Arizona (if anywhere), but certainly not in New Hampshire.  None of the sources Mr. Meagher spoke with in researching the articles were located in New Hampshire.  Meagher Decl. ¶¶8, 11.  *The Daily Pipeline* has just one subscriber in New Hampshire, which amounts to 0.15% of the total subscriber base.  Lundberg Decl. ¶14.  Although Dartmouth's 40 authorized users—representing 0.08% of the worldwide total—were authorized to read the Articles on *The Deal Pipeline* portal, none of them did.  *Id*. ¶19.  Last, *The Deal Pipeline* focuses on the financial industry, which is largely based in New York, not New Hampshire.  *Id*. ¶7.  The target audience for such a publication is large law firms and financial institutions, which tend to reside in metropolitan financial centers.  *Id*.  Taken altogether, it is clear that the neither Plaintiffs nor the Articles have

16

even the remotest connection with New Hampshire, which is a fatal defect under the effects test.

Even assuming *arguendo* that Plaintiffs were residents of New Hampshire or had some other business connection to this State, Plaintiffs still cannot establish that they "suffered any injury in New Hampshire," as they must. *Reynolds*, 2016 U.S. Dist. LEXIS 166774, at *12. In *Reynolds*, the plaintiff ("Reynolds") was a businessman living and working in New Hampshire, who alleged that his former Massachusetts business partners defamed him through press releases and statements purportedly distributed via the internet. *Id*. at *5-7. In his complaint, Reynolds claimed (without factual support) that the allegedly defamatory statements caused him to be denied funding by the New Hampshire Department of Resources and Economic Development and meant that he was unable to "obtain a second round of funding from the Massachusetts Center for Life Sciences." *Id*. at *17-18. Even though Reynolds claimed that the statements at issue negatively affected his New-Hampshire-based personal and business life, this Court nevertheless found that "these allegations support a conclusion that Reynolds suffered reputational damage in Massachusetts, but not that he did so in New Hampshire." *Id*. at *18. Accordingly, this Court held that Reynolds, a New Hampshire resident, had failed to demonstrate that the harm to his reputation caused by statements made out-of-state was "felt in New Hampshire," as he was required to do. *Id*. at *17.[5]

---

[5] Decisions from courts of appeal in other circuits have held, in accordance with this Court's ruling in *Reynolds*, that there can be no personal jurisdiction under *Calder* unless a plaintiff can show the forum state was the "focal point" of the allegedly defamatory publication. *Reynolds v. International Amateur Athlete Fed'n*, 23 F.3d 1110 (6th Cir. 1994) ("The fact that [the defendant] could foresee that the report would be circulated and have an effect in Ohio [was] not, in itself, enough to create personal jurisdiction" in the absence of proof of harm in Ohio); *see also Revell v. Lidov*, 317 F.3d 467, 473 (5th Cir. 2002) (no jurisdiction over author of internet message board article about Texas resident because the article contained no reference to Texas or the "Texas activities" of the plaintiff, Texas was not the "focal point of the article or the harm suffered," and the article "was not directed at Texas readers as distinguished from readers in other states"); *Young v. New Haven Advocate*, 315 F.3d 256, 263 (4th Cir. 2002) (holding that articles on websites of Connecticut newspapers about a prison warden in Virginia did not confer personal jurisdiction because plaintiff could not show that the newspapers, "through the Internet

Here, Plaintiffs are not New Hampshire residents and have not pled any injury specific to New Hampshire, but rather make the generic allegation that the "defamatory statements made by Defendants have substantially harmed Plaintiffs' business relationships."   Compl. ¶13.   If Reynolds, a New Hampshire resident and businessman, could not show that the brunt of the harm to his reputation was felt in New Hampshire, *a fortiori* Plaintiffs, who have no connection with New Hampshire, have failed to "establish[] that the effects of [Defendants'] conduct were felt in New Hampshire."  *Reynolds*, 2016 U.S. Dist. LEXIS 166774, at *17.

In sum, because neither the Articles nor Plaintiffs have any connection to New Hampshire, Plaintiffs are incapable of satisfying the *Calder* effects test requirement that the harm caused by Defendants be focused on and felt in New Hampshire.

