**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| SCOTTSDALE CAPITAL ADVISORS CORP, AND JOHN HURRY, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) CASE NO. 1:16-CV-00545 ) ) |
| THE DEAL, LLC AND WILLIAM MEAGHER, | ) ) |
| Defendants. | ) |

**DECLARATION OF ERIC LUNDBERG**
**IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

I, Eric Lundberg, being of lawful age and otherwise competent to testify in a court of law, do hereby declare under penalty of perjury that the following is true and correct pursuant to 28 U.S.C. §1746:

1.   I am the chief financial officer of defendant The Deal, LLC ("The Deal") and make this declaration based on my personal knowledge.  I am informed that defendants The Deal and William Meagher (collectively, the "Defendants") removed this action to the United States District Court for the District of New Hampshire after plaintiffs Scottsdale Capital Advisors Corp. and John Hurry (collectively, the "Plaintiffs") filed a complaint against Defendants in the Superior Court of New Hampshire.  I submit this declaration to provide information in support of Defendants' motion to dismiss this action for lack of personal jurisdiction.

**A.   The Deal**

2.   The Deal is a limited liability company formed under the laws of the state of Delaware with its principal place of business in New York, NY.

3.   The main offices of The Deal are located at 14 Wall Street, New York, NY.  The Deal

also operates smaller satellite offices located in Petaluma, California, and Washington DC.

4.   The Deal does not have an office in New Hampshire.  No officers, shareholders, reporters, editors or other employees of The Deal are New Hampshire residents.  The Deal does not own any property in New Hampshire, does not have New Hampshire bank accounts and does not pay any New Hampshire tax.

5.   The parent company (and sole member) of The Deal is The Street, Inc. ("The Street"), which is a corporation incorporated in Delaware with its principal place of business also located at 14 Wall Street, New York, NY.  The Street also has offices in California, Washington DC, Wisconsin, Chennai, India and London, United Kingdom.  The Street does not have an office in New Hampshire.

### A.  *The Deal Pipeline*

6.   The Deal offers its customers a range of services relating to the financial industry, but the only products relevant to this lawsuit are The Deal's editorial publications, particularly *The Deal Pipeline*.  The Deal also publishes *The Deal Flow*, *The Life Settlements Report*, *Event Driven Service*, *Out-of-Court Restructuring* and *Activist Service*.   *The Deal Pipeline* is an online business journal that is updated on a daily basis with articles written by The Deal's experienced financial journalists.  The reporting in *The Deal Pipeline* focuses on mergers and acquisitions, pre-auction offerings, private equity transactions and distressed debt offerings, with especial attention paid to the financial service providers operating in these markets.

7.   Like The Deal's other products, *The Deal Pipeline* was created for large law firms, investment banks, private equity firms, hedge funds and corporations that need market information to evaluate business opportunities or perform due diligence.  Given *The Deal Pipeline's* exclusive concern with the business world and the location of its client base, the

publication predominantly focuses on major financial centers in the United States, especially New York.

8.   The Deal does not mass market its services to potential subscribers, but rather solicits new customers through direct sales outreach targeting its core customers (*i.e.* major banks, law firms, hedge funds) through conferences and other established business channels.  Virtually all of the direct marketing efforts are focused on New York, with some activity targeting California. The Deal has never directly marketed its products to potential subscribers in New Hampshire.

9.   The Deal does not solicit advertising revenue from companies or individuals located in New Hampshire.  Like all of The Deal's online products, *The Deal Pipeline* does not carry advertising that geographically targets New Hampshire readers with local New Hampshire advertisements.

**B.  Distribution of *The Deal Pipeline***

10. Virtually all of the subscribers to The Deal (and its editorial products) are institutional organizations – such as investment banks or large law firms – rather than individuals.  By purchasing a subscription to The Deal, these organizations gain access to the whole suite of editorial publications offered through The Deal's website, including *The Deal Pipeline*.

