# EXHIBIT C



[RETURN TO ARTICLE]

Law

Share    Reprint   Save to My Articles

# Finra focusing on money-laundering violations

By Bill Meagher   Updated 07:00 PM, Apr-16-2014 ET

On March 10, the staff at Scottsdale Capital Advisors was startled when their receptionist called out into the office, "Finra is here!"

While representatives from the Financial Industry Regulatory Authority were expected at the end of the month for a scheduled two-week exam, this visit had nothing to do with that appointment. Rather, the investigators asked for files relating to overseas clients and omnibus accounts, which are owned in the names of other brokerage firms, according to a person familiar with the raid.

That person said that a group of Finra investigators hauled away copies of documents regarding omnibus accounts at Scottsdale that included those owned in the names of Belize-based Titan International Securities Inc. and Cayman Islands-based Caledonian Global Financial Services Inc., and a Cayman account linked to Scottsdale owner John Hurry.

Gerald Russello, a partner with the law firm of **Sidley Austin LLP** who represents Scottsdale, declined to comment. Representatives of Titan International did not return a phone call seeking comment.

Caledonian Global CEO Kobi Dorenbush said his firm had not been contacted by any U.S. regulators.

The action at Scottsdale's Arizona offices came a month after brokerage firm **Brown Brothers Harriman & Co.** was fined a record $8 million by Finra in a settlement over alleged violations of anti-money laundering regulations. Finra also levied a $25,000 fine and a one-month suspension from the securities industry against Harold Crawford, the New York-based firm's former anti-money-laundering compliance officer.

Finra said that, from January 2009 to June 2013, Brown Brothers executed trades or delivered securities in transactions involving at least 6 billion penny stock shares, with many of those transactions made through omnibus accounts on behalf of clients that the firm could not identify. Some of the $845 million in proceeds were allegedly wired to Switzerland, Guernsey and Jersey, countries with strong bank secrecy laws. Those locations and transactions should have raised red flags with Brown Brothers and prompted the firm to file suspicious activity reports under federal anti-money-laundering regulations, according to Finra.

Brown Brothers agreed to the settlement without admitting or denying Finra's findings. The firm also issued a statement saying it had changed its procedures for handling low-priced securities and for surveillance of

activity in low-priced securities to "mitigate a possible recurrence of this matter." Brown Brothers also said that the activity covered by the settlement represented a small part of its investor services business and did not involve its investment management or private banking business.

Some violations of anti-money-laundering regulations have been closely linked with stock manipulation and pump-and-dumps of microcap stocks, both of which have been identified as priority areas for enforcement action by Finra and the Securities and Exchange Commission.

Finra's action against Brown Brothers has gotten the attention of broker-dealers, anti-money laundering consultants and lawyers for two reasons. The fine, the largest ever handed down for an anti-money-laundering violation by Finra, has served notice that the regulator is serious about firms cleaning up their anti-money-laundering programs. And the fact that Crawford was fined for the company's alleged failure to create an effective anti-money-laundering program is seen by some as unfair.

"Finra has served notice that there is personal responsibility for a company failing to implement an adequate program," said Kevin Petrasic, a partner in the Washington office of law firm Paul Hastings LLP, whose practice includes anti-money-laundering litigation.

"It is a no-win situation and a bit draconian," he said. "AML compliance officers are in a barbell on this. They want to put a program in place, and Finra expects that program to work, but sometimes the senior management doesn't want to pay for the resources, so they choose not to implement the program, and the AML officers are in the middle between management and the regulators. Who wants that job?"

In Crawford's case, he went to Brown Brothers' management and proposed changes that would affect the anti-money-laundering program, according to documents that Finra staff filed in their administrative action. In November 2011, Crawford and other Brown Brothers compliance staff are said to have recommended that the firm stop executing trades for penny stocks below a certain threshold value. They are also said to have recommended that the firm require omnibus account clients that wished to offer brokerage services to their own customers to set up a disclosed subaccounts.

Brown Brothers did not change how it handled penny stocks until last June, according to Finra.

Omnibus accounts are often held in the name of foreign financial intermediaries who, in turn, are handling stocks for clients that might not be known to the U.S. broker-dealer. Finra has told broker-dealers that it is important to know who are the actual investors behind the omnibus accounts.

Anti-money laundering regulations are designed to keep money made in illegal activities from being made to look as if it is the product of legitimate endeavors. With Finra, they center on Rule 3310. It requires each brokerage firm to implement a compliance plan that is approved by a member of senior management in writing. The plan must be designed to detect and assure the reporting of suspicious transactions. The plan must also comply with the Bank Secrecy Act and include an annual independent compliance test. Firms are also required to identify to Finra an individual or group responsible for the day-to-day operation of the anti-money-laundering program.

