# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW HAMPSHIRE

---

Scottsdale Capital Advisors Corp. *et al.*,          Docket No. 1:16-cv-00545

*Plaintiffs*

v.

The Deal, LLC, *et al.*,

*Defendants*

---

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO

## DEFENDANTS' MOTION TO DISMISS

DEVINE, MILLIMET & BRANCH, P.A.
George R. Moore, Esq.
NH Bar No. 1791
111 Amherst Street
Manchester, NH   03101

HARDER MIRELL & ABRAMS LLP
Charles J. Harder, Esq. (pro hac vice)
132 South Rodeo Drive, 4th Floor
Beverly Hills, CA 90212

{00078077;1}

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................. 3

    A.    This Lawsuit ................................................................................................. 3

    B.    Defendants' Contacts With New Hampshire ............................................... 4

ARGUMENT ...................................................................................................................... 5

    A.    Legal Standards for Challenges to Personal Jurisdiction ............................ 5

    B.    This Court Has Personal Jurisdiction Over Defendants ............................. 6

        1.    Defendants Purposefully Availed Themselves To Personal Jurisdiction In New Hampshire. ..................................................................................... 6

            a.    Defendants Purposefully Availed Themselves Under *Keeton v. Hustler* ...................................................................................... 6

            b.    Personal Jurisdiction Exists Under *Zippo*. ........................... 9

            c.    The Number of New Hampshire Subscribers Is Irrelevant ................ 12

        2.    This Action Arises From Defendants' New Hampshire Related  Activities ....... 13

        3.    The Exercise Of Personal Jurisdiction In New Hampshire Is Reasonable .......... 15

    C.    Jurisdictional Discovery is Warranted. ..................................................... 17

CONCLUSION ................................................................................................................. 18

# TABLE OF AUTHORITIES

## *Cases*

*Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30 (1st Cir. 2001)................................................................................................................ 6

*American Network, Inc. v. Access America/Connect Atlanta, Inc.*, 975 F. Supp. 494 (S. D. N. Y. 1997) ........................................................................................ 10

*Brother Records, Inc. v. Harpercollins Publishers*, 141 N.H. 322 (1996) ................... 4

*Buckley v. McGraw–Hill, Inc.*, 762 F. Supp. 430 (D.N.H. 1991)................................ 16

*Burger King Corp. v. Rodzewicz*, 471 U.S. 462 (1985)................................................ 7

*Calder v. Jones*, 465 U.S. 783 (1984)................................................................... 4, 8

*Christian v. Barricade Books, Inc.*, No. CIV. 02-408-B, 2003 WL 21146168 (D.N.H. May 15, 2003) ............................................................................................ 14

*CompuServe, Inc. v. Patterson*, 89 F.3d 1257 (6th Cir.1996)..................................... 13

*Conlin Enterprise Corp. v. SNEWS, LLC*, 2008 WL 803041 (D. Utah March 24, 2008)............................................................................................... 11, 13, 14

*Eagle Coffee Co. v. Eagle Coffee International, Inc.*, 2010 WL 481201 (D. Md. Feb. 4, 2010)............................................................................................. 9

*Garvey v. Arkoosh*, 354 F. Supp. 2d 73 (D. Mass. 2005) ........................................... 3

*Gordy v. Daily News, L.P.*, 95 F.3d 829 (9th Cir. 1996) ............................................. 9

*Gray v. St. Martin's Press, Inc.*, 929 F. Supp. 40 (D.N.H. 1996) ................................ 4

*Hanson v. Denckla*, 357 U.S. 235 (1958) ................................................................ 2

*Hugel v. McNell*, 886 F.2d 1 (1st Cir. 1989)............................................................. 5

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945) ...................................... 12

*Keeton v. Hustler Magazine, Inc.*, 131 N.H. 6 (1988) ............................................................... 7, 8

*Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984) ............................................................ 1, 8

*Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997) ........................ 2

*McGee v. International Life Insurance Co.*, 355 U.S. 220, 223 (1957) ...................................... 12

*Phillips Exeter Acad. v. Howard Phillips Fund*, 196 F.3d 284 (1st Cir. 1999) ............................ 6

*Reynolds v. InVivo Therapeutics Holdings Corp.*, No. 16-CV-384-JL, 2016 WL

 6997489 (D.N.H. Nov. 30, 2016) ........................................................................................ 9

*Sawtelle v. Farrell*, 70 F.3d 1381 (1st Cir. 1995) ..................................................................... 17

*Sefton v. Jew*, 201 F. Supp. 2d 730 (W. D. Tex. 2001) ............................................................ 10

*Surpitski v. Hughes-Keenan Corp.*, 362 F.2d 254 (1st Cir. 1966) ............................................ 18

*Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201 (1st Cir. 1994) ......................................... 15

*United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610 (1st Cir. 2001). ........................................ 6

*Weld Power Indus., Inc. v. C.S.I. Techs., Inc.*, 124 N.H. 121 (1983) .......................................... 6

*Wolfe v. Gooding & Co.*, 2015 WL 917311 (D.N.J. Mar. 15, 2015) ............................................ 8

*World–Wide Volkswagen Corp. v. Woodsen*, 444 U.S. 286 (1980) ............................................ 15

*Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa.

