# EXHIBIT B

1 | THOMAS R. BURKE (CA State Bar No. 141930)
thomasburke@dwt.com
2 | DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
3 | San Francisco, California 94111
Telephone:   (415) 276-6500
4 | Facsimile:   (415) 276-6599

**FILED**

FEB 2 8 2017

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

5 | ELIZABETH A. MCNAMARA (*pro hac vice* forthcoming)
lizmcnamara@dwt.com
6 | JOHN M. BROWNING (*pro hac vice* forthcoming)
johnbrowning@dwt.com
7 | DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
8 | New York, New York 10020
Telephone: (212) 489-8230
9 | Facsimile:   (212) 489-8340

10 | Attorneys for Non-Party Journalist
William Meagher

11 |

**UNITED STATES DISTRICT COURT**

**LB**

12 |

**NORTHERN DISTRICT OF CALIFORNIA**

13 |

**SAN FRANCISCO DIVISION**

14 |

CV 17 80 026MISC

15 | John J. Hurry and Justine Hurry, as husband and ) 
wife; Investment Services Corporation, an
16 | Arizona Corporation, BRICFM LLC d/b/a
Corner of Paradise Ice Cream Store, a California
17 | Limited Liability Company,

18 |                              Plaintiffs,

19 |        vs.

20 | Financial Industry Regulatory Authority, Inc.,

21 |                              Defendant.

22 |

23 |

Case No. _____

(D. Ariz. No. 14-cv-04420-NC)

**NOTICE OF MOTION AND MOTION TO QUASH SUBPOENA ISSUED FROM A CIVIL CASE PENDING BEFORE THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA AND SERVED ON NON-PARTY JOURNALIST WILLIAM MEAGHER**

Hearing Date:
Hearing Time:

24 |

25 |

26 |

27 |

28 |

MOTION TO QUASH SUBPOENA
Case No.
4814-5734-5092v.3 0090219-000012

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on April 5, 2017, at 9.00 am, or as soon thereafter as counsel may be heard in the San Francisco Courthouse of the above-captioned Court, located at 450 Golden Gate Avenue, San Francisco, California 94102, non-party journalist William Meagher will and hereby does move this Court to quash a subpoena (the "Subpoena") issued in an ongoing action before the United States District Court for the District of Arizona and served on Mr. Meagher by counsel for John Hurry, Justine Hurry, Investment Services Corporation, and BRICFM LLC (collectively "Plaintiffs"). The Subpoena seeks to compel Mr. Meagher to appear for a deposition in San Francisco, California, at 9:00 a.m. on March 1, 2017, and to produce at that time unpublished documents created in the course of Mr. Meagher's newsgathering activities.

As set forth in more detail in the attached Memorandum of Points and Authorities, Plaintiffs' Subpoena should be quashed for two reasons. First, Plaintiffs cannot compel Mr. Meagher to testify because California's reporters' shield law provides Mr. Meagher with an absolute immunity against being found in contempt for refusing to reveal the identity of his confidential sources or disclose unpublished information acquired in connection with newsgathering activities. *See* Cal. Const. art. I, § 2(b) and Cal. Evid. Code § 1070 (collectively, the "California Shield Law"). In addition, the qualified federal reporters' privilege established under the First Amendment to the United States Constitution and the California State Constitution independently protects Mr. Meagher from being compelled to disclose the information sought by the Subpoena.

This Motion is based on this Notice, the Memorandum of Points and Authorities, and the declarations of William Meagher and John M. Browning, all matters of which this Court may take judicial notice, including filings in *Hurry v. Financial Industry Regulatory Authority*, No. CV-14-02490-PHX-ROS (D. Ariz) (the "Arizona Action"), the files and records in this action, and on such other argument as may be heard by this Court.

i

Dated: February 28, 2017

DAVIS WRIGHT TREMAINE LLP
THOMAS R. BURKE
ELIZABETH A. MCNAMARA (*pro hac vice* forthcoming)
JOHN M. BROWNING (*pro hac vice* forthcoming)

By: _____
    Thomas R. Burke

Attorneys for Non-Party Journalist William Meagher

# TABLE OF CONTENTS

Page

I.      SUMMARY OF ARGUMENT ............................................................................................ 1

II.     FACTUAL STATEMENT ................................................................................................. 3

        A.      The Articles and Mr. Meagher's Related Journalistic Activities............................ 3

        B.      Plaintiffs' Arizona Lawsuit against FINRA ............................................................ 5

        C.      Related Litigation against Mr. Meagher and The Deal............................................ 7

        D.      The Subpoena........................................................................................................... 8

I.      CALIFORNIA STATE LAW GOVERNS THE DISPOSITION OF
        MR. MEAGHER'S MOTION TO QUASH ..................................................................... 10

II.     CALIFORNIA'S STATUTORY REPORTERS' SHIELD PROHIBITS
        ENFORCEMENT OF THE SUBPOENA ........................................................................ 12

III.    THE REPORTERS' PRIVILEGE ESTABLISHED UNDER THE FEDERAL AND
        CALIFORNIA CONSTITUTIONS INDEPENDENTLY REQUIRES THE COURT
        TO QUASH THE SUBPOENA........................................................................................ 15

IV.     CONCLUSION................................................................................................................. 19

i

# TABLE OF AUTHORITIES

Page

**Cases**

Baker v. F. &. F. Inv.,
470 F.2d 778 (2d Cir. 1972).........................................................................................................2

Bartlett v. Superior Ct.,
150 Ariz. 178 (Ariz. Ct. App. 1986) .........................................................................................19

Bass v. First Pac. Networks Inc.,
219 F.3d 1052 (9th Cir. 2000) ...................................................................................................10

Branzburg v. Hayes,
408 U.S. 665 (1972)....................................................................................................................15

Condit v. National. Enquirer, Inc.,
289 F. Supp. 2d 1175 (E.D. Cal. 2003)......................................................................................16

CRS Recovery, Inc. v. Laxton,
600 F.3d 1138 (9th Cir. 2010) ...................................................................................................11

Hurry v. FINRA,
No. CV-14-02490-PHX-ROS, 2016 U.S. Dist. LEXIS 90147
(D. Ariz. Apr. 1, 2016)........................................................................................................ passim

In re Nucorp Energy Secs. Litig.,
661 F. Supp. 1403 (S.D. Cal. 1987)...........................................................................................11

Kenneally v. Bosa Cal. LLC,
No. 09-CV-2039 WQH JMA, 2011 U.S. Dist. LEXIS 57903
(S.D. Cal. May 26, 2011)............................................................................................................11

Los Angeles Mem'l Coliseum Comm'n v. NFL,
89 F.R.D. 489 (C.D. Cal. 1981).............................................................................................15, 17

Matera v. Superior Ct.,
170 Ariz. 446 (Ariz. Ct. App. 449)........................................................................................13, 18

