UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                              \*
SCOTTSDALE CAPITAL ADVISORS      \*
CORP. AND JOHN HURRY,          \*   16-cv-545-JL
         Plaintiffs,       \*   May 15, 2017
                          \*   10:10 a.m.
        v.                  \*
                          \*
THE DEAL, LLC AND WILLIAM       \*
MEAGHER,                     \*
         Defendants.       \*
                          \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE JOSEPH N. LAPLANTE


Appearances:

For the PlaintiffS:    Jordan Susman, Esq.
                     Harder Mirell & Abrams, LLP
                     132 South Rodeo Drive, Fl4
                     Beverly Hills, CA 90212

                     Christopher D. Hawkins, Esq.
                     Devine Millimet & Branch, PA
                     111 Amherst Street
                     Manchester, NH   03101

For the Defendants:    Elizabeth A. McNamara, Esq.
                     Davis Wright Tremaine, LLP
                     1251 Avenue of the Americas, Fl21
                     New York, NY   11238-1104

                     Steven M. Gordon, Esq.
                     Shaheen & Gordon
                     PO Box 2703
                     Concord, NH   03302-2703

Court Reporter:       Sandra L. Bailey, LCR, CRR
                     Official Court Reporter
                     U.S. District Court
                     55 Pleasant Street
                     Concord, NH 03301
                     (603) 225-1454

```
 1                    P R O C E E D I N G S
 2           THE CLERK:  The Court has before it for
 3   consideration this morning a motion hearing in civil
 4   case 16-cv-545-JL, Scottsdale Capital Advisors
 5   Corporation, et al. versus The Deal, LLC, et al.
 6           THE COURT:  All right, we're here for a motion
 7   to dismiss based on lack of personal jurisdiction.  Why
 8   don't counsel identify themselves for the record and
 9   we'll proceed.
10           MS. McNAMARA:  Good morning, your Honor.  My
11   name is Elizabeth McNamara and I represent the
12   defendants in this action.
13           THE COURT:  All right.  I want everyone to
14   identify themselves and we'll proceed.  So McNamara,
15   Gordon.  You guys?
16           MR. SUSMAN:  Jordan Susman on behalf of the
17   plaintiffs.
18           THE COURT:  How do I pronounce your last name?
19           MR. SUSMAN:  Susman.
20           THE COURT:  Thank you.
21           MR. HAWKINS:  Good morning, your Honor.  Chris
22   Hawkins, local counsel for the plaintiff.
23           THE COURT:  Right.  How are you, sir?
24           MR. HAWKINS:  I'm very well.  Yourself?
25           THE COURT:  It's been a while since I've seen
```

```
 1    you.  Who's going to be doing the argument today?

 2              MR. HAWKINS:  Attorney Susman.

 3              THE COURT:  All right.  Attorney McNamara,

 4    please proceed.

 5              MS. McNAMARA:  Thank you very much, your

 6    Honor.

 7              There's no dispute about the controlling facts

 8    for this motion to dismiss for lack of personal

 9    jurisdiction.  The plaintiffs have absolutely no

10    connection to New Hampshire.  They are residents of

11    Arizona and Nevada.  The news articles concerning the

12    government's investigation into the plaintiffs' alleged

13    multi-million-dollar stock fraud has absolutely no

14    connection to New Hampshire.  There's no sources from

15    New Hampshire.  There's no reference to New Hampshire.

16    The reporter, Bill Meagher, also has no connection to

17    New Hampshire.  Never set foot in the state.  Obviously

18    missing something.

19              THE COURT:  He's California, right?

20              MS. McNAMARA:  Yes, he's California.

21              THE COURT:  But it's published out of New

22    York?

23              MS. McNAMARA:  It's published out of New York,

24    although it was edited and reported in California.

25              THE COURT:  Right.
```

1        MS. McNAMARA:  And The Deal, The Deal LLC has

2  no offices in New Hampshire, no employees, doesn't pay

3  taxes in New Hampshire, has no connection.  Instead, the

4  plaintiffs attempt to establish personal jurisdiction

5  exclusively on the fact that The Deal has one and only

6  one subscription in the state, and that's with Dartmouth

7  College, even though the evidence shows that no one at

8  Dartmouth College that had access to its subscription

9  even downloaded or read the articles at issue.  In short

10  that would be --

11        THE COURT:  It was an online subscription,

12  right?

13        MS. McNAMARA:  It's an online subscription

14  although it wasn't sold online.

15        THE COURT:  What's that mean?

16        MS. McNAMARA:  It means that it's like a

17  traditional kind of newspaper, magazine, newspapers,

18  they either had contact from Dartmouth at a conference

19  or there was a call or something, it wasn't subscribed

20  online.

21        THE COURT:  All right.  I get it.

22        MS. McNAMARA:  So in other words --

23        THE COURT:  I'm just trying to figure out, and

24  it seems like it was never read.  It seems like not only

25  was this article never read, but the publication has

1   never been read.  Is that right?

2           MS. McNAMARA:  No, I don't think we can go so

3   far as to say the publication has never been read only

4   through the Dartmouth subscription, we don't really have

5   evidence to that effect.  What was looked for and what

6   was determined was that the three articles at issue in

7   this litigation, there's access codes associated with

8   Dartmouth and you could see whether they accessed those

9   three articles.  Those three articles were never

10  accessed, never downloaded, never read by anyone who was

11  at Dartmouth.

12          THE COURT:  Okay.

13          MS. McNAMARA:  So, and that's a critical

14  point, your Honor, because --

15          THE COURT:  I'm just -- believe me, I

16  understand your argument.  I'm just trying to understand

17  what a subscription means in this context.  That means

18  that somebody at Dartmouth College or maybe Dartmouth

19  business school, I don't know, somebody at Dartmouth in

20  the library, right, or it is, I mean, if no one can --

21  if no one can walk into the Dartmouth library and find a

22  stack of these, right, it's not how it works, am I

23  right?

24          MS. McNAMARA:  Correct.  No one can walk in

25  and find it.  What it is -- let me try to explain if I

1    may.

2              THE COURT:  Yeah.

3              MS. McNAMARA:  Usually -- this is a

4    publication, as one can tell by its name and the topics

5    that it covers, usually subscribers are financial

6    institutions.  So let's say, you know, Shearman &

7    Sterling or major law firms might subscribe, you

8    subscribe and then depending upon the users at your

9    organization, you authorize a certain specified number

10   of users at that organization, and that those users get

11   an access code so you can go online to The Deal, input

12   your access.

13             THE COURT:  So Dartmouth users get an access

14   code.  Now, the universe of users at Dartmouth, I'm just

15   trying, because I actually do understand the argument,

16   I'm just trying to understand the facts a little bit

17   better.

18             MS. McNAMARA:  Sure, sure.

19             THE COURT:  Would these be Dartmouth students,

20   business students, faculty, or would these be people who

21   are managing Dartmouth's assets?