### B.   Defendants' Publication and Distribution of the Articles Does Not Satisfy the Purposeful Availment Test

Even assuming *arguendo* that Plaintiffs could demonstrate that the Articles harmed them in New Hampshire, personal jurisdiction is *still* lacking because Plaintiffs cannot demonstrate that "the defendants' intentional conduct was 'calculated to cause injury to respondent in [New Hampshire].'"  *Noonan*, 135 F.3d 85 at 90 (*quoting Calder*, 465 U.S. at 791) (finding lack of personal jurisdiction even though plaintiff felt the brunt of the harm from a defamatory advertisement in the forum jurisdiction).  The only conceivable basis for finding that Defendants' intended to harm Plaintiffs in New Hampshire is the distribution of the Articles to New Hampshire residents, namely the users authorized to access *The Deal Pipeline* via the Dartmouth College subscription.  However, this meager distribution is insufficient to demonstrate purposeful availment.

The Supreme Court's decision in *Keeton* guides the exercise of jurisdiction based solely on

---

postings, manifest[ed] an intent to target and focus on Virginia readers").  Accordingly, "[t]he proper question is not whether the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way."  *A Corp.*, 812 F.3d at 60 (*quoting Walden*, 134 S. Ct. at 1125).

distribution.  As the First Circuit has noted, *Keeton* teaches that "[t]he size of a distribution of offending material helps determine whether a defendant acted intentionally."  *Noonan*, 135 F.3d at 91.  However, *Keeton* does not create a basis for imposing personal jurisdiction over Defendants based on The Deal's extremely limited distribution of the Articles to a single subscriber.  In *Keeton*, the Supreme Court upheld a finding of personal jurisdiction in New Hampshire over the publisher of *Hustler* magazine, even though the plaintiff was from New York and the defendant was an Ohio corporation based in California, because defendant distributed no less than "10 to 15,000" copies of the magazine in New Hampshire per month.  465 U.S. at 772.  The Court held that "such regular monthly sales of thousands of magazines cannot by any stretch of the imagination be characterized as random, isolated, or fortuitous."  *Id*. at 774.  Since the defendant in that case "continuously and deliberately exploited the New Hampshire market," there was "no unfairness in calling it to answer for the contents of [its] publication wherever a substantial number of copies are regularly sold and distributed."  *Id*. at 781.

When applying *Keeton* to out-of-state libel cases, the First Circuit has taken care to limit its scope.[6]  In *Noonan*, "at least 305 copies" of magazines containing an allegedly defamatory advertisement were distributed in Massachusetts by an out-of-state publisher.  *Noonan*, 135 F.3d at 88.  Noting that "[t]he Supreme Court has held that a publisher's regular circulation of a large number of magazines containing allegedly libelous content in a forum state indicated deliberate and continuous exploitation of a market," the First Circuit explained that "[j]ust as widespread circulation of a publication indicates deliberate action, thin distribution may indicate a lack of purposeful contact."  *Id*. at 91.  Accordingly, the First Circuit held that "this small distribution

---

[6] In keeping with the holding in *Noonan*, "the First Circuit has rejected the 'stream of commerce' theory of personal jurisdiction" under which personal jurisdiction can be premised on defendant's release of a product into the forum state's stream of commerce.  *Barricade Books*, 2003 U.S. Dist. LEXIS 8555, at *12, 203 DNH 078, at 10 (*citing Rodriguez v. Fullerton Tire Corp.*, 115 F.3d 81, 85 (1st Cir. 1997)).

[of 305 magazines], by itself, does not merit a finding that Massachusetts was the focal point of the events in question, or that [plaintiff] aimed the advertisements toward Massachusetts." *Id*; *see also Reynolds*, 2016 U.S. Dist. LEXIS 166774, at *12 ("The fact that some magazines containing the advertisement circulated in Massachusetts did not satisfy the [purposeful availment] element; their small number indicated, instead, a lack of purposeful contact.").[7]

By any definition, circulation of *The Deal Pipeline* in New Hampshire is "small" and "thin"—in fact, it could not be smaller or thinner without disappearing entirely. The Deal has only one subscriber in New Hampshire (0.15% of the total), through which 40 users (or roughly 0.08% of the publication's total readership) are authorized to read *The Deal Pipeline*. Lundberg Decl. ¶¶14-15. This *de minimis* distribution is far less than the 305 magazines found to be insufficient to demonstrate purposeful availment in *Noonan*. *Noonan*, 135 F.3d 85 at 88.[8] Reading *Keeton* and *Noonan* together, it is clear that due process must impose some limit on a court's ability to exercise personal jurisdiction over an out-of-state publisher. Accordingly, the law does not—and cannot—allow personal jurisdiction to be imposed on Defendants solely on the basis of a single, far-flung New Hampshire subscriber. "To find otherwise," as the First Circuit noted, "would inappropriately credit random, isolated, or fortuitous contacts and negate