11. Subscribers can access content on *The Deal Pipeline* through The Deal's online portal, pipeline.thedeal.com. The articles on *The Deal Pipeline's* website sit behind a paywall and are available only to authorized subscribers (as opposed to any user of the internet).  Institutional subscribers generally authorize identified individual users to access The Deal's content by providing them with log in names and passwords.  The Deal often assigns authentication codes to its subscribers, which The Deal uses to track how many times users affiliated with a particular subscriber's account have viewed any given article on The Deal's portal.

12. In addition to making content available through pipeline.thedeal.com, *The Deal Pipeline* is also distributed to authorized users in newsletter form.  Each newsletter contains summaries of selected articles and includes URL addresses that link to the full articles hosted on *The Deal Pipeline's* website.  Before *The Deal Pipeline* started distributing its articles via newsletters linking to The Deal's online portal, select articles were distributed to authorized users as PDF files attached to the email newsletters.  There is no print edition of *The Deal Pipeline* or any other editorial publications offered by The Deal.

13. I am informed that three articles from *The Deal Pipeline* are the subject of Plaintiffs' lawsuit before this Court (the "Articles").  The three Articles were published on December 6, 2013 (the "December 6 Article"), March 20, 2014 ("March 20 Article") and April 16, 2014 ("April 16 Article").  Thus, subscribers for the years 2013 and 2014 are particularly relevant. Nationwide, the Deal had 682 subscribers in December 2013 and 658 subscribers in April 2014. Accordingly, an average of 670 institutions had access to The Deal's editorial publications, including *The Deal Pipeline*, during this time period. Through these institutional subscriptions, approximately 50,000 individuals worldwide were authorized to access *The Deal Pipeline's* content in 2013, with the number of users fluctuating between 40,000 and 45,000 thereafter. Between April 2014 and December 2016, The Deal has averaged 604 subscribers.

**C.  Distribution of *The Deal Pipeline* to New Hampshire Subscribers**

14. Since the Articles were published, The Deal has had only one subscriber from New Hampshire.  Between 2013 and the present, Dartmouth College has held a subscription to The Deal's editorial products and its authorized users have had access to *The Deal Pipeline*. Dartmouth was also subscribed to The Deal for a single year in 2009 but dropped its subscription between 2010 and 2013.  Based on this sole subscriber, New Hampshire residents accounted for

approximately 0.15% of subscribers to The Deal between 2013 and 2014.

15. From 2013 onwards, a total of 40 Dartmouth College users have been authorized to access The Deal's products (although only 30 of these users were signed up to receive *The Deal Pipeline's* newsletters). Therefore, the percentage of individuals based in New Hampshire who could access *The Deal Pipeline* was approximately 0.08% of the total number of authorized users in 2013.

16. No employees of The Deal have travelled to New Hampshire in connection with Dartmouth College business. The subscription purchased by Dartmouth was originally negotiated over the phone and via email by an employee of The Deal working in New York. Any customer relation issues relating to Dartmouth's account are currently handled via phone and email by an account manager working out of The Street's Wisconsin office.

17. Between 2013 and 2014, Dartmouth College's subscription payments amounted to approximately 0.15% of The Deal's total revenue from editorial products. By contrast, New York was the source of 45% of The Deal's revenue from its editorial products, while California provided 14%. Arizona and Nevada contributed approximately 1% of revenue each. Dartmouth College's subscription payments amount to approximately 0.15% of The Deal's total revenue. Since Dartmouth College makes its payments to The Deal through an address located in Georgia, The Deal receives no revenue directly from New Hampshire.

**D. The Articles at Issue in this Lawsuit**

18. Using subscriber authentication codes, the Deal collects information about which subscribers have accessed the Articles directly through The Deal's web portal or by clicking through links contained in *The Deal Pipeline* email newsletters.