Each year in January, Finra issues its Regulatory and Examination Priorities Letter which details issues where the regulator plans to devote resources. In 2012, the letter named microcap stock fraud as an enforcement priority.

"As a part of their anti-money laundering responsibilities, member firms are obligated to monitor suspicious activity and to file Suspicious Activity Reports where warranted," the 2012 letter stated.

Last year, efforts against money laundering received their own paragraph in the letter.

"Finra examiners continue to focus on AML compliance, particularly at firms with higher-risk business models due to their clients, products and service mix or location in which they operate."

This year, Finra doubled the space in its letter devoted to efforts against money laundering. The regulator said it planned to focus on institutional business, as well as a trend of broker-dealers not pursing the identities of some shareholders in transactions disposing of large volumes of low-priced stocks.

"I think what is going on is obvious," said a former Finra official who now consults on anti-money-laundering issues. "Finra feels like these regulations have been on the books for what, 11, 12 years? The firms have had a chance to put AML programs in place, hire good people, and still there are problems. So Finra jumps the fines to get their attention. They are saying, 'We are serious and unless you take care of this, it is going to cost you some real money.'"

Paul Tyrrell, of counsel in the Boston office of law firm Sidley Austin LLP, said that some in the brokerage industry have been rattled by Finra's targeting of individuals for enforcement of anti-money-laundering rules.

"Where is the line being drawn?" he said. "I don't know and nobody else does either. What we are seeing in the [anti-money-laundering] exams is that Finra is being more robust, running it down to the end. They are asking what you did, and when you did it, and people are worried that Finra is now looking at AML officers, branch managers and even individual representatives."

For example, in March 2013, the regulator accused James Pilla, a registered representatives of Ameriprise Financial Services Inc., of failing to report red flags raised by penny stock trades in 26 of his client accounts and failing to meet face-to-face with 59 of his clients to verify their identities before opening their accounts. His actions allegedly violated Ameriprise's anti-money-laundering procedures. Finra suspended him for three months and fined him $15,000.

Finra filed 36 anti-money-laundering actions last year, down from 45 in 2012 and 38 in 2011. The regulator did not make anyone available to comment for this story.

Among its actions was a $1.4 million fine against **Oppenheimer Holdings Inc.** last August for alleged violations that included a failure to conduct due diligence on foreign financial intermediaries. Finra claims that from August 2008 through September 2010, Oppenheimer sold 1 billion unregistered penny stock shares on behalf of 13 clients, without performing due diligence on the status of the shares. The firm also allegedly failed to probe suspicious trading by a Bahamas-based broker-dealer. Oppenheimer agreed to pay the fine without admitting or denying Finra's allegations.

In December, Finra fined COR Clearing LLC of Omaha, Neb., $1 million over allegations that, for three years beginning in 2009, the firm failed to establish and implement anti-money-laundering policies and for a time in 2012, its anti-money-laundering program had almost collapsed. COR accepted the penalty without admitting or denying the allegations.

Both COR and Oppenheimer were required to hire independent consultants to monitor and evaluate their anti-money-laundering programs.

World Trade Financial Corp., a San Diego-based brokerage firm, was the subject of a $250,000 fine after Finra alleged it violated anti-money-laundering regulations by not setting up and enforcing supervisory procedures. From March 2009 to August 2011, World Trade bought and sold 27.5 billion shares of a dozen different penny stocks on behalf of one client. Those shares were unregistered and not eligible for an exemption from registration requirements, according to Finra. The transactions generated $61 million in proceeds for the client. The business generated by those transactions was the lion's share of World Trade's business.

The firm accepted the fine without admitting or denying the allegations.

The link between anti-money-laundering regulations involving omnibus accounts and penny stock trading is a growing topic of conversation in the brokerage industry.

"It is what everybody is talking about, and the recent Brown Brothers bust has really made it obvious that's what Finra is worried about as well," said one brokerage firm executive.

The connection was brought into sharp focus by the SEC's recent lawsuit and emergency asset freeze order against John Babikian, a Canadian national who the commission claims is behind the now defunct stock promoter Awesome Penny Stocks.

At the SEC's request, the federal court in Manhattan froze assets belonging to Babikian including two homes in Los Angeles, farm and vineyard land in Oregon and a fractional interest in a corporate jet.