 1997) ................................................................................................................................... 9

## *Statutes*

N.H. Rev. Stat. § 510:4(I) ............................................................................................................ 5

N.Y. C.P.L.R. 215(3) ................................................................................................................. 16

## INTRODUCTION

In 1981, a New York resident named Keeton brought a libel suit in New Hampshire against Hustler Magazine, Inc., located in Ohio.  New Hampshire had no connection to the case other than Hustler's distribution of the libelous statements about Keeton to New Hampshire residents.  The U.S. Supreme Court held that New Hampshire had personal jurisdiction over the case, and rejected Hustler's arguments (the same arguments by the defendants in this action) that there was no meaningful connection to New Hampshire.  In *Keeton v. Hustler*, none of the parties resided in the New Hampshire, and the magazine's circulation in the state amounted to less than one percent of its total circulation in the United States.  The U.S. Supreme Court still upheld jurisdiction, holding that Hustler's regular monthly sales in New Hampshire "cannot by any stretch of the imagination be characterized as random, isolated, or fortuitous. It is, therefore, unquestionable that New Hampshire jurisdiction over a complaint based on those contacts would ordinarily satisfy the requirement of the Due Process Clause that a State's assertion of personal jurisdiction over a nonresident defendant be predicated on 'minimum contacts' between the defendant and the State." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984).

Defendants here are reprising the same arguments that the U.S. Supreme Court **unanimously rejected** more than 30 years ago in *Keeton v. Hustler*, and Defendants' arguments should fail for the same reasons.  In particular, Defendants' argument that less than one percent of their subscribers are in New Hampshire is of no consequence, because **Defendants have continuously and deliberately exploited the New Hampshire market**, must therefore reasonably anticipate being haled into court here in a libel action based on the contents of their publication.  *Keeton*, 465 U.S. at 781.

Similarly, Defendants' argument regarding Plaintiffs' purported lack of contacts with New Hampshire also is without merit.  A Plaintiff is not required to have "minimum contacts" with New Hampshire in order for New Hampshire to assert personal jurisdiction over a nonresident defendant.  *Id.* at 779.

Defendants also make a number of extraneous and fanciful allegations regarding Plaintiffs' alleged motives for suing in New Hampshire, including claims that Plaintiffs are seeking to "coerce Defendants into giving up their source[s]" and that Plaintiffs are trying to take advantage of New Hampshire's statute of limitations.  These arguments are red herrings designed to distract the Court from another of *Keeton*'s holdings: that "applying New Hampshire's statute of limitations to all aspects of this nationwide suit has nothing to do with the jurisdiction of the Court to adjudicate the claims. 'The issue is personal jurisdiction, not choice of law.'"  *Id.* at 778 (quoting *Hanson v. Denckla*, 357 U.S. 235, 254 (1958)).

Finally, personal jurisdiction also is present under the holding of *Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997) ("*Zippo*").  Defendants here sold subscriptions to their online website in New Hampshire, and therefore entered into at least one contract in New Hampshire. Defendants were "clearly doing business" in New Hampshire, and its contacts were neither "fortuitous" nor "coincidental." *Id*. at 1124, 1127.  In fact, the object of Defendants' contract in New Hampshire was to transmit to New Hampshire the online news site on which the defamatory articles that form the basis of this suit appeared.  *Id*. at 1127.

In sum, Defendants purposefully availed themselves of the privilege of conducting activities within New Hampshire.  Consequently, there is no unfairness in calling them to answer for those activities in the state.

## FACTUAL BACKGROUND

**A.      This Lawsuit**

On December 6, 2013, an article written by Mr. Meagher appeared in *Deal Pipeline*, an online publication of defendant The Deal, headlined "FBI, securities officials investigating Scottsdale Capital, Alpine Securities, source says" ("December 6 Article"). (Motion, Meagher Decl. ¶ 5, Exh. A).  The December 6 Article falsely stated that Plaintiffs and their affiliated companies were being criminally investigated and being investigated by securities regulators. The December 6 Article further falsely stated that Plaintiffs engaged in favoritism towards shareholders of a company named Biozoom, including by allowing them to trade in violation of SCA policies and giving them special perks.  The December 6 Article also falsely stated that Plaintiffs ignored "red flags" with respect to Biozoom transactions.