Michael v. Estate of Kovarbasich,
No. CV 15-00275-MWF, 2015 U.S. Dist. LEXIS 168901
(C.D. Cal. Dec. 11, 2015) ...........................................................................................................16

Miller v. Superior Ct.,
21 Cal. 4th 883 (1999) ................................................................................................................13

Mitchell v. Superior Ct.,
37 Cal. 3d 268 (1984) ......................................................................................................... passim

ii

*Murphy v. Philip Morris Inc.*,
  CV 99-7155-RAP, 2000 U.S. Dist. LEXIS 21128 (C.D. Cal. Mar. 17, 2000) ......................10, 12

*N.Y. Times v. Superior Ct.*,
  51 Cal. 3d 453 (1990) ........................................................................................................ *passim*

*O'Grady v. Superior Ct.*,
  139 Cal. App. 4th 1423 (2006) ............................................................................................12, 16

*Playboy Enters., Inc. v. Superior Ct.*,
  154 Cal App. 3d 14 (1984)....................................................................................................11, 13

*SEC v. Tavella*,
  77 F. Supp. 3d 353 (S.D.N.Y. 2015)...........................................................................................4

*Shaklee Corp. v. Gunnell*,
  110 F.R.D. 190 (N.D. Cal. 1986)................................................................................................10

*Shoen v. Shoen*,
  5 F.3d 1289 (9th Cir. 1993) ........................................................................................................16

*Shoen v. Shoen*,
  48 F.3d 412 (9th Cir. 1995) ...................................................................................................15, 18

*Star Editorial, Inc. v. United States Dist. Ct.*,
  7 F.3d 856 (9th Cir. 1993) ..........................................................................................................10

*United States v. Burke*,
  700 F.2d 70 (2d Cir. 1983)..........................................................................................................18

*Wolpin v. Philip Morris Inc.*,
  189 F.R.D. 418 (C.D. Cal. 1999)...........................................................................................10, 11

*Zerilli v. Smith*,
  656 F.2d 705 (D.C. Cir. 1981).........................................................................................2, 11, 15

**Constitutional Provisions**

U.S. Const. amend. I ................................................................................................................ *passim*

Cal. Const. art. I, § 2(b) .......................................................................................................... *passim*

**Statutes**

Ariz. Rev. Stat. § 12-2237 ...............................................................................................................13

Cal. Evid. Code § 1070 ............................................................................................................. i, 12

MOTION TO QUASH
Case No.
4814-5734-5092v.3 0090219-000012

**Rules**

Fed. R. Civ. P. 1 ................................................................................................................14

Fed. R. Civ. P. 45(d)(3)(A) ..........................................................................................9, 14

Fed. R. Civ. P. 12(b)(6)..........................................................................................................6

Federal Rule of Evidence 501 .......................................................................................10, 11

N.D. Cal. Local Rule 30-1 ..............................................................................................9

**Other Authorities**

3 Weinstein's Federal Evidence § 501.02[3][b] (2d ed. 1999)..........................................11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

iv

MOTION TO QUASH
Case No.
4814-5734-5092v.3 0090219-000012

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   SUMMARY OF ARGUMENT

The Subpoena represents an impermissible intrusion upon Mr. Meagher's right to safeguard the anonymity of his sources and maintain the confidentiality of his unpublished journalistic work product. In his capacity as an investigative journalist, Mr. Meagher wrote a series of articles for *The Deal Pipeline*, a financial news journal, between 2013 and 2015. These articles reported on investigations by government regulators into whether Mr. Hurry's stock brokerage firm, Scottsdale Capital Advisors Corp. ("Scottsdale"), bore any responsibility for a massive stock market fraud perpetrated by its clients that cost investors tens of millions of dollars. In the course of researching his articles, Mr. Meagher received credible information from a confidential source(s) concerning the ongoing investigation and revealing details about Scottsdale's relationship with the off-shore clients that carried out the stock fraud.   There was a significant and self-evident public interest in Mr. Meagher's reporting on Scottsdale's involvement in financial fraud and that public interest encompassed the publication of the information entrusted to Mr. Meagher by his confidential source(s).

Nearly three and a half years after the first article was published, Plaintiffs seek to compel Mr. Meagher into disclosing the identities of his sources and handing over any records of their communications. In the Arizona Action that gave rise to the Subpoena, Plaintiffs are prosecuting two state law civil claims against the Financial Industry Regulatory Authority ("FINRA"), which both boil down to Plaintiffs' contention that FINRA improperly acted as Mr. Meagher's confidential source while investigating Scottsdale and defamed Plaintiffs by leaking false information about the extent of Scottsdale's involvement in the stock market fraud committed by its clients. It is evident from all that has transpired that Plaintiffs have one and only one goal from the issuance of this Subpoena: to force Mr. Meagher to identify whether FINRA was his confidential source and to obtain other information that might be useful in making a case against FINRA or others. Plaintiffs' determination to intrude upon Mr. Meagher's reporting is confirmed by their concurrent document requests, which call for unpublished records of "communications between [Mr. Meagher] and any source of information related to PLAINTIFFS" for a series of four articles

1

1   reporting on Scottsdale's involvement in various fraudulent schemes (the "Articles"). Although

2   Mr. Meagher is not a named party to the Arizona Action, the Subpoena is part of a wider campaign

3   of litigation gamesmanship against Mr. Meagher, which has saddled Mr. Meagher and his

4   employer, The Deal LLC (the "Deal"), with the considerable expense of defending meritless

5   lawsuits in New York and New Hampshire.

6        However, the law prohibits Plaintiffs from forcing Mr. Meagher to submit to the

7   Subpoena's demands that he divulge confidential information gathered in the course of researching

8   the Articles. The California Supreme Court has recognized the strong public interest reporters have

9   in protecting the anonymity of their confidential sources:

10         Without an unfettered press, citizens would be far less able to make informed

11         political, social, and economic choices. But the press' function as a vital source

12         of information is weakened whenever the ability of journalists to gather news is

13         impaired. Compelling a reporter to disclose the identity of a source may

14         significantly interfere with this news gathering ability; journalists frequently

15         depend on informants to gather news, and confidentiality is often essential to

16         establishing a relationship with an informant.

17   *Mitchell v. Superior Ct.*, 37 Cal. 3d 268, 274-75 (1984) (*quoting Zerilli v. Smith*, 656

18   F.2d 705, 710-11 (D.C. Cir. 1981)). Put another way, "[c]ompelled disclosure of

19   confidential sources unquestionably threatens a journalist's ability to secure information

20   that is made available to him only on a confidential basis …. The deterrent effect such

21   disclosure is likely to have upon future 'undercover' investigative reporting, the

22   dividends of which are revealed in articles such as [these] threatens freedom of the press

23   and the public's need to be informed." *Id.* at 275 (*quoting Baker v. F. &. F. Inv.*, 470

24   F.2d 778, 782 (2d Cir. 1972)). In light of these prevailing interests, California law

25   "provides an absolute rather than a qualified immunity" against compelled disclosure by

26   a non-party journalist in a civil action. *N.Y. Times v. Superior Ct.*, 51 Cal. 3d 453, 461

27   (1990).