22             MS. McNAMARA:  You know, we don't really know,

23   your Honor, but I suspect that it would be people doing

24   research reporting, not reporting, but probably research

25   students at the university.

```
 1              THE COURT:  Students.

 2              MS. McNAMARA:  Students.

 3              THE COURT:  All right.  Not people managing

 4   Dartmouth stock portfolio.

 5              MS. McNAMARA:  Not that we're aware of, your

 6   Honor.

 7              THE COURT:  Okay.  Is that your understanding

 8   as well?  Would that be consistent with what you think?

 9              MR. SUSMAN:  To the best of my knowledge, yes,

10   it would be one of the 6,000 students at Dartmouth.

11              THE COURT:  Got it.  Thank you.  Go ahead.

12              MS. McNAMARA:  So given, your Honor, that

13   there's been absolutely, there's no evidence that any of

14   these three articles were even read vis-a-vis the single

15   subscription, there is no injury in this state.  There's

16   no established injury to support a finding of personal

17   jurisdiction.

18              So let me step back a moment and focus, if I

19   may, on the three components to the First Circuit's test

20   to establish personal jurisdiction.

21              The first and perhaps most important factor is

22   the purposeful availment factor.  And the plaintiffs

23   understandably distance themselves.  They're not relying

24   on the Calder v. Jones line of cases where the plaintiff

25   was a resident of the state, there was over 600,000
```

1    copies in the state, the articles were directed at the

2    plaintiff in the state.  They instead try to focus on

3    the Keeton line of cases and the Zippo line of cases.

4    But we submit that neither line supports a finding of

5    personal jurisdiction here.

6              First as to Keeton which of course involves

7    New Hampshire, it instructs that jurisdiction may be

8    found when the plaintiffs have no connection with the

9    state, like the plaintiffs here, but where there is a

10   substantial number of copies of the publication that are

11   regularly sold and distributed.  And indeed in Keenton

12   there was ten to fifteen thousand copies of the magazine

13   that were being regularly distributed in New Hampshire.

14             The plaintiffs like to emphasize that the

15   number reflects that that ten to fifteen thousand

16   reflected about one percent of total sales in Keeton.

17   But that statistic, one percent, never is referenced by

18   the Supreme Court which was concerned it seems with

19   actual quantity, not relative quantity.  And indeed in

20   case after case when plaintiffs have attempted to

21   establish jurisdiction based on a handful of

22   subscriptions, significantly larger numbers than what

23   are at issue here, courts uniformly reject the effort.

24   Thus we have the Chaiken case, Chaiken versus Village

25   Voice which the district court in Massachusetts found

1    that four daily copies of the newspaper and 183 of the

2    Sunday was not sufficient to establish jurisdiction.

3              In the leading First Circuit case, Noonan,

4    there were 305 copies of the magazine that entered

5    Massachusetts, and there the plaintiff was a resident of

6    the state and had real damage in the state.

7              And then I think more recently we have the

8    Salgado case which involved 20 subscriptions, and yet

9    that was still not sufficient to establish personal

10   jurisdiction even though the plaintiff there as well was

11   a resident.  That arose out of Puerto Rico, was a

12   resident of Puerto Rico.

13             We submit that the lesson you can draw from

14   these cases is that you need to look at the whole

15   picture.  Even if the plaintiff is not relying on

16   Calder, it is highly relevant that the plaintiff is not

17   a resident here and the --

18             THE COURT:  I don't understand your -- I

19   understand I guess why, I think I understand why the

20   plaintiff is trying to say this is a Keeton case, not a

21   Calder case.  I don't think of jurisdiction as you

22   described it in the Keeton line and the Calder line.

23   They're the same.

24             MS. McNAMARA:  They're not different.  I agree

25   with you, your Honor.  I don't think they're different.

1   Because what the standard is, you look at the whole

2   picture, and what Calder I think emphasized because the

3   facts gave support for it, is just how much the articles

4   at issue were actually targeted at Calder.  She was a

5   resident of California.  So, here the fact that the

6   plaintiffs are not residents of New Hampshire, it's

7   highly relevant to the inquiry.  And what Keeton teaches

8   us, is that in that fact pattern you have to have a

9   substantial distribution of the work.

10          So, and you see that--

11          THE COURT:  You've got to be able to show

12  impact, effect.

13          MS. McNAMARA:  Exactly.

14          THE COURT:  Right.

15          MS. McNAMARA:  Exactly.  And that's what --

16          THE COURT:  But when you focus on one

17  subscription, there is only one, so that's what we're

18  going to focus on, but isn't it, you know, a

19  subscription to a, a physical subscription to a paper

20  magazine is one thing.  A single subscription at

21  Dartmouth could be viewed by many.  It's not the same as

22  one person reading their one brown wrapper magazine that

23  comes in the mail once a month.  You follow what I'm

24  saying?

25          MS. McNAMARA:  I do, your Honor.  And we know

1   the facts that can answer that question, and it's still

2   under the case law, it's not sufficient under Keeton and

3   other cases because we know how many people had access

4   to the subscription, 40, period.  And 40 is not

5   sufficient under any of these analysis.  You look back

6   at the Chaiken case, you had 183; Noonan you had 305;

7   Salgado you had 20.  And that in Salgado you had the

8   plaintiff was a resident of the jurisdiction.

9          So you balance these things.  You weigh them

10  together.  We know at maximum there could only be 40

11  people who could look at this publication at Dartmouth.

12  And you see the same -- so the plaintiff starts really

13  focusing on a lot of the internet subscription cases

14  that flow out of Zippo.

15         But here what each of those cases show is that

16  in each and every case that the Zippo kind of relatively

17  small numbers, and p.s., numbers that are still larger

18  than the numbers at issue here where jurisdiction has

19  been found, the plaintiff has consistently been a

20  resident of that state and the damage that happened

21  existed in that state.  So in Zippo, for example, the

22  plaintiff was a resident of Pennsylvania.  There were

23  3,000 subscriptions.

24         The plaintiff relies extensively on a case out

25  of Utah, Conlin.  And in the Conlin case there were 60

1   subscriptions, but importantly when you look at that

2   case not only did the plaintiff reside in Utah, but the

3   whole purpose of the article was to primarily cause harm

4   to the plaintiff in Utah.  So again, you look at the

5   whole picture, you bring it together and it supports

6   jurisdiction in those circumstances.

7            Here we have nothing in this picture set aside

8   the sole subscription to Dartmouth where no one read it

9   and so there are no actual injury from the articles at

10  issue.

11           And the other thing that Noonan teaches us

12  from the First Circuit is that where there is a large

13  number of magazines distributed in the state, it

14  indicates a deliberate exploitation of the market;

15  whereas where there are a thin distribution, it

16  indicates a lack of purposeful contact.

17           Here we have a vanishingly fine distribution

18  of the magazine into the state.  It is one subscription.

19  And it simply standing alone does not support personal

20  jurisdiction nor can you satisfy the relatedness prong

21  given the fact that you need to have actual injury.

22           What Keeton says is that of course New

23  Hampshire had an interest in that case because there

24  were ten to fifteen thousand readers of the magazine.

25  There was actual injury in the state.  Here we have

1  absolutely no actual injury or evidence thereof.  It's

2  more akin to another case out of this district court,

3  Christian versus Barricade Books, where one book was

4  sent into the state to a bookstore and then wasn't sold

5  and was returned to the publisher.  There was no actual

6  injury in the state because no one bought the book and

7  no one read it.

8         Those are the facts we're presented with here.

9  There's one subscription with 40 possible users that

10  could have downloaded it and no one did, and so there's

11  no actual injury.

12         THE COURT:  Like a lot of people do, though,

13  you're, it's not that I disagree with what you're saying

14  so much but relatedness to me -- I view relatedness as a

15  precursor even to purposeful availment.

16         MS. McNAMARA:  I agree with you.

17         THE COURT:  Well, you're talking about

18  purposeful availment.

19         MS. McNAMARA:  Well, because it kind of leads

20  into relatedness.