---

[7] Courts in other circuits have reached the same result in comparable cases. *See Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419, 422 (5th Cir. 2005) (finding in-state distribution of 70 copies by one defendant and 60 copies by other defendant to be "insufficient" to meet the substantial distribution "requirement" in *Keeton*); *Chaiken v. VV Publ'g Corp.*, 119 F.3d 1018, 1029 (2d Cir. 1997) (rejecting jurisdiction in Massachusetts over Israeli newspaper, where sales there were a "tiny fraction of its total circulation," explaining, "[w]e doubt that four copies per day, or even the 183 copies of the Sunday edition, constitute the 'substantial number of copies' that makes it fair to exercise jurisdiction over a non-resident publisher"); *Ouazzani-Chahdi v. Greensboro News & Record, Inc.*, No. CIV.A. H-05-1898, U.S. Dist. LEXIS 4126, at *9 (S.D. Tex. Sept. 27, 2005) (3 out of 95,600 copies sold in state); *Schnapp v. McBride*, 64 F. Supp. 2d 608, 610-11 (E.D. La. 1998) (19 subscribers); *Rodriguez Salgado v. Les Nouvelles Esthetiques*, 218 F. Supp. 2d 203, 209-11 (D.P.R. 2002) (20 subscribers); *Scherr v. Abrahams*, No. 97 C 5453, 1998 U.S. Dist. LEXIS 8531, at *10-11 (N.D. Ill. May 29, 1998) ("fewer than 60 copies").

[8] And, of course, The Deal's tiny distribution to New Hampshire is dwarfed by the "regular monthly sales" of 10,000-15,000 copies of *Hustler* in *Keeton*, to say nothing of the *National Enquirer*'s circulation of 600,000 in *Calder*.

the reason for the purposeful availment requirement."  *Id*. at 92.

Although it is anticipated that Plaintiffs will rely heavily on *Gordy v. Daily News, L.P.* in attempting to show purposeful availment, that case does not provide a basis for personal jurisdiction.  95 F.3d 829 (9th Cir. 1996).  As the First Circuit noted in *Noonan*, *Gordy* involved a New York newspaper publisher that "targeted the forum state by distributing newspapers via regular customer subscriptions to forum addresses" in California.  *Noonan*, 135 F.3d at 85.  The subject of the article in suit in *Gordy* was Berry Gordy, the founder of Motown Records, who had "lived in California for twenty-four years" and whose "friends, family and business associates reside in California."  *Gordy*, 95 F.3d at 831.  The Ninth Circuit ultimately held that personal jurisdiction lay in California primarily because Gordon felt "the bulk of the harm from defamation" in California, where he lived.  *Id*. at 833 ("The prime targeting arises, of course, from the fact that Gordy is an individual who lives in California ….").  Moreover, the Ninth Circuit recognized that when "plaintiff had no connection at all [to the forum state] except the desire to bring suit there," *Keeton* permits personal jurisdiction only upon a showing that an out-of-state publication "regularly distributed thousands of magazines in the state."  *Id*. at 834.  In other words, personal jurisdiction can exist only if one of two conditions is met: either the articles in suit must target a resident of the forum state (as in *Gordy*) or the out-of-state publication must have a "substantial" circulation in the forum state (as in *Keeton*).[9]  Here, neither

---

[9] *See also Gordy*, 95 F.3d at 834 ("Either 13 or 18 subscriptions are enough to count as a connection ***when distributed in the state where the target is domiciled and will suffer most from damage to his reputation***") (emphasis added).  Indeed, multi-state defamation cases in New Hampshire involving small in-state circulation of allegedly defamatory materials are also distinguishable from the facts here because the target of the statements was a New Hampshire resident.  *See, e.g.*, *Hugel v. McNeill*, 886 F.2d 1, 5 (1st Cir. 1989) ("[T]he brunt of the devastating blow caused by release of the allegedly libelous material would be felt in the State ***where [plaintiff] resides and has an established reputation as a businessman and public servant.***") (emphasis added).  Of course, personal jurisdiction is satisfied in cases, like *Calder*, where the publication not only actively targets a resident of the forum state but also boasts a large circulation there as well.

element is met because The Deal's distribution in New Hampshire is miniscule and the Articles make no mention whatsoever of New Hampshire or its residents.  Accordingly, there is no personal jurisdiction over Defendants in New Hampshire.