19. Dartmouth College was assigned an authentication code, which means that the Dartmouth

authentication code would appear in The Deal's tracking data if any user accessed the Articles via the Dartmouth College account.  Although our internal tracking data captured a number of authentication codes identifying subscribers whose users had viewed the Articles, the Dartmouth College authentication code does not appear.  This indicates that no users from Dartmouth College read any of the Articles through The Deal's online portal.

20. A more granular review of the data also indicates that no New Hampshire resident ever read the Articles on The Deal's website.  The December 6 Article was titled "FBI, securities officials investigating Scottsdale Capital, Alpine Securities, source says."  Since it first appeared, the December 6 Article has been viewed on The Deal's portal by subscribers a total of 101 times.  Authorization code information attributes 24 of these page views to major law firms and a financial consultancy, none of which have offices in New Hampshire.  The remaining 77 views cannot be attributed because they originated from subscriber accounts without an authentication code.  However, since Dartmouth College does have an authentication code, none of these views are attributable to Dartmouth users.

21. The March 20 Article was titled "SEC requests default judgment in $34M Biozoom pump-and-dump case."  The March 20 Article was viewed by subscribers 46 times through The Deal's portal.  Of those page views, 8 were attributable to law firms and other institutional subscribers, none of whom have offices in New Hampshire, with the remainder of the views unattributed.  The authorization code for Dartmouth College was not logged in connection with the March 20 Article, which indicates that no Dartmouth users read the article via *The Deal Pipeline's* website.

22. The April 16 Article was titled "Finra focusing on money-laundering violations."  The April 16 Article has been viewed by subscribers 76 times since it was published.  Of those 76

page views, 44 views are attributable by authorization code to law firms and other institutional clients, none of which have offices in New Hampshire.  Since the other 32 page views were unattributed views by subscribers without an authorization code, none of those views can be attributed to Dartmouth College.

23. A significant number of the unattributed page views for all three Articles are likely to have been caused by Plaintiffs and their counsel in connection with this lawsuit, which would have required them to view and download the Articles.  For instance, authentication code data shows that employees of a securities law firm, which represented Plaintiffs before this litigation was initiated, viewed each of the Articles now in suit.

24. In addition to appearing on The Deal's website, the December 6 Article was also posted on the website of The Deal's parent company, thestreet.com.  Although it is not unusual for The Deal to select certain of its articles to also be published on thestreet.com, the other two Articles were not posted on thestreet.com and were available exclusively to paying subscribers on pipeline.thedeal.com.

25. Unlike *The Deal Pipeline*, articles posted on thestreet.com do not appear behind a paywall and are accessible to all internet users throughout the United States (and the rest of the world).  Although users can sign up to various financial services via alternate links on thestreet.com, users do not need to enter any information in order to read the December 6 Article.  Rather, the December 6 Article appears on a section of the website advertised to users as "FREE."  While advertising does appear on the free section of thestreet.com, The Street does not solicit advertising revenue from New Hampshire and local advertising targeting New Hampshire residents does not appear on the website.

26. According to geographical internet traffic data provided by Google, the December 6

Article was viewed a total of 15,199 times by 8,599 readers worldwide between December 2013 and December 2016.  Broken down by region, 1,125 readers in California (13.08%) were responsible for 2,015 of the total page views (13.26%); in New York, 1,153 readers (13.41%) contributed 1,936 page views (12.74%); in Arizona, 487 readers (5.66%) contributed 909 page views (5.98%); and in Nevada 86 readers (1.00%) contributed 147 page views (0.97%).

27. By contrast, 21 readers located in New Hampshire were responsible for a total of 37 page views.  Therefore, 0.24% of the internet users who read the December 6 Article on thestreet.com were in New Hampshire and those readers were responsible for 0.24% of the total page views.

28. I certify under penalty of perjury that the foregoing is true and correct.


Dated:          January 31, 2017                    \_\_/s/ Eric Lundberg_____
                                                     Eric Lundberg