In its lawsuit filed last month, the SEC alleged that Babikian sold 1.3 million shares of coal mining company **America West Resources Inc.** on Feb. 23, 2012, in 90 minutes, after first promoting the stock to 700,000 subscribers to Awesome Penny Stocks' e-mail newsletters. He allegedly made $1.9 million, selling the shares through an omnibus account with Swiss bank Frankfurter Bankgesellschaft (Schweiz) AG maintained by Brown Brothers.

In a set of Finra internal records from 2012 and 2013 obtained by The Deal, the regulator said it has initiated probes of suspicious trading activity involving offshore entities tied to pump and dumps in **Toron Inc.**, U.S. Highland Inc., Bioflamex Corp., **Goff Corp.** and **Marine Drive Mobile Corp.** Those reports were furnished to the SEC.

The offshore brokerage firms cited by Finra in those reports include Caledonian Global, Caledonian Bank Ltd., Caledonian Securities Ltd., Clearwater Securities Inc., Legacy Global Markets SA, Argus Stockbrokers Ltd., CBH Compagnie Bancaire Helvetique SA, Bank Gutenberg AG, Sherman Capital, Rigi Capital and Verdmont Capital SA.

The regulator obtained trading records regarding the omnibus accounts from Scottsdale Capital, Brown Brothers, **Vertical Group**, Knight Execution and Clearing Services LLC, OC Securities Inc. and Ascendiant Capital Markets LLC, according to the Finra records.

Scottsdale is already the subject of investigations by Finra, the SEC and the FBI pertaining to an unusual $34 million pump and dump involving a German company known as Biozoom Inc., according to a person familiar with the situation. Scottsdale's clearing agency and related entity, Salt Lake City-based Alpine Securities is also a part of those probes.

The firms have provided securities officials with documents pertaining to the Biozoom trades and shareholders, including those sought under a request from the SEC and Finra that employees turn over all personal notes regarding Biozoom. Scottsdale and Alpine were also forbidden from destroying any Biozoom records.

The SEC filed a lawsuit last July, claiming that a group of 10 Argentine nationals had opened brokerage accounts at Scottsdale and New York-based Legend Securities Inc., depositing shares and providing paperwork stating that the Biozoom stock was purchased from shareholders in Entertainment Art Inc., the registered shell company that had merged with Biozoom to bring it public in February 2013.

Biozoom, which lists Kassel, Germany, as its headquarters, claims to produce a "biofeedback device" that consumers can use to monitor and analyze data related to their health.

The SEC alleges that the stock purchase agreement documents were false and that the Entertainment Art investors had sold all of their stock in 2009.

The account documents furnished by the Biozoom shareholders led to speculation that members of the group were not the real investors, but instead were simply nominees. None of the Argentines listed investor as their profession, and none of them deposited or traded in any other stocks, according to a person familiar with the investigation. The Argentine group is said to have included retired teachers and the owner of a delicatessen.

Scottsdale Advisors is said to have given the Biozoom shareholders perks that were not available to other clients. They submitted trade orders by e-mail or instant messaging, which the firm did not allow for most clients. The Biozoom shareholders were also charged commissions of just 2%, while other clients paid 4% to 4.5%.

The Biozoom shareholders were also allowed to wire funds from their accounts to banks in Cyprus, Switzerland, Panama and Belize, despite a standing anti-money-laundering policy at Scottsdale that usually only allows clients to wire funds to U.S. banks or to institutions in the country where they live.

The SEC halted trading in Biozoom on June 25 and, in July, asked the court for an emergency order freezing the defendants' assets. That kept $16 million in stock sale proceeds in the U.S. Another $17 million had already been wired overseas prior to the freeze.

The SEC alleges says that, from March 2013 through June, the Argentines received 20 million shares of Biozoom, which was about one-third of the company's stock. In May, they sold 14 million shares reaping almost $34 million.

The shares were sold into a promotion that started May 16, as the company issued a series of press releases, and continued into June. Biozoom's share price tripled, reaching an intraday high of $4.50, implying a valuation of $421.5 million.

As of June 30, Biozoom owned assets valued at only $1.05 million, according to its last filing with the SEC. In the quarter ending June 30, the company had no revenue and a loss of $328,671.

When the stock was halted, the shares were at $3.45. When trading resumed, they plunged to 13 cents, cutting more than $300 million from Biozoom's market value.

Share    Reprint    Save to My Articles

Privacy  |  Terms and Conditions  |  My Account  |  Contact Us

@Copyright 2013, The Deal, LLC. All rights reserved. Please send all technical questions, comments or concerns to the Webmaster.