On March 20, 2014, an article written by Mr. Meagher appeared in *Deal Pipeline* headlined "SEC requests default judgment in $34M Biozoom pump-and-dump case" ("March 20 Article").  (Motion, Meagher Decl. ¶ 10, Exh. B).  The March 20 Article falsely stated that Plaintiffs and their affiliated companies were being investigated by the FBI, and were the targets of criminal and securities investigations.  The March 20 Article also falsely stated that Plaintiffs were involved in a "pump and dump" scheme with Biozoom.[1]

On April 16, 2014, an article written by Mr. Meagher appeared in *Deal Pipeline* headlined "FINRA focusing on money-laundering violations" ("April 16 Article").  (Motion,

---

[1] "In a typical 'pump and dump' scheme, insiders inflate demand for a stock by disseminating laudatory information about a company – information that is usually false. If the market reacts favorably, the insiders cash in their shares before the market readjusts and the share price collapses. *Garvey v. Arkoosh*, 354 F. Supp. 2d 73, 76 (D. Mass. 2005).

Meagher Decl. ¶ 10, Exh. C).  The April 16 Article repeated the false claim that Plaintiffs and their affiliated companies were under FBI investigation.

Plaintiffs filed this lawsuit in New Hampshire on November 18, 2016, asserting causes of action against Defendants for defamation, invasion of privacy—false light, intentional interference with contractual relations, and tortious interference with prospective economic advantage.

**B.      Defendants' Contacts With New Hampshire[2]**

Defendant The Deal is a Delaware limited liability company that publishes print and electronic publications concerning the financial sector, including *The DealFlow Report* ("DealFlow") and *The Deal Pipeline* ("Deal Pipeline").  Defendant Meagher is a staff writer and associate editor at The Deal.  (Susman Decl. ¶ 2, Exh. 1).  Evidence proffered by Defendants, and supplemented herein (based entirely on publicly available information and prior to any jurisdictional discovery), demonstrates that Defendants purposefully injected themselves into New Hampshire in order to reap an economic benefit.

---

[2] Defendants improperly try to separate Mr. Meagher from The Deal, alleging that each defendant's contacts with the forum state should be assessed individually. (Motion at p. 14).  As an initial matter, the case Defendants cite for this proposition, *Calder v. Jones*, 465 U.S. 783 (1984), concerned the "effects test," and whether the defendant targeted the particular forum. *Id.* at 789.  As discussed *infra*, personal jurisdiction in this matter does not arise under *Calder.* Second, courts in this district have routinely held that the author of a published work is treated the same as the publisher for personal jurisdiction purposes.  *See e.g., Brother Records, Inc. v. Harpercollins Publishers*, 141 N.H. 322, 326-28 (1996) (authors of book are subject to personal jurisdiction because they "are directly responsible for its content" and they "knew the book would be distributed and sold nationally, and [] stood to profit from the sale of books in New Hampshire."); *Gray v. St. Martin's Press, Inc.*, 929 F. Supp. 40, 48 (D.N.H. 1996) ("By executing a contract with a national publisher for the national and international distribution of a book with nationwide appeal, [defendant who authored book] should reasonably have anticipated being haled into court in New Hampshire, a forum regularly served by [publisher] and one in which the book was actually sold.").

According to Defendants, *Deal Pipeline* is available on a subscription-only basis. (Motion p. 6).  These subscribers receive, among other things: "actionable, intraday coverage of mergers, acquisitions and all other changes in corporate control to institutional investors, private equity, hedge funds and the firms that serve them."  (Susman Decl. ¶ 3, Exh. 2).  Subscribers also receive "immediate access to our up-to-the-minute news, data and information. News, video, webcasts, podcasts, events and whitepapers, [t]opical newsletters target[ing] specific niches to form a holistic reach across the breadth of the deal community."  (Susman Decl. ¶ 4, Exh. 3).

According to Defendants, articles on *Deal Pipeline* "sit behind a paywall and are available only to authorized subscribers."  (Motion, Lundberg Decl. ¶ 10).  The Deal assigns authentication codes to their subscribers.  (Motion, Lundberg Decl. ¶ 11).  In addition to making content available through *Deal Pipeline*, The Deal also distributes newsletters to their subscribers.  To be clear: **the only way to access articles on *Deal Pipeline* is to enter into a contract with The Deal**.

According to Defendants, there were approximately 670 subscribers to *Deal Pipeline* during the relevant timeframe, including one subscriber in New Hampshire, Dartmouth College. (Motion, Lundberg Decl. ¶¶ 13, 14).  Accordingly, at the time the defamatory articles were published and distributed on *Deal Pipeline*, Defendants were in a contractual relationship with a New Hampshire resident that expressly provided that resident with the defamatory articles.