28

2

1        Ultimately, Mr. Meagher's interest in protecting his confidential sources and safeguarding

2 his unpublished newsgathering materials requires the Subpoena to be quashed. As a threshold

3 matter, California state law applies because state law supplies the exclusive rule of decision for

4 Plaintiffs' civil claims in the Arizona Action and because California has the greatest interest in

5 protecting its journalists. California law provides two independent grounds for quashing the

6 Subpoena. First, Mr. Meagher is entitled to the protections of the California Shield Law, which

7 confers upon non-party journalists "virtually absolute protection against compelled disclosure" in a

8 civil action. *Mitchell*, 37 Cal. 3d at 274. Second, Mr. Meagher also enjoys a distinct constitutional

9 "qualified privilege to withhold disclosure of the identity of confidential sources and of

10 unpublished information supplied by such sources," which Plaintiffs are unable to overcome. *Id.* at

11 279.

12        For these reasons, which are set forth in greater detail below, Mr. Meagher requests that this

13 Court quash the Subpoena served on him and release him from any obligation to submit testimony

14 about the Articles for use in the Arizona Action.

15 **II.**     **FACTUAL STATEMENT**

16     **A.**     **The Articles and Mr. Meagher's Related Journalistic Activities**

17        Mr. Meagher is a professional journalist with 30 years of experience. For more than five

18 years, Mr. Meagher has covered the small and microcap stock brokerage industry for *The Deal*

19 *Pipeline*, a subscribers-only financial news journal published online by The Deal. Declaration of

20 William Meagher ("Meagher Decl.") ¶2.[1] John and Justine Hurry own numerous businesses that

21 operate in the micro-cap and small cap securities sector, including Scottsdale. *See Hurry v. FINRA*,

22 No. CV-14-02490-PHX-ROS, 2016 U.S. Dist. LEXIS 90147, at *3 (D. Ariz. Apr. 1, 2016).

23 Between September 2013 and May 2015, Mr. Meagher researched and wrote a series of articles that

24 reported on Scottsdale's involvement in stock manipulation schemes, a multi-million dollar stock

25

26       [1] "Small" and "microcap" refers to the relatively small market capitalization of the firms
27 whose stock is traded. *Id.* ¶2. Small and microcap stocks have traditionally presented much greater
risk for investor fraud than other stocks since there tends to be less publicly available information
28 and professional analysis than there would be for bigger companies. *Id.*

MOTION TO QUASH
Case No.
4814-5734-5092v.3 0090219-000012

market fraud committed by Scottsdale clients and regulatory investigations into money laundering schemes relating to Scottsdale's Cayman Islands subsidiary.

On September 13, 2013, *The Deal Pipeline* published an article written by Mr. Meagher entitled "Finra targets a dozen offshore firms suspecting [sic] of trading in pump-and-dumps." Meagher Decl. Ex. B (the "September 13 Article"). The September 13 Article reported that FINRA had identified trading records indicating that Scottsdale's offshore clients may have used their trading accounts to perpetrate an illegal "pump-and-dump" scheme. *Id.*Ex. B at 2.[2]

On December 6, 2013, *The Deal Pipeline* published another article written by Mr. Meagher entitled "FBI, securities officials investigating Scottsdale Capital, Alpine Securities, source says" (the "December 6 Article").[3] *Id.* Ex. C. In the course of researching the December 6 Article, Mr. Meagher received credible information from confidential source(s) that Scottsdale was being investigated by the FBI and financial regulators in connection with another pump-and-dump scam carried out by Scottsdale customers. *Id.* ¶5. As reported in the December 6 Article, Scottsdale clients based in Argentina orchestrated a $32 million fraud by selling artificially overvalued stock in Biozoom, a medical instruments company, through their Scottsdale brokerage accounts.[4] *Id.* Mr. Meagher's confidential source(s) provided information about the investigation and how Scottsdale had treated its Biozoom clients, which was reported in the December 6 Article. *Id.*

---

[2] In a pump and dump scheme, the owners of cheaply purchased stock artificially inflate the stock's price by making false or misleading statements to investors and then sell the stock off at a profit at the expense of any investors still holding the worthless stock. *Id.* ¶3. Inexperienced and relatively poor investors are often targeted and taken advantage of by the firms running these schemes. *Id.*

[3] Alpine Securities is a Utah-based clearing firm controlled by Scottsdale that handles the sale of stock by Scottsdale clients.

[4] In January 2015, a federal court sitting in the Southern District of New York found at least six of Scottsdale's Biozoom clients liable for violating securities law for their part in the Biozoom pump and dump scheme. *See SEC v. Tavella*, 77 F. Supp. 3d 353, 358-59 (S.D.N.Y. 2015). The court ordered the guilty shareholders to disgorge millions of dollars of ill-gotten gains on top of substantial civil penalties. *Id.* at 359-64.

4

On March 20, 2014 and April 16, 2014, *The Deal Pipeline* published two more articles by Mr. Meagher, which re-reported information about Scottsdale's Biozoom clients that Mr. Meagher obtained from his confidential source(s) and published in the December 6 Article (the "March 20 Article" and "April 16 Article," respectively). *Id.* Exs. D, E. The March 20 and April 16 Article also reported new developments in the Biozoom investigation and the April 16 Article reported on a separate money laundering investigation into Plaintiffs' Cayman Islands subsidiary. *Id.* Although not mentioned in the Subpoena, on May 28, 2016, *The Deal Pipeline* published an additional article by Mr. Meagher about the ongoing money laundering investigation, which also repeated claims about Scottsdale's Biozoom clients provided by Mr. Meagher's confidential source(s) (the "May 28 Article"). *Id.* Ex. F.

Mr. Meagher is a resident of California and works out of The Deal's offices located in Petaluma. *Id.* ¶2. The Articles were entirely researched, written, and edited in California. *Id.* All newsgathering activities were conducted while Mr. Meagher was in California. *Id.* ¶8.

## B. Plaintiffs' Arizona Lawsuit against FINRA

The tortured history of the District of Arizona lawsuit that gave rise to the Subpoena at issue here was helpfully summarized by the judge presiding over that case in her order dismissing with prejudice all but two of the fourteen claims Plaintiffs initially lodged against FINRA. *See Hurry*, 2016 U.S. Dist. LEXIS 90147, at \*3-4. Since the Hurrys operate securities firms that do business with the public, Plaintiffs are subject to the regulatory authority of FINRA and other securities regulators. *Id.* In 2012, FINRA agents conducted a surprise inspection of Scottsdale's headquarters and seized numerous computers. *Id.* According to Plaintiffs, "FINRA began a campaign of escalating harassment against the Hurrys" shortly after the raid on Plaintiffs' offices was carried out. *Id.* (internal quotation marks and citation omitted). As part of the alleged campaign of harassment, Plaintiffs claim that FINRA were responsible for "leaking non-public, confidential, and false and misleading information to a reporter for [T]he Deal Pipeline, a financial news and information service." *Id.* In other words, Plaintiffs have alleged that a FINRA agent improperly acted as Mr. Meagher's confidential source for information relating to the investigation into Scottsdale's involvement in the fraud committed by its Biozoom clients.