21         THE COURT:  Well, leads in sort of factually?

22         MS. McNAMARA:  Yes.

23         THE COURT:  I guess it does to an extent.  But

24  I guess I need to hear, when you talk about a case like

25  Keeton, a case like Keeton, you know, it's focusing on

1   effects, injury, in the context of purposeful availment,

2   and it makes sense in the context of relatedness.  I

3   think I need to hear you focus a little bit more on

4   relatedness in order to -- because if there's

5   relatedness, to me, if you can knock out relatedness I

6   think you're a lot further along the road of knocking

7   the case out for lack of jurisdiction than you are, you

8   know, the purposeful availment in a very sort of

9   amorphous analysis.  And it's not that I really take

10  issue with your approach to it, but I think it puts the

11  cart before the horse.

12          Why don't you talk to me about relatedness.

13          MS. McNAMARA:  Yes.  Well, your Honor, I think

14  the relatedness that you have is the causation analysis

15  is really what it comes down to.  And what you have to

16  establish, the one fact that the record shows that there

17  has been any contact by a defendant here is the one

18  subscription to Dartmouth.  So in order to have a

19  causation analysis concerning the three articles that

20  are at issue here, one would want to be able to

21  establish or have reason to believe that readers who had

22  access to that subscription actually read the article.

23  So that the injury that the Keeton court recognized is

24  that there's not injury just to a plaintiff in the libel

25  suit, there is injury to readers if what they're reading

1   is arguably false information.  And here we don't have

2   any evidence since it's undisputed that there were 40

3   users who had access to the subscription, no one read

4   it, so where's the injury?  There's simply no evidence

5   in this record that there were readers that gave rise

6   out of the subscription, which is what they're looking

7   at as the causation to the beginning that we had a

8   subscription that did not lead to any actual injury.

9   And what Keeton underscores is actual injury.  And here

10  there simply is no actual injury.  And so as your Honor

11  I think correctly observes, if you can't establish that

12  basic foundational element, then there's no basis to

13  move into the other components really.  And here they

14  simply haven't established that.

15          And then briefly, I guess, in conclusion I

16  just want to touch on the reasonableness component of

17  this as well, which I think as your Honor has recognized

18  in Reynolds and elsewhere, you don't even really need to

19  reach that component if you're unable to establish the

20  relatedness or the purposeful availment, and we would

21  submit you don't really need to reach it here, but there

22  are factors I think that significantly weigh in the

23  defendant's favor in connection with that.  And the

24  first is that it really goes to the individual reporter,

25  Mr. Meagher.  He has absolutely no connection with this.

1    He has absolutely no relationship and no reason to

2    believe that there was even a subscription in New

3    Hampshire that the articles were to be theoretically

4    accessed here, because as I indicated earlier, this is

5    an institutional publication that's primarily

6    disseminated to financial institutions with the huge

7    bulk of the readership in New York City financial

8    communities.  And so there's just nothing in this record

9    that it would be reasonable to pull Mr. Meagher all the

10   way from California to here.

11           But we would also submit that it's

12   unreasonable as to all defendants.  And this really goes

13   to what we've raised in our papers, but we want to

14   underscore with some recent developments, your Honor,

15   and that really is that this action is part of a pattern

16   and practice of harassment by these particular

17   plaintiffs in order to do one and only one thing that

18   really is the goal here.  It's not necessarily to

19   theoretically redress defamatory articles but rather one

20   that sets out Mr. Meagher's confidential source.  So

21   after not only did they file an action in New York with

22   that primary goal as evidence on the complaint, but

23   since this action has been commenced in New Hampshire

24   they've also pursued third party subpoenas against --

25   subpoena against Mr. Meagher in California, and just a

1   few weeks ago in northern district a federal judge in

2   San Francisco quashed that subpoena, said you can't seek

3   information going after his confidential source, and

4   then even underlying the ultimate kind of alleged harm

5   and falsity of the articles here, just about five,

6   six weeks ago the FINRA court issued its ruling

7   concerning the plaintiffs here.  Plaintiff Mr. Hurry is

8   now barred from the securities industry for life.  The

9   Scottsdale Capital, because of egregious violations for

10  the very red flags that are allegedly cited in these

11  articles and false lies, Scottsdale Capital has been

12  fined $1.5 million.

13          And so there are serious -- I think this case,

14  the fact that it's continuing to be brought, the fact

15  that it was brought in New Hampshire after all this

16  delay is really just part of a pattern and practice.

17  And this Court has emphasized that in the First Circuit

18  in Ticketmaster and elsewhere that where there's some,

19  you know, notion that the case is really, has an

20  ulterior purpose, that that helps to tip the balance and

21  does not support personal jurisdiction.

22          THE COURT:  Yeah.  I don't want to spend a lot

23  of time -- spend a lot of time, I don't plan on spending

24  a lot of analytical energy on these Gestalt factors, but

25  if there is one, that's probably the one.

```
 1              All right, let me hear from Mr. Susman.
 2              MS. McNAMARA:  Thank you.
 3              THE COURT:  Why don't you start there,
 4     actually.  What's the difference between this suit and
 5     the Arizona suit?
 6              MR. SUSMAN:  I can't hear you.  What?
 7              THE COURT:  What's the difference between this
 8     suit and the Arizona suit?
 9              MR. SUSMAN:  The Arizona suit is a suit
10     against FINRA for FINRA's action -- the suit against
11     FINRA began, it had numerous causes of action against
12     FINRA including 1983 claims that were thrown out, and
13     all that remains now are the defamation and false lie
14     claims against FINRA and for FINRA leaking untruthful
15     information.  So this --
16              THE COURT:  But it's the same suit, different
17     defendants basically, right?
18              MR. SUSMAN:  Yes, in many ways.
19              THE COURT:  Okay.
20              MR. SUSMAN:  Sure.  Let me just address that
21     last point made by counsel and just say that it's
22     actually false that the FINRA ruling concerns anything
23     in the articles by Bill Meagher.  The FINRA ruling has
24     to do with other transactions by Scottsdale Capital and
25     has zero to do with any of the allegations in the Bill
```

1   Meagher articles.  So that is just patently false.

2          I'll start with relatedness since the Court

3   seems to want to focus on that.  The issue of

4   relatedness, and this comes from the Swiss American Bank

5   case, it's got to do with the nexus between the forum

6   contacts and the cause of action.  And the fact of the

7   matter is the, and this I'm quoting Kim v. Vaglis (ph),

8   District Court of Massachusetts.  "In order to satisfy

9   relatedness requirement, the evidence produced that

10  supports specific jurisdiction must show that the cause

11  of action either arises directly out or is related to

12  the defendant's forum base contacts."  That's simply

13  because we don't want to be suing The Deal for a slip

14  and fall case in New Hampshire that's not related to its

15  sale of the subscription to Dartmouth College.  This is

16  a related matter because it arises directly from The

17  Deal's decision to gain financially by entering into a

18  contract with a New Hampshire resident.  It's not a slip

19  and fall case against them or anything else.  It's

20  completely related to their activities in the state, and

21  that is the relatedness prong.

22          Defendants say --

23          THE COURT:  But their activity --

24          MR. SUSMAN:  Yes.

25          THE COURT:  Say that again.

```
1              MR. SUSMAN:  It arises --

2              THE COURT:  It was The Deal's decision to I

3    guess, I don't know, profit by entering a subscription

4    deal with a subscriber in New Hampshire, right?

5              MR. SUSMAN:  Correct.  And then based on that

6    they then delivered to --

7              THE COURT:  You haven't alleged any conduct by

8    the defendants based on their business dealings in New

9    Hampshire.  You've alleged defamation.

10             MR. SUSMAN:  Correct, that they put into

11   circulation in New Hampshire and that remains in

12   circulation in New Hampshire as a result of that

13   contact.  They entered into a contract with the largest

14   private college in New Hampshire that has over 7,000

15   students and faculty that could at any given moment and

16   maybe already has, someone has accessed one of the three

17   defamatory articles.  So it arises -- it's related to

18   their contact with New Hampshire.

19             When defendants say that plaintiffs' claim is

20   not related because there is no injury --

21             THE COURT:  What conduct are you alleging in

22   your complaint that either arises from, not has impact

23   in, arises from or is related to their conduct in New

24   Hampshire or with New Hampshire?  I mean, it's not -- to

25   say it arises from implicates it's conduct in New
```

1   Hampshire.  It's conduct that's actionable that you sued

2   them for.  You can sue them for doing business in New

3   Hampshire or breaching a business arrangement in New

4   Hampshire or undertaking any sort of conduct in New

5   Hampshire.  It's conduct that I guess potentially could

6   have effects felt in New Hampshire or impact in New

7   Hampshire, but that's not the, that's not what the case

8   arises from.