The fact that the December 6 Article was made freely available on thestreet.com also does not affect the analysis under *Keeton* and *Noonan*.  First Circuit precedent dictates that "the mere availability of a passive website … cannot, standing alone, subject a defendant to personal jurisdiction in [that] forum."  *A Corp.*, 812 F.3d at 61.[10]  Indeed, "[t]he overwhelming weight of authority holds that merely operating a website—even if it is a popular website that makes money from advertising…—does not constitute 'purposeful availment'" for the purposes of haling an out-of-state libel defendant into a foreign court.  *Trump v. Tarpley*, 424492-V (Md. Cir. Ct. Feb. 1, 2017), annexed hereto as Browning Decl. Ex. C.  The free news section of thestreet.com that the December 6 Article appears on is a classic "passive" website, available to all, "that does little more than make information available to those who are interested in it."  *Zippo Mfg. Co. v. Zippo Dot Com*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997).  Accordingly, the act of posting the December 6 Article "to the internet at large, even if read by non-plaintiff residents of the forum state [was not] specifically directed at the forum absent some indication

---

[10] Under the well-known *Zippo* sliding scale, "a passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise [of] personal jurisdiction."  *Id.*  By contrast, "[i]f the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper."  *Id.*  "The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer.  In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web Site."  *Id.*  Here, the section of thestreet.com that the December 6 Article appears on is completely passive: it is information made freely accessible worldwide and requires no interaction from internet visitors.  Although The Street's website also contains more "interactive" services (including links to subscribe for financial services), these functions are totally unrelated to the December 6 Article at issue and thus cannot serve as a basis for personal jurisdiction.  *See, e.g.*, *Revell*, 317 F.3d at 471-72 (explaining that, "[f]or specific jurisdiction we look only to the contact out of which the cause of action arises," and "[s]ince th[e] defamation action does not arise out of the solicitation of subscriptions or applications by [the defendant], those portions of the website need not be considered").

that they were directed at those residents." *Reynolds*, 2016 U.S. Dist. LEXIS 166774, at *16. There is no indication from the street.com that New Hampshire citizens were the intended recipients of the December 6 Article, since the posted articles focus on the financial industry generally (rather than New Hampshire specifically) and there are no New Hampshire-centric advertisements.  Lundberg Decl. ¶25.  Moreover, under *Noonan*, the fact that only 21 out of the 8,599 readers of the March 20 Article on thestreet.com were in New Hampshire (or 0.24%) further "indicate[s] a lack of purposeful contact" with New Hampshire based on the web posting. 135 F.3d at 91.

In sum, neither *The Deal Pipeline's* one subscriber in New Hampshire, nor the mere availability of the December 6 Article on thestreet.com gives rise to personal jurisdiction over Defendants in New Hampshire.  "To conclude otherwise…could improperly erode important limits on personal jurisdiction over out-of-state defendants."  *A Corp.*, 812 F.3d at 61.

## III.   IT IS NOT REASONABLE TO EXERCISE PERSONAL JURISDICTION OVER DEFENDANTS IN NEW HAMPSHIRE

Even assuming *arguendo* that these miniscule contacts somehow scrape past the relatedness and purposeful availment threshold—which they clearly do not—this motion should still be granted under the third prong because it is unreasonable to extend personal jurisdiction over Defendants in New Hampshire, especially given Plaintiffs' track record of bad conduct with regard to Defendants.  To assess reasonableness, courts in the First Circuit consider:

> (1) the defendant's burden of appearing [in the forum state], (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interests in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

*Ticketmaster-UK*, 26 F.3d at 209 (listing five "gestalt factors").  When applying the gestalt factors, "the weaker the plaintiff's showing on the first two prongs…the less a defendant need show in terms of unreasonableness to defeat jurisdiction."  *Id*. at 210.  Where, as here, personal

jurisdiction is premised on "so gossamer a showing of causation and voluntariness," Defendants'

threshold for demonstrating unreasonableness is set low.  Even so, the factors favor Defendants.