## ARGUMENT

### A.      Legal Standards for Challenges to Personal Jurisdiction

New Hampshire's long arm statute confers jurisdiction over non-resident defendants who themselves or through an agent commit a tortious act in New Hampshire.  N.H. Rev. Stat. Ann. § 510:4(I); *Hugel v. McNell*, 886 F.2d 1, 3 (1st Cir. 1989).  The New Hampshire long-arm statute

is coextensive with the limits of personal jurisdiction set by the Due Process clause of the Constitution.  *Weld Power Indus., Inc. v. C.S.I. Techs., Inc.*, 124 N.H. 121, 125 (1983).

"When a district court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, as in this case, the 'prima facie' standard governs its determination."  *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 618 (1st Cir. 2001).

"In deciding whether the plaintiff has proved a prima facie case of personal jurisdiction, the district court must draw all reasonable inferences arising from the proof, and resolve all factual disputes, in the plaintiff's favor." *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co*., 267 F.3d 30, 36 (1st Cir. 2001).

Determining whether a plaintiff has alleged sufficient facts for a finding of specific jurisdiction requires a three-part analysis: (1) whether the defendant's contacts constitute purposeful availment of the benefits and protections afforded by the forum's laws; (2)  whether the claim that undergirds the litigation directly relates to or arises out of the defendant's contacts with the forum, and (3) the overall reasonableness of an exercise of jurisdiction in light of a variety of pertinent factors that touch upon the fundamental fairness of an exercise of jurisdiction.  *Phillips Exeter Acad. v. Howard Phillips Fund*, 196 F.3d 284, 288 (1st Cir. 1999).

**B.      This Court Has Personal Jurisdiction Over Defendants**

**1.      Defendants Purposefully Availed Themselves To Personal Jurisdiction In New Hampshire.**

**a.      Defendants Purposefully Availed Themselves Under *Keeton v. Hustler***

Pursuant to established personal jurisdiction cases, there is more than ample evidence here of Defendants' minimum contacts with New Hampshire.  In *Keeton v. Hustler*, the U.S. Supreme Court held that jurisdiction is proper over a publisher who "produces a national

publication aimed at a nationwide audience" with respect to a libel claim brought by a non-resident plaintiff.  *See also Burger King Corp. v. Rodzewicz*, 471 U.S. 462, 473 (1985) (explaining that *Keeton* holds that a "publisher who distributes magazines in a distant state may fairly be held accountable in that forum for damages resulting there from an allegedly defamatory story"). This is true even where "only a small portion" of copies of the publisher's publication were distributed within the forum state. *Keeton*, 465 U.S. at 775.

In *Keeton*, a New York resident brought a libel suit in New Hampshire, against Hustler Magazine, Inc., an Ohio corporation. A small number of copies of *Hustler* magazine (10,000 to 15,000 per month) were distributed in New Hampshire.  *Keeton*, 465 U.S. at 772.  This was less than one percent (1%) of Hustler's circulation at the time.  *Keeton v. Hustler Magazine, Inc.*, 131 N.H. 6, 9 (1988).  The United States Supreme Court held that *Hustler*'s "regular circulation" of its publication in New Hampshire was sufficient to support assertion of jurisdiction. *Keeton*, 465 U.S. at 773-74.

The U.S. Supreme Court expressly found that such regular distribution could not "by any stretch of the imagination be characterized as random, isolated, or fortuitous" and it was "unquestionable that New Hampshire jurisdiction over a complaint based on those contacts would ordinarily satisfy the requirement of the Due Process Clause that a State's assertion of the personal jurisdiction over a nonresident defendant be predicated on 'minimum contacts' between the defendant and the State." *Id.* at 774.  Because Hustler was "carrying on a 'part of its general business' in New Hampshire," this was "sufficient to support jurisdiction when a cause action arose out of the very activity being conducted." *Id*. at 779-80.

In so finding, the Court said that New Hampshire had a "significant interest" in redressing injuries that occurred within the state, including injuries in libel actions brought by

nonresidents against nonresidents. *Id.* at 776. "False statements of fact harm both the subject of the falsehood and the readers of the statement." *Id.* A state "may rightly employ its libel laws to discourage deception of its citizens" and to address "the injury that in-state libel causes within [the state] to a nonresident." *Id.* "The communication of the libel may create a negative reputation among the residents of a jurisdiction where the plaintiff's previous reputation was, however small, at least unblemished." *Id.*

Based on Defendants' substantial contacts with this forum through its subscriber(s), New Hampshire has a legitimate interest in holding Defendants answerable to Plaintiffs' claims based upon the posting of the defamatory articles on *Deal Pipeline*. As in *Keeton*, New Hampshire has a "significant interest" in redressing injuries that occur within the State, including injuries in this libel action brought by nonresidents against nonresidents.