5

1       In November 2014, "the Hurrys and close to thirty of their companies" filed suit in the

2  United States District Court for the District of Arizona and brought a mix of fourteen state and

3  federal claims against FINRA and Scott Andersen, who was FINRA's Deputy Regional Chief

4  Counsel at that time (collectively, the "Defendants"). *Id.* at \*4. Since Plaintiffs' federal claims

5  predominated, the Arizona court initially exercised federal question jurisdiction over the Arizona

6  Action. Defendants filed a motion to dismiss Plaintiffs' first amended complaint and, on August 5,

7  2016, "the Court dismissed all fourteen claims based on a variety of legal and factual theories." *Id.*

8  In disposing of Plaintiffs' first amended complaint, "[t]he Court granted leave to amend certain

9  claims but denied leave to amend others." *Id.* Plaintiffs filed their second amended complaint on

10  August 28, 2015, which alleged the same fourteen state and federal claims. *Id.* Defendants again

11  moved to dismiss. *Id.* On April 4, 2016, the Arizona court dismissed all of Plaintiffs' federal

12  claims for a second time and dismissed all but two of Plaintiffs' state law claims. *Id.* at \*6-9. Since

13  there are no more federal claims before the Arizona court, its subject matter jurisdiction to

14  adjudicate the remaining state claims must be predicated either on diversity or pendent jurisdiction.

15       The two remaining Arizona state claims allege defamation and false light invasion of

16  privacy. *Id.* at \*9. Plaintiffs' theory of liability is that "Defendants were providing true

17  information to [Mr. Meagher] and, while doing so, Defendants were also providing [allegedly] false

18  information" that was reported in the Articles. *Id.* Assessing whether Plaintiffs' claims fulfilled

19  the plausibility requirement of Federal Rule of Civil Procedure 12(b)(6), the Arizona court

20  expressed considerable doubt as to the validity of Plaintiffs' claims. *Id.* at \*10. Although the

21  defamation and false light claims were ultimately deemed to have scraped past the plausibility

22  threshold, the Arizona court explicitly stated that "this is ... a very close call. Only by drawing all

23  reasonable inferences in favor of Plaintiffs *and* giving Plaintiffs a very generous benefit of the

24  doubt are the defamation and false light claims barely plausible." *Id.* Noting that it was "a stretch

25  to allow these claims to proceed," the Arizona court made clear that it would "very carefully

26  circumscribe discovery to allow this case to quickly reach a resolution. *Id.* at \*10-11.[5]

27

28     [5] As part of its efforts to prune the Arizona Action of extraneous parties, the Arizona Court dismissed the claims brought by all but four of the initial plaintiffs. Arizona Action, Dkt. No. 156.

MOTION TO QUASH
Case No. _____
4814-5734-5092v.3 0090219-000012

1        In August 2016, proceedings before the District of Arizona were stalled by the withdrawal
2  from the case of Plaintiffs' counsel, who had determined that they were "ethically required to
3  terminate their representation" of Plaintiffs for undisclosed reasons.  Declaration of John M.
4  Browning ("Browning Decl.") ¶1, Ex. A.  Although Plaintiffs were able to engage new counsel by
5  October 2016, the parties have nevertheless failed to keep up with the discovery schedule imposed
6  by the Arizona court on November 8, 2016.  *Id.* ¶2, Ex. B.  Discovery is due to be completed by
7  March 1, 2017, but a joint status report filed on February 16, 2017, reveals that "the major
8  percipient witnesses," including Mr. Andersen and two former Scottsdale employees, will not take
9  place until sometime later in March at the earliest.  *Id.*

10         **C.**    **Related Litigation against Mr. Meagher and The Deal**

11        On May 26, 2016, Plaintiffs opened up a second front of litigation through which Plaintiffs
12  sought to pressure Mr. Meagher into revealing the identity of his confidential source(s) for the
13  Articles.  On that date, John Hurry and Scottsdale filed suit against Mr. Meagher and The Deal in
14  New York State Supreme Court and, in September, filed a complaint alleging that the May 28,
15  2015 Article was defamatory (the "New York Complaint").  *Id.* ¶¶3, 7, Ex. C.  It is clear from the
16  New York Complaint that Plaintiffs' primary strategic purpose in the litigation was to coerce
17  Mr. Meagher into revealing his confidential source(s) in the hopes that this information would
18  bolster Plaintiffs' case against FINRA in Arizona.  To this end, Plaintiffs alleged – without any
19  identified factual or legal basis whatsoever – that Mr. Meagher's confidential sources were
20  individuals "within FINRA or government regulatory agencies that have discussed confidential
21  information involving Plaintiffs" and that "the identity of such sources would not be protected by
22  the NYS 'Shield' laws" protecting the anonymity of confidential sources.  *Id.*

23        Since New York confers an absolute privilege against forced disclosure of the identity of a
24  confidential source, The Deal and Mr. Meagher steadfastly refused to reveal the identity of any
25  confidential sources and notified Plaintiffs that they would file a motion to dismiss the New York
26  Complaint for failure to state a claim for defamation.  *Id.* ¶5.  Apparently frustrated by their

27
    In addition, the parties stipulated to withdraw the claims against defendant Andersen.  *Id.*, Dkt. No.
28  140.

7

1    inability to ferret out the confidential source(s), Plaintiffs turned instead to litigation

2    gamesmanship. Although they were fully aware that Defendants were filing a motion to dismiss,

3    Plaintiffs waited to voluntarily dismiss the New York action, without warning, on the eve of

4    Defendants' filing deadline. *Id.* ¶7. By doing so, Plaintiffs sandbagged Defendants into spending

5    considerable time and money on drafting motion papers that Plaintiffs had to know would be

6    unnecessary. *Id.*

7         Less than a month later, on November 18, 2016, John Hurry and Scottsdale filed a separate

8    complaint against Mr. Meagher and The Deal with the Superior Court of New Hampshire, which

9    alleged that the December 9, March 20, and April 16 Articles gave rise to four claims:

10   (1) defamation, (2) false light invasion of privacy, (3) intentional interference with contractual

11   relations, and (4) tortious interference with prospective economic advantage (the "New Hampshire

12   Complaint"). *Id.* ¶8. Since nothing in the Articles or Plaintiffs' tortured litigation history has even

13   the remotest connection with New Hampshire, the only plausible explanation for the New

14   Hampshire lawsuit is litigation gamesmanship and a desire to coerce Mr. Meagher into identifying

15   his confidential source(s).[6] After removing the case to the United States District Court for the

16   District of New Hampshire, The Deal and Mr. Meagher moved to dismiss for lack of personal

17   jurisdiction. That motion – which will be fully briefed on or before March 2, 2017 – is currently

18   pending. *Id.* ¶9.