9           MR. SUSMAN:  The case arises from -- the case

10  arises from -- and this again, it gets back to how

11  relatedness is connected to the purposeful availment.

12          THE COURT:  Sure.

13          MR. SUSMAN:  But the fact of the matter is The

14  Deal decided that it wanted to benefit financially by

15  entering into a contract with a resident in New

16  Hampshire.  They believed that that's in their financial

17  interest.  If they did not expect to ever be sued in New

18  Hampshire, it was completely within their control.

19          THE COURT:  That's purposeful availment.

20          MR. SUSMAN:  That is purposeful --

21          THE COURT:  That is not relatedness.

22          MR. SUSMAN:  You are correct.  So once they

23  entered into that contract, though, with Dartmouth

24  College and circulated to New Hampshire, had they not

25  entered into that contract, willfully entered into that

1   contract, the articles at issue never would have been

2   circulated in New Hampshire.  They did and they have.

3   And that's why it's related to the conduct in New

4   Hampshire.

5           And to focus on the harm caused in New

6   Hampshire, that conflates relatedness with the effects

7   test which is something the court in Swiss American Bank

8   warned against.

9           THE COURT:  Sure.  But I thought you were the

10  one doing that.

11          MR. SUSMAN:  I'm not the one doing that.

12          THE COURT:  From my perspective you're the one

13  conflating.  I mean, because nothing about the -- I'm

14  just trying to think of an analogy, probably should have

15  thought of this before we had oral argument, but I'm

16  trying to think of an analogy for what you're

17  suggesting, but I'm not going to try to slow you down on

18  this.

19          Tell me -- how is it they're conflating and

20  you're not?  Because my view is, if you want to talk

21  about, you know, an expectation about being hailed into

22  court because they made a contractual agreement in New

23  Hampshire that has nothing to do with this defamatory

24  conduct, that to me sounds like you're conflating

25  relatedness and purposeful availment.  Why did the

1    defendants and not you --

2         MR. SUSMAN:  No, no, no, I'm not -- no, no, I

3    think that relatedness and purposeful availment are

4    definitely conflated.  I'm saying that they focus on the

5    injury caused, the damage in the state, the effects.

6    They're trying to focus on the effects test, and that's

7    what should not be conflated with relatedness.

8         THE COURT:  Okay, I'm with you.

9         MR. SUSMAN:  That's my point.  I should also

10   say that defendants' reliance on Christian v. Barricade

11   Books is completely misplaced.  It wasn't that the books

12   in New Hampshire remained unsold.  It was the books

13   remained unsold and were shipped out of state.  They

14   were removed from circulation in the state of New

15   Hampshire so that no one could purchase them.

16        The difference here is the circulation

17   remains.  It's not as though The Deal has taken down the

18   defamatory articles.  They're still here in the state

19   because of the contract.

20        And finally there's the issue in terms of

21   relatedness that defendants have not really even

22   established, and this would be a point of jurisdictional

23   discovery regarding who among the 7,000 students and

24   faculty at Dartmouth has access to the subscription, who

25   can access it, who currently has access to it and who

1  could.

2          They also haven't even looked at the ISPs of

3  those who did access it because they say, and I'm

4  getting a bit into the weeds here, but they say that the

5  December 6th article was viewed a total of 101 times by

6  everyone.  That's everyone in the world where they have

7  the article has been viewed.  Only 24 of those times

8  were with authorization codes, 77 they say do not have

9  authorization codes.  Those 77, who were people that

10 were accessing these articles without authorization

11 codes.  We would have to do jurisdictional discovery to

12 the ISP addresses of where those people are located.

13 The point being when they focus on the Dartmouth

14 authorization did not access the articles, they're not

15 giving you have the full story.

16          THE COURT:  So tell me the full story in the

17 best case scenario for you.

18          MR. SUSMAN:  The full story is that it seems

19 as though the majority of people that accessed these

20 articles did not even have authorization.  So, all I've

21 got to do is some jurisdictional discovery as to the ISP

22 addresses of the people that did access the articles.

23          THE COURT:  What's your best case scenario?

24          MR. SUSMAN:  That there will be --

25          THE COURT:  All of them would be --

1          MR. SUSMAN:  Seventy-seven in New Hampshire

2     would be the best case scenario, but one in New

3     Hampshire would be sufficient.  And again, none of this

4     would have happened but for -- but for defendants'

5     decision to enter into a contract in New Hampshire with

6     Dartmouth College.  Clearly they are receiving a benefit

7     from it and they should not be surprised to be brought

8     into court in New Hampshire.

9          If I could focus a little bit on the

10    purposeful availment prong.  The defendants concede that

11    The Deal falls on the interactive side of the Zippo

12    scale.  That's not even in dispute here.  And when you

13    have a website that falls within the interactive scale,

14    that in and of itself shows a, quote, manifest intent of

15    targeting the state.  And that comes from Carefirst of

16    Maryland v. Carefirst Pregnancy Center.  And that can be

17    determined, targeting the state can be determined by the

18    character of the website at issue.

19          Again, even if one were to focus on numbers,

20    one sale in the state is sufficient, particularly if

21    it's to a school of 7,000 students and faculty, the

22    largest private college in the state.  That's why Zippo

23    says the test for minimum contact has always focused on

24    the nature and the quality of the contacts with the

25    forum and not the quantity.  And that's why case after

1   case it's said that even a single, and this comes from

2   Burger King, even a single substantial act directed

3   toward the forum can support specific jurisdiction.  And

4   that's why in other cases such as American Network, Inc.

5   v. Access America Connect there were six New York

6   subscribers, and PS Productions v. Maxell Corp. there

7   was two sales in Arkansas.

8          Over and over again the question is they keep

9   focusing on this number, but the number is not just a

10  single one.  The number should be looked at in terms of

11  the fact that this is an interactive website.  That,

12  again, this is based upon the Zippo scale, the nature

13  and the contact of it was a subscription with the state

14  of New Hampshire.  This is not your typical, as you

15  said, as the Court said, a magazine that arrived in a

16  brown paper bag.

17         And finally if I may look at the

18  reasonableness of the exercise of personal jurisdiction.

19  The burden on the defendant seems to be one of the main

20  things that the defendants focus on.  As we stated in

21  our papers, according to defendants we should have

22  either sued in California or New York.  If we were to

23  sue in New York, Bill Meagher would have to come to New

24  York.  If we sued in California, The Deal would have to

25  come to California.  Litigating the matter in New

1    Hampshire does not impose a burden on the defendant.

2    This is a --

3            THE COURT:  You don't have a case under the

4    statute of limitations.

5            MR. SUSMAN:  I do -- oh, pardon me?

6            THE COURT:  I thought the statute of

7    limitations --

8            MR. SUSMAN:  Well, that would be the problem,

9    yes.  And that's why --

10           THE COURT:  Which is why you're here.

11           MR. SUSMAN:  For plaintiffs to have effective

12   relief, one of the Gestalt factors is the statute of

13   limitations, which is one of the reasons why we're here.