First, it would plainly impose a burden on Defendants, who are based in California and

New York, to litigate in New Hampshire, a state to which they are perfect strangers.  *See, e.g.*, *id.*

("The burden associated with forcing a California resident to appear in a Massachusetts court is

onerous in terms of distance, and there are no mitigating factors to cushion that burdensomeness

here.").  Moreover, as the First Circuit has noted, the first factor weighs more heavily in favor of

dismissal when "the inconvenience to the defendant may not be coincidental."  *Id.* at 210-11.

Since Plaintiffs' decision to file this action in New Hampshire fits a wider pattern of harassment,

it would be unreasonable for personal jurisdiction to be extended as a reward for Plaintiffs'

gamesmanship, which has included saddling Defendants with wasted expenses in preparing a

futile motion to dismiss and thinly veiled efforts to force Defendants to reveal the identity of a

confidential source to gain advantage in a lawsuit against FINRA.

Second, while New Hampshire may have some interest in protecting the reputations of its

citizens from out-off-state harm, this interest is diminished by "the doubts surrounding whether

defendant's act can be said to have been committed in the forum." *Id.* at 211; *see also Medicus

Radiology, LLC v. Nortek Med. Staffing, Inc.*, No. 10-cv-300-PB, 2011 U.S. Dist. LEXIS 249, at *17

(D.N.H. Jan. 3, 2011) ("New Hampshire's interest in this litigation is diminished because all of the

alleged tortious acts occurred outside its borders.").  Moreover, the fact that this lawsuit may be

retaliatory and opportunistic further diminishes New Hampshire's legitimate interest in it.

*Ticketmaster-UK*, 26 F.3d at 211.  The administration of justice would be best served by dismissing

Plaintiffs' "vexatious" litigation against Defendants (*id.*), which appears motivated not out of a desire

to prevail on the merits but rather out of a desire to obtain the identity of Defendants' confidential

sources in the hope that this information might be useful in Plaintiffs' ongoing lawsuit against

FINRA.  Finally, since "the appearance of possible harassment…cuts strongly against jurisdiction" in the District of New Hampshire, there is a strong public policy incentive to discourage future bad conduct in litigation by declining to extend personal jurisdiction.  *R&R Auction Co. v. Johnson*, No. 15-cv-199-PB, 2016 U.S. Dist. LEXIS 67273, at *9, 2016 DNH 195, at 8 (D.N.H. May 23, 2016).[11]

Taking the gestalt factors altogether, it would be plainly unreasonable and fundamentally unfair to exercise *in personam* jurisdiction over Defendants to further Plaintiffs' efforts at harassment, especially when Plaintiffs "can muster only the most tenuous showings of relatedness and purposefulness." *Ticketmaster-NY*, 26 F.3d at 212.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed for lack of personal jurisdiction.

DATED:  February 2, 2017                    Respectfully submitted,

The Deal, LLC and William Meagher
By Their Attorneys:
SHAHEEN & GORDON, P.A.

/s/ Steven M. Gordon
Steven M. Gordon
NH Bar No. 964
107 Storrs Street, P.O. Box 2703
Concord, NH 03302-2703
(603) 225-7262
sgordon@shaheengordon.com

DAVIS WRIGHT TREMAINE LLP
Elizabeth A. McNamara (*pro hac vice*)
John M. Browning (*pro hac vice*)
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
(212) 489-8240

---

[11] The third factor—Plaintiffs' interest in obtaining convenient and effective relief—might be said to weigh in Plaintiffs favor because, without the benefit of New Hampshire's three year statute of limitations, Plaintiffs would be time barred from suing over the Articles in any other jurisdiction.  However, Plaintiffs were aware of the Articles for years and any interest is tempered by the fact that the true motivation of this action is not to prevail on the merits but to discover the identity of Plaintiffs' source (which is protected by law).  Depriving Plaintiffs of the ability to use this lawsuit as leverage against Defendants comports with due process.

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing Defendants' Memorandum of Law in Support of their Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(2) was served on the following persons on this date and in the manner specified herein:

Electronically Served Through ECF:
        George R. Moore, Esq.- gmoore@devinemillimet.com
        Christopher D. Hawkins, Esq. - chawkins@devinemillimet.com

Via 1st Class Mail

        Charles J. Harder, Esq. (*pro hac vice*) - charder@hmafirm.com
        Jordan Susman, Esq. (*pro hac vice*) - jsusman@hmafirm.com
        Steven Frackman, Esq. (*pro hac vice*) - sfrackman@hmafirm.com


Dated: February 2, 2017              /s/ Steven M. Gordon
                             Steven M. Gordon, NH Bar #964