Defendants' attempt to analogize its conduct to defendants who engaged in minimal distribution in the forum state fails for another reason as well—*Keeton* did not establish a threshold of subscribers (in either raw numbers or percentage of total subscribers) in the forum state in order to exercise personal jurisdiction. In *Keeton*, Hustler's distribution of between 10,000 and 15,000 of its magazine constituted approximately one percent (1%) of its total circulation (*Keeton*, 131 N.H. at 9), and was sufficient to confer personal jurisdiction over defendant. *Keeton*, 465 U.S. at 774. Looking at raw numbers, the court in *Wolfe v. Gooding & Co.*, 2015 WL 917311 at *3 (D.N.J. Mar. 15, 2015) upheld personal jurisdiction under *Keeton* based on the distribution of just 55 copies of a publication in the forum state.[3] As the Court of

---

[3] Defendants conflate the *Keeton* test with another case, *Calder v. Jones*, 465 U.S. 783 (1984), which holds that the plaintiff's residence is a sufficient contact for specific jurisdiction in a libel case, because the defamatory communication injured the plaintiff in the forum state. Plaintiffs are not making a *Calder* claim here; Plaintiffs are not residents of New Hampshire. Plaintiffs are

Appeals for the Ninth Circuit concluded, "mailing to regular subscribers, even though few," may amount to purposeful availment because such mailing "is not random or fortuitous and is not even necessarily isolated." *Gordy v. Daily News, L.P.*, 95 F.3d 829, 833 (9th Cir. 1996).

Defendants entered into ongoing business relationship with a New Hampshire resident, New Hampshire therefore has a significant interest in redressing the harm caused in the forum that resulted from that relationship.

### b.      Personal Jurisdiction Exists Under *Zippo*.

Personal jurisdiction is also present under the test enunciated by *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997) ("*Zippo*").  Under *Zippo*, personal jurisdiction over the operators of interactive websites is determined by "examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site." *Id.* "[T]he *Zippo* model does not supersede the traditional personal jurisdiction analysis, it merely compliments [*sic*] it." *Eagle Coffee Co. v. Eagle Coffee International, Inc.*, 2010 WL 481201 at *3 (D. Md. Feb. 4, 2010).

*Zippo* established a "sliding scale" test to evaluate a defendant's contacts with a forum state when the defendant's only contacts are through a website.  *Zippo*, 952 F. Supp. at 1124. The Zippo test outlined three basic designations for contacts with the forum state: (1) **Clearly Doing Business**: "If the defendant enters into contracts with residents of a foreign jurisdiction

---

making a *Keeton* claim (and a *Zippo* claim), which turns on the distribution of the defendant's publication in the jurisdiction, not the targeting of harm towards the plaintiff residing in the jurisdiction.  In their Motion, Defendants extensively discuss *Reynolds v. InVivo Therapeutics Holdings Corp.*, No. 16-CV-384-JL, 2016 WL 6997489 (D.N.H. Nov. 30, 2016), which is a *Calder* case, not a *Keeton* case.  Defendants do not cite any authority for the proposition that the analysis in *Reynolds* applies to *Keeton* claims.

that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper."  (2) **The Middle Ground**: "occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site."  (3) **Passive Website:** "situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions . . .[D]oes little more than make information available to those who are interested in it, [so] it is not grounds for the exercise personal jurisdiction."  *Id.*

Over and over again, courts have consistently held that a subscription-based website falls within the first category, and personal jurisdiction is proper.  *See e.g., Zippo*, 952 F. Supp. at 1126; *American Network, Inc. v. Access America/Connect Atlanta, Inc.*, 975 F. Supp. 494, 499 (S. D. N. Y. 1997); *Sefton v. Jew*, 201 F. Supp. 2d 730, 741 (W. D. Tex. 2001).

In *Zippo*, the defendant operated an online news service, which had three levels of membership ranging from free/public information to exclusive subscription-only information. *Zippo*, 952 F. Supp. at 1121.  Defendant had approximately 140,000 paying subscribers, of whom approximately 3,000 were located in Pennsylvania.  *Id.*  These subscribers entered into contracts with defendant, for which they received a password to access defendant's online news services.  *Id.*  The court held that personal jurisdiction in Pennsylvania was proper over defendant because it purposefully availed itself of doing business in the forum.  *Id.* at 1125-26.