19       **D.**     **The Subpoena**

20         Plaintiffs served Mr. Meagher with the Subpoena at issue here on February 14, 2017 –

21   nearly two and a half years after Plaintiffs commenced their lawsuit against FINRA. Meagher

22   Decl. ¶1. The Subpoena demands that Mr. Meagher appear for a deposition in San Francisco at

23   9:00 a.m. on March 1, 2017. The Subpoena also demands that Mr. Meagher produce at his

24

25          [6] By filing suit in New Hampshire, Hurry and Scottsdale seek to profit from New

26   Hampshire's three-year statute of limitations. While the longer statute of limitations opens up a
   libel suit to older articles barred by New York's one-year statute of limitations, the fact that they

27   abruptly withdrew the New York Complaint based on the May 28 Article containing substantially
   the same allegedly defamatory statements belies that gamesmanship was the true purpose of the

28   exercise.

1  deposition all written communications and documents relating to his sources for the Articles. *Id.*

2  Ex. A. It is evident that by this production and testimony that Plaintiffs intend to test their

3  remaining state-law claims in the Arizona Action that FINRA acted as Mr. Meagher's confidential

4  source. *Id.* Simply put, although Plaintiffs' Arizona action has been pending since 2014 and they

5  had ample time to serve the Subpoena on Mr. Meagher, they have scheduled Mr. Meagher's

6  deposition for the last day of the time allotted for discovery and have given him a mere two weeks'

7  notice, knowing full well that Mr. Meagher intends to assert his reporters' privilege against

8  testifying. *See* Browning Decl. ¶Ex. C at 3 (Joint Status Report indicating Plaintiffs anticipate "a

9  claim of a journalistic shield protection by Mr. Meagher").[7]

10                                **ARGUMENT**

11         Under the Federal Rules of Civil Procedure, "the court for the district where compliance is

12  required must quash or modify a subpoena that … requires disclosure of privileged or other

13  protected matter … or subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iii)-(iv).

14  For the reasons set forth more fully below, Mr. Meagher now moves to quash the Subpoena on the

15  grounds that California's statutory Shield Law immunizes him from being compelled to testify and

16  that the qualified constitutional privilege prohibits forced disclosure of confidential information

17  obtained in the process of newsgathering.

18

19

20

21  [7] In addition to giving Mr. Meagher little time to respond to the Subpoena, Plaintiffs failed to abide

22  by Local Rule 30-1 of this Court, which requires a party noticing the deposition of a third-party
   witness to meet and confer about scheduling. Browning Decl. ¶10. Counsel for Plaintiffs did not

23  contact counsel for Mr. Meagher until after Plaintiffs received a letter putting them on notice that
   Mr. Meagher would move to quash the Subpoena. *Id.* Ex. 10, Ex. E. Plaintiffs' attorneys contacted

24  counsel for Mr. Meagher for the first time on the morning before he was due to appear for

25  deposition. *Id.* ¶11. On that call, Plaintiffs offered to withdraw their document requests if Mr.
   Meagher agreed to sit for deposition. *Id.* However, as counsel for Mr. Meagher explained, it

26  would violate Mr. Meagher's rights as a journalist and exceed the "very carefully circumscribe[d]
   discovery" required in the Arizona Action to force Mr. Meagher to sit through a futile deposition at

27  which he would be privileged from disclosing any information pertinent to the Arizona Action. *Id.*

28  ¶12-13. For these reasons, Plaintiffs' offer was rejected and this motion was filed in order to
   safeguard Mr. Meagher's rights. *Id.* ¶13.

                                        9

## I.    CALIFORNIA STATE LAW GOVERNS THE DISPOSITION OF MR. MEAGHER'S MOTION TO QUASH

State law is controlling here because the only two causes of action that survived Defendants' motions to dismiss are Plaintiffs' state law claims for defamation and false light invasion of privacy, respectively. As the Ninth Circuit has stated, "Federal Rule of Evidence 501 provides that when a federal court hears a civil action in which state law provides the rule of decision, 'the privilege of a witness, … shall be determined in accordance with State law.'" *Star Editorial, Inc. v. United States Dist. Ct.*, 7 F.3d 856, 859 (9th Cir. 1993) (*quoting* Fed. R. Evid. 501). Given that state law provides the exclusive rule of decision in the Arizona Action and given that the only possible grounds for federal subject matter jurisdiction are diversity or pendent jurisdiction, "the state law of privilege applies" to determine whether Mr. Meagher is immune from being compelled to provide testimony concerning Plaintiffs' two surviving state law claims. *Shaklee Corp. v. Gunnell*, 110 F.R.D. 190, 192 (N.D. Cal. 1986) (applying California reporters shield to subpoena issued by District of Utah seeking evidence from California reporter for use in libel case); *see also Star Editorial*, 7 F.3d at 859 (applying California reporters' privilege to defamation action removed to federal court because "[s]tate law will clearly provide the rule of decision"); *Bass v. First Pac. Networks Inc.*, 219 F.3d 1052, 1055 n.2 (9th Cir. 2000) ("[A] federal court exercising supplemental jurisdiction over state law claims is bound to apply the law of the forum state to the same extent as if it were exercising its diversity jurisdiction.").

California's choice-of-law rules require this Court to apply California law in quashing the Subpoena. As a threshold matter, the California choice-of-law analysis should be applied instead of the Arizona equivalent. Courts have held that, "where the court hearing the discovery dispute and the court hearing the underlying action differ, the court hearing the discovery dispute must apply the choice of law rules of its forum." *Wolpin v. Philip Morris Inc.*, 189 F.R.D. 418, 423 (C.D. Cal. 1999); *see also Murphy v. Philip Morris Inc.*, CV 99-7155-RAP, 2000 U.S. Dist. LEXIS 21128, at *3-4 (C.D. Cal. Mar. 17, 2000) ("While Rule 501 of the Federal Rules of Evidence says nothing about 'which states privilege law to apply when state law controls and the litigation has contacts with two or more states, … the majority of circuits apply the privilege law of the state that

10

1  would be chosen under the choice-of-law rules used by the state where the court sits.") (*quoting* 3

2  Weinstein's Federal Evidence § 501.02[3][b] (2d ed. 1999).

3       "California applies the 'governmental interest' analysis in choice-of-law questions." *CRS*

4  *Recovery, Inc. v. Laxton*, 600 F.3d 1138, 1141-42 (9th Cir. 2010) (citation omitted). Under this

5  approach, "the forum will apply its own rule of decision unless a party litigant timely invokes the

6  law of a foreign state. In such event he must demonstrate that the latter rule of decision will further

7  the interest of the foreign state and therefore that it is an appropriate one for the forum to apply to

8  the case before it." *Wolpin*, 189 F.R.D. at 423 (internal quotation marks and citations omitted).