14           But if you look at Fagan v. Kelly, they said

15   that a New Jersey resident, it did not impose the burden

16   on them, a significant burden on the defendant to

17   litigate the matter in New Hampshire.

18           THE COURT:  Well, in terms of burdens, I mean,

19   I assumed that The Deal is indemnifying this reporter

20   and providing a defense, right?

21           MS. McNAMARA:  Correct, your Honor.

22           THE COURT:  So, you know, you don't need to

23   focus on burden too much.

24           MR. SUSMAN:  Okay.  Then I will focus on this

25   conspiracy theory that the plaintiffs are out to harass

1   Mr. Meagher.

2          THE COURT:  Well, what about this New York

3   situation?  Tell me about this New York situation where

4   on the eve of the due date to a motion to dismiss you

5   folks nonsuited -- you dismissed your case.

6          MR. SUSMAN:  That's correct, your Honor.

7          THE COURT:  Were you lead counsel in that

8   case?

9          MR. SUSMAN:  I came in -- I was not when it

10  was originally filed.  I came in --

11         THE COURT:  You were when it was dismissed.

12         MR. SUSMAN:  I was, dismissed and refiled

13  here, yes, your Honor.

14         THE COURT:  That really strikes me as

15  gamesmanship.  I mean, why would you ever conduct

16  yourself that way?

17         MR. SUSMAN:  In what way?  I wanted to --

18         THE COURT:  You read their brief, right?

19         MR. SUSMAN:  I did indeed.

20         THE COURT:  Don't say you don't know what I'm

21  talking about.  You waited until the day before their

22  motion to dismiss was due.  So they put all the time and

23  resources into drafting it, you knew it was coming, and

24  then you dumped your case.  That strikes me that, you're

25  about to tell me why it's not, but that strikes me on

1    the printed page as you playing games and trying to

2    harass and being burdensome.  So explain to me why it

3    wasn't.

4              MR. SUSMAN:  Because, your Honor, we had given

5    them multiple months and months and months of extensions

6    to file their motion, and in fact we were on the verge

7    of giving them another one, and at that point we decided

8    it was better to just dismiss the case and refile it

9    here.

10             THE COURT:  Because?

11             MR. SUSMAN:  Based on the statute of

12   limitations.

13             THE COURT:  Okay.

14             MR. SUSMAN:  If the Court has any questions.

15             THE COURT:  Well, I'm actually somewhat

16   persuaded by your argument as to the decision by

17   Dartmouth to -- the decision by Dartmouth to do business

18   in New Hampshire.  I mean not by Dartmouth, I'm sorry,

19   by the defendants to do business in New Hampshire with

20   Dartmouth.  But to me if it gets you anywhere, it gets

21   you somewhere on purposeful availment, not so much on

22   relatedness.  I'm still struggling with the concept.  I

23   guess I need some kind of authority or precedent for the

24   proposition that those -- that that decision alone to

25   contract with a New Hampshire subscriber goes to

1   relatedness, because it seems to have nothing whatsoever

2   to do, to the Court anyway, to your claims, which are

3   for defamation.  They're not a breach of contract.  They

4   have nothing to do with the formation of that Dartmouth

5   contract, the execution of that Dartmouth contract,

6   anything about the Dartmouth contract except I guess in

7   some very attenuated way providing contact to Dartmouth

8   through the subscription, right?

9            MR. SUSMAN:  Right, that's the nexus.  That is

10  the direct -- that there is a direct line between The

11  Deal entering into a contract with Dartmouth and its

12  circulating defamatory articles here.  Remember the --

13  I'm going to assume that they have no subscribers in

14  Montana, therefore there is no relatedness to suing --

15  there would be no relatedness to suing defendants in

16  Montana because the articles are not in circulation

17  there.  They are in circulation here and they are

18  available to over 7,000 New Hampshire residents because

19  of --

20            THE COURT:  But what if the Tuck School of

21  Business has, you know, hundreds maybe thousands of

22  alums in Montana who access through Dartmouth

23  subscription The Deal, right, they are authorized users

24  because they've got the magic number.  Wouldn't you say

25  under that circumstance that you've got relatedness in

1   Montana?

2          MR. SUSMAN:  I would have relatedness but not

3   purposeful availment.

4          THE COURT:  I'm sorry.  Thanks -- no.

5          MR. SUSMAN:  Yes.

6          THE COURT:  Not purposeful availment because

7   they haven't contracted with, all right.  You would have

8   relatedness.

9          MR. SUSMAN:  I would have relatedness.  I

10  think that's a great example, your Honor, because that

11  shows relatedness but not purposeful availment.  And

12  that's why here we have both purposeful availment and

13  relatedness.

14         THE COURT:  I'm not sure you have either, but

15  I --

16         MR. SUSMAN:  I appreciate your candor.

17         THE COURT:  Well, you're going to have to give

18  me an answer at some point anyway, right?

19         MR. SUSMAN:  Thank you, your Honor.

20         THE COURT:  Thank you.

21         MS. McNAMARA:  Your Honor, if I may just very

22  briefly.

23         THE COURT:  You may, of course.

24         MS. McNAMARA:  Thank you, your Honor.  I want

25  to I think focus on what was emphasized I think with the

 1   Court's questions and my adversary's commentary.

 2            You know, as I said earlier, you have to look

 3   at the whole.  And the way the purposeful availment as

 4   well as the relatedness, they all intersect and interact

 5   with one another and no facts can be taken in isolation

 6   and becomes determinative.

 7            It is not simply that there is circulation or

 8   theoretical, because what we're dealing with here, what

 9   the facts, the evidence before the Court, is that there

10   is a theoretical circulation.  So the mere act of making

11   a contract with Dartmouth on these -- in this state did

12   not cause any actual injury since we know for a fact

13   from the evidence that no user at Dartmouth accessed the

14   article.

15            THE COURT:  We know that for a fact based on

16   the evidence we have so far, but what about the idea of

17   unknown ISPs?  What about the idea of --

18            MS. McNAMARA:  It's not possible, and that's

19   where I think --

20            THE COURT:  Oh.

21            MS. McNAMARA:  -- my adversary is misstating

22   the record.

23            THE COURT:  Okay.

24            MS. McNAMARA:  And I can show you and the

25   Court can focus if it wishes on the Lundberg declaration

1    that was put into evidence in support of the motion.

2              THE COURT:  Right.

3              MS. McNAMARA:  And it's clear that it is not

4    an interactive website in the way Mr. Susman is

5    confusing the Zippo line of cases where there's a public

6    website and it interacts with the public and any person

7    can go to the website and can draw down information.

8              That's not the case here.  These are articles

9    that are behind pay walls that no one has access to

10   whatsoever.  The 6,000 students at Dartmouth do not have

11   access to this subscription, could never today, tomorrow

12   or the next day have access to these articles.  They

13   have to be an authorized user that Dartmouth has

14   identified through its subscription to have access to

15   the articles.

16             THE COURT:  Wait a minute.  That's because an

17   authorized user gets a password.

18             MS. McNAMARA:  Correct.

19             THE COURT:  Right?  So, if somebody who is

20   authorized at Dartmouth gave Steve Gordon the password,

21   he's not an authorized user but he can view it, and if

22   his ISP shows up on the cyber trail and, you know, he's

23   a possible -- he's a possible source of damages for this

24   case.  He's a possible example of effects in this case.

25             MS. McNAMARA:  Well, I don't think you can

1    establish jurisdiction at this juncture on a theoretical

2    future when the facts before the Court are unequivocal.