> [Defendant] was under no obligation to sell its services to Pennsylvania residents. It freely chose to do so, presumably in order to profit from those transactions. If a corporation determines that the risk of being subject to personal jurisdiction in a particular forum is too great, it can choose to sever its connection to the state. If [defendant] had not wanted to be amenable to jurisdiction in Pennsylvania, the solution would have been simple—it could have chosen not to sell its services to Pennsylvania residents.

*Id*. at 1126-27.

The case of *Conlin Enterprise Corp. v. SNEWS, LLC*, 2008 WL 803041 (D. Utah March 24, 2008) is instructive.  In *Conlin Enterprise*, the defendant published an online trade newsletter, and the only thing that could be purchased on defendant's website was a subscription to the online trade newsletter. *Id*.  Defendants were not Utah residents and had no Utah employees, no place of business in Utah, no Utah bank accounts, no Utah phone or fax numbers, no Utah mailing address, and no Utah agents.  *Id*.  There were however, sixty (60) subscribers to the newsletter in Utah.  The Court held that it could exercise personal jurisdiction over Defendants because:

> [Defendants] engaged in at least sixty commercial transactions in Utah when individuals subscribed to [Defendants'] newsletter. . . . Selling subscriptions to the newsletter is a commercial transaction. . . . This is doing business in the forum state.

*Id*. at *6.

> Paraphrasing *Zippo*, the court held:

> [Defendant] repeatedly and consciously chose to process Utah residents' applications and to assign them passwords. [Defendant] knew that the result of these contracts would be the transmission of electronic messages into Utah. The transmission of these files was entirely within its control.  Defendant was under no obligation to sell its services to Utah residents.  If [defendant] had not wanted to be amenable to jurisdiction in Utah, the solution would have been simple – it could have chosen not to sell its services to Utah residents.

*Id*. at *6 (internal quotes and citations omitted).

The holdings in *Zippo* and *Conlin Enterprise* are directly on point here: The Deal repeatedly and consciously chose to process a New Hampshire resident's application and to assign it a subscription. The Deal knew that the result of this contract would be the transmission

of electronic messages into New Hampshire. The transmission of these files was entirely within its control.  The Deal was under no obligation to sell its services to a New Hampshire resident.  It freely chose to do so, presumably to make a profit from the transaction(s).  If The Deal did not want to be haled into court in New Hampshire, it could easily have chose not to sell its services to a New Hampshire resident.

The Deal purposefully availed itself of the privilege of conducting business in New Hampshire; it is therefore subject to personal jurisdiction in the state.

**c.     The Number of New Hampshire Subscribers Is Irrelevant**

The gravamen of Defendants' argument is that they only have one subscriber in New Hampshire, and the exercise of personal is somehow "random" or "fortuitous."  This species of argument has been made time and again by internet defendants trying to escape personal jurisdiction in forums where they conducted business.  Time and again, these arguments have been rejected by the courts, because courts evaluate "the nature and quality of commercial activity that an entity conducts over the Internet" not the quantity of the contacts.  *Zippo*, 952 F. Supp. at 1124.

In *Zippo*, the defendant argued that only two percent (2%) of its online news subscribers were residents of the forum state.  *Id*. at 1127.  The Court was decisive in rejecting this argument:

> Defendant points to the fact that only two percent of its subscribers are Pennsylvania residents.   However, the Supreme Court has made clear that even a single contact can be sufficient.  *McGee v. International Life Insurance Co*., 355 U.S. 220, 223 (1957).  The test has always focused on the "nature and quality" of the contacts with the forum and not the quantity of those contacts.  *International Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945).  The Sixth Circuit also rejected a similar argument in CompuServe when it wrote that the contacts were "deliberate and repeated even

if they yielded little revenue." *CompuServe, Inc. v. Patterson*, 89
F.3d 1257, 1265 (6th Cir.1996).

*Id.* (emphasis added).

Similarly, in *Sefton*, defendants argued that their website did not target Texas residents
and that Texas residents represented only 1.86% of their subscribers. *Sefton*, 201 F. Supp. 2d at
740. The court found this argument "unpersuasive." *Id.* "The minimum contacts test focuses
on the 'nature and quality' of the contacts with the forum, not the quantity of those contacts." *Id.*

As discussed above, in *Conlin Enterprise*, the defendant published an online trade
newsletter with approximately 5,000 subscribers worldwide, of whom approximately 60 resided
in Utah – i.e., 1.2%. *Conlin Enterprise*, 2008 WL 803041*1. Again, the Court held that these 60
transactions constituted doing business in Utah. *Id*.

Here, Defendants had less than 670 subscribers worldwide, one of whom was in New
Hampshire. This one subscription was not random or fortuitous: The Deal deliberately and
repeatedly entered into a subscription contract with Dartmouth College, even if it yielded little
revenue. Defendants therefore cannot say that they did not target New Hampshire, because they
expressly, knowingly, entered into an ongoing contract with one of its residents.