9  Assuming Plaintiffs intend to invoke the law of Arizona, they must first demonstrate that "there is

10 in fact a conflict between the competing jurisdictions since there is obviously no problem where the

11 laws of the two states are identical." *Kennealy v. Bosa Cal. LLC*, No. 09-CV-2039 WQH JMA,

12 2011 U.S. Dist. LEXIS 57903, at *8 (S.D. Cal. May 26, 2011) (internal quotation marks and

13 citation omitted). For the reasons set forth in greater detail below, the respective California and

14 Arizona shield laws and constitutional reporters' privileges both prohibit the Court from

15 compelling Mr. Meagher to disclose the identity of his confidential source or the unpublished

16 information he obtained in the course of his newsgathering activities. *See infra* 13 n. 8, 18 n.11.

17 Since the choice of law makes no difference to the outcome, California law should apply.

18      But assuming *arguendo* that there are significant differences between the protections

19 conferred on reporters under Arizona and California law, California law should still apply because

20 California has the stronger interest in adjudicating this motion. "If both jurisdictions have a

21 legitimate interest in the application of their conflicting laws, the court should apply the law of the

22 state whose interest would be the more impaired if its law were not applied." *Kennealy*, 2011 U.S.

23 Dist. LEXIS 57903, at *8 (*quoting In re Nucorp Energy Secs. Litig.*, 661 F. Supp. 1403, 1412 (S.D.

24 Cal. 1987)). Mr. Meagher is a California resident, who researched and wrote the Articles entirely

25 from California. Meagher Decl. ¶¶2, 8. The California Supreme Court has recognized the

26 importance of investigative journalists like Mr. Meagher "as a vital source of information."

27 *Mitchell*, 37 Cal. 3d at 274 (*quoting Zerilli v. Smith*, 656 F.2d 705 (D.C. Cir. 1981)); *see also N.Y.*

28 *Times*, 51 Cal. 3d at 461 (applying California privilege against compelled disclosure from non-

11

1  party journalist). The California Shield Law thus "reflects a strong interest in the Legislature and
2  the people of this state to afford newspersons the highest possible level of protection from
3  compelled disclosure of confidential sources and confidential information." *Playboy Enters., Inc.*
4  *v. Superior Ct.*, 154 Cal App. 3d 14, 27 (1984)).

5        In light of these clearly articulated concerns over the ability of California journalists to
6  protect their sources, the State of California has an extremely strong interest in protecting the
7  ability of one of its citizens, Mr. Meagher, to continue his important work as an investigative
8  financial journalist without fear of being forced to surrender his confidential sources. *See also*
9  *Murphy*, 2000 U.S. Dist. LEXIS 21128, at *4 ("California has a significant interest in ensuring that
10 its statutory provisions for confidentiality … are vindicated"). Accordingly, California law governs
11 under the California governmental interest test.

12 **II.**     **CALIFORNIA'S STATUTORY REPORTERS' SHIELD PROHIBITS**
13         **ENFORCEMENT OF THE SUBPOENA**

14       The Subpoena must be quashed because it confers upon non-party journalists like
15 Mr. Meagher "virtually absolute protection against compelled disclosure" of unpublished
16 information relating to their newsgathering activities. *Mitchell*, 37 Cal. 3d at 274; *see also*
17 *N.Y.Times*, 51 Cal. 3d at 461. This protection is enshrined in both the California Constitution (art.
18 I, § 2, subd. (b)) and in a substantially identical statute (Cal. Evid. Code § 1070). The statutory
19 authority provides that "[a] reporter, or other person connected with or employed upon a
20 newspaper, magazine or any other periodical publication … cannot be adjudged in contempt … for
21 refusing to disclose … the source of any information procured while so connected or employed for
22 publication in a newspaper, magazine or other periodical publication, or for refusing to disclose any
23 unpublished information obtained or prepared in gathering, receiving or processing of information
24 for communication to the public." Cal. Evid. Code § 1070. For the purposes of applying the
25 statute, "any other periodical publication" has been interpreted to include online journals like *The*
26 *Deal Pipeline*. *See O'Grady v. Superior Ct.*, 139 Cal. App. 4th 1423, 1466 (2006) (holding that
27 California reporters' shield applies to "online news magazine[s]").

28

MOTION TO QUASH
Case No.
4814-5734-5092v.3 0090219-000012

The law specifically prohibits the Court from compelling Mr. Meagher to reveal this information at Plaintiffs' behest.  As a full-time reporter employed by a prominent online financial journal, Mr. Meagher is clearly included in the class of people protected by the California Shield Law.  Meagher Decl. ¶¶2, 8.  Moreover, the Subpoena calls exclusively for information "obtained or prepared in gathering" news, since Plaintiffs seek to compel Mr. Meagher to reveal confidential information he collected in the course of researching and writing the Articles.  *Id.* ¶9, Ex. A (Subpoena).  Having met the statutory requirements, Mr. Meagher cannot be compelled to comply with the Subpoena by the threat or execution of a contempt judgment.  *See N.Y. Times*, 51 Cal. 3d at 461 ("We find nothing in the shield law's language or history to suggest the immunity from contempt is qualified such that it can be overcome by a showing of need for unpublished information within the scope of the shield law."); *Playboy*, 154 Cal App. 3d at 27 ("order compelling production of petitioner's source materials and editorial drafts and working papers is not enforceable by contempt…") (quoting *Mitchell*, 37 Cal. 3d at 274).  As the California Supreme Court explained, "[s]ince contempt is generally the only effective remedy against a nonparty [journalist], the California enactments grant such witnesses *virtually absolute protection* against compelled disclosure."  *N.Y. Times*, 51 Cal. 3d at 461.  At bottom, the Shield Law provides Mr. Meagher with an "absolute rather than a qualified immunity" against compelled disclosure of unpublished newsgathering materials in civil cases, which bars the Court from compelling Mr. Meagher to comply with the Subpoena.  *Id.*; *see also Miller v. Superior Ct.*, 21 Cal. 4th 883, 890 (1999) ("The shield law is, by its own terms, *absolute* rather than qualified in immunizing a newsperson from contempt for revealing unpublished information obtained in the newsgathering process.").[8]

----

[8] For the same reasons, Mr. Meagher would be entitled to an absolute privilege against compelled disclosure under Arizona's statutory reporters' shield. That statute provides that a "person engaged in … reportorial work, or connected with or employed by a newspaper … shall not be compelled to testify or disclose in a legal proceeding … the source of information procured or obtained by him for publication in a newspaper … with which he was associated or by which he is employed." Ariz. Rev. Stat. § 12-2237; *see also Matera v. Superior Ct.*, 170 Ariz. 446, 449 (Ariz. Ct. App. 449) (Arizona reporters' shield statute "protects members of the media from being compelled to testify about or otherwise disclose confidential sources utilized during the newsgathering process").