3           THE COURT:  No, they're not unequivocal.

4    You're asking me to rule on an affidavit by your client.

5    And I'm asking you, and I just gave you a hypothetical

6    that I think you've just acknowledged not, and not in an

7    evasive way -- well, yeah, in an evasive way, but

8    appropriately evasive way, that you can't eliminate.

9    Plenty of people -- that's why I asked adverse counsel

10   that question.  Was it 71, 111?

11          MR. SUSMAN:  110 overall and then 77 that were

12   not registered users.

13          MS. McNAMARA:  This is 110 throughout the

14   world, your Honor, this is not --

15          THE COURT:  That's the problem.  We don't know

16   where the 110 are.

17          MS. McNAMARA:  We do know.  We do know.  In

18   the affidavit there's 101 people looked at the December

19   6 article.

20          THE COURT:  Right.

21          MS. McNAMARA:  Authorization codes were

22   attributed to 24 of those to major law firms and

23   financial consultants, none of which were in New

24   Hampshire.  The remaining 77 cannot be attributed to the

25   Dartmouth account because they had no authentication

1    code in order to get access somehow.

2              THE COURT:  I see.

3              MS. McNAMARA:  And that Dartmouth had an

4    authentication code, the only way you would get access

5    is through the authentication code that ends with zero.

6    That is -- those are the facts.  Those are what's before

7    there.  But the important point here is not simply that

8    you have a subscription and a determination to contract

9    with an entity in the state of New Hampshire.  What

10   these cases teach us is you need to look at the whole,

11   and that invariably there's not a precedent, there's not

12   a case they have cited, and we're not aware of a case

13   where a single subscription has been sufficient to give

14   rise to personal jurisdiction.

15             THE COURT:  Understood.  But I think single

16   subscription in this context is probably -- don't I have

17   to view this as at least --

18             MS. McNAMARA:  Forty.

19             THE COURT:  -- forty subscriptions.

20             MS. McNAMARA:  Okay, and there's no precedent

21   for that that they've cited, where standing alone that

22   was the only evidence.  They have not cited a single

23   case.  All the Zippo line of cases that they've talked

24   about where there was interactive websites and that

25   there are subscriptions, you go down the roster of every

1    case they've cited, and in each and every one not only

2    do they invariably have more subscribers than, if you

3    want to use the 40 number, than the 40, but in each and

4    every case the plaintiff resided in the jurisdiction at

5    issue.  The plaintiff was injured.

6           So that if you take Zippo itself, the reason

7    why there is a relatedness and the connection there is

8    that the plaintiff lived in Pennsylvania, there were

9    3,000 subscriptions to Pennsylvania.  So at least 3,000

10   readers did or could have read, and the plaintiff was

11   personally injured by virtue of that readership in the

12   state in which he resided.  That is the -- that's how

13   you marry this together.

14          Here we have nothing.  We have one

15   subscription and 40 theoretical users, none of which

16   actually read any of the three articles, and no

17   plaintiff, nothing else.  There's nothing else to speak

18   to personal jurisdiction other than a single what I

19   would say fortuitous commercial relationship of one

20   subscriber in the state period.  That's it.  It's not a,

21   you know, and he keeps going back to interactive

22   websites and theoretical people, the 6,000 users.  No,

23   you have to be an authorized user.

24          THE COURT:  Yeah.

25          MS. McNAMARA:  So, it just doesn't add up,

1   your Honor.  And I would just finally say, because I

2   don't want to, for anybody to say that I've

3   misrepresented anything to the Court.

4           THE COURT:  Yeah.

5           MS. McNAMARA:  The judgment, the ruling by

6   FINRA in fact did involve an egregious finding of

7   ignoring red flags, whether it was the specific same red

8   flags identified in this article I can't stay, but there

9   was -- Mr. Hurry had been banned from the securities

10  industry and a $1.5 million fine against him based upon

11  in part ignoring egregious red flags of potential

12  security fraud.  So, I would think in any --

13          THE COURT:  With respect to the transactions

14  that were the subject of these alleged by defamatory

15  articles?

16          MS. McNAMARA:  I haven't --

17          THE COURT:  That's what he's saying.

18          MS. McNAMARA:  That's what he's saying, but I

19  think that the decision, which I actually have here,

20  your Honor, it's a very long decision and I don't know

21  whether it got into the Biozoom transaction --

22          THE COURT:  Respectfully, respectfully, and I

23  mean this respectfully, I'm not trying to be a wise guy,

24  I expect you to have read that and tell me, not vice

25  versa.

1          MS. McNAMARA:  Exactly, your Honor.  Oh, I'm

2    not suggesting that you --

3          THE COURT:  I know, so you're telling me you

4    don't really know if it's the same red flags.  He's

5    standing up saying it's different facts.  It's different

6    I guess malfeasance that led to that fine and his

7    termination from the exchange.  And if it's different,

8    it's different.  I don't know.  And you don't know

9    either apparently.

10         MS. McNAMARA:  Well, it's clearly sufficiently

11   related since the whole connection between all the

12   flurry of litigation is the desire, the claim -- the

13   plaintiffs' claims against FINRA in Arizona where they

14   are seeking to find my client's confidential source.

15         THE COURT:  Yeah.

16         MS. McNAMARA:  That clearly there's --

17         THE COURT:  A little smoke there.

18         MS. McNAMARA:  There is nexus.  And I'm happy

19   to address any other questions that the Court has.

20         THE COURT:  I think I'm good.

21         MS. McNAMARA:  Great.  Thank you very much,

22   your Honor.

23         THE COURT:  Give me a moment.

24         MR. SUSMAN:  Your Honor, may I have one

25   moment?

```
 1            THE COURT:  Oh, you can all -- we're here.
 2  I'm going to listen to you.
 3            MR. SUSMAN:  Thank you.  One thing.  I just
 4  want to quote from the Keeton case where it says that it
 5  is undoubtedly true that the bulk of the harm done to
 6  petitioner occurred outside of New Hampshire, but that
 7  would be true in almost every libel action brought
 8  somewhere other than the plaintiff's domicile.
 9            THE COURT:  Sure.
10            MR. SUSMAN:  I just want that to be clear.
11  Finally I just want to say that --
12            THE COURT:  But there were thousands of
13  subscriptions in Keeton.
14            MR. SUSMAN:  Correct.
15            MS. McNAMARA:  Ten to fifteen thousand.
16            MR. SUSMAN:  And in this case The Deal has
17  less than 700 subscribers overall worldwide.
18            THE COURT:  So you're saying by percentages --
19            MR. SUSMAN:  Exactly.  If you're comparing
20  apples and oranges.
21            And if the Court is inclined to grant the
22  motion, I would ask that the Court at least consider
23  allowing plaintiffs to take some jurisdictional
24  discovery regarding The Deal's advertising and
25  solicitation regarding the number of, you know, where
```

1    the articles were accessed, ISPs, how the articles were

2    delivered, what circulation actually --

3          THE COURT:  Hold on, let me -- I'll be honest

4    with you, you know, that's why Mr. Hawkins is here.

5    He's supposed to know the rules in New Hampshire.  I'm

6    not suggesting you don't.  But look, you want

7    jurisdictional discovery.  Our rules are you've got to

8    file a motion to ask for jurisdictional discovery.  It's

9    not tacked on at the end of your motion, objection to

10   motion to dismiss.  I see it all the time in motions to

11   amend.  It's becoming more of a problem around here

12   where people move to dismiss and the plaintiff comes

13   back and objects and there's a reply and a surreply at

14   the very end, by the way, judge, if you decline to

15   dismiss this case I'd like to amend.  That's just not

16   the way it works.