Under both *Keeton* and *Zippo*, it is indisputable that Defendants conducted business in
New Hampshire and purposefully availed themselves of the benefits and protections afforded by
the New Hampshire's laws. The Court should therefore exercise personal jurisdiction over
Defendants.

### 2.    This Action Arises From Defendants' New Hampshire Related Activities

Defendants argue that Plaintiffs' claims do not arise out of Defendants' contacts with
New Hampshire. Nonsense. "The tort of libel is generally held to occur wherever the offending

material is circulated.  The reputation of the libel victim may suffer harm even in a state in which he has hitherto been anonymous." *Keeton*, 465 U.S. at 777 (citing Restatement (Second) of Torts § 577A, Comment a (1977)).

Moreover, Defendants willingly and knowingly entered into a subscription contract with a New Hampshire resident that provided New Hampshire residents with access to *Deal Pipeline* – the subscription-based website and newsletter on which the defamatory articles appeared.  As the U.S. Supreme Court in *Keeton* held: "respondent is carrying on a 'part of its general business' in New Hampshire, and that is sufficient to support jurisdiction when the cause of action arises out of the very activity being conducted, in part, in New Hampshire." *Keeton,* 465 U.S. at 779-80.

In *Conlin Enterprise*, the Court examined similar facts regarding an online subscription-based newsletter and similar causes of actions for defamation and interference with contractual relations. *Conlin Enterprise*, 2008 WL 803041*7 The Court held:

> The relevant contacts with Utah are the Internet subscriptions through [defendant's] website. The cause of action arises out of the contacts with Utah because those Utah subscribers had access to the purportedly defamatory article. Not only is the defamatory article the source of the harm, its explicit purpose was to harm the Plaintiffs who are Utah residents.

*Id.*

Plaintiffs' contacts arise from Defendants' New Hampshire related activities—a subscription agreement between Defendants and a New Hampshire resident.[4]

---

[4] Defendants' attempt to analogize the facts of this case to *Christian v. Barricade Books, Inc.*, No. CIV. 02-408-B, 2003 WL 21146168 (D.N.H. May 15, 2003) to argue a lack of relatedness to New Hampshire fails because it ignores the ongoing business relationship Defendants have in this jurisdiction.  In *Christian,* the court found the relatedness requirement was not satisfied because the one book that was shipped to the New Hampshire bookstore was not sold and was returned to the defendant. *Id.* at *3.  In other words, no sale was consummated and the defendant

### 3.    The Exercise Of Personal Jurisdiction In New Hampshire Is Reasonable

The final prong for exercising personal jurisdiction over Defendants concerns whether the exercise of personal jurisdiction is reasonable.  *Phillips Exeter Acad.*, 196 F.3d at 288.   The "reasonableness" prong exists to protect defendants against unfairly inconvenient litigation (*World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)), and the exercise of jurisdiction is reasonable if it does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co.*, 326 U.S. at 316.  When determining the reasonableness of a particular forum, the Supreme Court has identified five "gestalt factors," namely: "(1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies." *Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 209 (1st Cir. 1994) (citing *Burger King*, 471 U.S. at 477).  Defendants have the burden to show that, in light of these factors, defending the suit in this court would be "so gravely difficult and

---

did not receive any profits from a New Hampshire resident.  Defendants herein however, are in fact receiving an ongoing economic benefit from a New Hampshire resident *vis-à-vis* their subscription contract with Dartmouth.  Defendants' reliance on *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610 (1st Cir. 2001) is similarly unavailing.  There, the court found that relatedness was not satisfied because the defendant, a foreign based bank, did not reach into the forum since it did not call or write to the customer at issue.  *Id.* at 622.  Only after making this finding did the court note that the funds at issue came from a foreign location rather than from the United States. *Id.*  Defendants' reliance on this case again ignores the subscription agreement with Dartmouth and the fact that they called and emailed Dartmouth to negotiate the agreement and continue to perform "client service work" for Dartmouth via telephone phone and email.  (Motion p. 5).  Based on these facts, the court in *Swiss Am. Bank* would have undoubtedly found that Defendants reached into this forum regardless of where Dartmouth's payments originate from.

inconvenient" that they would be at a "severe disadvantage" in comparison to the Plaintiffs. *Burger King*, 471 U.S. at 478. Defendants have not met this burden.

**New Hampshire has an interest in adjudicating this dispute.** A State's interest in adjudicating a dispute extends to libel actions brought by nonresidents because libel harms **both** the subject of the falsehood **and** the readers of the statement. Thus "New Hampshire may rightly employ its libel laws to discourage the deception of its citizens," even to remedy "the injury that in-state libel causes within New Hampshire." *Brother Records, Inc.*, 141 N.H. at 328 (citing *Keeton*, 465 U.S. at 776.