13

MOTION TO QUASH
Case No.
4814-5734-5092v.3 0090219-000012

The fact that California courts have construed the statutory reporters' shield narrowly as "an immunity from contempt, not a privilege" does not divest this Court of its power to quash the Subpoena. *N.Y. Times*, 51 Cal. 3d at 459. In *New York Times*, the California Supreme Court determined that it was premature for a non-party journalist to move for relief under the Shield Law before the "newsperson has been adjudged in contempt." *Id.* In light of this precedent, it is likely that Plaintiffs will attempt to argue that Mr. Meagher should allow himself to be found in contempt of court before seeking relief. However, invoking such procedure would result in the very same end game: the ultimate quashing of the subpoena and an order preventing Mr. Meagher's testimony and production. The Federal Rules of Civil Procedure "should be construed, administered and employed by the court ... to secure the just, speedy, and inexpensive determination of every action and proceeding" Fed. R. Civ. P. 1. Subject to this overarching principle, the same rules also dictate that the Court "must quash ... a subpoena that ... subjects a person to undue burden." *Id.* 45(b)(3)(A)(iv). The spirit and substance of these rules dictate that the Court grant this Motion in order to liberate Mr. Meagher from the undue burden of placing himself at risk of imprisonment or other sanctions stemming from his entirely justified refusal to comply with the Subpoena. Moreover, by declining to quash the Subpoena at this juncture on the basis of a procedural technicality, the Court would reward Plaintiffs' campaign of litigation gamesmanship, which has already saddled Mr. Meagher and his employer with the considerable effort and expense of defending two meritless defamation lawsuits. *See* Browning Decl. ¶¶4-9.

In sum, the California Shield Law vests Mr. Meagher with protections that amount to an absolute privilege against being compelled to testify about his confidential sources or to produce his unpublished newsgathering materials. In order to vindicate Mr. Meagher's rights without forcing him to jump through needless procedural hoops, the Court should fulfil the guarantees of the California Shield Law by taking this opportunity to quash the Subpoena.

III.    **THE REPORTERS' PRIVILEGE ESTABLISHED UNDER THE FEDERAL AND**
        **CALIFORNIA CONSTITUTIONS INDEPENDENTLY REQUIRES THE COURT**
        **TO QUASH THE SUBPOENA**

Even assuming for purposes of this motion that the California state privilege does not effectively bar enforcement of the Subpoena (it does), a qualified constitutional privilege independently prohibits Plaintiffs from compelling Mr. Meagher to identify his confidential source(s) or turn over his unpublished journalistic work product.

The United States Supreme Court has recognized that journalists have "constitutional rights with respect to the gathering of news or in safeguarding their sources." *Branzburg v. Hayes*, 408 U.S. 665, 709 (1972) (Powell, J., concurring).  Drawing on this constitutional right, the California Supreme Court has held that "in a civil action a reporter, editor, or publisher has a qualified privilege to withhold disclosure of the identity of confidential sources and of unpublished information supplied by such sources." *Mitchell*, 37 Cal. 3d at 279.  The California Supreme Court also stressed that compelled disclosure from a non-party journalist "should by no means be automatic in libel cases" such as this.  *Id*. at 280.  Rather, a rigorous showing is required to overcome the qualified privilege, which will "depend upon the consideration and weighing of a number of interrelated factors."  *Id*. at 279.  For the reasons that follow, the Subpoena must be quashed because Plaintiffs are unable to shoulder their burden as to any of the five relevant factors identified by the California Supreme Court in *Mitchell*.[9]

---

[9] Although federal law does not apply here with respect to the scope of Mr. Meagher's privilege, cases applying the federal analogue to California's qualified reporter's privilege are nonetheless instructive since, as one court noted, "California law and federal common law appear to coincide." *Los Angeles Mem'l Coliseum Comm'n v. NFL*, 89 F.R.D. 489, 495 (C.D. Cal. 1981). Accordingly, the Ninth Circuit has articulated a substantially similar qualified privilege under the First Amendment. Under this formulation, a litigant may overcome the reporter's privilege "only upon a showing that the requested material is: (1) unavailable despite exhaustion of all reasonable sources; (2) noncumulative; and (3) clearly relevant to an important issue in the case." *Shoen v. Shoen*, 48 F.3d 412, 416 (9th Cir. 1995) ("*Shoen II*"). Consistent with the practice of California courts, federal courts apply this test strictly to "ensure that compelled disclosure is the exception, not the rule." *Id. See also Zerilli*, 656 F.2d at 712 ("[I]f the privilege does not prevail in all but the most exceptional cases, its value will be substantially diminished."). For the same reasons Plaintiffs cannot overcome the California qualified privilege set forth below, Plaintiffs would also be unable to overcome the federal common law privilege, assuming *arguendo* that it applied.

15

First, the law strongly disfavors compelling non-party journalists like Mr. Meagher to testify since "the scope of the privilege depends on … whether the reporter is a party." *Id.* While disclosure may be appropriate in civil cases "when the reporter is a party to the litigation," the California Supreme Court has excluded non-party journalists from this category and suggested that the qualified privilege bars compelled disclosure against non-parties even if other factors weigh against imposing the qualified privilege. *Id.* at 279 ("In California, where a shield law prevents the use of contempt to enforce disclosure orders … compelling disclosure from a nonparty reporter may be impractical even in a case in which other considerations argue in favor of disclosure."). In any event, it is clear that the non-party status of a journalist "obviously favors nondisclosure." *O'Grady*, 139 Cal. App. 4th at 1469. Accordingly, the fact that Mr. Meagher is not a party to the Arizona Action weighs heavily (if not dispositively) in favor of quashing the Subpoena.

Second, the law imposes – and courts routinely enforce – a stringent requirement that "discovery should be denied unless the plaintiff has exhausted all alternative sources of obtaining the needed information." *Mitchell*, 37 Cal. App. 3d at 282; *see also O'Grady*, 139 Cal. App. 4th at 1471 (failure by the party seeking disclosure to demonstrate that he or she has "exhausted all alternative sources of obtaining the needed information weighs decisively against disclosure") (internal quotation marks and citation omitted). Courts applying the essentially identical federal qualified privilege exhaustion requirement have also refused to enforce subpoenas for failure to demonstrate exhaustion of alternate sources of information. *See, e.g.*, *Shoen v. Shoen*, 5 F.3d 1289, 1297-98 (9th Cir. 1993) ("*Shoen I*") (privilege barred enforcement of subpoena served on author where party had not deposed the "most patently available other source"); *Condit v. National Enquirer, Inc.*, 289 F. Supp. 2d 1175, 1181 (E.D. Cal. 2003) (noting that "[t]he failure to exhaust alternative sources is a crucial and necessary condition, and therefore, is dispositive" and holding that "[b]ecause the condition of exhaustion has not been met, the protection from disclosure remains intact"); *Michael v. Estate of Kovarbasich*, No. CV 15-00275-MWF (ASx), 2015 U.S. Dist. LEXIS 168901, at *10-11 (C.D. Cal. Dec. 11, 2015) (refusing to compel production of newsgathering materials for failure to exhaust alternate sources of information). At bottom, "compulsory disclosure of sources is the last resort, permissible only when the party seeking

16

disclosure has no other practical means of obtaining the information." *Mitchell*, 37 Cal. 3d at 282 (internal quotation marks and citations omitted).