17          So, I'm disinclined to allow it, but I guess

18   I'm inclined enough to ask you to start over with that

19   list of what you hope to do.

20          MR. SUSMAN:  Thank you very much for indulging

21   me.  I would take jurisdictional discovery regarding The

22   Deal's advertising and solicitation in the state; how it

23   is that Dartmouth College even got the subscription in

24   the first place; how the articles are delivered.  I'd

25   like to actually see the contract with Dartmouth

1  College.  And --

2          THE COURT:  You said how the articles.

3          MR. SUSMAN:  The articles themselves, how

4  they're delivered.  Do they come in an email blast.  Can

5  people sign up for the email blast.  Is there simply

6  that you have to look it up.  Is it on the -- I don't

7  know the answers to these questions.

8          THE COURT:  Understood.

9          MR. SUSMAN:  And I think they're all relevant

10  both to purposeful availment and relatedness.  And

11  finally, and like I said, the ISP addresses of the

12  people who did access the articles I think would be very

13  important.

14          THE COURT:  Well, what we do know, what we do

15  know and which I don't think you contest is what Ms.

16  McNamara told me is that those ISP addresses, the 71,

17  right, those are -- those are not -- they are not ISP

18  addresses that access these, this publication because

19  nobody accessed the articles as far as we know, right?

20          MS. McNAMARA:  Correct.

21          THE COURT:  Wait a minute.  See, I'm getting

22  -- those floating ISP addresses, they didn't come

23  through any access code, though, right?  Isn't that the

24  case?

25          MS. McNAMARA:  Your Honor, the 71 did not have

1   an access code and so they were not Dartmouth because

2   Dartmouth had an access code in order to get it.

3              THE COURT:  But everybody had an access code,

4   right?

5              MS. McNAMARA:  Correct.  It's just that they

6   weren't access codes that were identified, that they

7   could readily identify with a particular subscriber,

8   whereas they could readily identify one of those 71s if

9   any of them had been the Dartmouth access code if you

10  follow me.

11             THE COURT:  Yeah, but if, and the mystery is

12  71, right?

13             MS. McNAMARA:  The mystery is 71.

14             THE COURT:  The mystery -- not a mystery, I'm

15  sorry --

16             MS. McNAMARA:  It's not a mystery.  We know

17  it's not Dartmouth.

18             THE COURT:  No, that's the problem.  You don't

19  know it's not Dartmouth.  You know it's not -- if they

20  didn't come through any access code, you know it's no

21  particular subscriber, or don't you?  I don't know.  Do

22  all subscribers have the access code that their users

23  use or are there --

24             MS. McNAMARA:  All subscribers have to have

25  some kind of access, but they don't all necessarily have

1   a -- have an authentication code.  And in order to

2   access Dartmouth, they have an authentication code.  So

3   I guess the way to describe it is this way.  I can

4   personally have an access code, I could personally

5   subscribe, but I wouldn't have an authentication code

6   because I'm an individual and I'm not an entity.

7           THE COURT:  Access towards when an entry

8   supplies its, you know, its members --

9           MS. McNAMARA:  Correct.  So that if you're an

10  institution or you're a financial institution or in this

11  case an educational institution, you get an

12  authentication code and you authorize a certain number

13  of users to use that authentication code.  Here there

14  were 40 authorized users.  And so in order to go through

15  Dartmouth the authentication code would have to show up,

16  and it did not as to any of these three articles.

17      THE COURT:  Yeah.

18          MR. SUSMAN:  I'm a bit baffled now because

19  according to defendants' pleadings the majority, the

20  vast majority of all their subscribers are institutions,

21  yet the vast majority of people who accessed these

22  articles I'm now hearing were not institutions.

23          THE COURT:  No, well, I don't know.

24          MR. SUSMAN:  I don't know.

25          THE COURT:  Let's try it this way.  Here's the

 1   thing.  When I asked you what you want to do discovery

 2   on, you gave me a laundry list and I wrote them down

 3   because I want to give them some thought, but they're

 4   all focused, see, they're all focused on the contract,

 5   right?  The Deal/Dartmouth contract.  Which seems to me

 6   if I understand your papers correctly, they're the

 7   thrust of your relatedness argument.  It's that

 8   contract.  It's that relationship that The Deal had with

 9   Dartmouth College and I guess its authorized users

10   through the subscriptions, right?  That's sort of my

11   first observation about it.

12          My second observation or my question to you is

13   let's suppose I said, sure, jurisdictional discovery on

14   whatever issues including the mystery 71, right?  The

15   ISPs that are not affiliated with some institution or

16   some, I'm not sure I understand it, but not affiliated

17   with some subscriber, what would you, I mean, so you get

18   the ISP addresses, right?  I guess you researched them.

19   If they can attach them to a specific person or user,

20   they provide that under a protective order I guess, how

21   does this play out for you in a way that strengthens

22   your jurisdictional argument?

23          MR. SUSMAN:  It strengthens the relatedness

24   article, prong of the argument.

25          THE COURT:  But what facts?  Like what facts

1    would do that?

2              MR. SUSMAN:  Because one of the things or the

3    primary fact that I hear defendants relying on is that

4    no one in the jurisdiction accessed the article, so

5    therefore it's not related.  There is no injury, no

6    relation.  And I'm saying if there was in fact an access

7    in New Hampshire, that would eviscerate that argument.

8              MS. McNAMARA:  But your Honor, we have no

9    subscribers in New Hampshire other than Dartmouth, so I

10   don't know how this theoretical exploration of the 71

11   ISPs --

12             THE COURT:  But are these ISP subscribers?  If

13   they were subscribers you would know who they are,

14   they're not mysteries.  So they could be anybody.  And,

15   we all know this is not the case, but if every single

16   one of them happened to be in the Granite State,

17   wouldn't that impact my -- wouldn't that impact the

18   relatedness -- if they are not subscribers, I guess it

19   doesn't go to purposeful availment, I'm with you there,

20   but couldn't they go to relatedness if they're all in

21   New Hampshire?

22             MS. McNAMARA:  I think we're talking about, I

23   mean, I don't see how that can be because I don't see,

24   if they have a list of all their subscribers and there's

25   no subscriber who identifies themselves as being a

1    resident of New Hampshire, then I don't see how any of

2    the 71 could be New Hampshire.  I just -- I'm at a loss

3    to understand how you could theoretically get there.

4                THE COURT:  Well, you don't know who the --

5                MS. McNAMARA:  Well, we do know who the

6    subscribers are.  We know who the subscribers are.

7                THE COURT:  But there are 71 people who have

8    seen these articles that aren't subscribers, right?

9                MS. McNAMARA:  No, no, they are subscribers.

10   They're subscribers.  All the 71 are subscribers.  The

11   only distinction between, that I understand, the only

12   distinction between something like Dartmouth and a small

13   subscriber is --

14               THE COURT:  If they're -- wait a minute.

15   Stop.  If they're subscribers, how is this a mystery?

16   You know who they are.

17               MS. McNAMARA:  It's not -- then that's why we

18   say none of them are New Hampshire.  They are not

19   attributed to Dartmouth.  We don't have any subscribers

20   in New Hampshire.

21               THE COURT:  It's not just that they're not

22   attributed to Dartmouth, he's saying that they're

23   unidentified.