This principle applies to the facts of this case: That the parties have no apparent connections to New Hampshire does not mean that Plaintiffs did not suffer injury in New Hampshire. The defendants, all of whom had a direct hand in the writing and publication of the defamatory articles must reasonably anticipate being haled into court in a libel action where injury to the targeted plaintiffs can be expected to occur, which in this case included New Hampshire. *Buckley v. McGraw–Hill, Inc*., 762 F. Supp. 430, 438–39 (D.N.H. 1991).

**Plaintiffs' interest in obtaining convenient and effective relief necessitates that the matter be heard in New Hampshire**. Perhaps not surprisingly, Defendants relegate their argument regarding this factor to a single footnote. (Motion p. 25). This, however, may be the most important of the gestalt factors. Because of New York's draconian one-year statute of limitations for libel (N.Y. C.P.L.R. 215(3)), Plaintiffs' claims would be barred if brought there. As is their right, Plaintiffs have brought their claims in New Hampshire because it is one of the only jurisdictions in which they can obtain relief for their claims.

The facts and holding in *Keeton* are instructive.  In *Keeton*, plaintiff's claims were barred by the statute of limitations in every single state except New Hampshire.  *Keeton*, 465 U.S. at 773.  The Supreme Court, rightfully, put the onus on defendant, holding:

> Petitioner's successful search for a State with a lengthy statute of limitations is no different from the litigation strategy of countless plaintiffs who seek a forum with favorable substantive or procedural rules or sympathetic local populations.  Certainly Hustler Magazine, Inc., which chose to enter the New Hampshire market, can be charged with knowledge of its laws and no doubt would have claimed the benefit of them if it had a complaint against a subscriber, distributor, or other commercial partner.

*Id*. at 779.

**Defendants' burden of appearing in New Hampshire is a red herring**.  According to Defendants, Defendants are based in California and New York, and it would supposedly impose a burden to litigate in New Hampshire.  (Motion at p. 24)  However, even if Plaintiffs brought this action in California or New York (or in Plaintiffs' home state of Arizona), at least one of the Defendants would be required to travel cross-country.  "[D]efending in a foreign jurisdiction almost always presents some measure of inconvenience, and hence this factor becomes meaningful only where a party can demonstrate a special or unusual burden."  *Sawtelle v. Farrell*, 70 F.3d 1381, 1395 (1st Cir. 1995) (internal citations and quotes omitted).  When, as here, one of the Defendants would be required to defend the action on the other side of the country, the burden is neither special nor unusual.

The exercise of personal jurisdiction in New Hampshire is therefore reasonable.

## C.        Jurisdictional Discovery is Warranted.

If the Court is at all inclined to dismiss (which would be unwarranted for the reasons discussed herein), Plaintiffs should be entitled to conduct limited discovery regarding

Defendants' connections to New Hampshire.  *See Swiss Am. Bank, Ltd*., 274 F.3d at 625 ("We have long held that a diligent plaintiff who sues an out-of-state corporation and who makes out a colorable case for the existence of *in personam* jurisdiction may well be entitled to a modicum of jurisdictional discovery if the corporation interposes a jurisdictional defense.").  As one court colorfully explained, such discovery is **not** a fishing expedition: "When the fish is identified, and the question is whether it is in the pond, we know no reason to deny a plaintiff the customary license."  *Surpitski v. Hughes-Keenan Corp*., 362 F.2d 254, 256 (1st Cir. 1966).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the instant motion be denied in its entirety or, in the alternative, that Plaintiff be allowed the opportunity to conduct jurisdictional discovery.

Respectfully submitted,

SCOTTSDALE CAPITAL ADVISORS CORP.
AND JOHN HURRY
By their attorneys

DEVINE, MILLIMET & BRANCH, P.A.

Dated: February 16, 2017      By:_____/s/ George Moore_____
George R. Moore, Esquire (NH Bar No. 1791)
111 Amherst Street
Manchester, NH   03101
603-669-1000

HARDER, MIRELL & ABRAMS, LLP

Dated: February 16, 2017      By:_____/s/ Charles Harder_____
Charles J. Harder (*pro hac vice*)
132 South Rodeo Drive, 4th Floor
Beverly Hills, CA 90212
424-203-1600

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of February, 2017, I served a copy of the foregoing

pleading upon Defendants' counsel in the manner specified herein:

**Electronically served through ECF**:

Elizabeth A. McNamara, Esq. – lizmcnamara@dwt.com
John M. Browning, Esq. - jackbrowning@dwt.com
Steven M. Gordon, Esq. – sgordon@shaheengordon.com