Here, the joint status report filed in the Arizona Action reveals that none of "the major percipient witnesses" in the case have been deposed yet, including the FINRA agent responsible for allegedly harassing Plaintiffs, other FINRA employees with knowledge of its investigation and several former employees of Scottsdale. Browning Decl. ¶2, Ex. B. Plaintiffs certainly cannot be permitted to depose Mr. Meagher *before* testing their theory that FINRA was a confidential source by deposing the FINRA agent and others with knowledge of the regulatory investigations into Scottsdale's involvement into market fraud committed by its clients, which was the subject of Mr. Meagher's Articles. [10] Simply put, in "the absence of a showing that alternative sources had been exhausted," Plaintiffs' Subpoena must be quashed. *Mitchell*, 37 Cal. 3d at 284.

Third, since this Court "should consider the importance of protecting confidentiality in the case at hand," the public importance of Mr. Meagher's reporting on Scottsdale's involvement in major financial fraud weighs heavily against enforcing the Subpoena. *Id.* at 282. As the California Court of Appeal has explained, the "investigation and revelation of hidden criminal or and unethical conduct is one of the most important roles of the press in a free society – a role that may depend upon the ability of the press and the courts to protect sources who may justifiably fear exposure and possible retaliation." *Id.* at 283. Here, the confidential source(s) contributed pertinent information that was included in Articles about a then-ongoing investigation into Scottsdale's involvement in a multi-million dollar fraud perpetrated by its clients. Meagher Decl. Exs. C, D, E. Moreover, the scorched earth litigation tactics Plaintiffs have advanced against Mr. Meagher and The Deal thus far give rise to a real possibility that Mr. Meagher's confidential source(s) would be subject to retaliation if his or her identity became known. Since the "information [at issue] relates to matters of great public importance" and "the risk of harm to the

---

[10] Of course, Mr. Meagher could not be compelled to testify on the grounds that another person might waive his privilege by disclosing the identity of a confidential source. "The journalist's privilege belongs to the journalist alone and cannot be waived by persons other than the journalist." *Los Angeles Mem'l Coliseum*, 89 F.R.D. at 494.

17

1  source is a substantial one, the court may refuse to require disclosure even though [Plaintiffs have]

2  no other way of obtaining essential information." *Mitchell*, 37 Cal. 3d at 283.

3      Fourth, Plaintiffs cannot show that the vast majority of the information sought by the

4  Subpoena "goes to the heart" of their claim, as they are required to do in order to overcome

5  Mr. Meagher's qualified privilege. *Id*. at 281. At this point, the Arizona Action turns entirely on

6  whether defendant FINRA was Mr. Meagher's source, since Plaintiffs' defamation and false light

7  claims against FINRA are only actionable if FINRA made the allegedly libelous statements

8  reported in the Articles. In this context, Mr. Meagher's testimony is relevant only to the extent to

9  which he can confirm or deny that FINRA was his confidential source. The qualified privilege thus

10  precludes the Court from enforcing the Subpoena to the extent that it calls for information unrelated

11  to Mr. Meagher's alleged conversations with FINRA. Since the "discovery sought by [P]laintiffs is

12  … quite broad, and is not limited to sources whose information relates to the alleged libelous

13  statements," Mr. Meagher's qualified privilege bars compelled disclosure of the vast majority of the

14  testimony and materials demanded by the Subpoena. *Id.* at 282. Moreover, depending on whether

15  the party depositions substantiate or disprove Plaintiffs allegations that FINRA was Mr. Meagher's

16  confidential source, Mr. Meagher's testimony may be "merely cumulative" and thus not subject to

17  compelled discovery. *United States v. Burke*, 700 F.2d 70, 77-78 (2d Cir. 1983); *see also Shoen II*,

18  48 F.3d at 417 (federal qualified privilege bars compelled disclosure when "the requested material

19  is … cumulative").

20      Fifth (and finally), Plaintiffs cannot compel Mr. Meagher to comply with the Subpoena

21  unless they can "make a prima facie showing that the alleged defamatory statements are false."

22  *Mitchell*, 37 Cal. 3d at 283. The California Supreme Court explained that the falsity of statements

23  at issue in a defamation claim "should be drawn into question and established as a jury issue before

24  discovery is compelled because to routinely grant motions seeking compulsory disclosure without

25  first inquiring into the substance of a libel allegation would utterly emasculate the fundamental

26  principles [of First Amendment jurisprudence]." *Id*. at 283 (internal quotation marks and citations

27  omitted). Simply put, Plaintiffs must set forth evidence demonstrating the falsity of the statements

28  in the Articles attributed to Mr. Meagher's confidential source(s) before proceeding to enforce the

18

1 | Subpoena. Plaintiffs have so far failed to do this and must remedy the defect with the benefit of

2 | discovery in the Arizona Action before enforcing the Subpoena against Mr. Meagher.[11]

3 |      In sum, since Plaintiffs are unable to satisfy any of the five elements required to overcome

4 | the qualified constitutional privilege that immunizes Mr. Meagher from compelled disclosure, the

5 | Subpoena must be quashed.

6 | **IV.    CONCLUSION**

7 |      Because California's Shield Law makes it impossible to compel Mr. Meagher to comply

8 | with the Subpoena and because Plaintiffs cannot satisfy the stringent test necessary to unseat the

9 | qualified privilege enshrined in the California and Federal constitutions, Mr. Meagher respectfully

10 | requests that this Court quash the Subpoena.

11 | Dated: February 28, 2017        DAVIS WRIGHT TREMAINE LLP

12 |       THOMAS R. BURKE
      ELIZABETH A. MCNAMARA (*pro hac vice* forthcoming)

13 |       JOHN M. BROWNING (*pro hac vice* forthcoming)

14 |       By: _____

15 |           Thomas R. Burke

16 |       Attorneys for Non-Party Journalist William Meagher

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |     [11] Mr. Meagher would also enjoy a constitutional privilege against compelled disclosure if

25 | Arizona law applied here (which it does not). The Arizona Court of Appeals has recognized the existence of a federal constitutional privilege for newsgathering. *Matera*, 170 Ariz. at 449. Under

26 | this version of the constitutional privilege, courts are empowered to grant a motion to quash when "compliance with a subpoena would either result in disclosure of confidential information or

27 | sources or would seriously interfere with the news gathering and editorial process." *Bartlett v. Superior Ct.*, 150 Ariz. 178, 182 (Ariz. Ct. App. 1986). Mr. Meagher would be privileged from

28 | complying with the Subpoena under this rubric.

19

MOTION TO QUASH
Case No.
4814-5734-5092v.3 0090219-000012