24               MS. McNAMARA:  What it says, and I'm reading

25   --

```
 1            THE COURT:  Wait a minute.  Stop.  We're just
 2    talking past each other.  If there's not a mystery about
 3    who these ISP addresses are affiliated with, then
 4    there's not a mystery.  But if you know they're not
 5    Dartmouth, which I understand because they didn't come
 6    in through a Dartmouth access code, right, are you
 7    saying that they are not subscribers or they are
 8    subscribers?
 9            MS. McNAMARA:  They are subscribers.  They
10    originated from subscriber accounts, but they were
11    subscriber accounts that did not have authentication
12    codes, okay?
13            THE COURT:  So we're back to you now.  If they
14    know who the subscribers are and they're telling us
15    they're not New Hampshire subscribers, what's the
16    mystery?
17            MR. SUSMAN:  Then --
18            THE COURT:  There is none.
19            MR. SUSMAN:  I'd say there is none.  Let me
20    just say one other thing.  But regarding jurisdictional
21    discovery, though, there's the issue of how the articles
22    are delivered.  And the reason why this is important is
23    because it's not necessary to access the articles.
24            THE COURT:  Sitting in New Hampshire.
25            MR. SUSMAN:  No, no, no.  It's not necessary
```

1    to access the articles to receive defamatory material

2    because, again, if it appears on the head --

3                THE COURT:  It's on the banner of an email.

4                MR. SUSMAN:  Exactly.  The headlines --

5                THE COURT:  That one might click on, right?

6                MR. SUSMAN:  The headlines of the articles are

7    defamatory.  One of the headlines says my clients were

8    investigated by the FBI and the SEC.  Patently false.

9    So, if you open up The Deal's website, and again, I

10   don't know how it's delivered, is it an email blast, is

11   it on the front page that says, you know, your daily

12   round up and here's what Bill Meagher is saying about,

13   you know, my clients, then if it's just showing the

14   headline alone, the damage has already been done.  And

15   in fact, that could still be on their website.  I don't

16   know.  I don't know exactly how it would look to a

17   subscriber because I'm not one.

18                THE COURT:  Let me just take a step back here

19   as I continue to contemplate the unlikely event of

20   jurisdictional discovery here.

21                I'm just trying to imagine, I mean, if one can

22   be defamed by the headlines, I mean, I don't know how

23   The Deal, I feel like I've seen references in my life to

24   The Deal, you know, out there reading emails and reading

25   the internet, and I'm not a person who's focused on the

1  market even slightly, okay, slightly, zero interest, you

2  know, but I feel like I've seen it somewhere, and what

3  I'm wondering is, are there constantly emails being

4  blasted, broadcast all over the country that have, you

5  know, all the articles listed and, you know, to

6  subscribe, click here.  I mean, how does that work?

7          MS. McNAMARA:  Okay, your Honor, that's

8  answered in the declaration as well if you focus on

9  paragraph 11 and 12 --

10         THE COURT:  Go ahead.

11         MS. McNAMARA:  -- of the declaration.  Readers

12  receive access or knowledge concerning articles in one

13  of two ways.  Either they can access through the online

14  portal and then they have to put in their subscriber

15  number and then pop up, and yes, there would be listings

16  of articles, but again, you'd have to have the initial

17  impetus done --

18         THE COURT:  You're talking about readers.

19         MS. McNAMARA:  Right.

20         THE COURT:  So respectfully you're not

21  answering my question.  I'm talking about how the

22  publication is marketed to the --

23         MS. McNAMARA:  Oh marketed, I'm sorry, your

24  Honor.  Okay.

25         THE COURT:  Yeah, my bad.  But you see what

1    I'm asking then?

2           MS. McNAMARA:  Yes, absolutely.

3           THE COURT:  If one can be defamed by

4    headlines, if these headlines are contained in marketing

5    materials that are broadcast all over the internet in

6    various ways --

7           MS. McNAMARA:  It's not.

8           THE COURT:  It's not.

9           MS. McNAMARA:  It's this -- that's why

10   Dartmouth was not a subscriber through kind of the, like

11   the Zippo line of cases where you have interactive

12   websites and people have access to something that's

13   available on the World Wide Web and then you achieve an

14   interest and you connect and you subscribe.  As is clear

15   here, the subscription was with Dartmouth, and virtually

16   all subscriptions either happened at trade shows,

17   financial industry trade shows, or there's actual

18   solicitation done by the people who sell the

19   subscription so that they're calling up financial

20   institutions and the like around, you know, that they

21   think would be likely subscribers of the publication,

22   and so it's not just out there.  Whether, you know,

23   whether you can, you could go to The Deal --

24          THE COURT:  But is this in the record

25   somewhere?  Is this in the declaration?  Because I don't

1    think it is, this issue of marketing.  Not that it

2    should be, by the way, I'm just --

3              MS. McNAMARA:  I believe it is, actually.

4              THE COURT:  He's describing to me what he'd

5    like to do in terms of jurisdictional discovery.

6    There's also the question about whether any of this is

7    alleged in the complaint.  But I'm not sure it needs to

8    be --

9              MS. McNAMARA:  It's not alleged in the

10   complaint.  But I do, okay, I do, paragraph eight of the

11   declaration indicates The Deal does not mass market its

12   service to potential subscribers, but rather solicits

13   new customers through direct sales outreach targeting

14   the customers --

15             THE COURT:  Yeah, I did read that.

16             MS. McNAMARA:  -- i.e. major banks, law firms,

17   hedge funds, through conferences and other establish

18   business channels.  Virtually all of the direct

19   marketing efforts are focused on New York with some

20   activity targeted in California.  The Deal has never

21   directly marketed its product to potential subscribers

22   in New Hampshire.

23             So it is addressed, your Honor, and there's

24   nothing to discover about it.

25             THE COURT:  All right.  Is there something

1    else you want to say?

2              MR. SUSMAN:  No, it doesn't answer the

3    question, though, how they ended up with a subscriber

4    with 6,000 students and potential people that access it

5    in New Hampshire.  And we still don't know why is it,

6    you know, we get this number of 6,000 students but only

7    40 students have access to it.  We don't how it is that

8    6,000 don't have access to it or could access it at any

9    time.

10             And again, I would just like to know because

11   if the headlines themselves are defamatory, we're not

12   understanding how The Deal is published and circulated

13   in the state.  We would need discovery on that.

14             THE COURT:  We've kind of circled back to my

15   original question at the beginning of this hearing about

16   who at Dartmouth is reading this material.  Is it

17   students, is it faculty, is it alumni, is it portfolio

18   managers.  It doesn't sound like it's that, doesn't

19   sound like it's the last thing I mentioned.  But, you

20   know, 40, I don't know, 40 might be 40 professors who

21   have students and they forward this stuff to students, I

22   don't know.  I don't want to make up facts and add them

23   to the jurisdictional analysis, but this is an area

24   where it's just not completely clear to the Court.

25             I do think some extra focus on that

1    declaration is warranted, though, because a couple of

2    times I've asked questions about a declaration I've

3    already read and you were able to focus me on the answer

4    that was in the declaration, so I appreciate that.

5           All right, let me take a little break here.  I

6    want to just talk to my law clerk and maybe rejoin you

7    in five minutes -- do you have five minutes to wait?

8           MS. McNAMARA:  Absolutely, your Honor.

9           MR. SUSMAN:  Yes.

10          THE COURT:  Let's take a little recess.

11          (Recess taken.)

12          (Adjourned at 11:35 a.m.)

13

14

15                 C E R T I F I C A T E

16

17          I, Sandra L. Bailey, do hereby certify that

18   the foregoing transcript is a true and accurate

19   transcription of the within proceedings, to the best of

20   my knowledge, skill, ability and belief.

21

22

23   Submitted: 5/19/2017    **SANDRA L. BAILEY, LCR, CM, CRR**
                              LICENSED COURT REPORTER, NO. 15

24                            STATE OF NEW HAMPSHIRE

25