# EXHIBIT C

## FINANCIAL INDUSTRY REGULATORY AUTHORITY
## OFFICE OF HEARING OFFICERS

|  |  |
|---|---|
| DEPARTMENT OF ENFORCEMENT, | |
| Complainant, | Disciplinary Proceeding No. 2014041724601 |
| v. | Hearing Officer–LOM |
| SCOTTSDALE CAPITAL ADVISORS CORPORATION (CRD No. 118786), | **EXTENDED HEARING PANEL DECISION** |
| JOHN J. HURRY (CRD No. 2146449), | March 31, 2017 |
| TIMOTHY B. DIBLASI (CRD No. 4623652), | |
| and | |
| D. MICHAEL CRUZ (CRD No. 2450344), | |
| Respondents. | |

The Respondent firm violated FINRA Rule 2010 by selling securities without registration and without an exemption, in contravention of Section 5 of the Securities Act of 1933. The firm's owner, Respondent John Hurry, also violated Rule 2010, because he engaged in activities designed to enable the unlawful transactions and evade regulatory scrutiny.

The Respondent firm and its Chief Compliance Officer, Respondent Timothy DiBlasi, violated NASD Rules 3010(a) and (b) and FINRA Rule 2010 by failing to establish and maintain a supervisory system, including written supervisory procedures, reasonably designed to ensure that the firm complied with Section 5 of the Securities Act.

**The Respondent firm and its President, Respondent Michael Cruz, violated NASD Rule 3010(b) and FINRA Rule 2010 by failing to supervise and failing to respond appropriately to numerous red flags indicative of unlawful unregistered distributions.**

**The Respondent firm is fined $1.5 million. Hurry is barred in all capacities. He would also be fined $100,000, but, in light of the bar, the fine is not imposed. DiBlasi is suspended for two years and fined $50,000. Cruz is suspended for two years and fined $50,000. In addition, Respondents are ordered to pay costs, for which they are jointly and severally liable.**

### Appearances

For the Complainant: Jeffrey D. Pariser, Esq., Gregory R. Firehock, Esq., Laura Leigh Blackston, Esq., and Heather L. Freiburger, Esq., Department of Enforcement, Financial Industry Regulatory Authority.

For the Respondents: Kevin J. Harnisch, Esq., Michael J. Edney, Esq., and Ryan E. Meltzer, Norton Rose Fulbright US LLP.

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................... 5

  A. The Respondent Firm ............................................................................................... 5

    1. The Firm Relied On The Rule 144 Exemption ............................................................ 5
    2. The Firm Lacked A Basis For "Tacking" To Achieve The Required Holding Period
       Under SEC Rule 144 ................................................................................................. 5
    3. The Firm Also Failed To Address Red Flags Signaling Unlawful Distributions ......... 6

  B. Other Respondents ................................................................................................... 7

    1. John Hurry ................................................................................................................ 7
    2. Timothy DiBlasi ........................................................................................................ 7
    3. Michael Cruz ............................................................................................................ 7

  C. Parties To The Transactions At Issue ...................................................................... 8

II. PROCEDURAL HISTORY ........................................................................................... 8

III. FINDINGS AND CONCLUSIONS ............................................................................. 9

  A. Jurisdiction ............................................................................................................... 9

  B. Background ............................................................................................................... 9

    1. Respondents .......................................................................................................... 10
    2. Other Key Figures At Scottsdale .......................................................................... 19
    3. CSCT And Its Key Figures ................................................................................... 24

  C. The Firm's General Practice For Reviewing Deposits ......................................... 39

  D. Transactions .......................................................................................................... 40

    1. NHPI (Three Unicorn deposits derived from Collins promissory note) .................. 41
    2. VPLM (Montage deposit derived from Kipping oral line of credit) ...................... 50
    3. VPLM (Titan deposit derived from Kipping and Locksmith through the ▮▮▮ ) ........ 55
    4. ORFG (Unicorn deposit derived from Forward line of credit) ............................... 58

  E. Credibility ............................................................................................................. 61

    1. Ruzicka ................................................................................................................. 61
    2. Hurry .................................................................................................................... 63
    3. DiBlasi .................................................................................................................. 66
    4. Cruz ...................................................................................................................... 66
    5. Diekmann ............................................................................................................. 67
    6. Experts ................................................................................................................. 69

  F. Law And Regulations Relating to Section 5 .......................................................... 72

    1. It Is Unlawful To Sell Securities Without Registration, Unless An Exemption
       Exists .................................................................................................................... 72

2. Sales Are Not Exempt If They Involve A Distribution By An "Underwriter"........... 73
3. Broker-Dealer Has Burden Of Showing A Reasonable Basis For An Exemption..... 74
4. Respondents Claim Two Exemptions........................................................................ 75
5. Both Exemptions Required A "Searching Inquiry" To Ensure That No Underwriter Was Involved ........................................................................................................... 77
6. FINRA Guidance On Red Flags Signaling That Underwriter May Be Involved....... 78

G. Ethical Violations (First Cause Of Action—Scottsdale And Hurry)................................ 79

1. Rule 2010......................................................................................................... 79
2. Enforcement Established A *Prima Facie* Case Of A Section 5 Violation ................ 80
3. The Firm Lacked A Reasonable Basis For An Exemption......................................... 80
4. Hurry's Violation .................................................................................................. 86

H. Supervisory Violations (Second And Third Causes Of Action—DiBlasi And Cruz)...... 90

1. NASD Rule 3010 Imposes Supervisory Duties............................................................ 90
2. DiBlasi's Violation .............................................................................................. 91
3. Cruz's Violation.................................................................................................. 98

IV. SANCTIONS ........................................................................................................... 100

A. Scottsdale ............................................................................................................ 101

1. Aggravating Factors................................................................................................ 102
2. Potential Mitigating Factor .................................................................................... 106
3. Sanction................................................................................................................. 107

B. Hurry...................................................................................................................... 107

C. DiBlasi ................................................................................................................... 108

D. Cruz........................................................................................................................ 108

E. Respondents' Arguments For Lesser Sanctions Rejected ........................................... 109

V. CONCLUSION......................................................................................................... 110

4

# DECISION

## I.   INTRODUCTION

### A.   The Respondent Firm

The Respondent firm, Scottsdale Capital Advisors Corporation ("Scottsdale" or the "Firm"), is primarily engaged in the business of liquidating penny stocks for its customers without registration. The sale of securities without registration is unlawful unless an exemption exists. In selling securities without registration, Scottsdale usually relies on a "safe harbor" exemption created by the Securities and Exchange Commission ("SEC"), Rule 144. But the securities at issue here did not qualify for the Rule 144 exemption. Thus, the sales were unlawful.

#### 1.   The Firm Relied On The Rule 144 Exemption

SEC Rule 144 is highly detailed and technical. It both restricts some transactions and permits others that meet certain conditions. It comes into play where securities have been acquired from the issuer or an affiliate in an unregistered private transaction. Such securities typically are marked with a restrictive legend, and the holder may not sell such securities in the public marketplace unless an exemption applies to the sale.

In determining whether a sale of securities is exempt from registration under Rule 144, a broker-dealer must conduct an inquiry that focuses primarily on identifying the individual who is the beneficial owner of the securities to be sold, analyzing that person's relationship (if any) to the issuer of the securities, investigating the circumstances of that person's acquisition of the securities, and calculating how long the person has held the securities. Rule 144 imposes different holding periods on affiliates and non-affiliates of an issuer before they can resell the issuer's securities. In some circumstances, the holder can "tack" his holding period to that of his predecessor in the chain of holders to meet the applicable holding period.

The purpose of the Rule 144 inquiry is to ensure that the transaction is not a subterfuge for an issuer or its affiliates to distribute securities to the public while evading the disclosure requirements that accompany registration. Representations made by the parties interested in selling the securities must be carefully scrutinized by a broker-dealer firm because of the incentive to misrepresent the circumstances and conceal the true beneficial owners.

#### 2.   The Firm Lacked A Basis For "Tacking" To Achieve The Required Holding Period Under SEC Rule 144

In the transactions at issue, the purported beneficial owners claimed that neither they nor their predecessors were affiliates of the issuer. Their lack of affiliate status was critical to their ability to sell the shares pursuant to SEC Rule 144 because of the shorter holding period and fewer restrictions on non-affiliates.

Even as non-affiliates, however, none of the purported beneficial owners of the shares that Scottsdale accepted for resale had held the shares long enough to qualify for the Rule 144 safe harbor holding period. Each seller therefore claimed that the applicable Rule 144 holding period was satisfied by tacking his holding period to the holding period of a prior holder.

In the transactions at issue, one prior holder claimed that he had forgiven a loan that he had made to the issuer and had exchanged the right to payment on the loan for stock. One of the prior holders forgave a promissory note that the issuer had used to pay him for consulting services. Another prior holder claimed to have extended an oral line of credit to the issuer and then to have accepted shares in satisfaction of a sum owed on the line of credit. A third prior holder forgave a portion of a promissory note extending an open-ended line of credit.

Each of these prior holders received the shares around the same time that he transferred them. Thus, the prior holder did not actually hold the shares long enough for his successor to satisfy the applicable holding period by tacking, creating an impediment to resale.

To overcome that impediment, the sellers of the securities claimed the benefit of another tacking provision under Rule 144. Rule 144 provides that where a holder of a security exchanges that security for another of the same issuer's securities, without any additional compensation, the holder may tack the holding period of the first security to the holding period of the second. The theory is that the exchange of one security for another of the same issuer does not change the nature of the holder's capital at risk, so the holding period for the new security can tack back to the date the old security was acquired. The sellers here characterized their prior holders' exchanges of notes for stock as exchanges of one security for another. On that basis, the sellers claimed that they could tack back to the inception of the prior holders' loans.

Whether the first instrument in the chain was a security is thus a threshold issue. The Firm treated the prior holders' promissory notes and lines of credit as securities and the conversion of that debt into stock as the exchange of one security of the issuer for another security of the same issuer. As a result, the Firm concluded that the sellers were permitted to tack their holding period all the way back to the inception of the prior holders' loans.

The Firm erred. The promissory notes and lines of credit were not securities. Rather, they were ordinary debt liabilities. Accordingly, the purported beneficial owners could not establish the requisite holding period, and the Rule 144 exemption did not exist.

### 3. The Firm Also Failed To Address Red Flags Signaling Unlawful Distributions

The transactions at issue involved persons seeking to sell large blocks of thinly traded, little-known securities acquired in a chain of private transactions originating with the issuer -- generally a red flag that the SEC and FINRA have both said requires a "searching inquiry." The sellers acquired the shares from the prior holders and sought to resell the shares almost immediately. The immediate resale of a large block of stock that has never been the subject of registration disclosures strongly suggests an attempt to distribute securities to the public without

registration. In addition, there were a large number of discrepancies and suspicious circumstances indicating that sham transactions, false documents, and nominees were being used to evade the securities laws and effect unlawful securities sales without registration. These red flags ought to have been investigated and appropriately resolved before the securities could be sold.

The Firm, however, blinded itself to the multiple red flags signaling that the transactions were unlawful public distributions of securities. It did not conduct the required searching inquiry. It sold the securities without a reasonable basis for a Rule 144 exemption. Because of the suspicious circumstances known to the Firm, it also was not entitled to the so-called "broker's exemption" under Section 4(4) of the Securities Act for ordinary trading.

### B.    Other Respondents

#### 1.    John Hurry

Scottsdale is owned indirectly by Respondent John Hurry and his wife, Justine Hurry, through other entities they own and control. John Hurry also owns the clearing firm that handles Scottsdale's business, Alpine Securities Corporation ("Alpine"), and an off-shore foreign financial institution ("FFI") located in the Cayman Islands, Cayman Securities Clearing and Trading SECZ, Ltd. ("CSCT").

Hurry set up CSCT in 2013 to act as a conduit through which other FFIs could deposit penny stocks at Scottsdale for resale in the U.S. securities market. During the relevant period, December 1, 2013, through June 30, 2014, CSCT deposited billions of shares of penny stocks for resale by Scottsdale. All the transactions at issue were routed through CSCT to Scottsdale.

#### 2.    Timothy DiBlasi

Respondent Timothy DiBlasi became Scottsdale's chief compliance officer ("CCO") shortly before the events at issue, and he remains its CCO. He maintains, however, that his responsibilities do not extend to the Firm's Rule 144 business.

#### 3.    Michael Cruz

Respondent Michael Cruz was the Firm's president, but now serves as general counsel to the collection of Hurry enterprises. During the relevant period, Cruz had final approval authority over the Rule 144 transactions at issue. In that role, he reviewed the information collected by others and determined whether it was sufficient to approve a deposit of stock certificates for resale. Everyone at the Firm, including Henry Diekmann, who headed the Firm's Rule 144 team at the time of the transactions at issue, and who is now the Firm's president, considered Cruz responsible for Rule 144 compliance.

### C.    Parties To The Transactions At Issue

This case concerns Scottsdale's sales of stock issued by three little-known companies—Neuro-Hitech Inc. ("NHPI"), VoipPal.com ("VPLM"), and Orofino Gold Corp. ("ORFG"). CSCT deposited millions of the three issuers' shares in certificate form at Scottsdale for resale. Alpine cleared them, and Scottsdale sold them into the U.S. securities market pursuant to Rule 144 without registration.

In making the deposits of NHPI, VPLM, and ORFG stock, CSCT acted on behalf of three other FFIs: (i) Montage Securities ("Montage"), (ii) Titan International Securities ("Titan"), and (iii) Unicorn International Securities ("Unicorn"). Montage was located in Panama; Titan and Unicorn were in Belize. The FFIs, in turn, purported to act for the benefit of other entities, which were represented to be owned by individuals identified in documents as the beneficial owners of the shares.

## II.    PROCEDURAL HISTORY

FINRA's Department of Enforcement ("Enforcement") filed the Complaint on May 15, 2015. After an extension of time, Respondents filed an Answer on June 26, 2015. On December 11, 2015, Respondents filed a motion for summary disposition that challenged FINRA's authority to bring a disciplinary action for misconduct associated with the sale of unregistered securities. Briefing on the motion was completed on January 29, 2016. The Hearing Officer issued an Order on February 26, 2016, denying the motion and finding that FINRA has authority to bring this proceeding.

The hearing ran a total of 12 days in two sessions. The first session in Los Angeles, California, was held June 13-24, 2016. The second session in Washington, D.C. was held July 11-12, 2016. Ten witnesses testified at the hearing, including two experts.[1] In addition, the full transcript of an on-the-record interview ("OTR") was admitted into evidence, along with more

---

[1] In addition to Hurry, DiBlasi, and Cruz, the following persons testified: Henry Diekmann, the Firm's current president; Jay Noiman, a former Scottsdale employee who served as CCO until DiBlasi took on that responsibility; David Byrne, a FINRA examiner who is a manager of the AML Investigative Unit; Craig D'Mura, a former Scottsdale employee who worked for a couple of months at CSCT; Christopher Frankel, the current CEO of Alpine; Marc Menchel, Respondents' expert; and Brian Underwood, Enforcement's rebuttal expert.

References to hearing testimony are in the following format: "Hearing Tr. (last name of witness), page of transcript." For example, Hurry's testimony is cited as "Hearing Tr. (Hurry) 1542-43."

than 200 other exhibits.[2] On September 9, 2016, Enforcement and Respondents each filed one post-hearing brief.[3]

## III.   FINDINGS AND CONCLUSIONS

### A.   Jurisdiction

FINRA has jurisdiction to bring this proceeding against Scottsdale, Hurry, and DiBlasi because they are currently registered, and the Complaint charges them with misconduct committed while they were registered. FINRA has jurisdiction as to Cruz although he is no longer registered, because the Complaint was filed within two years of the time he was registered and it charges him with misconduct committed while he was registered.[4]

### B.   Background

We provide substantial background regarding Respondents and others connected to the transactions at issue to provide the context needed to understand the transactions, the Firm's

---

[2] Gregory V. Ruzicka, who worked at CSCT during the relevant period, gave an OTR on May 27, 2015. The OTR became an exhibit. Complainant's exhibits are referred to with the prefix "CX" and an identifying number. Respondents' exhibits are referred to with the prefix "RX" and an identifying number. Joint exhibits are referred to with the prefix "JX" and an identifying number. Ruzicka's OTR is CX-178.

[3] References to the post-hearing briefs are as follows: Enf. PH Br. and Resp. PH Br. Respondents attached graphs and other materials to their post-hearing brief that were not offered or admitted into evidence. Respondents apparently created the graphs after the hearing based on exhibits that were admitted into the record. However, the graphs were not subject to any testimony explaining their creation or testing their accuracy. Respondents' post-hearing brief also contained references to website articles that were not admitted into the record. No copies of the articles were attached to the post-hearing brief. Respondents have not asked permission to reopen the record to admit any of these materials. Respondents simply refer and rely on the non-record materials. The Hearing Panel has not considered any of the following items (or assertions made in argument based on them) in formulating its decision:

- Huperzine A in Alzheimer's Disease—website article relating to NHPI (Resp. PH Br. 5, n.9);
- Same (Resp. PH Br. 7, n.20);
- OTCMarkets.com website on VPLM (Resp. PH Br. 7, n.22);
- The Markets OTCQB website article on VPLM (Resp. PH Br. 7, n.23);
- Historical price figures derived from data on OTCMarkets.com (Resp. PH Br. 12, n.58);
- A purported page from a FINRA Continuing Education Module (Resp. PH Br. 17, n.86; Appendix A);
- Graphs generated by Respondents purporting to use data in JX-264 and JX-268 (Resp. PH Br. 19, n.94; Appendix B);
- Graphs generated by Respondents purporting to use data in JX-279 and JX-281 (Resp. PH Br. 25, n.129; Appendix C);
- Graphs generated by Respondents purporting to use data in JX-308 and JX-310 (Resp. PH Br. 29, n.155; Appendix D); and
- Statement about trading volume attributable to CSCT's sales of ORFG (Resp. PH Br. 29, n.156; statement made without reference to source of information or record citation).

[4] FINRA By-Laws, Art. IV, Section 6; Art. V, Section 4.

culture, and the Respondents' failure to take reasonable action in response to obvious red flags in connection with the transactions at issue. The background also provides information important in assessing the witnesses' credibility, and in evaluating the Respondents' likely future compliance with the laws and regulations governing Scottsdale's business.

### 1. Respondents

#### a. Scottsdale

##### i. The Firm's Focus On Rule 144 Business

Scottsdale, which is located in Scottsdale, Arizona, has been a FINRA member since 2002.[5] During the relevant period, the Firm had approximately 14 to 20 employees.[6]

Scottsdale's principal business is the deposit and liquidation of penny stocks for its customers.[7] Throughout the proceeding, the penny stocks sold by Scottsdale were also referred to as "microcap" securities.[8] Scottsdale sells most of these securities without registration. The primary exemption that Scottsdale relies on is Rule 144, so it has a dedicated Rule 144 team to review deposits of stock certificates for resale, and its procedures are oriented to Rule 144.[9] Scottsdale obtains customers by advertising in OTC Markets and through referrals.[10]

##### ii. The Firm's Direct Business With FFIs

Prior to Hurry's creation of CSCT in 2013, Scottsdale did business with FFIs directly. Two of the FFIs involved in this case (Titan and Unicorn) had pre-existing direct relationships with Scottsdale before they started doing business through CSCT.[11]

---

[5] CX-1, at 3-9.

[6] Hearing Tr. (Cruz) 116; Hearing Tr. (Diekmann) 1496.

[7] Hearing Tr. (Hurry) 1318; Hearing Tr. (Cruz) 83; Hearing Tr. (Noiman) 1180. DiBlasi acknowledged that during the relevant period penny stock transactions accounted for most of the Firm's revenues, and that over 95% of the transactions that Scottsdale executed for its customers involved penny stocks, most of them unregistered. Hearing Tr. (DiBlasi) 1923.

[8] Microcap securities may be defined as low-priced stock issued by small companies with a market capitalization of $300 million or less. Microcap securities are generally more volatile and less liquid than the stock of larger companies. Most important, because many microcap issuers do not file financial reports with the SEC, it may be difficult for investors to obtain information about the management, products, services, and finances of microcap issuers. https://www.sec.gov/investor/pubs/microcapstock.htm. The SEC has expressed concern that the lack of publicly available information about microcap issuers can enable the spread of false information that misleads investors. *Id.* Many microcap securities trade in the "over-the-counter" ("OTC") market instead of a national exchange such as the New York Stock Exchange or NASDAQ. *Id.*

[9] Hearing Tr. (Cruz) 577, 583; Hearing Tr. (DiBlasi) 1952-54; Hearing Tr. (Diekmann) 818-19, 875-76, 884-86; Hearing Tr. (Hurry) 1600.

[10] Hearing Tr. (Cruz) 116.

[11] Hearing Tr. (Cruz) 192; Hearing Tr. (Diekmann) 727, 817-18; Hearing Tr. (Noiman) 1140-52.

### iii. The Firm's Disciplinary History

Scottsdale has been disciplined previously for selling unregistered securities and having inadequate supervisory procedures and written supervisory procedures ("WSPs") to detect and prevent the sale of unregistered securities. In October 2011, the Firm settled these and other charges, agreeing to a censure and a total fine for all the charges of $125,000 ("2011 Settlement").[12]

The Firm has also settled other types of disciplinary charges against it, which are relevant to the sanctions determinations. In 2009, it agreed to a censure and a $7,500 fine to settle charges that it had bought bonds from customers at unfair prices ("2009 AWC").[13] In August 2012, the Firm settled charges that it had failed to take appropriate action after being on notice that one of its representatives had been using his name and CRD number in stock promotion press releases. The Firm agreed to a censure and a $7,500 fine ("2012 AWC").[14] In 2015, the Firm agreed to a censure and a fine of $10,000 to settle charges that it had submitted reports to FINRA for the Order Audit Trail System that were inaccurate, incomplete, or in the wrong format ("2015 AWC").[15]

### iv. The Firm Had Notice That Sham Transactions And The Use Of Nominees Were A Risk In Its Rule 144 Business With FFIs

### (a) Four Prior SEC Disciplinary Actions

We find that prior to the events at issue in this case, the Firm was on notice that its business was susceptible to sham transactions and the use of nominees to conceal the true beneficial owners of securities. In four disciplinary actions involving Scottsdale's own employees and customers, the SEC alleged that sham transactions and nominees were used in unlawful sales in violation of Section 5 of the Securities Act of 1933. Those unlawful sales in turn were used to facilitate fraud and manipulation.

In December 2011, two of Scottsdale's registered representatives were named in an SEC complaint ("*Ruettiger*") involving the supposed assignment of portions of a convertible note to satisfy the applicable Rule 144 holding period, the use of nominees to conceal the identity of the true beneficial owners, the use of a "pump-and-dump"[16] scheme to manipulate the market for the stock, and an unlawful distribution of securities without registration. According to the complaint,

---

[12] CX-12.

[13] CX-11.

[14] CX-13.

[15] CX-14.

[16] "Pump-and-dump" schemes involve the touting of a company's stock (typically small, so-called "microcap" companies) through false and misleading statements to the marketplace. https://www.sec.gov/answers/pumpdump.htm.

Scottsdale's registered representatives handled some of the accounts involved in the scheme, and one of them had an interest in an entity that received and sold some of the securities. The complaint alleged that a single person had used 16 Panamanian corporations to conceal his identity and enable him to sell approximately $6 million of stock without registration.[17]

In March 2013, the SEC filed a complaint ("*Gibraltar I*") against a number of people and entities alleging a market manipulation scheme that was facilitated by a Scottsdale customer, Gibraltar. That complaint alleged that individual defendants had secretly sold shares through Gibraltar while simultaneously promoting the stocks and encouraging others to buy. It also alleged that Gibraltar had provided false affidavits and misleading statements that allowed an individual defendant to secretly sell shares of companies he was promoting.[18]

In April 2013, the SEC filed a second complaint against Gibraltar and its owner ("*Gibraltar II*"), alleging that they had facilitated unlawful sales of securities without registration through the use of nominees. According to that complaint, Gibraltar liquidated low-price, thinly traded stocks on behalf of its clients, often during periods of suspicious promotion. Gibraltar assisted its clients to incorporate international business corporations ("IBCs") and encouraged them to use nominee officers and directors so that their identities would remain confidential. The SEC charged that two persons had opened "fake nominee accounts" at Scottsdale.[19]

Gibraltar had been a direct customer of Scottsdale since before the spring of 2010, at least two years before the SEC filed charges against it.[20] It shut down after the filing of the two *Gibraltar* complaints, and some of its customers transferred to Titan, one of the FFIs involved in this case.[21]

In July 2013, the SEC filed an action against ten Argentinians, four of whom had opened accounts at Scottsdale ("*Tavella*"). That complaint alleged that the defendants had submitted false documentation to accompany their securities deposit checklist at Scottsdale, and sold millions of shares into the public markets without registration in violation of Section 5. The defendants claimed that they had purchased their shares from former shareholders, but the former shareholders had already sold their shares years before. Thus, the transactions in which the defendants claimed that they had acquired the shares were a sham.[22]

---

[17] *SEC v. Ruettiger*, No. 2:11-cv-2011 (D. Nev. filed Dec. 16, 2011), available at https://www.SEC.gov/litigation/complaints/2011/comp22198.pdf.

[18] Hearing Tr. (Cruz) 195-99; *SEC v. Carrillo Huettel*, No. 13 Civ. 1735 (S.D.N.Y. filed Mar. 15, 2013), available at https://www.SEC.gov/litigation/complaints/2013/comp-pr2013-39.pdf.

[19] Hearing Tr. (Cruz) 185-192; *SEC v. Gibraltar Global Sec., Inc.*, No. 13 Civ. 2575 (S.D.N.Y. filed Apr. 18, 2013), available at https://www.sec.gov/litigation/complaints/2013/comp22683.pdf.

[20] Hearing Tr. (Diekmann) 1912-13.

[21] Hearing Tr. (Diekmann) 727.

[22] *SEC v. Tavella*, No. 13-cv-4609 (S.D.N.Y. filed July 3, 2013), available at https://www.SEC.gov/litigation/complaints/2013/comp-pr2013-122.pdf.

These regulatory actions should have caused the Firm to take special care when dealing with FFIs, and to revise its procedures to focus on potential sham transactions and the use of nominees. The Firm did not. Its main reaction to *Ruettiger* was to eliminate the branch office involved in the case. Cruz believed that the misconduct identified in the *Gibraltar* cases was "isolated."[23] Scottsdale's current president, Diekmann, who was the head of the Rule 144 team when the *Tavella* complaint was filed, testified that he could not remember if the Firm conducted any investigation of the four Argentinians named in the *Tavella* complaint who had Scottsdale accounts.[24] In Diekmann's view it was "just impossible to know that there was somebody else behind this."[25] Cruz similarly said, "[I]t's almost impossible to detect these nominees, that they're going to be ... misrepresenting the—you know, the true identity of these persons."[26] Although the Firm changed some procedures as a result of *Tavella* (it would not accept more than 9.9% of a security at any one time from its customers and it instituted a stock watch list to monitor trading and promotions), Diekmann could not remember doing anything different to address the problem of nominees.[27]

### (b) Respondents' Arguments Minimizing Significance Are Rejected

In their post-hearing brief, Respondents argue that the SEC complaints are not relevant because they were classic pump-and-dump cases, and no charge is made here that the transactions at issue were part of a pump-and-dump fraud. It is not necessary, however, to prove that fraud occurred in order to conclude that Respondents failed to perform their gatekeeping duty adequately. The focus here is on Respondents' failure (i) to recognize as a threshold matter that the transactions lacked a legal underpinning, and (ii) to respond appropriately to an accumulation of red flags and suspicious circumstances, either conducting further investigation to make sure an exemption existed or declining to sell the securities.

Respondents also claim that references in the prior complaints to nominees were "peripheral."[28] To the contrary, the use of nominees was critical to facilitating the fraud and manipulation charged in those cases. We reject Respondents' attempt to brush aside the SEC complaints.

Cruz took a different approach at the hearing to minimizing the significance of the SEC complaints, which we also reject. He insisted on a benign definition of the term "nominee" to mean only someone designated to act on behalf of another. He declined to view the *Ruettiger* complaint as raising a concern about the use of nominees. He said, "I wasn't sure if this is a

---

[23] Hearing Tr. (Cruz) 219.

[24] Hearing Tr. (Diekmann) 732-33.

[25] Hearing Tr. (Diekmann) 732.

[26] Hearing Tr. (Cruz) 213-14.

[27] Hearing Tr. (Diekmann) 733-34.

[28] Resp. PH Br. 36-37.

situation where the——the nominees here that are being listed were purposely hiding their identity. It could be, but … that just was not my takeaway when I was looking at this … Complaint."[29] When asked whether the allegation of "fake nominee entities" gave him pause, Cruz responded, "I have no idea what fake – I mean, if it's an entity – I mean, if it – I don't know what they mean by 'fake.'"[30] Cruz refused to admit that the complaint in *Ruettiger* put him on notice of the possibility of nominees hiding the actual true beneficial owner of securities. He testified, "I would say this is probably not a case that gave me a great concern about the nominee issue, per se …. There might be a nominee issue in there. I guess I don't know the context of that."[31]

We find Cruz's refusal to acknowledge the plain import of the SEC's allegations in *Ruettiger* and the other complaints disingenuous. Even Respondents' expert agreed that Scottsdale was on notice that its customers could be nominees for beneficial owners as of the relevant period in this case.[32]

### (c) Later Actions Confirm Risk Of Sham Transactions And Nominees

The risky nature of Scottsdale's Rule 144 business with FFIs became undeniable in the summer of 2014, when the SEC and criminal authorities initiated two new proceedings charging that certain Scottsdale customers and others had used sham transactions and nominees to sell penny stocks unlawfully without registration. These proceedings were brought based on extensive evidence gathered through the use of undercover agents, cooperating witnesses, and recorded conversations. The allegations appeared well founded, and they finally caused Scottsdale and CSCT to react.

The SEC filed a complaint on July 11, 2014 ("*Amogear*"), charging five individuals with using nominee accounts in FFI trading to conceal beneficial ownership and facilitate a pump-and-dump scheme. The SEC alleged that Titan had agreed to assist in the scheme and that Alpine, the clearing firm, was involved in readying shares for trading in connection with the scheme. In reaction to *Amogear*, Scottsdale froze its FFI trading for a couple of months.[33]

On September 8, 2014, prosecutors filed an indictment in federal district court in New York ("*Bandfield*") that charged Titan, Unicorn, and several individuals with whom Scottsdale and CSCT did business with securities fraud, tax fraud, and a money-laundering conspiracy. Those individuals included the following persons, who were also involved in the transactions at issue here: Cem ("Jimmy") Can at Unicorn; Kelvin Leach and Rohn Knowles at Titan; Frank Gray at Montage; and Robert Bandfield and Andrew Godfrey, who purported to represent

---

[29] Hearing Tr. (Cruz) 191.

[30] Hearing Tr. (Cruz) 192.

[31] Hearing Tr. (Cruz) 184.

[32] Hearing Tr. (Menchel) 2488-89.

[33] Hearing Tr. (Diekmann) 705-12; Hearing Tr. (Cruz) 204-08; CX-250.

customers of Montage, Unicorn, and Titan and appeared in connection with numerous sub-accounts and sub-sub-accounts at Scottsdale. According to the indictment, Robert Bandfield claimed in a recorded conversation that he had created Titan and more than 5000 sham companies. In that conversation, he explained how reporting requirements could be circumvented and beneficial ownership concealed by using nominees.[34] After the indictment was unsealed and became public, CSCT's business substantially diminished.[35]

### b.   John Hurry

Indirectly, through a trust and a holding company, John Hurry and his wife, Justine Hurry, own Scottsdale.[36] From the Firm's inception in 2002 until December 2012, Respondent Hurry was a registered representative, among other roles.[37] John Hurry again registered with the Firm in October 2014, and remains registered today.[38] Hurry admitted in his Answer to the Complaint that he has been the Firm's director since 2002. However, at the hearing, he claimed that he first became a director of Scottsdale in January 2013. Justine Hurry became its second director in May 2013.[39]

Scottsdale has been highly profitable for Hurry and his wife. According to the Annual Audited Report Form for Scottsdale during the year beginning July 1, 2013, and ending June 30, 2014, the Firm paid $6,222,550 in directors' compensation. Since John and Justine Hurry were the Firm's only directors, this expense presumably was paid to them.[40] The Firm paid other

---

[34] CX-244; CX-226; Hearing Tr. (Cruz) 224-30; Hearing Tr. (Diekmann) 1725-26, 1781.

[35] Hearing Tr. (Cruz) 237-38; Hearing Tr. (Hurry) 1529-30.

[36] CX-1, at 7-9; CX-5; Hearing Tr. (Cruz) 81-82.

[37] CX-15, at 11.

[38] CX-15, at 4-5.

[39] CX-1, at 3-9 (showing the Firm's direct owners and directors); CX-17, at 1. In his Answer, Hurry admitted that he had been a director of Scottsdale since 2002. Answer ¶ 16. At the hearing, however, Hurry denied that he had been a director of Scottsdale before January 2013. He did so despite the fact that his signature appeared over the designation "sole director" in a December 2012 document authorizing the creation of the Firm's Management Committee. At the hearing, he claimed that the designation as sole director was a typographical error and that he was acting president prior to January 2013, not sole director. CX-3; Hearing Tr. (Hurry) 1306-09. Cruz testified as to the December 2012 document that Hurry had established the Firm's Management Committee in his capacity as director of the Firm. Hearing Tr. (Cruz) 74-76.

The conflict between the Answer and Hurry's testimony is inexplicable. We find the conflict between Hurry's testimony and the Firm's record of the creation of the Management Committee disturbing, because it reflects a lack of transparency and accountability. We find the typographical error explanation with regard to something as important as corporate authority to designate the responsibilities of senior management—particularly in a simple one-page document—not credible. There is no explanation for the conflict between Hurry's testimony that he was not a director of the Firm in December 2012 and Cruz's testimony that he was. The conflict in the evidence on this point diminishes Hurry's credibility.

[40] RX-42, at 7, 11. When Cruz officially became Scottsdale's president in March 2014, it was by unanimous consent of the Board of Directors, John and Justine Hurry. CX-4.

compensation of $1,665,574 and professional and consulting fees of $1,138,090. When these payments and other expenses were subtracted from the Firm's gross profit of $11,569,817, the Firm reported net income of $1,446,655. Because Scottsdale is an S corporation, this income flowed through to the shareholders. In the next year, ending June 30, 2015, although the Firm reported only $589 in net income, the Firm paid directors' compensation of $3,255,200.[41]

During the relevant period, Respondent Hurry also was the indirect owner of Scottsdale's clearing firm, Alpine, which is located in Salt Lake City, Utah. Hurry has been its director since March 2011,[42] and has been registered with Alpine since May 15, 2015.[43]

In 2013, Hurry established CSCT, the Cayman Islands broker-dealer through which the securities at issue were deposited at Scottsdale.[44] Hurry owns CSCT,[45] and, as more fully discussed below, he made decisions, both large and small, about how it conducted its business.[46] Despite the highly specialized nature of CSCT's business, Hurry hired Gregory Ruzicka—an out-of-work California real estate attorney who had no prior experience in the securities broker-dealer industry, much less in the specialized business of liquidating microcap securities—to run CSCT.[47] Ruzicka went down to the Cayman Islands in October 2013 to take on his CSCT duties.[48] Hurry then monitored Ruzicka's activities almost daily, right down to his cigarette breaks, and visited the Cayman Islands at least monthly.[49]

Although Hurry attempted to conceal the extent of his involvement in CSCT's business, he admits that he spoke with the three CSCT customers involved in this case (Montage, Titan, and Unicorn), and that he personally visited two of them, Montage in Panama and Unicorn in Belize.[50] He claims that he did not solicit business for CSCT, but, as discussed below, that claim is not credible.

---

[41] RX-42, at 27. See also the Firm's FOCUS Reports for 2013-Q4, 2014-Q1, 2014-Q2, 2015-Q3, 2015-Q4, and 2016-Q-1, and the summary of them created by Enforcement. CX-6 through CX-10.

[42] CX-15, at 3, 11; CX-18.

[43] Hearing Tr. (Hurry) 1307.

[44] Hearing Tr. (Hurry) 1329; Hearing Tr. (Noiman) 1117-18; CX-29.

[45] CX-178, at 40-41.

[46] Hearing Tr. (Hurry) 1333-35.

[47] Hearing Tr. (Hurry) 1631; CX-178, at 13-24. Ruzicka had limited experience in the early 1980s with intrastate real estate limited partnership offerings. In that context, he handled post-foreclosure unlawful detainers, relief from automatic bankruptcy stays, and receiverships on commercial properties. CX-178, at 15-18.

[48] CX-178, at 20.

[49] Hearing Tr. (Hurry) 1437-40; CX-178, at 138-41, 151-52; CX-132; CX-133.

[50] Hearing Tr. (Hurry) 1406-08, 1412-14, 1421-22.

That Hurry was in charge was obvious to his employees and to CSCT customers. Ruzicka referred to him as "the big boss."[51] As noted below, one of the persons at Scottsdale who approved CSCT to become a Scottsdale customer did not even consider rejecting CSCT's application because he knew that Hurry had brought CSCT to the Firm.[52] Similarly, Ruzicka said that CSCT never considered using any broker-dealer except Scottsdale because of Hurry.[53] As Hurry acknowledged, customers also sought direct contact with him because he is "highest on the totem pole."[54]

Respondent Hurry thus owns and controls all three firms involved in the transactions at issue in this proceeding—Scottsdale, Alpine, and CSCT. In fact, the three firms were almost a self-contained system for processing and distributing microcap securities. CSCT did all its business through Scottsdale,[55] and Scottsdale in turn did all its business with Alpine.[56] Alpine's current CEO described Alpine as a small "boutique" clearing firm with a focus on the kind of business brought to it by CSCT.[57] No independent third party was involved in preparing, approving, or clearing the deposits of stock certificates by CSCT at Scottsdale for resale.

### c.    Timothy DiBlasi

DiBlasi first entered the securities industry in 2002. From December 2002 through March 2012, he was a compliance analyst at First Investors Corporation in New Jersey. DiBlasi has been associated with Scottsdale since April 2012. In June 2012, he became the Firm's anti-money laundering chief officer ("AMLCO"). In October 2013, shortly before the events at issue, DiBlasi became the Firm's CCO, and he remains the Firm's CCO today. Prior to joining the Firm, DiBlasi had limited experience in microcap securities, and he had not handled the type of restricted stock deposits that are the bulk of Scottsdale's business.[58]

---

[51] CX-240; Hearing Tr. (Diekmann) 1764-65.

[52] Hearing Tr. (Noiman) 1079, 1103, 1105-06, 1117-18. See also CX-29, at 10, 25 (forms to establish CSCT as a Scottsdale customer listed Hurry as referral or source of the business ).

[53] CX-178, at 108.

[54] Hearing Tr. (Hurry) 1432.

[55] Ruzicka testified that CSCT never considered using a firm other than Scottsdale because of Hurry. CX-178, at 108.

[56] Hearing Tr. (Cruz) 143, 306, 382; Hearing Tr. (Diekmann) 759; Hearing Tr. (D'Mura) 2293. The person Hurry hired to run CSCT, Gregory Ruzicka, described CSCT as an "adjunct" of Hurry's operations at Scottsdale. CX-178, at 34.

[57] Hearing Tr. (Frankel) 2342-43. Alpine did do business with other FFIs in addition to CSCT during the relevant period. Hearing Tr. (Frankel) 2343.

[58] Hearing Tr. (DiBlasi) 1919-21; Hearing Tr. (Cruz) 122; CX-19.

#### d.   Michael Cruz

Cruz entered the securities business in 1994, when he began working at a San Francisco investment banking firm on underwritings, asset-backed securities, and private placements. After approximately six years, he joined FINRA's predecessor, NASD, starting in its San Francisco office as a cause examiner and then moving to New York as a cycle examiner. He then took a job with Citigroup Smith Barney in their central risk group, reporting to the General Counsel and CCO. Subsequently, he moved with his family to Arizona and passed the bar there. In Arizona, he first worked for Wells Fargo in its audit department and then took a similar position at Countrywide in its bank legal department. He left Countrywide when Bank of America acquired it, and he began working at Scottsdale in May 2008.[59]

Cruz has held Series 7, 24, and 63 licenses. However, since January 29, 2015, he has not been registered through Scottsdale. He currently is the general counsel for the holding companies that own Scottsdale and its clearing firm, Alpine.[60]

At the beginning of the relevant period, Cruz was listed on the Firm's Form BD as legal counsel and member of the Management Committee.[61] Cruz officially became the Firm's president by a board resolution dated March 17, 2014. He testified that, at least since December 1, 2013, he had been acting as *de facto* president.[62] The Firm amended its Form BD on March 31, 2014, to disclose that Cruz was the president, as well as legal counsel.[63]

During the relevant period, Cruz approved Rule 144 deposits, including the transactions at issue.[64] Cruz signed the Deposited Securities Checklist ("Checklist") for the transactions at issue under the heading "144 Compliance Approval." Between that heading and his signature is the statement "[B]ased on the information received and reviewed as described in this Deposited Securities Checklist, SCA [Scottsdale] reasonably believes the subject securities are free trading."[65]

---

[59] Hearing Tr. (Cruz) 72-73, 557-59, 661; CX-20.

[60] Hearing Tr. (Cruz) 72-73; CX-20.

[61] CX-17, at 1.

[62] Hearing Tr. (Cruz) 78-79; CX-4. Cruz said that the original plan had been for Justine Hurry to be president of the Firm. Hearing Tr. (Cruz) 79. Cruz's testimony that he was the acting president in December is inconsistent with Hurry's testimony that he was president at that time. This conflict concerning who was in charge illustrates the Firm's lack of appropriate supervisory procedures that clearly delegated authority and created accountability.

[63] CX-17, at 7.

[64] Hearing Tr. (Diekmann) 693-94.

[65] RX-1, at 2, 79, 159; RX-2, at 2, 107; RX-3, at 2.

Cruz acted as the conduit between senior management of the Firm and the board of directors, John and Justine Hurry.[66]

### 2. Other Key Figures At Scottsdale

#### a. Henry Diekmann

After graduating from college with a degree in history, Diekmann spent approximately a year as a financial trainee with Morgan Stanley. He then was an insurance salesman for four months. After that, he was unemployed for about a year-and-a-half before he joined Scottsdale in March 2010 as an office assistant. In January 2011, he moved to the Firm's Rule 144 team, where he spent two years before being promoted to head the team. Although many members of the team were lawyers, Diekmann is not. He had no experience with low-priced securities or in clearing unregistered securities for trading before he joined Scottsdale. He was trained to review deposits by Cruz and another person who worked on the Rule 144 team.[67]

During the relevant period, Diekmann focused solely on reviewing CSCT deposits. But he did not have authority to approve a deposit of certificates. Final approval authority rested with Cruz.[68]

Since January 2015, Diekmann has been the Firm's president.[69] As the Firm's current president, Diekmann now has the authority that once belonged to Cruz.[70]

#### b. Eric Miller

Eric Miller was a Scottsdale salesman. He called potential customers and assisted in conducting due diligence on new accounts.[71] Miller sometimes referred clients to Ruzicka at CSCT.[72]

Although Miller did not testify at the hearing, there is substantial evidence that he was involved with Unicorn's deposits. Miller had a relationship with Unicorn because it had been Scottsdale's direct customer before moving its business to CSCT, and he continued to have contact with Unicorn even after it started doing business with Scottsdale through CSCT, as Diekmann admitted.[73]

---

[66] Hearing Tr. (Cruz) 80-82.

[67] Hearing Tr. (Diekmann) 686-90.

[68] Hearing Tr. (Diekmann) 694, 886.

[69] Hearing Tr. (Diekmann) 685; Hearing Tr. (DiBlasi) 1954.

[70] Hearing Tr. (Cruz) 129-30, 583-84; Hearing Tr. (Diekmann) 685-86, 694, 908-09.

[71] Hearing Tr. (Cruz) 116-17; Hearing Tr. (Noiman) 1075-76; CX-29, at 9.

[72] CX-178, at 167-68.

[73] Hearing Tr. (Diekmann) 858, 934-35.

The fact that Miller continued to have at least some direct contact with Unicorn is significant for the following four reasons:

*First*, the evidence regarding Miller casts doubt on the effectiveness of the Firm's compliance and supervisory efforts. Diekmann claimed that Miller's direct contact with Unicorn was prohibited and that Miller was "written up" a number of times for corresponding by email with Unicorn. Diekmann did not identify any written prohibition against direct contact with Unicorn, but he said that the prohibition was something that was a matter of business practice at the Firm.[74] The supposed prohibition is inconsistent with the record, which contains a number of emails to and from Unicorn that include Miller as a sender or recipient.[75] Moreover, in some Unicorn emails, Diekmann is a recipient along with Miller.[76] There is no evidence that Diekmann protested Miller's involvement or reprimanded him. If Miller was "written up" a number of times for contact with Unicorn, as Diekmann testified, it apparently had little effect. Diekmann's testimony regarding the supposed prohibition was not credible.

*Second*, the emails indicate that Miller was a "back door" for Scottsdale in dealing with Unicorn. Although the Unicorn deposits supposedly came through CSCT, Miller and others at Scottsdale corresponded directly with Unicorn personnel and directed Unicorn as to what needed to be done.

For example, Miller engaged in extensive email correspondence with Natalie Bannister at Unicorn in November 2013 about setting up its account with CSCT. Miller instructed her that the stock certificates to be deposited at Scottsdale had to be made out in CSCT's name and sent by CSCT to Scottsdale. Bannister indicated that she did not like transferring ownership to CSCT, "especially with it not in writing." Miller insisted, "These are important details." He said that the account at Scottsdale was in CSCT's name and the "cert[tificate deposit] NEEDS to be in [CSCT's] name, that is all there is to it."[77] Thus, it was Scottsdale—not CSCT—that was making the arrangements and instructing the customer on what had to be done.

Miller shepherded Unicorn's due diligence packages through CSCT. In March 2014, he instructed Unicorn staff and Ruzicka to get together on the telephone to discuss which documents were needed and could be provided for a deposit.[78] Similarly, in May 2014, Miller engaged in email correspondence directly with Unicorn's Back Office Manager, Chinique Lewis, asking her about ORFG, one of the stock deposits at issue in this case. He asked her—not Ruzicka—how the package was coming along. Then Lewis emailed Miller—not Ruzicka—to ask if there was "[a]nything on the [ORFG] as yet?" At that point, Miller emailed her back

---

[74] Hearing Tr. (Diekmann) 1664-65.

[75] See CX-216.

[76] See CX-119.

[77] CX-270.

[78] CX-171.

directing her to call Ruzicka and have him call Miller.[79] Miller's last instruction in the correspondence appears to us to reflect an awareness that Scottsdale should be seen to be dealing only with and through CSCT, when, in fact, Scottsdale, through Miller, was continuing to guide the business with Unicorn.

In April 2014, when Diekmann was unable to obtain the information he needed on a deposit of stock certificates by Unicorn from Ruzicka at CSCT, he emailed Miller a copy of his request to Ruzicka, saying he had not received a response. And Miller, in turn, forwarded the email directly to two persons at Unicorn, Cem Can and Chinique Lewis, asking them to "please address this ASAP."[80] Diekmann denied that he had asked Miller to obtain the information for him, but the correspondence has no other reasonable explanation. Diekmann's testimony in this regard was not credible.[81]

In May 2014, Miller obtained information from Chinique Lewis at Unicorn about the purported beneficial owner of the entity that had deposited VPLM stock through Unicorn for sale by Scottsdale and forwarded that to Diekmann. The email correspondence was included in the VPLM due diligence package.[82]

The degree to which Miller corresponded directly with Unicorn and managed the Unicorn deposits raises the question whether there was any need for CSCT at all. As discussed below in the credibility section, Hurry's decision to route Scottsdale's FFI business through CSCT had little discernible business rationale. His implementation of that decision and staffing of CSCT with Ruzicka, who was unqualified to run CSCT, coupled with the evidence of Miller's continuing role as a "back door" to Scottsdale, demonstrate that CSCT was a façade.

*Third*, we interpret certain email correspondence between Miller and a client as suggesting that the Firm assisted its clients "all the time" to conceal beneficial ownership of stock. Scottsdale supposedly had a policy not to accept business from Canadian citizens residing in Canada, but, when a client in the Bahamas asked on behalf of a friend whether a Canadian citizen residing in Canada could do business with Scottsdale, Miller suggested that the friend set up a corporation to do the business. Miller called it a "work around." The client responded, "If they get a corporation set up US, Panama, Belize or wherever won[']t your Compliance want to know who is beneficial owner?" Miller responded, "Yes they will but the account holder is the corporation. Trust me on this one, we do it all the time."[83]

---

[79] CX-311, at 1.

[80] Hearing Tr. (Diekmann) 1668-71; CX-221.

[81] CX-221; Hearing Tr. (Diekmann) 1665-71. In denying that he intended for Miller to obtain the information from Unicorn that Ruzicka had failed to supply, Diekmann testified that he had no interest whatever in whether he obtained the information. Hearing Tr. (Diekmann) 1665-71. That statement is not credible. If he had no interest, there would have been no reason to send the email to Miller.

[82] RX-3, at 17.

[83] CX-210; Hearing Tr. (Diekmann) 1672-77.

We are unconvinced by Diekmann's benign reading of this correspondence. He testified that he thought that the client was asking something different, "Won't your compliance know that a Canadian resident owns the LLC and, therefore, won't they reject the deposit or account opening?"[84] Diekmann's interpretation is a rewriting of the client's words. It ignores that Miller's implicit point was that the corporation would be identified as the account holder, not the Canadian owner. That is why the Canadian's deposit would not be rejected. Furthermore, Diekmann's interpretation does not reflect the tone of Miller's comments. When Miller suggested that the shares could be put in the name of the corporation, he treated that as a magical solution to the problem, saying "and wa-la! We get it done that way."[85] Finally, if Diekmann's interpretation of the question were correct, then Miller never answered the question. Miller never explained why the Firm would not reject the deposit if it knew that a Canadian resident owned the LLC.

*Fourth*, according to Diekmann, after Miller left the Firm in April 2016, the Firm discovered that he had set up his work email to be forwarded to his personal email.[86] This means that Miller could have engaged in communications with FFIs like Unicorn "off the record," avoiding oversight. Although Diekmann testified that all of Scottsdale's emails remained on its system, and were not removed by Miller, Diekmann provided no basis for knowing whether that was true. Diekmann testified that the Firm had asked Miller to confirm he had not removed any emails from the Firm's system but that Miller had not responded.[87]

The inquiry suggests that the Firm in fact does *not* know whether Miller removed emails from the Firm's system. There was no evidence that the Firm employed any technical analysis of its systems to find out if emails or other information had been deleted. There also was no evidence that the Firm made any effort to recover any email correspondence that Miller might have had with customers using only his personal email. Thus, it is undisputed that Miller communicated directly with Unicorn, and it is impossible to know the number or substance of all those communications.

Given the allegations against Unicorn and Cem Can in the *Bandfield* indictment, the inability to review Miller's communications with them is a serious concern. The Firm's reaction—simply to ask Miller to confirm he did not remove any emails from the Scottsdale's system—is an inadequate response. If Miller took emails from Scottsdale's system or deleted them, he would hardly be likely to confess to that wrongdoing. That is particularly so where the emails were with persons subject to a criminal indictment and might place Miller under suspicion. The request to a potential wrongdoer to confirm that he committed no wrongdoing is almost farcical. The inadequacy of the Firm's response mirrors the inadequacy of its checklist

---

[84] Hearing Tr. (Diekmann) 1673.

[85] CX-210, at 5.

[86] Hearing Tr. (Diekmann) 1662-63.

[87] Hearing Tr. (Diekmann) 1663-64.

approach to Rule 144 due diligence and contributes to our conclusion that stringent sanctions are required here.

### c.   Jay Noiman

Jay Noiman joined Scottsdale in September 2011 and left at the end of December 2014.[88] Prior to October 2013, when DiBlasi became CCO, Noiman was the Firm's CCO.[89] He was on the Management Committee from approximately January 2013 through January 2014. He served as vice chairman of the Management Committee and second in command after Cruz. During the relevant period, Noiman was the trading manager and had responsibility for supervising the traders and sales staff. He identified DiBlasi as his supervisor.[90]

Noiman was responsible for reviewing the blotter for restricted stocks. He focused on FFIs,[91] and he approved the account opening documents for CSCT, which was an FFI. Noiman never considered not approving the CSCT account. He knew at the time that it was a referral from Hurry.[92]

Noiman also signed documents in the due diligence packages for the transactions in this case. His signature appears on the Checklist under the heading "Broker Approval." Between the heading and Noiman's signature was the statement that he had carefully reviewed the Checklist and the supporting documents and that to the best of his knowledge "any resale will be made in compliance with firm policy and all applicable laws."[93] By that language, the Checklist makes it appear that Noiman was certifying that he believed that the transaction would comply with the law.

Noiman testified, however, that his signature signified only that all the necessary forms were in the file—a check-the-box function.[94] The parties stipulated that Noiman's signatures on the documents in the three due diligence packages meant the same thing: he checked that the documents were filled out but did not substantively approve or review them.[95] Thus, Noiman's signature on the Checklist created only a façade of compliance and accountability.

---

[88] Hearing Tr. (Noiman) 1041-42.

[89] Hearing Tr. (Noiman) 1043.

[90] Hearing Tr. (Cruz) 81, 564; Hearing Tr. (Noiman) 1043-44.

[91] Hearing Tr. (Noiman) 1045-46, 1049-51.

[92] Hearing Tr. (Noiman) 1139-40.

[93] RX-1, at 2; RX-2, at 2; RX-3, at 2.

[94] Hearing Tr. (Noiman) 1156-68, 1171-73.

[95] Hearing Tr. (Noiman) 1172-73.

During the relevant period, Noiman, like Miller, had contact with one of the FFIs involved in this case, Titan.[96] Noiman talked with Rohn Knowles of Titan at least monthly and sometimes weekly and engaged in email correspondence with Knowles.[97] Both Titan and Knowles were defendants in the *Bandfield* indictment. As discussed below, Noiman obtained information directly from Knowles, which he forwarded to Cruz, to resolve a serious potential problem with a CSCT deposit of VPLM stock. CSCT's staff was not involved.[98] Thus, Noiman was another "back door" to a CSCT customer, raising once again the question why CSCT even existed.

### 3.    CSCT And Its Key Figures

#### a.    Gregory V. Ruzicka

Prior to joining CSCT, Gregory Ruzicka was a real estate attorney in Newport Beach, California. He began his legal career advising exclusively on real estate issues and continued in the real estate field. He did not advise on the federal securities laws.[99] Before beginning work at CSCT, Ruzicka had no experience with Rule 144 or any of the other exemptions from registration under the federal securities laws.[100] Nor did Ruzicka have any prior experience with Cayman Islands law, the Bank Secrecy Act, or anti-money laundering rules and regulations.[101]

Ruzicka met John Hurry in 2002 when Hurry hired him to do some work on a commercial real estate issue. From time to time after that, Ruzicka did work for Hurry, but none of that work involved the securities laws or Hurry's broker-dealer business.[102]

Later, Ruzicka suffered a substantial financial setback that left him out of work and adrift.[103] At this point, Ruzicka asked Hurry to give him a job at a bicycle shop that Hurry owned. Hurry admitted that he was "kind of taken back a little bit."[104] Hurry proposed instead

---

[96] Prior to the events at issue, Noiman was involved in the customer due diligence on Titan when it was a direct customer of Scottsdale. On January 18, 2012, Noiman signed a due diligence form as a principal of the Firm representing that to the best of his knowledge the information provided by Titan was true and correct. Noiman also signed the form as the person giving compliance approval. CX-242, at 48.

[97] Hearing Tr. (Noiman) 1185-87. Ruzicka was under the impression that Titan "had a special pipeline to Scottsdale." CX-178, at 110.  He spoke of a young woman as being the "private liaison for Titan." CX-178, at 110.

[98] CX-296; CX-294; Hearing Tr. (Noiman) 1187-98. *See infra* at ___.

[99] CX-178, at 12-20.

[100] CX-178, at 22-23.

[101] CX-178, at 18-19, 22-24.

[102] CX-178, at 25-29

[103] CX-178, at 14-15, 19-20, 30, 38, 54.

[104] Hearing Tr. (Hurry) 1631, 1635-36. Hurry told D'Mura that Ruzicka had asked, "Would you be able to help me out? Is there any position or something? Could I work at your bike shop or your ice cream shop? You know, you don't have to pay me a lot, but at this point, I don't have anything. I have $50 in my pocket." Hearing Tr. (D'Mura) 2262.

that Ruzicka go to the Cayman Islands to run Hurry's operation there. According to Ruzicka, Hurry told him that Ruzicka would be running the business and acting as Hurry's lawyer.[105] Ruzicka had been to the Cayman Islands once before to go scuba diving, but he was willing to relocate because he had been through such a hard time and wanted a "change of scenery."[106] Hurry told Ruzicka that he had 30 days to read about Rule 144,[107] so Ruzicka read Rule 144, the Securities Act of 1933, and what he could find on the internet about the Rule 144 exemption.[108]

In mid-October 2013, Hurry flew with Ruzicka in Hurry's private plane to the Cayman Islands so that Ruzicka could begin work.[109] Ruzicka remained with CSCT until mid-October 2014.[110]

Diekmann testified that if CSCT had been his business, Ruzicka would not have been his choice to run the Cayman Islands broker-dealer. Ruzicka lacked securities experience, and he seemed disorganized, sending materials to Scottsdale piecemeal and failing to follow instructions.[111]

Ruzicka never had a securities license or registered with FINRA. Consequently, FINRA had no jurisdiction to compel him to testify. Ruzicka testified voluntarily at an OTR, and he considered testifying voluntarily at the hearing. However, after being contacted by counsel for Respondents, as discussed below in the credibility section, Ruzicka declined to testify. Consequently, Ruzicka's entire OTR was admitted into evidence.

### b.   Craig D'Mura

Craig D'Mura graduated from Arizona State University in May 2006 and shortly afterward began work at Vanguard Group in the retirement participant services department. After a year and a half, he went to law school at Syracuse University. Although he finished law school, he never took the bar examination and did not become licensed as an attorney. He returned to Phoenix and started a broker training program in 2010. However, he did not feel that being a broker was his "calling."[112]

D'Mura was unemployed in summer of 2011. He responded to an advertisement on Craigslist for an operations position at Scottsdale. In July or August 2011, after an interview with

---

[105] CX-178, at 38-40.

[106] CX-178, at 54.

[107] CX-178, at 40.

[108] CX-178, at 22, 62-63.

[109] CX-178, at 37.

[110] CX-178, at 231.

[111] Hearing Tr. (Diekmann) 759-61, 765.

[112] Hearing Tr. (D'Mura) 2246-47.

Justine Hurry, Scottsdale hired him. Prior to his work at Scottsdale, D'Mura was not even aware of the microcap securities industry.[113]

After two or three weeks in the operations position, D'Mura joined the Rule 144 team. His training was ongoing. By summer of 2013, he was handling more complicated deposits and was able to review files as a principal. However, he did not review deposits by FFIs.[114]

In summer of 2013, Hurry began discussing with Scottsdale staff his plan to open a broker-dealer in the Cayman Islands, and Cruz asked D'Mura if he might be interested in working there. D'Mura began filling out the paperwork necessary if he took the position in the Cayman Islands, and in January 2014, he flew with Hurry in Hurry's private airplane to the Cayman Islands to visit and consider a position with CSCT.[115] D'Mura decided to take the position, returned to Phoenix for a few days, and then went back to the Cayman Islands on January 28, 2014. He stayed with CSCT only about six weeks. After concluding that the situation was intolerable and would never improve, he left on March 14, 2014.[116]

### c. CSCT

#### i. Hurry Set Up CSCT

In early 2013, Hurry set up CSCT in the Cayman Islands.[117] He became its director and intended to have overall management supervision of it and its business.[118] Through a chain of entities, a Hurry family trust owns CSCT, and Hurry and his wife serve as co-trustees of the trust.[119]

Hurry claimed that he set up CSCT because Alpine, his U.S. clearing firm, wanted to be relieved of IRS tax withholding obligations. According to Hurry, Alpine wanted to do business only with FFIs that had agreed with the IRS to take on tax withholding obligations, thereby becoming what is known as a qualified intermediary ("QI").[120] Hurry testified that withholding obligations are complicated and burdensome.[121] He also testified that there are risks in getting

---

[113] Hearing Tr. (D'Mura) 2247-48.

[114] Hearing Tr. (D'Mura) 2248-51.

[115] Hearing Tr. (D'Mura) 2252-58.

[116] Hearing Tr. (D'Mura) 2266, 2306-09.

[117] Hearing Tr. (Hurry) 1329, 1333-34.

[118] Hearing Tr. (Hurry) 1394-95; CX-160, at 3.

[119] CX-21, at 2.

[120] Hearing Tr. (Hurry) 1373-74, 1552-61; Hearing Tr. (Frankel) 2345-46, 2349-51. Resp. PH Br. 8.

[121] Hearing Tr. (Hurry) 1554-57.

the paperwork wrong and incurring penalties, and that there were tax advantages to generating and retaining funds offshore.[122]

Hurry's testimony was at a high level of generality, and there was no corroborating evidence to show the analysis. There was no evidence regarding how Alpine made the decision that it would only do business with QIs, or who made the decision. There was no evidence other than Hurry's testimony to demonstrate that CSCT made business sense. It is unclear how the expense of establishing and staffing a separate offshore office was less burdensome than Alpine's withholding obligations, or why the same goal of eliminating Alpine's withholding obligation could not have been achieved less expensively by requiring the Firm's FFI customers to obtain QI certification in order to do business with Scottsdale and Alpine. Moreover, since Hurry ultimately bore the costs regardless of which entity had the obligation, Alpine or CSCT, we are not persuaded that the claimed reason for creating CSCT made sense.[123]

Nor did the creation of CSCT make sense from the perspective of achieving regulatory compliance. As Cruz agreed, it is easier to spot problems with direct accounts than through an FFI like CSCT that operated as an intermediary for sub-accounts and sub-sub-accounts.[124]

Hurry's intense involvement in CSCT's operations did not abate after he hired Ruzicka in October 2013 to run CSCT's day-to-day operations. Hurry located and rented office space for CSCT before Ruzicka began work and then continued to closely oversee the details of establishing and opening the office after Ruzicka arrived. Hurry obtained a floor plan from Ruzicka, told Ruzicka it was not correct, and asked Ruzicka to take measurements and create a revision.[125] Hurry provided Ruzicka with contact information for shippers to ship furniture Hurry had found for the office.[126] Hurry reviewed the proposed CSCT website design and asked about the costs.[127] Hurry made the final decision on hiring a bookkeeper[128] and all the decisions on entering contracts.[129]

---

[122] Hearing Tr. (Hurry) 1554-57.

[123] Hurry testified that he had allocated between $4 and $5 million for the project and had invested well over seven figures in CSCT. Hearing Tr. (Hurry) 1552. When asked what he had taken out of CSCT, he said "Zero." Hearing Tr. (Hurry) 1553.

[124] Hearing Tr. (Cruz) 220.

[125] CX-48; CX-50; CX-52; CX-55; CX-75.

[126] CX-52; CX-53.

[127] CX-49; CX-84.

[128] CX-178, at 43-44.

[129] CX-178, at 46.

Hurry instructed Ruzicka on fundamental business operations, as well. For example, he explained to Ruzicka that he should open a separate bank account for customer funds to keep their funds separate from CSCT's funds.[130]

Hurry decided that CSCT should be in the Special Economic Zone within the Cayman Islands, and that it should apply to be exempt from regulation by the Cayman Islands Monetary Authority ("CIMA"). In addition, Hurry instructed Ruzicka to apply to the IRS for QI status.[131] Although Ruzicka expressed concerns about the obligations and representations associated with QI status and was reluctant to make the required representations without further study, Hurry insisted that Ruzicka do it.[132]

Hurry determined the fees and commissions CSCT clients would pay. He instructed Ruzicka to take whatever Scottsdale charged CSCT and tack on 200 basis points.[133] Hurry in turn obtained a discount from Scottsdale on its charges to CSCT.[134] By this means, he kept the cost of doing business through CSCT roughly the same as doing business directly with Scottsdale. Otherwise, the rerouting of the FFI business through CSCT would have made no economic sense for the customers. However, there was no evidence that it made economic sense for Hurry to keep customer expenses roughly the same as they would have been working directly with Scottsdale when he was incurring substantial extra expenses setting up and staffing the extra office in the Cayman Islands.[135]

Hurry was intimately involved in setting up CSCT's technical systems. Hurry made the arrangements for computer software for CSCT and instructed Ruzicka to download Office 2010 for two users.[136] Similarly, Hurry selected computer equipment for CSCT and brought it down to the Cayman Islands in mid-January 2014 at the same time that he brought D'Mura to look at joining CSCT. D'Mura testified that Hurry set up the office network for CSCT.[137] When Ruzicka showed Hurry the information he planned to send to clients, Hurry told him he should make it look better and instructed him on how to do that. Hurry told Ruzicka to print to PDF and get a clean file to email customers. He advised Ruzicka that he could do that on his computer.[138]

---

[130] CX-83.

[131] CX-178, at 48-53.

[132] CX-105; CX-107; CX-178, at 50-53.

[133] CX-178, at 106-09.

[134] Hearing Tr. (Cruz) 141-43; Hearing Tr. (D'Mura) 2294-95.

[135] Hurry and Diekmann testified that routing the FFI business through CSCT was actually a little less expensive for customers than dealing with Scottsdale directly. Hearing Tr. (Hurry) 1642-44; Hearing Tr. (Diekmann) 1652-53. If true, that testimony further undercuts the business justification for CSCT.

[136] CX-94; Hearing Tr. (Hurry) 1461.

[137] Hearing Tr. (D'Mura) 2263, 2266-68.

[138] CX-77; CX-78.

Ruzicka, by contrast, was fairly unsophisticated about technology. He was vague on even identifying the programs that he used at CSCT.[139]

### ii. Hurry Micro-Managed CSCT's Business

Although Hurry portrayed Ruzicka as being in charge of CSCT,[140] the evidence is otherwise. Hurry micro-managed CSCT, and he bullied Ruzicka and D'Mura to get them to do what he wanted them to do. Hurry also closely tracked CSCT's business with Scottsdale and with its FFI customers.

Ruzicka considered himself to be only an intermediary.[141] Hurry dictated what should be done, and Ruzicka complied. Ruzicka said with respect to Hurry, "You don't discuss; you do as you are ordered."[142] For example, when Ruzicka protested that he was not comfortable with signing off on the QI application, Hurry responded, "Stupid, just do it." Ruzicka said that he "kind of dropped the subject at that point."[143] Ruzicka signed off, despite his discomfort, because he knew if he did not "there is a ticket back to LA coming tomorrow."[144]

Similarly, although Ruzicka thought that Unicorn engaged in some suspicious trading and constant pressure from Cem Can at Unicorn gave him the "creeps," Ruzicka did not think he had authority to terminate the relationship with Unicorn. If he had done so without clear authority from Hurry, he thought that would have been his last day at CSCT.[145] D'Mura confirmed that neither he nor Ruzicka could terminate a client relationship, and, although they hated dealing with Cem Can at Unicorn, they did not consider it an option to turn away the business.[146]

Some of the initial customers of CSCT were pre-existing customers of Scottsdale. When Ruzicka asked the commonsense question why the pre-existing business was going to flow through the new entity, Hurry told him to shut up. After that, Ruzicka just did as he was told.[147]

Ruzicka testified in his OTR, and D'Mura testified at the hearing, that Hurry barraged them with telephone calls while they were working at CSCT. Hurry called Ruzicka almost every day, sometimes multiple times. He called D'Mura less often, probably a couple of times a week.

---

[139] CX-77; CX-178, at 24-25.

[140] Hearing Tr. (Hurry) 1433, 1436, 1549-50. Hurry claimed that he hired Ruzicka to fulfill an "executive role." Hearing Tr. (Hurry) 1648.

[141] CX-178, at 46.

[142] CX-178, at 51.

[143] CX-178, at 51-52.

[144] CX-22; CX-178, at 52-53.

[145] CX-178, at 177-80, 188-89.

[146] Hearing Tr. (D'Mura) 2283-86.

[147] CX-178, at 79-80.

The calls could come at all hours as well.[148] Often the calls were followed by demanding, abrupt, and increasingly impatient emails saying "call me."[149] In one email, Hurry wrote "Your phone is not working TURN IT ON. I need a call."[150] In another he wrote, "Call me in 60 minutes. DO YOU NOT UNDERSTAND THAT?"[151] In another the subject line was "pick up your phone!!!!!!!"[152]

Hurry developed an Excel spreadsheet to track various aspects of CSCT's business. Although Hurry characterized it in his testimony as an "empowerment tool" that enabled his people to track their work for themselves without his having to keep track of their progress,[153] that characterization is not consistent with the evidence.

The spreadsheet tracked daily gross production, number of trades placed, certificate deposits approved, new certificate deposits received, and number of new accounts. It also tracked Ruzicka's start and finish times.[154] Ruzicka said that in telephone calls Hurry would even ask about how many cigarettes he had smoked during the day.[155] An email from Hurry corroborated Ruzicka's testimony. In the email, Hurry told Ruzicka "Need all the below," including start time, finish time, and "number of cig breaks."[156] Hurry acknowledged that the email included an inquiry about cigarette breaks, but he claimed that he was trying to help Ruzicka get himself organized. He claimed to know that Ruzicka was only in the office for ten minutes in an hour, which meant things were not getting done.[157]

Hurry wanted the numbers prepared every day, even if he did not ask for the information every day. Ruzicka and D'Mura prepared themselves for Hurry's frequent telephone calls and tried to have talking points and updated information ready to go if Hurry should call.[158]

Hurry tracked Ruzicka's and D'Mura's contacts with CSCT customers, including the FFIs involved in the transactions at issue. Ruzicka testified that in their frequent telephone calls Hurry would ask him about whether he had talked to Rohn Knowles at Titan or Cem Can at

---

[148] Hearing Tr. (D'Mura) 2301-02; CX-178, at 67-73.

[149] CX-63; CX-68; CX-71; CX-74; CX-118; CX-121; CX-126; CX-127.

[150] CX-121.

[151] CX-127.

[152] CX-118.

[153] Hearing Tr. (Hurry) 1433-39.

[154] CX-131; Hearing Tr. (Hurry) 1433-34.

[155] CX-178, at 140-41.

[156] CX-133; Hearing Tr. (Hurry) 1438-39.

[157] Hearing Tr. (Hurry) 1438-40.

[158] CX-178, at 140-41; Hearing Tr. (D'Mura) 2301-04; Hearing Tr. (Hurry) 1436-40.

Unicorn or other particular people from the Bahamas, Panama, or Belize.[159] D'Mura testified that Hurry would ask about customers, not particular deposits, but he and Ruzicka did discuss with Hurry how they were doing on specific deposits.[160] For example, in email correspondence and telephone conversations, Ruzicka discussed with Hurry the amount of trading in at least two of the symbols at issue here, NHPI and VPLM.[161]

D'Mura decided to leave CSCT and the Cayman Islands, in part, as a result of Hurry's constant demands. Hurry had called on a day that Ruzicka was attending a wedding as best man and D'Mura was working at his rented condominium instead of the office. Hurry expressed aggravation that neither of them was in the office and spoke of "having a come to Jesus moment" when he arrived in the Cayman Islands in a few days.[162] D'Mura then packed his bag and said good-bye to Ruzicka, who expressed the wish that he could leave, too. However, Ruzicka said he had nowhere to go and no alternative. D'Mura left before Hurry arrived; Ruzicka stayed.[163]

Eventually, in October 2014, Ruzicka also left CSCT. Its business had dwindled in reaction to the SEC complaint in *Amogear* and the *Bandfield* indictment.[164] According to Ruzicka, in October 2014 Hurry offered him other positions back in the United States, but Ruzicka concluded that he "did not want to work any long[er] for that man," referring to Hurry. Ruzicka said, "I don't care what he offered, you know. Incremental value of that last dollar just was not worth it."[165]

### iii. Hurry Prospected For CSCT Customers

CSCT did not advertise[166] or engage in cold-calling to try to generate business.[167] Hurry's business plan was for CSCT to develop clients through contacts and referrals,[168] but Ruzicka, who had no prior industry experience, had no network he could cultivate for potential customers.

---

[159] CX-178, at 74-77, 84-85.

[160] Hearing Tr. (D'Mura) 2304-05.

[161] CX-132.

[162] Hearing Tr. (D'Mura) 2308-09. Hurry confirmed that he was frustrated that Ruzicka and D'Mura were not in the office. Hearing Tr. (Hurry) 1602-03. When people called CSCT and did not get an answer, they called Alpine trying to find Hurry. Hearing Tr. (Hurry) 1622-23.

[163] Hearing Tr. (D'Mura) 2306-10.

[164] Hearing Tr. (Cruz) 237-38.

[165] CX-178, at 232.

[166] CX-178, at 218. In contrast, even though Scottsdale had been in business for ten years, it advertised for business. Hearing Tr. (Cruz) 116.

[167] Hearing Tr. (D'Mura) 2279-80.

[168] CX-160, at 3; Hearing Tr. (Hurry) 1393.

Customers simply appeared seeking to establish a business relationship with CSCT. They were referred to CSCT by Hurry or by someone at Scottsdale or Alpine.[169] Ruzicka testified at his OTR that he had an "express representation" that two of the FFIs involved in this case, Titan and Unicorn, were referred by Hurry.[170] Ruzicka did not know how Montage "found" CSCT.[171]

At the hearing, Hurry flatly contradicted Ruzicka's testimony that Hurry had referred Titan and Unicorn to CSCT.[172] We do not credit Hurry's testimony because he gave the testimony only after he knew that Ruzicka would not appear at the hearing to dispute Hurry's statement. To the extent that Hurry means that the referral came from someone at Scottsdale, we do not regard that as proving that Hurry was not the ultimate source of the referral, even if he made the link to CSCT through Scottsdale. Hurry had a pre-existing relationship with Titan while it was a direct customer of Scottsdale,[173] and he admitted talking to existing Scottsdale customers about his plan to establish CSCT.[174] He also admitted, as discussed below, to talking directly to Titan and other customers even after they became CSCT customers.

Hurry admits that he had at least one face-to-face meeting with Montage in Panama[175] and another face-to-face meeting with Unicorn in Belize.[176] He flew to Central America in January 2014 for these meetings, after dropping off D'Mura on his initial visit to CSCT. He did not take Ruzicka with him.[177]

At the hearing, Hurry claimed not to recall discussing business with either Montage or Unicorn during these visits.[178] Hurry claimed that he went to Montage because Ruzicka had asked him to evaluate a back-office system Montage was using to see if it would be suitable for CSCT. Hurry did not identify the nature of the system. He said that in the end they determined that it was not suitable for CSCT. He did not explain why it was unsuitable.[179]

We do not find Hurry's testimony with respect to his visit with Montage credible. Ruzicka was not technologically sophisticated and was too subordinate to suggest such a thing to

---

[169] CX-178, at 104, 167-68.

[170] CX-178, at 203-04.

[171] CX-178, at 203.

[172] Hearing Tr. (Hurry) 1410, 1416.

[173] Hurry was listed as the registered representative and financial consultant for Titan when it was a direct customer of Scottsdale. Hearing Tr. (Hurry) 1413-14, 1610-12; CX-242, at 44, 48.

[174] Hearing Tr. (Hurry) 1401-06.

[175] Hearing Tr. (Hurry) 1412-13, 1612-13.

[176] Hearing Tr. (Hurry) 1406, 1422, 1613-14.

[177] Hearing Tr. (D'Mura) 2300-01; Hearing Tr. (Hurry) 1617-19.

[178] Hearing Tr. (Hurry) 1406, 1618-19.

[179] Hearing Tr. (Hurry) 1612-13, 1617-19.

Hurry. Furthermore, D'Mura testified that he remembered no discussion of evaluating a back office system.[180] Hurry's testimony was vague and lacked specificity, and, again, Hurry gave his testimony only after it was clear that Ruzicka would not appear at the hearing. Hurry knew he would not be contradicted.

Hurry counseled Ruzicka to do business with Montage and, in particular, to do business with a person who was not identified in Montage documents as being connected with it. Ruzicka testified in his OTR that he was unclear about the role of a Montage contact named Frank Gray with whom Hurry spoke from time to time. Gray's name did not appear on the Montage incorporation documents. When Ruzicka asked Hurry about Gray, Hurry said to him "Hey, that's fine, you can interface with that guy. He's part of the operation."[181] This evidence shows that Hurry knew more about Montage than Ruzicka did, and that Hurry was instructing Ruzicka with regard to customer dealings. Gray was a named defendant in the *Bandfield* indictment.

Hurry claimed at the hearing that he only went to Belize to meet with Cem Can at Unicorn (both named defendants in the *Bandfield* indictment) because Ruzicka asked him to do so. According to Hurry, Ruzicka was trying to open the account and Can had requested a meeting with Hurry. Hurry said it is not uncommon for people to want to meet the owner of a business.[182] However, in somewhat inconsistent testimony, Hurry testified that he did not recall discussing business during his visit with Unicorn.[183]

Hurry's hearing testimony was impeached by his OTR. In his OTR, Hurry testified that Cem Can had asked him whether it would be better to do business with Scottsdale or CSCT. Hurry told him that it might be quicker to go directly to Scottsdale, but there could be "holdups" because of potential withholding there. On the other hand, because CSCT was a QI, Hurry told Can the "holdup" would be eliminated.[184]

There was additional evidence that Hurry discussed business with Unicorn. In late January 2014, Chinique Lewis of Unicorn sent an email to Eric Miller, Diekmann, and Ruzicka asking for Hurry to join a call on the processes and procedures to be used in connection with Unicorn's business with CSCT and Scottsdale. She said from "our personal face to face conversation with Mr. Hurry, I am certain he will not mind getting on a call."[185]

With respect to the request to involve him on a call with Unicorn, Hurry testified that it was no more than the common desire to deal with the person at the head of an organization.[186]

---

[180] Hearing Tr. (D'Mura) 2300-01.

[181] CX-178, at 123-24.

[182] Hearing Tr. (Hurry) 1613-14.

[183] Hearing Tr. (Hurry) 1406.

[184] Hearing Tr. (Hurry) 1407-10, 1421-22.

[185] CX-119.

[186] Hearing Tr. (Hurry) 1432

We find his explanation unconvincing. He traveled to a potential CSCT client without taking Ruzicka, the designated head of CSCT, discussed that client doing business with CSCT, and was viewed by the client as an important participant in the client's business dealings with CSCT.

Although he denied it, Hurry provided other leads and referrals to Ruzicka, too. In an email dated November 17, 2013, for example, Hurry wrote to Ruzicka, "Referrals and Leads call me on them." In the email, Hurry provided a couple of names and telephone numbers. One of those named was an "Andrew Farmer."[187] On November 20, 2013, Ruzicka wrote Hurry that he had tried to call "Andy" at the number Hurry had given him but the call did not go through. That same day Hurry provided another telephone number.[188] Hurry maintained he had identified the people in the email to Ruzicka not as prospects or potential customers but because they knew FFIs.[189]

Hurry revealed that, in fact, he was guiding Ruzicka's customer dealings, when he volunteered that Ruzicka did not in the end talk to the people Hurry had identified in the email. Hurry said that he had afterward found out that they had some "issues" and had told Ruzicka, "Don't bother."[190]

D'Mura testified that while he was at CSCT Hurry and Ruzicka met with another potential customer, Caledonian Securities. CSCT received over 50 Caledonian deposits afterward.[191]

Despite this evidence that Hurry was critical to developing CSCT's business, Hurry portrayed himself as offering only slight help to Ruzicka. He claimed that all he did was to recommend to Ruzicka that he get a book of international financial institutions and prospect for customers using that.[192] This testimony is not credible. Since Ruzicka and D'Mura engaged in no cold calling, they had no use for a book to help them prospect for customers.[193] Furthermore, such an approach to business promotion—cold calling people out of a book—was not likely to be successful. Hurry would certainly have known that, and he would not have been satisfied with

---

[187] CX-51.

[188] CX-62.

[189] Hearing Tr. 1401-04; CX-51.

[190] Hearing Tr. (Hurry) 1404.

[191] Hearing Tr. (D'Mura) 2295-97. D'Mura testified that he received the initial documents from Caledonian in the last week before he left Scottsdale and laid them out on a table to review, so he was well aware of the volume submitted to CSCT. The Caledonian-related deposits were not passed on to Scottsdale before he left CSCT. Hearing Tr. (D'Mura) 2317.

[192] Hearing Tr. (Hurry) 1403-04.

[193] Hearing Tr. (D'Mura) 2279.

that approach to marketing CSCT. He wanted CSCT to be successful and worked hard to make it so.[194]

### iv. Hurry Tried To Conceal His Involvement With CSCT

Both Ruzicka and D'Mura had the impression that secrecy was important to Hurry. Ruzicka said that Hurry "flat told me, 'I'm going to Caymans, because that way I don't have to give anything to anybody.'"[195] D'Mura testified that when he first flew down to the Caymans with Hurry, Hurry spent time discussing with him the privacy laws of the Cayman Islands. Hurry noted that some of them were criminal, not just civil.[196] In so doing, Hurry stressed the serious consequences if a person failed to comply.

Hurry denied any particular interest in secrecy.[197] Hurry's denial is not credible. We find that he was intensely concerned with secrecy and concealing his involvement with CSCT's customers and business. His concern was manifested in the following ways.

### (a) Use Of Email Address That Hid His Identity

Hurry used an email address that hid his identity. When Ruzicka started working at CSCT, he used as his work email address ▮▮▮▮▮▮▮. The address identified him by his initials, the firm by its initials, and the Cayman Islands location by the last two letters. Ruzicka set up a similar email address for Hurry, using Hurry's first initial and last name: ▮▮▮▮▮▮▮[198]

Hurry had an extreme reaction to his email address. Ruzicka said that Hurry "just crucified me." Hurry told Ruzicka that the address was too long, and instructed Ruzicka to change the individual identifier to x.[199] Thus, during the relevant period Hurry's email address at CSCT was ▮▮▮▮▮▮, which did not identify Hurry.

At the hearing, Hurry repeated the same explanation for changing his email address. He testified that he wanted an address that was short.[200]

We find Hurry's explanation to be false. He volunteered elsewhere in his testimony that his main email address is ▮▮▮▮▮▮▮.[201] Thus, Hurry's main email address is constructed in the same way that Ruzicka initially constructed Hurry's address at CSCT. If that construction

---

[194] Hearing Tr. (Hurry) 1417-18; CX-178, at 74-75, 135-42.

[195] CX-178, at 36.

[196] Hearing Tr. (D'Mura) 2259.

[197] Hearing Tr. (Hurry) 1361-62, 1364-65.

[198] CX-178, at 146-47.

[199] CX-178, at 146-47.

[200] Hearing Tr. (Hurry) 1459.

[201] Hearing Tr. (Hurry) 1426.

was not too long for Hurry's main email address, then it was not too long for his CSCT address. Furthermore, we find that the choice of x instead of an identifier such as JH was designed to conceal Hurry's involvement in CSCT business and perhaps give him the possibility of denying that it was his address. Finally, the extreme nature of his reaction to the initial email address— making Ruzicka feel almost "crucified"—strongly suggests that Hurry was concerned with something more important than having a short email address.

### (b) Assertion Of Attorney-Client Privilege

Hurry insisted on asserting the attorney-client privilege even where it was not appropriate. Hurry almost always marked his emails with Ruzicka as attorney-client privileged. He did so even when his emails simply asked Ruzicka to call him and when his emails concerned only floor plans and office furniture and the like, which emails neither sought nor received nor reflected any legal advice.[202] In contrast, Ruzicka rarely marked his emails to Hurry as privileged,[203] even though Hurry instructed Ruzicka that he should mark all his email correspondence with Hurry as attorney-client privileged.[204]

Hurry claimed at the hearing that he marked his emails privileged because Ruzicka advised him to use the privilege designation.[205] That claim is not credible in light of Ruzicka's practice of not marking his emails with Hurry as privileged. Nor is Hurry's claim consistent with the written record that it was Hurry who instructed Ruzicka to use the privilege designation, not the other way around. We find that Hurry wanted all his correspondence with Ruzicka marked privileged because he believed that he might be able to shield that correspondence from future regulatory scrutiny or litigation discovery. Similarly, in his hearing testimony, Hurry sometimes used the phrase "on advice of counsel" in his answer, as though it were a talisman against more probing inquiry or criticism.[206]

### (c) Avoiding Written Record

Hurry tried to avoid creating a written record. Ruzicka wrote in an email to Diekmann that Hurry had directed him to take a particular deposit, specifying the symbol, SVLE. Diekmann forwarded the email to Hurry and DiBlasi. When Hurry saw the email, he "tore" into Ruzicka

---

[202] CX-48; CX-49; CX-50; CX-51; CX-52; CX-55; CX-58; CX-62; CX-63; CX-71; CX-75; CX-77; CX-78; CX-79; CX-83; CX-84; CX-92; CX-94; CX-107; CX-129; CX-151.

[203] CX-53; CX-62; CX-75; CX-77; CX-79; CX-84; CX-151.

[204] CX-53 and CX-84.

[205] Hearing Tr. (Hurry) 1485.

[206] Hearing Tr. (Hurry) 1333-35.

"like you wouldn't believe."[207] Hurry told Ruzicka something to the effect of "Never put in writing that I am directly involved in business decisions."[208]

Ruzicka said that Hurry did not want any permanent record of his communications.[209] For that reason he communicated with Ruzicka primarily through FaceTime, the iPhone tool for video communications. Hurry called Ruzicka frequently, sometimes as many as four times in a day. He called early in the morning and as late as 9:30 p.m.; he called on weekends as well as business days. Ruzicka viewed the video calls as invasive, but Hurry told him that he used FaceTime because it was free.[210] Notably, emails are similarly "free" communications once you have paid the internet provider, and Hurry would have incurred no additional expense if he had communicated with Ruzicka by email.

Hurry disputed Ruzicka's testimony that he did not want a written record of his communications with CSCT.[211] However, D'Mura confirmed that Hurry did not want a written record of his involvement in CSCT business. D'Mura testified that Hurry expressed to him and Ruzicka both specifically and generally not to send him documents.[212]

### (d) Use Of FaceTime To Conceal Contacts With Customers

Hurry also communicated with CSCT customers (including all three FFIs involved in this case) using FaceTime, thereby concealing his contacts with them. Hurry would call Ruzicka at CSCT and ask Ruzicka to call a customer on CSCT's landline. Then Ruzicka would hold his iPhone next to the landline telephone so that Hurry and the customer could talk. Ruzicka did not participate in the calls, although he had to be present to hold the telephones together. This manner of conducting the telephone conversation would avoid a record that Hurry had talked to the customer. To the extent there was any record, it would appear that Hurry had only called CSCT. Ruzicka testified at his OTR that this happened roughly a dozen times and that Hurry had conversations in this manner with Rohn Knowles and Kelvin Leach at Titan, Cem Can at Unicorn, and Frank Gray at Montage.[213]

In hearing testimony, D'Mura similarly described a FaceTime conference call with Caledonian. Caledonian was on the speaker phone in the CSCT office and Hurry was on the iPhone. Ruzicka would hold the telephones next to each other. D'Mura remembered at least one

---

[207] CX-178, at 155-61.

[208] CX-178, at 161.

[209] CX-178, at 70.

[210] CX-178, at 67-71.

[211] Hearing Tr. (Hurry) 1540.

[212] Hearing Tr. (D'Mura) 2300.

[213] CX-178, at 118-27.

other time that such a FaceTime conference happened.[214] D'Mura believed that it was Hurry's idea to conduct the calls this way.[215]

Hurry does not deny that he conducted telephone calls with CSCT customers in this manner. However, he gives the practice an innocent explanation. He claims that he used the iPhone app because it cost less and because he found it difficult to do a conference call on his cell phone. He claimed that Ruzicka was a participant in the call, disputing Ruzicka's OTR testimony after he knew that Ruzicka would not appear at the hearing.[216]

We find Hurry's explanation not credible. Hurry generally did not conduct his business in such a frugal manner. He flew back and forth to the Cayman Islands in his own private airplane, and flew to Panama and Belize from there to meet with Montage and Unicorn.[217] He funded expensive offices for CSCT[218] and provided Ruzicka and D'Mura with housing when they worked there.[219] He instructed Ruzicka to buy Hurry a seven-seat vehicle to use while he was in the Cayman Islands.[220] He liked to tell people how rich he is.[221] It is unlikely that the costs associated with a dozen international telephone calls would trouble him much.

We also find Hurry's assertion that he used FaceTime because he was too technologically challenged to figure out how to do a conference call on his cell phone not credible. Hurry was technologically sophisticated enough to set up CSCT's computer network.[222] He instructed Ruzicka on how to use PDFs and other software, and he created an elaborate Excel spreadsheet.[223] When he was asked whether he was aware that his use of FaceTime to speak with customers would conceal his involvement in a conversation with the customers, Hurry answered evasively, avoiding a direct yes or no.[224]

Hurry testified that he started using FaceTime in February 2014.[225] Coincidentally, his email traffic with Ruzicka and D'Mura at CSCT dropped to nearly nothing.[226] We find a

---

[214] Hearing Tr. (D'Mura) 2297-98.

[215] Hearing Tr. (D'Mura) 2302-03.

[216] Hearing Tr. (Hurry) 1540-42.

[217] Hearing Tr. (D'Mura) 2252-58, 2300-01; Hearing Tr. (Hurry) 1412-13, 1613-14, 1617-19.

[218] CX-178, at 35.

[219] Hearing Tr. (Hurry) 1447, 1649-51; Hearing Tr. (D'Mura) 2265, 2316-17.

[220] CX-58.

[221] CX-178, at 26, 70.

[222] Hearing Tr. (Hurry) 1461; Hearing Tr. (D'Mura) 2263, 2266-68; CX-94.

[223] Hearing Tr. (Hurry) 1433-34; CX-178, at 24-25; CX-77; CX-131.

[224] Hearing Tr. (Hurry) 1541.

[225] Hearing Tr. (Hurry) 1540.

[226] Resp. PH Br. 45.

significant connection between the two events. Hurry's purposeful use of FaceTime enabled him to stop creating a trail of emails.

### C.   The Firm's General Practice For Reviewing Deposits

Everything that Scottsdale knew about a deposit when the Firm concluded that it could sell the deposited securities pursuant to the Rule 144 exemption is contained in a due diligence package for the deposit.[227] Generally, at the top of the package is a two-page Deposited Securities Checklist ("Checklist"). That is followed by various other documents, including a Beneficial Ownership Declaration signed by the purported beneficial owner of the shares deposited for resale by Scottsdale.[228]

Scottsdale's general process for reviewing and approving a deposit of stock certificates was for a person on the Rule 144 team to assemble the due diligence package, working from the Checklist. Then, the person who had put together the file (sometimes referred to as the first reviewer) would go to Cruz and talk with him about it. Depending on the complexity of the deposit, the talk could take 15 minutes to an hour. Cruz did not review every page in the file. He would read through the Checklist and ask questions. He might ask to see particular documents and conduct Google searches while sitting together with the initial reviewer.[229]

The Firm heavily depended upon the representations made in the Beneficial Ownership Declaration for its conclusion that the purported beneficial owner was not an affiliate of the issuer and was the person who had the economic interest in the shares on deposit. Diekmann initially denied that the persons signing as beneficial owners could be lying. He testified that he saw no reason for them to lie, and he emphasized that the document is very clear about the information it requests. Only upon being pressed did he eventually agree that if someone were acting as a nominee for a secret beneficial owner one would expect them to lie.[230] We find his testimony on this subject evasive.

Cruz similarly focused on the fact that the Beneficial Ownership Declaration was the tool that the Firm used to find out who owned the shares.[231] He stressed that the Declaration was "unequivocal," and that the parties to the transactions understood the Firm's expectations when they made parallel representations regarding the person identified as the beneficial owner.[232] When asked whether language on Unicorn's website offering to appoint nominee officers and directors would be a red flag to him, Cruz responded that it "could have been." He suggested that the way he would deal with that red flag would not be to seek independent verification. Rather,

---

[227] Hearing Tr. (Diekmann) 1916-17.

[228] RX-1, at 1-2, 11-12, 78-79, 88-89, 158-59, 169-70; RX-2, at 1-2, 12-13, 106-07, 117-18; RX-3, at 1-2, 11-12.

[229] Hearing Tr. (Diekmann) 694-96; Hearing Tr. (Cruz) 278.

[230] Hearing Tr. (Diekmann) 1895-96.

[231] Hearing Tr. (Cruz) 201-03.

[232] Hearing Tr. (Cruz) 202.

he would simply emphasize to the interested persons the importance of disclosure. He said that the Firm would "reiterate and make sure they understand the purpose of our forms and ... that they need to – to disclose the underlying beneficial owner."[233]

Cruz testified that during the relevant period, from December 2013 through June 30, 2014, the Firm did not conduct a specific search for nominees.[234] Diekmann testified that he thought the Firm's general practice would pick up a problem with nominees, but he could not cite any particular procedures that were geared to do that. He said the "procedures in sum" would address the nominee problem.[235] Cruz confirmed, however, that the term "nominee" appears nowhere in the Firm's policies and procedures.[236]

Given the complexity of the analysis required, and the high potential for interested parties to obfuscate and make misrepresentations, we find the Firm's general process for final approval inadequate. A conversation that may last fifteen minutes and not involve review of all the documents in the file is not enough to analyze the content of the representations and understand whether the business transactions made sense. We also find that the Firm's reliance on the honesty of the interested parties filling out the forms was unreasonable in light of the high potential for the use of nominees.

We are concerned that the Firm's general process for review and approval was so poor when the processing of microcap stock certificates for resale to the public was its primary business. We are further concerned because the transactions at issue here were typical of Scottsdale's business. Cruz testified that the Firm's customers typically were persons who made loans to issuers and then sold the loans to others who then attempted to profit by exchanging them for shares. Thus, the Firm's lack of a good process for review and approval was not a minor aspect of the Firm's business.[237]

### D.   Transactions

The Firm followed a check-the-box approach to its Rule 144 reviews, without evaluating and independently verifying the information it gathered. This approach is apparent from the following in-depth analysis of the three NHPI deposits. The Firm followed the same approach with the VPLM and ORFG deposits, which we discuss in less detail.

---

[233] Hearing Tr. (Cruz) 307-08.

[234] Hearing Tr. (Cruz) 199-202, 211-13; Hearing Tr. (Diekmann) 908-10.

[235] Hearing Tr. (Diekmann) 922.

[236] Hearing Tr. (Cruz) 666-67.

[237] Hearing Tr. (Cruz) 352-53.

1.      **NHPI (Three Unicorn deposits derived from Collins promissory note)**

a.      **Due Diligence Package**

i.      **Purported Beneficial Owners**

CSCT made three NHPI deposits. They all came from Unicorn, which, in turn, purported to act on behalf of other supposedly independent entities: Sky Walker, Inc. ("Sky Walker"), Swiss National Securities ("Swiss National"), and Ireland Offshore Securities ("Ireland Offshore"). The beneficial owner of Sky Walker is identified on the Checklist as Patrick Gentle; the beneficial owner of Swiss National is identified on a separate Checklist as Talal Fanni (apparently a misspelling, since the person signed documents as Talal Fouani); and the beneficial owner of Ireland Offshore is identified on the third Checklist as Jeff Cox.[238]

Each purported beneficial owner signed a Beneficial Ownership Declaration representing that he was not an affiliate of the issuer, that the issuer was not to his knowledge a shell, and that the securities were free trading, without resale restrictions under Rule 144. The documents were not witnessed or notarized. No address, telephone number or other contact information was given for the purported beneficial owner.[239]

Scottsdale did nothing to identify the purported beneficial owners more specifically. While it did a Google search combining the name of the beneficial owner with the words "securities fraud" and put the first page of the initial index of results in the due diligence package, it did not search for the person's name alone, or the person's name in combination with the name of the entity through which he acquired the shares, or the person's name along with the names of the issuer and issuer's principals.[240]

The purpose of the Google search using the name of the purported beneficial owner with the words securities fraud is unclear in light of the fact that Diekmann testified that a "hit" on such a search indicating that a person was engaged in some sort of securities fraud would be unrelated to beneficial ownership.[241] That testimony demonstrates the check-the-box attitude of the Firm. Diekmann was insensitive to the possibility that if a person was engaged in securities fraud, then the representations made by that person and others connected to a deposit could be false.

As discussed below, the three deposits shared the same origin.

---

[238] RX-1, at 1-2, 11-12, 78-79, 88-89, 158-59, 169-70.

[239] RX-1, at 11-12, 88-89, 169-70.

[240] RX-1, at 67, 152, 223. The Firm misspelled Fouani's name when it did the Google search, illustrating its careless approach to conducting due diligence. RX-1, at 67.

[241] Hearing Tr. (Diekmann) 927.

### ii. Prior Holder Transaction

The Checklists for the Sky Walker, Swiss National, and Ireland Offshore deposits state that the issuer, NHPI, gave a $10,000 promissory note dated May 1, 2012, to someone named Thomas Collins. Each NHPI depositor purports to tack back its holding period to that date and that note.[242]

A copy of the May 2012 promissory note is included with the Sky Walker and Ireland Offshore deposits. The note was due and payable no later than July 1, 2012. It provided that if NHPI did not pay the note by the due date, Collins would have the right to convert the debt into common shares. No address or contact information is given for the company or for Collins. Although the note provided that Collins would have a right of conversion upon the company's default, it contained no provision for either party to give notice to the other in the event of a default. The signatures for NHPI and Collins were not witnessed or notarized.[243]

According to the attorney opinion in the due diligence package, the May 2012 note was the company's promise to pay Collins a fee for services.[244] The unaudited financial statements in the due diligence package similarly indicated that the note was for consulting services.[245]

With respect to Collins' identity and possible connection to the issuer, the due diligence package contains a statement signed by Collins declaring that he had never been an affiliate of the issuer. Again, the statement is not witnessed or notarized, and no contact information is provided.[246]

The issuer did provide the stock transfer agent with an address for Collins when it instructed the transfer agent to issue new unrestricted shares to him, as reflected in the instructions to the transfer agent, which are in the due diligence package. Collins had a Texas address.[247] Also in the due diligence package is the transfer agent's list of shareholders, which showed that all active shareholders of NHPI had U.S. addresses.[248]

Scottsdale did not run a Google search on Collins using the address contained in the due diligence package. Nor did it search to see whether Collins had any links to the other persons on the NHPI shareholder list. Rather, it ran a Google search linking Collins' name to the words "securities fraud." Apparently, a person named Thomas Collins had been involved in a securities fraud, but the Firm obtained an SEC litigation release indicating that that person had died prior to

---

[242] RX-1, at 1, 78, 158.

[243] RX-1, at 106, 183.

[244] RX-1, at 22, 101, 178.

[245] RX-1, at 40, 122, 198.

[246] RX-1, at 25.

[247] RX-1, at 31.

[248] RX-1, at 37.

1997. The Firm never determined the identity of the particular Thomas Collins involved in the NHPI deposits.[249]

### iii. Acquisition Of Shares By Depositors

Collins gave Sky Walker, Swiss National, and Ireland Offshore each a separate $50,000 note dated September 1, 2013. The notes were to be paid in full by November 7, 2013. The notes specified that in the event of a default the entire sum would become due.[250] Each note was ostensibly secured by a Stock Pledge Agreement pledging 20 million shares of NHPI,[251] which, at the time, Collins did not own. These notes, like the note between Collins and NHPI, contain no address or contact information for any party and no provision for either party to give notice to the other in the event of a default. They are neither witnessed nor notarized.[252]

The next items in the chronology are three Note Satisfaction Agreements dated September 16, 2013. These three identical Agreements indicate that Collins had already defaulted on the $50,000 note, although the due date was not until November 7, 2013. Each depositor declared a desire to take title to the NHPI shares described in the pledge agreement.[253] The Securities Deposit Pre-Review Request Unicorn submitted for Swiss National likewise gives September 16, 2013, as the date of acquisition, referring to the Note Satisfaction Agreement,[254] as does the Deposited Securities Request Form submitted for Ireland Offshore.[255]

On November 15, 2013, more than a year after the due date for the May 2012 note, the issuer and Collins purportedly entered into a note conversion agreement whereby Collins agreed to forgive 90% of the note in return for 90 million shares of NHPI.[256] The Note Conversion Agreement included in the due diligence package, like the May 2012 promissory note, contains no address or contact information for the company or for Collins and is not witnessed or notarized. The Note Conversion Agreement does not explain why the conversion occurred so

---

[249] RX-1, at 57-58.

[250] RX-1, at 32, 112, 190.

[251] RX-1, at 113-16, 191-94.

[252] RX-1, at 32, 112, 190.

[253] RX-1, at 33, 117, 195.

[254] RX-1, at 13.

[255] RX-1, at 161. Other documents give conflicting, later dates as the acquisition date. Some documents represent that the three depositors acquired the securities on November 25, 2013, pursuant to a Stock Purchase Agreement. RX-1, at 11, 19, 88, 98, 169. However, the due diligence package for NHPI contains no Stock Purchase Agreement. Another document says that the acquisition date was November 15, 2013, the same date that Collins entered into the Note Conversion Agreement and the shares were issued to him. RX-1, at 81. The Firm did not resolve the discrepancy between the September acquisition date and the November acquisition dates before selling the securities.

[256] RX-1, at 1, 78, 158.

long after the default or how the remaining unpaid 10% of the May 2012 promissory note was to be treated.[257]

NHPI issued the 90 million shares to Collins on November 15, 2013, the same day as the note conversion agreement.[258]

Although the exact date that Collins assigned the shares to the three beneficial owners is not clear, it was at most a few days after NHPI issued the shares to Collins. Thus, the transaction between the issuer and Collins, the issuance of the stock, and the transactions between Collins and the three purported beneficial owner entities all happened almost simultaneously.

Although the transactions happened almost simultaneously, the value given to the shares differed substantially. There is no evidence of a corporate event or other explanation for the variance. In return for forgiving a debt of $9,000, Collins obtained 90 million shares, but each beneficial owner entity forgave a debt of $50,000 for its 20 million shares. No money actually changed hands in these transactions.

### iv. Issuer Filings

Although NHPI had once been a reporting company with the SEC, it stopped being a reporting company in 2009. After that it made less frequent and less regular filings on OTC Markets.[259] On November 20, 2013, a few days after the NHPI shares were issued and around the time that Sky Walker, Swiss National, and Ireland Offshore acquired the shares, the issuer filed an annual report for the year ending December 31, 2012.[260] In the November 20, 2013 report, NHPI mainly discussed its pharmaceutical business and then stated in a single sentence that it had entered into the oil and gas business. It declared that further disclosure related to the oil and gas business was in an Interim Information and Disclosure Statement for the period ended November 20, 2013.[261]

In the annual report filed on November 20, 2013, notes to unaudited financial statements declared that NHPI had given Collins a promissory note for unspecified consulting services.[262] Scottsdale relied upon this disclosure to verify the existence of the May 1, 2012 promissory note, which was critical to the ability of the beneficial owners to sell the securities without registration.

---

[257] RX-1, at 26-28, 106-09, 184-86.

[258] RX-1, at 29.

[259] Hearing Tr. (Byrne) 2069-75; CX-255; CX-256; CX-260; CX-261; RX-1, at 130.

[260] CX-256. Diekmann testified that it appeared that the company had had a gap in its reporting prior to its November 2013 filing. Hearing Tr. (Diekmann) 939. However, he did not believe that such a gap would be suspicious, even if it were as long as two-and-a-half years. Hearing Tr. (Diekmann) 1011-13.

[261] CX-256, at 4. One page from the Interim Information and Disclosure Statement was in the due diligence package for the NHPI deposits. But that page did not contain the disclosure relating to the oil and gas business. RX-1 at 39.

[262] RX-1, at 40.

The only evidence that the note existed, however, was created about the same time as the transactions leading up to the sale of securities into the public markets.

In order to determine that NHPI was not a shell, Scottsdale relied on the representation by the president of NHPI that it was not a shell.[263] It also relied on descriptions of the company's assets and liabilities in unaudited financial statements contained in the annual report filed in November 2013 and in a quarterly report filed about the same time to cover the period ending June 30, 2012. However, those descriptions were vague; they showed mostly unspecific cash assets, not physical assets. In the annual report, for example, the company reported that it had less than $28,000 in a checking account, accounts receivable over $600,000, unspecified inventory over $70,000, and investment assets over $750,000. The financial statements also show that the issuer had incurred some expenses. The financial statements do not provide, however, any indication of the nature of the expenses or the business activities that supposedly gave rise to them. The issuer disclosed no verifiable facts.[264]

The company's public filings created a significant discrepancy between the disclosure in those filings and the NHPI deposits. The interim financial report for the period ending November 20, 2013, states that 981,408,909 shares were outstanding, of which 970,326,182 were restricted.[265] That means that only around 11 million shares were free-trading shares. But the three depositors deposited 60 million for resale to the public. There is no evidence that the Firm investigated this discrepancy.

### v. Attorney Opinion Letter

The Firm relied upon an attorney opinion letter stating that the shares could be issued as free trading shares and sold pursuant to Rule 144. However, that opinion made plain that the attorney relied on certifications by the principal officers of NHPI. The attorney assumed that all signatures were genuine and the facts set forth in the certificates were correct.[266] The attorney relied on the company's filings for his conclusion that the company was actively marketing its pharmaceutical products and exploring one or more strategic alliances and licensing arrangements.[267] Similarly, the attorney relied on company filings as showing that NHPI was actively pursuing the acquisition of mineral rights leases.[268] The attorney did not independently verify the facts in his opinion letter.

---

[263] RX-1, at 24.

[264] RX-1, at 38–40.

[265] RX-1, at 43.

[266] RX-1, at 20.

[267] RX-1, at 21.

[268] RX-1, at 21.

### vi. Scottsdale Approval And Sales

During the first week of February 2014, Noiman and Cruz approved the first NHPI deposit, Sky Walker, for resale by Scottsdale. At the time, the 20 million shares were given an estimated value of $268,000.[269] Noiman and Cruz approved the Swiss National NHPI deposit on April 9, 2014, which was given a value of $98,000.[270] They approved the Ireland Offshore NHPI deposit at the end of April 2014 with a given value of $82,000.[271]

Sales of NHPI shares began on February 26, 2014, and continued through May 7, 2014. Periodically, Scottsdale would wire out the proceeds of the sales of NHPI and other securities in the CSCT account.[272] As with all transactions conducted with CSCT and its customers, after Scottsdale wired the proceeds of the sales to CSCT's bank account, Scottsdale did not know where the funds flowed after that.[273] Thus, it did not know who received the economic benefit.

### vii. Promotional Activity

In December 2013, not long after the series of transactions by which the purported beneficial owners acquired their shares of NHPI, there was promotional activity regarding NHPI, as reflected in the due diligence file for the NHPI deposits. Diekmann testified that he would have looked at the promotional activity but he did not recall doing so. He asserted that promotional activity was not necessarily a red flag, but that he might try to see if there was a link to the customer. He acknowledged, however, that it would be difficult to know if a customer was behind the promotion if a nominee were being used.[274]

In February and March 2014, there also was promotional activity regarding NHPI.[275] In a February 19, 2014 email, Ruzicka wrote to Diekmann that Unicorn was particularly eager to trade NHPI. Diekmann did not remember the email, and did not think it particularly remarkable. He said that no customer wants "to miss an opportunity to trade."[276] Scottsdale sold NHPI shares deposited by CSCT during February and March 2014, when the promotional activity was ongoing.[277]

---

[269] RX-1, at 78-79 (Sky Walker).

[270] RX-1, at 1-2.

[271] RX-1, at 158-59.

[272] JX-268.

[273] Hearing Tr. (Cruz) 661-62.

[274] Hearing Tr. (Diekmann) 1014-16; RX-1, at 132-33; CX-262, at 6.

[275] CX-262, at 2-5; CX-263.

[276] Hearing Tr. (Diekmann) 1016-18.

[277] JX-268.

### b.     Red Flags Signifying A Scheme To Evade The Securities Laws

Even aside from the fact that the May 2012 promissory note was not a security, as discussed below, the circumstances of the three NHPI deposits raised a number of red flags signaling that the transactions were likely sham transactions using nominees to conceal the identity of the persons actually benefiting from the sale of securities. Some, but not all, of the red flags are listed below.

*First*, Collins and NHPI entered the agreement to convert the note he held from the company to shares—and NHPI issued the shares—almost simultaneously with his execution of three separate agreements to transfer a portion of those shares to Sky Walker, Swiss National, and Ireland Offshore. The almost simultaneous transactions are compelling evidence that the parties were not truly independent. The suspect nature of the transactions is heightened by the identical terms of the notes to Sky Walker, Swiss National, and Ireland Offshore.

Respondents attempted to rebut any suspicion arising from the timing and identical terms of the Sky Walker, Swiss National, and Ireland Offshore transactions. Diekmann testified that he assumed that one person had put together the loan transactions for Collins, and that was why the three entities had agreed with Collins to the same loan terms. He acknowledged that he did not know who that person might be, but he did not think it was a red flag that Sky Walker, Swiss National, and Ireland Offshore agreed to the same terms or that the same documents were used for the three loan transactions.[278] We find that Diekmann's unverified hypothesis did not excuse the failure to investigate this red flag.

*Second*, Collins entered into the agreement with the three depositors, along with the agreement pledging NHPI shares as security, before he actually had any shares. However, he represented in the pledge agreement that he held title to them already. It should have been a concern that Collins apparently misrepresented his ownership. It also is suspicious that the depositors would loan him $50,000 each without verifying that he owned the shares. It is even more suspicious that Collins would take on a $150,000 obligation without knowing whether he could obtain the shares. The facts support the conclusion that Collins entered into the agreement with the depositors because he (or whoever was pretending to be Collins) was affiliated with the issuer and knew that the shares could be obtained. Further investigation was required before proceeding to sell the securities.

*Third*, the documents relating to the NHPI transactions in 2012 lack important elements that would permit verification. For example, the 2012 Collins-NHPI promissory note bears no physical address, telephone number, or other contact information for Collins or NHPI. Similarly, the documents relating to the loan notes Collins gave the three depositors do not include any contact information for Collins or for the depositors. The lack of contact information is odd because there is no provision for where and how payment should be made. It is almost as though there is no expectation of payment.

---

[278] Hearing Tr. (Diekmann) 1699-1700.

*Fourth,* the obviously impossible September date declaring Collins in default on the notes held by the depositors—even before the notes became due on November 7, 2013—should have been investigated. The fact that the identical mistake was made in three separate documents supposedly involving independent parties is suspicious. If the parties were independent, one would have expected someone to notice the mistake. That is particularly so where the error was not a transposition of numbers but, rather, an incorrect month. The error would have been easier to spot.

Diekmann testified that the September 16, 2013 date on the note satisfaction agreement had to be a typographical error. "In all likelihood," he said, "that's supposed to read November 16, 2013."[279] When asked about the fact that the same error appears in all three note satisfaction agreements signed by Sky Walker, Swiss National, and Ireland Offshore, Diekmann said that was not surprising. He noted that the agreements were all executed the same day, and hypothesized that someone must have done a search and replace function to change the words without noticing the mistake.[280] Cruz similarly explained the date as a typographical error. He testified that even though the same mistake occurred in connection with the documentation for three purportedly separate transactions it gave him no pause.[281]

Between hearing days, Respondents obtained a copy of the relevant stock certificate, which was then introduced into evidence. It showed a transfer date of November 21, 2013. They argue that this proves that the September date was a typographical error.[282]

Respondents miss the point. Nothing in the due diligence package shows that the Firm noticed or investigated the discrepancy before selling the securities. Furthermore, if the September date was a typographical error generated by a search and replace function in documents governing supposedly independent transactions, that only increases the appearance of coordination among the parties to those transactions.

*Fifth,* Diekmann admitted that there was no evidence contemporaneous with the May 2012 note to show that the note existed.[283] The only evidence that the 2012 promissory note from NHPI to Collins existed was created after Collins purported to convert the note to NHPI shares. Rather than confirming the existence of the note, the timing of the late filing suggests the fabrication of false evidence to support the tacking period necessary for the exemption.

*Sixth,* it is peculiar that Collins did not enforce his right to conversion of the shares at the time if NHPI defaulted in July 2012 on the $10,000 promissory note. There is no explanation why he would have waited more than a year—until November 2013—to do so.

---

[279] Hearing Tr. (Diekmann) 949, 1835-37.

[280] Hearing Tr. (Diekmann) 949-52, 956.

[281] Hearing Tr. (Cruz) 365-66, 390-98.

[282] RX-115; Resp. PH Br. 15.

[283] Hearing Tr. (Diekmann) 939.

48

*Seventh*, there were signs that NHPI was a shell. The change from being in the pharmaceutical business to entering the oil and gas business, without any explanation for why, when, and how it had done so, was not consistent with a real business plan. The Firm collected no information regarding the change in business, and the attorney opinion letter, which relied on representations by the interested parties and assumed the asserted facts to be true, was not a sufficient basis for concluding that NHPI was not a shell.

Respondents maintained that the oil and gas business was added to NHPI's pharmaceutical business as a "supplement" to its business line.[284] We reject this characterization. These were radically different businesses that involved different expertise and different business models.

*Eighth*, the transactions have an air of fantasy. Collins supposedly took the $10,000 note in exchange for unspecified consulting services—no money changed hands. And then he took shares in return for forgiving the note—no money changed hands. When Collins supposedly borrowed $50,000 each from Sky Walker, Swiss National, and Ireland Offshore, nothing in the documents provided how, when, or where he would receive the money. There is no evidence that any money changed hands then either. Collins merely entered into a promissory note with each purported lender in which he pledged to give them stock if he defaulted; and then he defaulted. No money changed hands when Sky Walker, Swiss National, and Ireland Offshore took the pledged shares.[285]

*Ninth*, there is little evidence to support the value given to the NHPI securities. Within the span of a few months the value of NHPI shares varied substantially without any explanation. In November 2013, Collins received 90 million shares in return for forgiving $9,000 of his loan to NHPI. Simultaneously, he realized $150,000 for 60 million of those shares. By early February 2014, the 20 million shares in the Sky Walker deposit were estimated to have a value of $268,000. There is no evidence of a basis for the increase in value. Then, in April 2014 the value of the shares held by Swiss National and Ireland Offshore declined to less than $100,000—again, without explanation. This is particularly suspicious in light of the promotional activity that occurred in February and March 2014.

---

[284] Resp. PH Br. 16 and n.80.

[285] Diekmann testified that the only evidence the Firm had that the September 1, 2013 notes between Collins and the three depositors existed was the notes themselves. He never asked for documentation showing that $50,000 actually was transferred from Sky Walker to Collins. He was satisfied that the document looked like a loan to an individual and not an effort by a small company to raise capital. Hearing Tr. (Diekmann) 943-45.

### 2. VPLM (Montage deposit derived from Kipping oral line of credit)

#### a. Due Diligence Package

##### i. Purported Beneficial Owner

There was evidence in the record about two VPLM deposits by CSCT. The one included in the allegations of the Complaint was through Montage for the further benefit of VHB International. The Checklist identifies Victor Bretel as the president of VHB International. The deposit was for 9.3 million shares.[286]

##### ii. Prior Holder Transaction

In the Montage deposit, the prior holder in the VPLM chain was an entity called Locksmith Financial. The Checklist noted that Locksmith Financial was affiliated with Richard Kipping, who was the former president of VPLM. The Checklist stated, however, that Kipping was no longer an affiliate of the issuer because he had resigned more than two years earlier.[287]

In concluding that Kipping was not an affiliate, the Checklist relied on an attorney opinion dated September 6, 2013, stating that Kipping had resigned more than two years before.[288] As discussed below, that attorney opinion was insufficient to support the conclusion that Kipping was no longer an affiliate of VPLM. Cruz testified at the hearing that the Firm also relied on a December 16, 2013 letter signed by VPLM's Chairman, Thomas Sawyer, which made a representation that Locksmith was not an affiliate of the issuer.[289] The Sawyer letter declared that the parties to the sale of securities from Locksmith to VHB International (discussed below) were not affiliates of the issuer.[290]

The Checklist for the VPLM deposit indicated that the depositor had satisfied the Rule 144 holding period by tacking back to a "verbal [oral] line of credit" whereby the prior holder, Locksmith, had loaned the issuer, VPLM, $58,636.24. The Checklist stated that the last advance on the line of credit was made July 6, 2012.[291]

An August 15, 2013 written agreement purported to document and formalize the oral line of credit. According to the 2013 document, Locksmith agreed in 2012 to advance funds as loans

---

[286] RX-2, at 1.

[287] RX-2, at 1, 268.

[288] RX-2, at 1, 19-21.

[289] Hearing Tr. (Cruz) 441.

[290] RX-2, at 23-24.

[291] RX-2, at 1.

against a revolving line of credit and had received the right to demand payment in full or in part at any time.[292]

On the same day, August 15, 2013, a debt settlement agreement was executed between the issuer and Locksmith. In that document, the issuer indicated that it wanted to settle the amount it owed Locksmith by giving stock to Locksmith. The parties agreed to settle the company's $58,636.24 debt as of July 31, 2012.[293]

Although VPLM did not issue the shares to Locksmith until September 2013,[294] the Beneficial Ownership Declaration later signed by Bretel treated the date on which Locksmith acquired the shares as August 1, 2012.[295] The depositor thus relied on tacking his holding period to Locksmith's oral line of credit.

### iii. Acquisition Of Shares By Depositor

On August 23, 2013, Locksmith entered into a stock purchase agreement with VHB International. It was roughly a week after Locksmith had memorialized the purported oral line of credit and before the shares were actually issued. The aggregate purchase price for the stock was $240,000.[296] There is no evidence explaining why Locksmith was able to sell the shares for more than four times the value placed on the shares when Locksmith and the issuer entered into the debt settlement agreement only days before.[297] The buyer, VHB International, purported to acquire the shares for investment and not with a view to resale or distribution.[298]

Although Victor Bretel was identified as the beneficial owner of VHB International, Andrew Godfrey signed the Stock Purchase Agreement.[299] The Firm made an inquiry, and Montage responded that Godfrey "handles day to day operations due to Mr. Victor Bretel's travel schedule." Montage represented that Bretel remained the beneficial owner of VHB International.[300] Diekmann testified that the response was, as far as he was concerned, sufficient.[301]

---

[292] RX-2, at 26-27.

[293] RX-2, at 28.

[294] RX-2, at 12.

[295] RX-2, at 13.

[296] RX-2, at 33.

[297] RX-2, at 32.

[298] RX-2, at 35.

[299] RX-2, at 37.

[300] RX-2, at 38.

[301] Hearing Tr. (Diekmann) 1744-45.

#### iv.  Issuer Filings

The Firm relied on public filings for proof of the existence of the oral line of credit. The Firm characterized the oral line of credit as "generally disclosed" in the issuer's annual report for September 30, 2012.[302] The annual report for the period ending September 30, 2013, which was only published on November 6, 2013—*after* the oral line of credit had been memorialized in writing—attached a grid showing that the issuer had settled many of its debts and payments for professional services by issuing VPLM stock. According to the grid, on August 15, 2013, VPLM issued a little over 29.3 million shares to Locksmith Financial as a debt settlement.[303]

The grid actually raised more red flags. It showed that the company regularly followed a practice of compensating affiliates and others with stock. During the period from October 12, 2011, through August 15, 2013, VPLM issued shares to Locksmith three times and shares to Locksmith's owner, the former president of VPLM, Richard Kipping twice. Thus, during the two-year period, Kipping received, either directly or through Locksmith, roughly 80 million shares of VPLM. In fact, according to the grid, during the same period the company issued more than 185 million shares to various persons and entities, including Dennis Chang, the issuer's president, Thomas Sawyer, its Chairman and CEO, and Carl Mattera, an authorized signatory for the issuer.[304]

Curiously, in May 2013 VHB International received directly from the issuer approximately 2.4 million shares of VPLM. This was only a few months before it received the 29 million shares from Locksmith Financial.[305] That VHB had already received shares directly from the issuer raised a red flag that it might be an affiliate or might be coordinating its acquisition and resales of shares with others who were affiliates. There is no evidence that Scottsdale took note of that red flag.

#### v.  Scottsdale Approval And Sales

On February 10, 2014, Noiman and Cruz approved the VPLM shares deposited by VHB International for sale to the public.[306] Sales began on February 20, 2014, and continued through June 5, 2014. Periodically, Scottsdale wired out the proceeds from those and other sales for the account of CSCT.[307]

---

[302] RX-2, at 1.

[303] RX-2, at 40.

[304] RX-2, at 40 (excluding an additional 265 million shares issued to consummate an acquisition of another company).

[305] RX-2, at 40.

[306] RX-2, at 2.

[307] JX-281.

**b.    Red Flags Signifying A Scheme To Evade The Securities Laws**

A number of red flags were raised by this VPLM deposit. Here we discuss two that required the Firm to conduct further inquiry to establish that an exemption existed.

*First*, the Firm knew that Kipping had been an affiliate of the issuer at some point. This red flag required heightened scrutiny of the transaction. The Firm failed, however, to gather sufficient evidence to conclude that Kipping was no longer an affiliate.

There is no copy of a resignation letter in the due diligence package. Scottsdale did not even have a specific resignation date. It had a vague statement in a legal opinion that Kipping had resigned from the issuer over two years before. The attorney declared that she had reviewed documents filed with the SEC and had determined that Locksmith was not an affiliate or control person of the issuer, but she did not specify the documents she reviewed or explain how she arrived at her conclusion. She did not say she had seen the resignation letter. The attorney further stated that Locksmith and Kipping had represented to her that they were not controlled by any of the officers or directors of the issuer. In making that statement, the attorney was little more than a conduit for representations by the interested parties.[308] Diekmann was unaware of anything that anyone at Scottsdale did to confirm that Kipping no longer had any duties as president of the issuer.[309]

Cruz vaguely testified that he thought the Firm had some sort of resignation or acknowledgement of Kipping's resignation in the file.[310] Cruz may have been referring to the December 16, 2013 letter from VPLM's Chairman, which represented that none of the parties to the sale of the securities to VHB International had been an affiliate of the company within 90 days of the sale.[311] That bare representation provides no detail whatever. It does not indicate when Kipping might have resigned as an officer of VPLM or provide any other verifiable fact. For purposes of ensuring that an issuer is not behind a chain of transactions designed to effect a public distribution without registration, a representation by a principal of the issuer must be viewed more skeptically.

Even more important, from the outset, Scottsdale had affirmative evidence in its due diligence package indicating that Kipping might be affiliated with the issuer regardless of whether he had resigned as president. Under Rule 144, if Locksmith and Kipping held 10% or more of the issuer, they would be affiliates for purposes of the exemption. The grid showed that Kipping, either directly or through Locksmith, had received 80,318,000 shares of VPLM between October 2011 and August 2013.[312] The total outstanding shares of the company at the

---

[308] RX-2, at 19-21.

[309] Hearing Tr. (Diekmann) 1719-20.

[310] Hearing Tr. (Cruz) 440-41.

[311] RX-2, at 23-24.

[312] RX-2, at 40.

time that Scottsdale evaluated the deposit were 730,460,237.[313] Thus, Kipping and Locksmith received at least a 10.996% ownership interest in VPLM and Kipping could have been an affiliate regardless of whether he was still an officer of the company.

There were other signs that Kipping could have been an affiliate. In the due diligence file is the first page of results from a Google search for "Richard Kipping + securities fraud." One of the results dated May 15, 2013, contains a fragment of content apparently referring to VPLM. That fragment says, "So Richard Kipping still has personal interest in this penny scam."[314] Another entry dated May 7, 2013, also refers to VPLM and says, "The next few days will show if the stock can keep its unprecedented … in fraud look at the shareholders Richard kipping pretty much owns the …"[315] The Google search page was filed in the package, apparently without anyone looking at the full stories concerning Kipping or following up on his ownership of VPLM shares.

If Scottsdale had conducted further due diligence, it might have discovered that Kipping was indeed an affiliate of VPLM. During the relevant period, the Board of Directors of VPLM ordered a review of Kipping and Locksmith's debt conversions to VPLM stock. The resulting "forensic audit" dated June 5, 2014, described Kipping as a director and shareholder of VPLM. It indicated that, at the time of the August 15, 2013 stock conversion that was the basis for tacking VHB International's holding period, Kipping had executive responsibilities at both VPLM and Locksmith, including check signing privileges at VPLM.

The accountant who performed the forensic audit opined that many aspects of the August 15, 2013 agreement purporting to memorialize the earlier oral line of credit were problematic. Many of the items that appeared to him to indicate that the arrangement was not a true arms-length transaction were facts known to Scottsdale at the time it approved the sale of VHB International's shares based on tacking to the oral line of credit. Among other things, the accountant noted that the written memorialization was a year after the purported oral line of credit. He also noted that the stock for debt agreement did not specify any particular terms for the conversion, and he viewed Locksmith's right to demand payment in full or part at any time as onerous.[316]

The forensic audit illustrates that an objective analysis of the facts known to Scottsdale would raise strong doubt that Kipping was independent of VPLM at the time of the August 15, 2013 agreement and stock conversion.

*Second*, the grid attached to the November 2013 public filing shows that the issuer had a pattern of paying for services and its business expenses with stock. It issued much of this stock to

---

[313] RX-2, at 1.

[314] RX-2, at 95.

[315] RX-2, at 95.

[316] RX-292, at 6-7.

company insiders.[317] The pattern suggests that the issuer may have substituted the issuance of stock for compensation to insiders and business partners, leaving them to realize any monetary benefit by selling the stock to others. The constant flow of new issuer stock looks like a two-step process for unlawfully distributing securities into the public marketplace without registration.

This pattern is particularly troubling because all three parties in the chain of holders for the deposit—Kipping, Locksmith, and VHB International—were on the list of persons and entities that had converted debt to shares.[318] This was a red flag that they and the issuer could be coordinating. The Firm should have further investigated before concluding that the transaction was exempt under Rule 144.

3.  **VPLM (Titan deposit derived from Kipping and Locksmith through the ▇▇)**

a.  **Due Diligence Package**

i.  **Purported Beneficial Owner**

CSCT deposited another 13 million shares of VPLM for the benefit of Titan and for the further benefit of Cumbre Company. The Checklist identified Patrick Gentle as the ultimate beneficial owner of Cumbre and the VPLM stock.[319]

We discuss the evidence regarding this transaction as evidence of other similar conduct for purposes of sanctions and as additional evidence that CSCT was no more than a façade. Scottsdale continued to deal directly with the FFI and to ignore CSCT.

ii.  **Prior Holder Transactions**

This is the one transaction that was not derived from the conversion of a debt liability into shares. However, it also traces back to Kipping and Locksmith in a chain of holders.

The Checklist identified two prior holders, ▇▇▇▇▇▇ and ▇▇▇▇▇▇▇▇▇[320] ▇▇▇▇▇▇ acquired 1.5 million shares by a Stock Purchase Agreement dated June 12, 2012, from Richard Kipping. In that Stock Purchase Agreement, Kipping represented that he was not an affiliate of the issuer and had not been an affiliate at least for the previous 90 days. An attachment to the Stock Purchase Agreement indicated that ▇▇ paid Kipping $13,000 for the shares. A copy of a check written to Locksmith for $13,000 was attached. It appears to be written by Brooks K-9 Services Ltd., but it bears a notation saying "re VPLM certs."[321] Nothing in the

---

[317] RX-2, at 40.

[318] RX-2, at 40.

[319] RX-2, at 106.

[320] RX-2, at 106.

[321] RX-2, at 126-29.

due diligence package explains the connection between Brooks K-9 Services and ■■■ or the nature of Brooks K-9 Services.

■■■■■■■ acquired another 500,000 shares for $5,000 from Locksmith Financial pursuant to a Stock Purchase Agreement dated October 19, 2012. Locksmith made the same representation that it was not an affiliate of the issuer. Kipping signed on behalf of Locksmith. Another check from Brooks K-9 Services Ltd. was attached.[322]

■■■■■■■■■■ acquired three million shares of VPLM from Locksmith by a Stock Purchase Agreement dated August 1, 2012, for $20,000. Locksmith represented that it was not an affiliate of the issuer. Kipping signed on behalf of Locksmith.[323]

### iii. Acquisition Of Shares By Depositor

Cumbre acquired five million shares of VPLM from ■■■■■■■■ on January 10, 2014.[324] In a separate document written to Cumbre, ■■■confirmed receipt of $60,000 for the shares.[325] On January 13, 2014, in a separate document, ■■■■■ similarly confirmed receipt of $20,000 for 500,000 shares of VPLM.[326]

### iv. Scottsdale Approval

On May 29, 2014, Noiman and Cruz signed the Checklist approving the shares of VPLM for sale.[327]

### v. Blackout Period On Trading VPLM Shares

On June 5, 2014, Thomas Sawyer, the Chairman of the Board of Directors of VPLM, sent Titan by email a signed declaration notifying it of a blackout period starting June 6, 2014, on trading VPLM stock by certain "covered persons." Covered persons were defined to include directors, officers, and holders of 10% or more of the company's outstanding shares, among others. Richard Kipping (and his assigns) and Locksmith were on the list of covered persons. So was VHB International. The list also included FFIs and broker-dealers. Montage, Titan, Alpine, and Scottsdale were all on the list.[328] Noiman discussed the blackout notice with Titan and requested a copy.[329]

---

[322] RX-2, at 136-39.

[323] RX-2, at 147-49.

[324] RX-2, at 160.

[325] RX-2, at 155.

[326] RX-2, at 145.

[327] RX-2, at 107.

[328] CX-294.

[329] RX-104.

On June 6, 2014, a lawyer named David Wise, who had often done work for Scottsdale, wrote an email to Sawyer claiming to represent unnamed clients on the covered-person list and threatening to sue Sawyer and others for "slow[ing] down or prevent[ing] the transfer of shares by my clients." Wise called the blackout notice an attempt to prevent sales of VPLM stock in order to conduct a promotional campaign to raise the share price. He characterized Sawyer's actions as "clearly illegal" and said he would be calling the SEC.[330]

On June 6, 2014, Wise sent a copy of his email to Sawyer to Kelvin Leach at Titan and to both Noiman and Diekmann at Scottsdale. His cover note to them was breezy: "Hi Guys, See below. David." The tenor of the cover note indicates that Scottsdale and Titan were working closely together to address the problem of the blackout notice.

On June 9, 2014, Titan forwarded the blackout notice to Noiman, and Noiman immediately forwarded it to Cruz.[331] That same day, Noiman also forwarded the Wise email to Cruz.[332] The Firm stopped selling VPLM shares held by VHB International in order to investigate.[333]

On June 11, 2014, Titan received what appears to be an unsigned clarifying memorandum from Sawyer stating that the broker-dealers and FFIs such as Scottsdale and Titan were only on the list because they had been known to trade VPLM stock for covered persons. The memorandum declared that the broker-dealers and FFIs were still free to trade on behalf of *non*-covered persons. Titan forwarded the clarification that same day to Noiman and Diekmann,[334] and Noiman forwarded it to Cruz.[335] The clarifying memorandum did not take Kipping (and his assigns), Locksmith, or VHB International off the list of covered persons. Nor did it explain why they were listed as covered persons. When Noiman forwarded the clarification to Cruz on June 11, 2014, he wrote that "Titan received the attached after David Wise's VPLM notice."[336]

On June 24, 2014, a lawyer claiming to represent VPLM wrote to Noiman as Scottsdale's "Compliance Officer." Scottsdale had requested the transfer of two stock certificates, and the lawyer stated that the stock certificates appeared to be owned by covered persons. Kipping (and his assigns), Locksmith, and VHB International were on the attached list of covered persons. One of the two stock certificates identified, 2985, related to the VPLM deposit by Titan on

---

[330] Hearing Tr. (Cruz) 578-79. Wise provided an attorney opinion letter on which the Firm relied in connection with the ORFG stock deposit. RX-3, at 70. Wise also went to the Cayman Islands to assist Ruzicka for a couple of weeks after D'Mura left. Hearing Tr. (Hurry) 1603-04.

[331] CX-294.

[332] Hearing Tr. (Noiman) 1265-67; RX-104.

[333] Hearing Tr. (Cruz) 442-43; JX-281.

[334] CX-295.

[335] CX-296.

[336] CX-296.

behalf of Cumbre.[337] The other, 2228, may relate to a VPLM deposit not part of the record in this case. The certificate number for the deposit by VHB International is 2525.[338]

Notably, although the Titan deposit on behalf of the Lees nominally came through CSCT, Ruzicka was not included on any of the correspondence about the blackout period.[339] The correspondence reveals that Scottsdale, through Noiman, was continuing to manage FFI deposits without regard to CSCT. CSCT was performing no real function in connection with the VPLM deposit.[340]

### b.   Red Flags Signifying A Scheme To Evade The Securities Laws

Given what Scottsdale already had in its file on VPLM, it should not have approved the VPLM shares deposited by Cumbre for resale without obtaining better evidence that Kipping was not an affiliate of the issuer. The ▆▆▆transactions closely followed the VHB International transaction and revealed a pattern—Kipping was continually acquiring and selling large blocks of VPLM shares. When coupled with the information from the grid showing that VPLM followed a practice of issuing stock to insiders in settlement of its debts, the circumstances raised a strong suspicion that the issuer or an affiliate was unlawfully distributing securities without registration in a two-step process designed to obscure what was actually happening and who was benefiting from the sales of stock.

### 4.   ORFG (Unicorn deposit derived from Forward line of credit)

### a.   Due Diligence Package

### i.   Purported Beneficial Owner

In connection with the deposit of approximately 13.2 million shares of ORFG, CSCT acted for Unicorn, and Unicorn acted for an entity called Media Central, which named Geovanni Moh as the beneficial owner.[341] Media Central was identified as a Belize corporation, and Moh

---

[337] RX-2, at 106-09.

[338] RX-2, at 3.

[339] When Ruzicka was shown the blackout notice at his OTR, he expressed shock. He testified that he had never seen it, and that if he had he would not have processed the VPLM deposit for resale. He would have expected Scottsdale to treat it as a problem or red flag. CX-178 at 257-60.

[340] In the middle of explaining what he did in connection with investigating the VPLM blackout, Cruz made a half-hearted assertion that CSCT was involved, saying, "I asked or I briefed with CSCT to—to get an explanation if they—if they could." Hearing Tr. (Cruz) 442-43. We do not find that testimony credible. There is no corroborating evidence of any kind, and his testimony about CSCT, in contrast to his detailed testimony about Wise, was vague. Cruz did not say he had a conversation with Ruzicka—who was the only person at CSCT. Rather Cruz referred to CSCT in the abstract. Nor did Cruz say anything about the content of what he "asked" or "briefed" when he supposedly had contact with CSCT.

[341] RX-3, at 1.

was identified as a citizen of Belize.[342] Media Central was originally incorporated on February 14, 2014, under the name Lock Investments Ltd. Only two weeks later, on February 27, 2014, the name was changed to Media Central.[343] Nothing in the due diligence package explains the reason for the name change or whether there was any change in the identity of the principals of the company.

### ii. Prior Holder Transaction

Media Central claimed that it had satisfied the holding period for a non-affiliate by tacking to a prior holder's note as of September 1, 2012.[344] The prior holder was a person named Casey Forward. He purportedly took the issuer's note in return for an open-ended line of credit up to the maximum amount of $600,000. The note provided that the issuer would pay on "loans, advances and debt as of August 31, 2011 ... with interest on the principal balance outstanding from time to time" up to a principal amount of $600,000.[345] The note provided Forward with a right to convert any portion of the unpaid principal amount of note to restricted common stock. This right was open-ended and did not specify a particular amount that could be converted or a particular date when the conversion could take place.[346] Furthermore, the note provided that the holder could transfer in whole or in part any portion of the note without the prior consent of the company. Any such transfer was at the discretion of the holder.[347]

Forward subsequently assigned a $50,000 portion of the note to an entity called Anything Media in exchange for shares of Anything Media. As described on the first page of the Deposited Securities List, that transaction was reflected in an Assignment and Modification Agreement dated January 18, 2014, by which ORFG agreed to modify the terms of the original note.[348]

### iii. Acquisition Of Shares By Depositor

On April 16, 2014, Anything Media sold 15 million shares of ORFG to Media Central for $75,000 pursuant to a stock purchase agreement. However, at that time, Anything Media did not own the shares. It acquired shares of ORFG only a few days afterward, on April 22, 2014, when it converted a $9,000 portion of the note into 15 million shares of ORFG.[349] There is nothing in the due diligence package to explain why Anything Media sold ORFG shares before it actually owned them. Nor is there anything to explain why the shares could be sold for $75,000 when

---

[342] RX-3, at 9, 13.

[343] RX-3, at 15-16.

[344] RX-3, at 36-41.

[345] RX-3, at 36.

[346] RX-3, at 38.

[347] RX-3, at 40.

[348] RX-3, at 1, 42-45.

[349] RX-3, at 1.

they only had a value of $9,000 when they were converted a few days later. Cruz testified that he did not consider these matters red flags that required further inquiry and that the Firm did not conduct further inquiry based on these matters.[350]

### iv. Scottsdale Approval And Sales

On June 5, 2014, Noiman and Cruz signed the Checklist for ORFG approving the sale of securities.[351] Sales began June 11, 2014, and continued through the end of the relevant period on June 30, 2014. Periodically, Scottsdale would wire out the proceeds along with the proceeds from the sales of other securities out of CSCT's account.[352]

### v. Promotional Activity

From early May through early July, ORFG was the subject of multiple promotions.[353] Cruz testified that the promotions were consistent with the reviewer's findings on the Checklist. He said he probably would have looked at a couple of pages of printouts showing the existence of promotions. The Firm typically would look to see whether the customer had any involvement and whether the promotions were having any effect on the trading done in the security.[354]

### b.    Red Flag Signifying A Scheme To Evade The Securities Laws

We discuss here only one of the red flags in the ORFG deposit. The initial transaction underlying the deposit made no business sense. With respect to the original line of credit, no reasonable company would agree to borrow money on a line of credit that permitted the lender to convert the debt to stock at any time in any amount at the holder's discretion. Certainly a company would not agree that the open-ended conversion option could be assigned to an unknown third party without the issuer's prior consent. Under such an agreement the company would not know whether it was going to be required to pay back some or all of the money it borrowed on the line of credit or whether it would be required to issue shares. Nor could it know to whom the conversion option might be assigned. It could not manage its finances or be certain of its shareholder dynamics and corporate control.

As the forensic audit of the Kipping-Locksmith loan found with respect to the open-ended line of credit in that transaction, the onerous terms from the issuer's perspective were a sign that the loan was not an arms-length transaction. Unless the Firm investigated and discovered some sensible explanation, it could not lawfully sell the securities.

---

[350] Hearing Tr. (Cruz) 533-34.

[351] RX-3, at 2.

[352] JX-310.

[353] CX-303, at 17-25.

[354] Hearing Tr. (Cruz) 537-38.

### E. Credibility

#### 1. Ruzicka

As noted above, Ruzicka was never registered with FINRA and was never subject to its jurisdiction. He voluntarily testified at an OTR, and considered testifying voluntarily at the hearing. Throughout the first week of the hearing, Enforcement reported at the end of each day on the likelihood of Ruzicka appearing.[355] On Friday of the first week, Enforcement announced that Ruzicka had agreed to appear the following Monday.[356]

However, Ruzicka changed his mind over the weekend and never appeared. He apparently changed his mind because of a text that Respondents' counsel sent to him on the Saturday after the first week of hearing. That text, although portrayed by counsel afterward as nothing more than a request to talk, appears to us to have been an attempt to sow distrust between Ruzicka and Enforcement counsel. It made Ruzicka angry at the way he thought he was being portrayed by Enforcement at the hearing and unwilling to be "put through hell" by appearing.[357]

Respondents' counsel telephoned Ruzicka on Saturday but only received an automated instruction to leave a message or text. Respondents' counsel then left him a text saying the following, which included quotations from Enforcement's opening statement:

> You may want to know how FINRA has been characterizing you during the first week of the hearing. For example, you were "hapless," "malleable," and "bereft of other options." You may want to know the other side of what FINRA is telling you. I would welcome the opportunity to discuss.[358]

After receiving the text from Respondent's counsel, Ruzicka texted Enforcement counsel saying, in part, "If even veracity, I am done."[359] We interpret Ruzicka's response to mean he was offended at the portrayal of him as desperate and easily manipulated, and to mean that he would not appear at the hearing if that was an accurate picture of Enforcement's comments about him.

Enforcement reported at the hearing that it had neither confirmed nor denied to Ruzicka what Respondents' counsel told him in the text. Enforcement took the position that it could not reveal what was said in the proceeding because it was confidential.[360]

---

[355] Initially, the discussions of Ruzicka's likely participation were off the record. Later, they were on the record. Hearing Tr. (remarks of counsel) 748, 840-41, 1032, 1275, 1277.

[356] Hearing Tr. (remarks of counsel) 1275, 1277.

[357] Hearing Tr. (counsel reading text into record) 1288.

[358] Hearing Tr. (counsel reading text into record) 1288.

[359] Hearing Tr. (counsel reading text into record) 1287.

[360] Hearing Tr. (remarks of counsel) 1299.

Enforcement argued that Respondents' counsel had violated at least the spirit of the sequestration order in the case; Respondents' counsel asserted that the sequestration order was about witness testimony and that counsel's quotations from Enforcement's opening statement did not violate the order. The Hearing Officer declined to rule on the charge of misconduct.[361]

Based on legal analysis separate from the alleged misconduct of Respondents' counsel, as laid out at the hearing on the record, the Hearing Officer admitted the entire transcript of Ruzicka's OTR. The Hearing Officer declared that the Hearing Panel would determine the probative value and weight to give the OTR after it had reviewed the OTR in the context of the evidence at the hearing, taking into account the circumstances that led to the admission of the OTR in lieu of live testimony from Ruzicka.[362]

The Hearing Panel now specifically finds that Ruzicka's testimony at his OTR was credible. It was consistent with other evidence in the record and corroborated by D'Mura's testimony. Wherever Ruzicka's testimony is cited here, it is cited because we credit it.

We reject Respondents' arguments for discounting Ruzicka's testimony.

*First*, Respondents assert that it is unfair to rely upon Ruzicka's testimony because they did not have an opportunity to cross-examine him.[363] The short answer to that argument is that Respondents' counsel was responsible for that lack of opportunity to cross-examine the witness. Respondents cannot complain about it now.

*Second*, Respondents argue that Ruzicka was angry and biased against Hurry, so his OTR should not be viewed as reliable.[364] After review of the transcript, we conclude that, although Ruzicka evidently did not like the way Hurry treated him, Ruzicka was truthful as to the facts and as to Hurry's intimidating and controlling manner.

*Third*, Respondents claim that Ruzicka gave inconsistent information in a prior telephone call with FINRA staff.[365] However, the inconsistency was explained by the fact that Ruzicka still felt "beholden" to Hurry at the time of the telephone call. By the time of the OTR he did not feel that way.[366]

---

[361] Hearing Tr. (remarks of Hearing Officer) 1302.

[362] Hearing Tr. (remarks of Hearing Officer) 1302-05. There had always been uncertainty about whether Ruzicka would give testimony at the hearing. In light of that uncertainty, the parties had earlier briefed the issue of whether the OTR should be admitted. The Hearing Officer's ruling was informed by that earlier briefing.

[363] Resp. PH Br. 44 and n.253.

[364] Resp. PH Br. 44 and n.253.

[365] Hearing Tr. (remarks of counsel) 1296.

[366] Hearing Tr. (remarks of counsel) 1298.

*Fourth*, Respondents claim that Ruzicka gave an affidavit inconsistent with his OTR. They assert that Ruzicka swore that Montage, Titan, and Unicorn came to CSCT through a referral from Scottsdale. However, Ruzicka signed that affidavit at Hurry's request while still working for Hurry.[367] By the time of his OTR, Ruzicka no longer worked for Hurry. For that reason, we credit his OTR testimony that he was told that Titan and Unicorn came to CSCT through Hurry. Moreover, the affidavit saying that the three FFIs were referred by Scottsdale is not inconsistent with Ruzicka's understanding that ultimately Hurry was behind the referral. Even if Hurry persuaded the FFIs to do business with Scottsdale through CSCT, it would be consistent with his desire for secrecy for him to arrange for someone at Scottsdale to make the necessary introductions.

Finally, we observe that although Ruzicka's OTR testimony is valuable, his absence from the hearing deprived the Extended Hearing Panel of what would have been helpful live testimony and the opportunity for the Panel to ask him questions. Ruzicka's absence also encouraged Hurry to dispute the OTR testimony without fear of being contradicted, as discussed below. The distrust sown by Respondents' counsel impeded our adjudicatory process.

## 2.   Hurry

As indicated above in connection with specific testimony, we repeatedly found that Hurry was not credible. Many of Hurry's self-serving explanations were not convincing on their face. His testimony was often inconsistent with other reliable evidence. Much of what he said also conflicted with Ruzicka's OTR testimony, which we find more credible than Hurry's uncorroborated assertions.

Hurry's ostensible purpose for setting up CSCT—to relieve Alpine of IRS withholding obligations—was not supported by any evidence that it made business sense. Rather, we conclude from Cruz's and Diekmann's testimony regarding heightened regulatory scrutiny in the period leading up to the establishment of CSCT, and the filing of the four prior SEC complaints against Scottsdale customers and employees, that Hurry sought to insulate his business from regulatory oversight by moving Scottsdale's FFI business offshore. This conclusion is reinforced by the fact that Scottsdale personnel continued to manage the FFI business with entities such as Unicorn and Titan (through Miller and Noiman). They needed to do that because Ruzicka was not qualified to run a broker-dealer, particularly one in the highly specialized business of liquidating microcap stock pursuant to Rule 144. Moreover, CSCT got its business through Hurry and Scottsdale. CSCT did not, and indeed could not, operate as an independent entity. CSCT served no function that Scottsdale could not have performed without it.

---

[367] Hearing Tr. (Hurry) 1565-69, 1638-39; RX-110.

Hurry disputed that Ruzicka was not qualified to run CSCT and emphasized how accomplished Ruzicka was.[368] His testimony in this regard was not credible. It is plain from Ruzicka's inquiry about working in Hurry's bike shop that Ruzicka had no relevant experience and was desperate.[369] D'Mura described trying to educate Ruzicka about the securities industry and the elements for free-trading securities. D'Mura said it was "rough going" and that Ruzicka "wasn't picking it up."[370] D'Mura said that Ruzicka was anxious, stressed, and not capable of handling due diligence on microcap deposits by himself.[371] Even more important for our purposes here, D'Mura testified that he had conversations with Hurry about Ruzicka's difficulties and how Ruzicka was not "getting it."[372] Thus, contrary to his hearing testimony, Hurry knew that Ruzicka was not capable of running CSCT.

Hurry's assertion that he had little to do with CSCT was disproved. D'Mura testified that Hurry frequently bombarded him and Ruzicka with telephone calls about CSCT business and that he and Ruzicka tried to prepare for those calls with updated information about deposits. D'Mura portrayed Hurry as an intense and constant presence in their lives while they worked at CSCT, and emails corroborate that testimony. Emails show that Hurry oversaw every detail of CSCT's business, and Hurry admitted that he traveled to the Cayman Islands at least once a month. He so closely oversaw the CSCT operation that he claimed to know that Ruzicka was in the office only ten minutes out of every hour.

To the extent that Cruz, Diekmann, D'Mura, and Ruzicka all testified that Ruzicka, not Hurry, ran the daily operations of CSCT, as Respondents assert in their post-hearing brief,[373] we do not view that testimony as contradicting the evidence that Hurry was deeply involved in

---

[368] Hearing Tr. (Hurry) 1574-77. When asked why he did not hire someone who had broker-dealer experience and who knew about FFIs to run CSCT, Hurry said that he hired Ruzicka to play an "executive role," someone who was "an all-around person, somebody who had some entrepreneurial skills, some management skills, proven to be able to do that." Hearing Tr. (Hurry) 1648.

[369] Hearing Tr. (Hurry) 1631, 1635-36.

[370] Hearing Tr. (D'Mura) 2273-77.

[371] Hearing Tr. (D'Mura) 2277-78.

[372] Hearing Tr. (D'Mura) 2274-77. D'Mura may not have been emphatic about Ruzicka's difficulties—he testified that it was against his self-interest to cause Hurry to fire Ruzicka—but D'Mura did raise concerns with Hurry. Hearing Tr. (D'Mura) 2314-15.

Email correspondence corroborates D'Mura's judgment that Ruzicka did not understand the business. For example, in May 2014, Ruzicka sought Diekmann's approval to consider a deposit of 11 million shares with an ostensible value of two million dollars. Diekmann wrote back that the issuer's shares traded in so little volume—roughly 3,500 per day—that it would take a "bazillion" years to sell the entire deposit. Diekmann said it was inappropriate to set the value that high and the transaction was the kind that should be avoided. CX-241.

This email correspondence also illustrates that CSCT served no real function independent of Scottsdale. Ruzicka sought Diekmann's guidance before even considering the deposit. Ruzicka was not independently vetting deposits before presenting them to Scottsdale. CX-241, at 2.

[373] Resp. PH Br. 45.

CSCT's business. Ruzicka was responsible for the day-to-day processing of paper, but Hurry was responsible for bringing in business, cultivating the clients, and making all important decisions. Ruzicka, an out-of-work real estate attorney, did not have the background to do more than process the paper as directed. For Hurry to maintain that he left Ruzicka on his own to prospect for customers and manage client relationships defies belief.

Based on D'Mura's testimony and various emails, Hurry's contention that he was not concerned with secrecy was false. D'Mura testified that Hurry emphasized to him the privacy laws of the Cayman Islands, and D'Mura thought Hurry was very concerned about secrecy. Hurry's concern with secrecy was manifested in multiple ways, from his admitted use of FaceTime to confer with Montage, Titan, Unicorn, and other customers, to his obsession with labeling every email to and from Ruzicka as privileged, to his use of an email address that did not reveal its connection to him, to his refusal to use emails to discuss business and insistence on using telephone calls to do that.

Ruzicka's testimony only confirms D'Mura's. Ruzicka testified that Hurry told him that he was moving the FFI business to the Caymans precisely because he would not have to "give anything" to anyone. According to Ruzicka, Hurry was fanatical about not creating a record of his involvement with CSCT.

As for Hurry's efforts to develop business for CSCT, Hurry admitted having telephone calls with principals of Montage, Titan, and Unicorn, and he admitted personally visiting Montage in Panama and Unicorn in Belize. Although he claimed that he discussed a back-office system with Montage at Ruzicka's request, his testimony was vague and unspecific. There was no corroboration for Hurry's assertion, and he only made it when he knew that Ruzicka would not appear at the hearing to contradict him. Similarly, as to Hurry's initial assertion that he did not discuss business with Unicorn when he went to Belize, Hurry was impeached by his own OTR testimony. In his OTR he testified that he discussed pros and cons of doing business with Scottsdale directly or going through CSCT. Emails showed that Hurry provided other leads and referrals to Ruzicka, and D'Mura testified that Hurry was involved in developing Caledonian as a CSCT customer.

We further find Hurry not credible when he testified that he could not remember anything about his meetings with Montage in Panama and Unicorn in Belize. Hurry appeared to have excellent recall of other information and events. He testified in detail about the intricacies of taxation in the Cayman Islands and how it differed for Canadians and U.S. citizens, as well as the way the special economic zone in the Caymans operates.[374] He also testified about the Cayman Islands Monetary Authority, CIMA, and its information sharing agreement with the SEC, noting

---

[374] Hearing Tr. (Hurry) 1554-65, 1647-48.

that the original agreement was in 2005 and that it was updated in 2012.[375] He insisted that he knew the exact days on which Ruzicka and D'Mura began at CSCT.[376]

We observe that Hurry appeared to be a canny, sophisticated, controlling, and hard-driving businessman. Hurry's attempt to portray himself as a distant figure, far removed from CSCT's business was not credible. Although he claimed that he likes to empower his people to run their businesses on their own,[377] that is demonstrably untrue.

### 3.   DiBlasi

We find DiBlasi's testimony that he was the CCO—but not in connection with the Firm's Rule 144 business—astonishing.[378] Almost all of the Firm's business involved Rule 144 sales. As explained below in discussing DiBlasi's violation, DiBlasi was responsible for the WSPs, and nothing in the WSPs clearly allocated Rule 144 compliance to Cruz. Indeed, during much of the relevant period, the WSPs assigned the CCO specific responsibilities in connection with Rule 144.[379] DiBlasi's testimony may accurately reflect what he believes his job responsibilities to be, but, if so, his designation as CCO was misleading.

### 4.   Cruz

Cruz's testimony was vague and unreliable. He often said he could not recall whether he had looked at various materials in conducting his due diligence reviews but that he "could" have done so.[380] Cruz also changed his testimony or made it vaguer as he was testifying if he became uncomfortable with his original statement. For example, he said that the change in NHPI's business from pharmaceuticals to oil and gas was not so important because the company's "management team had been stable. It's not the situation where we had a roaming management team."[381] But when asked how he knew that the management team was stable, he could point to nothing in the due diligence package or elsewhere. He ended by denying that he had said that the management team had been stable, saying, "I didn't see any change of - evidence of a change of management. I didn't use 'stable.'"[382] When pressed whether certain items were red flags calling for a searching inquiry about the issuer, Cruz resorted to general statements such as it "depends

---

[375] Hearing Tr. (Hurry) 1630.

[376] Hearing Tr. (Hurry) 1620, 1624.

[377] Hearing Tr. (Hurry) 1550.

[378] Hearing Tr. (DiBlasi) 1921-23, 1946-47, 1952-53, 1965-66.

[379] Hearing Tr. (DiBlasi) 1967-73.

[380] Hearing Tr. (Cruz) 279, 284, 292-96, 301-03, 308.

[381] Hearing Tr. (Cruz) 288.

[382] Hearing Tr. (Cruz) 288-91.

on the facts and the circumstances."[383] He never explained any basis for determining which facts and circumstances would trigger the duty to conduct a searching inquiry.

### 5.   Diekmann

We find Diekmann's testimony vague, evasive, and unreliable. He characterized documents in ways that on their face the documents did not support, such as the Miller email indicating that a Canadian citizen could conceal himself by using a corporate entity as the owner of his Scottsdale account. Diekmann asserted that the Firm's procedures would root out a nominee problem but could point to nothing in the procedures that was designed to do that.[384] He was insensitive to suspicious circumstances such as a Google search that turned up information suggesting that a person was engaged in securities fraud,[385] or the identical terms and circumstances of the three supposedly independent NHPI deposits.[386] He contradicted his own OTR testimony.[387] He repeatedly resisted admitting that inconsistencies and suspicious circumstances could signify that a transaction was a sham until he had to admit what was obvious.[388]

Given Diekmann's position as the Firm's current president, we are concerned about his ability to ensure that the Firm responds appropriately in the future to obvious red flags and suspicious circumstances. This concern bears on the need for stringent sanctions, as discussed below.

Illustrative of the issue is Diekmann's testimony regarding information on Unicorn's website. Unicorn advertised the use of nominees to give customers an "extra level of confidentiality" because the customer's "name will not show up."[389] At his OTR, Diekmann testified that he had not seen this page of the Unicorn website before his OTR, but if he had it would have caused him concern whether the true beneficial owner was being disclosed.[390] At the hearing he testified differently. He said that he would not be concerned about the information on Unicorn's website because he had seen nothing on the website that suggested that Unicorn was offering to affirmatively lie about beneficial ownership.[391] When asked whether Unicorn would

---

[383] Hearing Tr. (Cruz) 293.

[384] Hearing Tr. (Diekmann) 737-38.

[385] Hearing Tr. (Diekmann) 927.

[386] Hearing Tr. (Diekmann) 1853-54, 1901-04.

[387] Diekmann testified at his OTR that a print-out from the Unicorn website caused him concern about whether Patrick Gentle was the true beneficial owner of stock deposited at Scottsdale in his name. At the hearing, however, he denied that the information on the Unicorn site was a concern. Hearing Tr. (Diekmann) 925-30.

[388] Hearing Tr. (Diekmann) 1881-84, 1886-87.

[389] Hearing Tr. (Diekmann) 1818-19.

[390] Hearing Tr. (Diekmann) 1875-78.

[391] Hearing Tr. (Diekmann) 1819.

have had to offer to lie about the beneficial owner before the website language would concern him, Diekmann answered "Yes."[392] That is not consistent with his and the Firm's gatekeeping function.

A second example of Diekmann's insensitivity to suspicious circumstances is his response to questions concerning an email exchange between one of the Rule 144 staff members and Titan. The staff member sent an email to Ryan Mendez at Titan saying that Scottsdale had multiple subaccounts at Scottsdale with Andrew Godfrey as the authorized signer. She requested a statement from Godfrey that explained the purpose for the multiple entities and provided an explanation of "any distinguishing features among the separate entities." She then named the eight entities.[393]

Godfrey provided an astoundingly broad and vague response:

[The eight companies] are holding company's [sic] that are used to invest in development and exploration stage companies that engage in local, regional, multinational, global, sporting, manufacturing, wholesale, transportation, technology and eco friendly companies, etc., etc. Each investment is placed into a holding company based on investment criteria such as location, industry, long or short-term investment etc., etc.

Godfrey made no distinction among the companies. He provided no facts that could be verified. The response was undated and addressed "To Whom It May Concern." Godfrey provided no address, telephone number, or other contact information for himself or any of the companies. The response was forwarded by email from Titan to Scottsdale.[394]

Diekmann characterized Godfrey's response as reasonable.[395] We do not find it so. It lacks specificity and has no indicia of reliability or authenticity.

Finally, Diekmann displayed a lack of the skepticism, analytic acuity, and ingenuity that are required to perform the broker-dealer's gatekeeping function in the Rule 144 context. He testified that the identical documentation for the NHPI transactions did not trouble him because some unidentified person could have put Collins together with the three parties seeking to sell the NHPI shares they acquired from him. When asked whether that unidentified person could be the secret beneficial owner of the three sub-sub-accounts, he said that there was nothing in the documentation indicating that was so. He further declared that he did not know how you would

---

[392] Hearing Tr. (Diekmann) 1875.

[393] CX-247.

[394] CX-248.

[395] Hearing Tr. (Diekmann) 891.

investigate whether it was so. He seemed content not to know who the unidentified person was and to assume that it was a person who had put the three depositors in touch with Collins.[396]

Diekmann said that "there's always a risk that there could be some puppet master pulling the s[t]rings."[397] But he expressed frustration at the thought that the Firm could and should have done more to ascertain whether a puppet master was at work. As he remarked regarding the Argentinian nominees in the *Tavella* case, "It's just impossible to know that there was somebody else behind this."[398]

For purposes of assessing the Firm's ability to avoid violations in the future and crafting remedial sanctions, his remarks cause us concern. Diekmann said that what happened with NHPI happens all the time.[399]

### 6.   Experts

#### a.   Marc Menchel

We give little weight to the testimony of Respondents' expert, Marc Menchel. Although he opined that Scottsdale's procedures were reasonable and consistent with industry custom and practice, his experience related to Rule 144 was both a long time ago and in a much different context than Scottsdale's business. Menchel ran a Rule 144 desk at a large broker-dealer more than 30 years ago. That desk did not concentrate the way Scottsdale does on large blocks (100,000 shares or more) of microcap stocks.[400]

Furthermore, Menchel did not opine on the sufficiency of Scottsdale's due diligence in the context of the specific transactions at issue. He did not review the exhibits or the investigative testimony. While he did look at all the relevant due diligence packages, he did not review them with the idea of "second guessing" the Firm's handling of the deposits. He merely looked to see whether the due diligence packages contained the sorts of items that one would expect them to contain.[401] Essentially, Respondents' expert, like Respondents, took a check-the-box look at the due diligence packages.

Finally, Menchel's opinion seemed influenced by his admittedly idiosyncratic view that Regulatory Notice 09-05 goes beyond Rule 144, and his claim that many of the red flags listed in the Regulatory Notice are not really red flags for purposes of Rule 144.[402] Menchel's opinion

---

[396] Hearing Tr. (Diekmann) 1901-03.

[397] Hearing Tr. (Diekmann) 720.

[398] Hearing Tr. (Diekmann) 732.

[399] Hearing Tr. (Diekmann) 1901, 1903.

[400] Hearing Tr. (Menchel) 2459-61.

[401] Hearing Tr. (Menchel) 2478-80, 2496-98, 2529-33, 2554-65, 2572-73, 2575.

[402] Hearing Tr. (Menchel) 2503-07, 2515-24.

similarly seemed influenced by his view that FINRA has no authority to charge a broker-dealer firm with a Rule 2010 violation for a Securities Act violation, a view that he admits has no decisional support.[403] Menchel's opinion regarding FINRA's authority is contrary to the Hearing Officer's prior determination in the Order dated February 26, 2016, that FINRA has jurisdiction to bring this case. We decline to accept Menchel's view for the reasons stated in that Order, which we do not repeat here.[404]

### b.    Brian Underwood

We find the opinion of Enforcement's expert, Brian Underwood, more reliable, more persuasive, and entitled to greater weight than Menchel's. His experience with Rule 144 was more extensive and more recent. Until retiring in 2008, Underwood served as the Chief Compliance Officer of two major broker-dealers for a combined period of almost 20 years. The broker-dealers traded microcap securities on a fairly frequent basis and their Rule 144 desks reported to Underwood through one of his direct reports.[405] He also served on two NASD working groups in the 1990s that reviewed roughly 300 sets of policies and procedures as part of an effort to develop a model set of procedures.[406] Underwood has maintained a consulting practice since he retired, and in that capacity he has more recently seen between 20 and 25 entire policies and procedures of different firms.[407]

Underwood also reviewed more of the materials relating to the particulars of this case, including the pleadings, the parties' memoranda, the exhibits, and the OTRs conducted in connection with the investigation.[408] He, unlike Menchel, evaluated the substance of Scottsdale's due diligence and whether it was consistent with industry custom and practice.[409]

Underwood expressed the following opinions, among others, which we find consistent with our own views and supportive of our conclusions:

(i)     In its WSPs, the Firm did not adequately address the risk of nominees being used to conceal the identity of the beneficial owners of the shares—it did not even mention the risk.[410]

---

[403] Hearing Tr. (Menchel) 2593-99.

[404] *See also KCD Financial Inc.*, Exchange Act Release No. 80340, slip op. at 5-6 & nn.8-13 (SEC Mar. 29, 2017).

[405] Hearing Tr. (Underwood) 2609, 2615-21.

[406] Hearing Tr. (Underwood) 2711-12.

[407] Hearing Tr. (Underwood) 2712-13.

[408] Hearing Tr. (Underwood) 2619-20.

[409] Hearing Tr. (Underwood) 2651-57, 2665-67, 2669-71, 2673-78, 2685-89, 2691-94.

[410] Hearing Tr. (Underwood) 2682-83.

(ii)   The Firm's practice of placing all FFIs on its red flag list was counterproductive because it did nothing to narrow the focus to the kinds of anomalies that required a searching inquiry.[411]

(iii)  The Firm's general practice of accepting the registered agent's address without requiring the physical address of the entities and persons purporting to own the shares was inconsistent with industry custom and practice.[412]

(iv)   Even though the Firm gathered large volumes of paper in connection with the transactions, it failed to analyze the information, did not identify issues raised by the files, and did not conduct the type of searching inquiry necessary to resolve those issues.[413] As Underwood testified, a searching inquiry "means asking questions. It means not just assuming an answer that is possible to explain the transaction when there are other answers that might not properly explain or satisfy the question. It means asking and inquiring and doing it independently ...."[414]

(v)    Underwood made plain that a broker-dealer cannot go forward with a Rule 144 transaction simply because it finds it too difficult to determine the identity of the beneficial owner. The broker-dealer must have reliable evidence of the identity of the purported beneficial owner. Otherwise it cannot proceed with the transaction.[415]

Underwood also explained that it would be typical in the industry to use other resources in addition to the internet to verify representations by the interested parties and make sure that those parties were not actually participating in an unregistered distribution of securities. With respect to whether the issuer is a shell, for example, it is not enough to obtain a representation from the issuer's principal as to its non-shell status. Underwood said that it would be common in the industry to obtain what is known as a "Bradstreet report." That report "can be quite enlightening in terms both of [the issuer's] operations, revenues, assets, who the key officers and directors are, shareholders—a great deal of information that is not necessarily available simply by going on the internet."[416]

Underwood concluded that a firm engaged in Rule 144 sales would also have more detailed written procedures that "would describe who did what, when, and how."[417] He said that

---

[411] Hearing Tr. (Underwood) 2685-86, 2752-55.

[412] Hearing Tr. (Underwood) 2679-80.

[413] Hearing Tr. (Underwood) 2689.

[414] Hearing Tr. (Underwood) 2694.

[415] Hearing Tr. (Underwood) 2734.

[416] Hearing Tr. (Underwood) 2661.

[417] Hearing Tr. (Underwood) 2677-78.

a firm would "anticipate questions that would be investigated with respect to issuers, with respect to sellers, with respect to the transfers of securities."[418] Furthermore, they would analyze the information collected and would "independently satisfy themselves to clear any red flags that arose. And that did not happen in any of these instances in my opinion."[419] He declared that the Firm did not meet the industry custom and practice for the conduct of this type of business.[420]

**F.      Law And Regulations Relating to Section 5**

**1.      It Is Unlawful To Sell Securities Without Registration, Unless An Exemption Exists**

It is unlawful for a firm to sell securities without an effective registration statement in place unless an exemption applies. Sections 5(a) and 5(c) of the Securities Act prohibit the "sale" and "offer for sale" of securities in interstate commerce unless a registration statement has been filed or is in effect, or an exemption from registration applies.[421] The prohibition applies to "any person,"[422] and the Securities Act defines "person" broadly to include both individuals and entities such as corporations and partnerships.[423] The prohibition also applies to any person who "directly or indirectly" sells or offers to sell securities.[424] Thus, Section 5 may be violated by a person who does not pass title to the securities but who is involved in the process of offering the securities for sale.[425]

The registration requirements are not merely technical—they are the "heart" of the Securities Act.[426] They serve to protect investors by promoting full disclosure of information thought necessary to informed investment decisions.[427] As the preamble to the Securities Act

---

[418] Hearing Tr. (Underwood) 2678.

[419] Hearing Tr. (Underwood) 2678.

[420] Hearing Tr. (Underwood) 2689.

[421] 15 U.S.C. § 77e(a), § 77e(c). *See also Ronald S. Bloomfield*, Exchange Act Release No. 71632, 2014 SEC LEXIS 698, at *20-21 (Feb. 27, 2014). A violation of Securities Act Section 5 also is a violation of FINRA Rule 2010, which requires members and associated persons to conduct their business consistent with high standards of commercial honor and just and equitable principles of trade. *Midas Sec.*, Exchange Act Release No. 66200, 2012 SEC LEXIS 199, at *46 n.63 (Jan. 20, 2012); *Dep't of Enforcement v. Padilla*, No. 2006005786501, 2012 FINRA Discip. LEXIS 46, at *1 n.2 (NAC Aug. 1, 2012).

[422] 15 U.S.C. § 77e(a), § 77e(c).

[423] 15 U.S.C. § 77b(a)(2).

[424] 15 U.S.C. § 77e(a), § 77e(c).

[425] *Pinter v. Dahl*, 486 U.S. 622, 642-47 (1988).

[426] *ACAP Fin. Inc.*, Exchange Act Release No. 70046, 2013 SEC LEXIS 2156, at *28 (July 26, 2013) (quoting *Pinter v. Dahl*, 486 U.S. at 638), *aff'd*, 783 F.3d 763 (10th Cir. 2015).

[427] *SEC v. Elliott*, 2012 U.S. Dist. LEXIS 82992, at *1 (June 12, 2012); *Bloomfield*, 2014 SEC LEXIS 698, at *21; *ACAP*, 2013 SEC LEXIS 2156, at *28 (quoting *Pinter*, 486 U.S. at 638); *Dep't of Enforcement v. KCD Fin., Inc.*, No. 2011025851501, 2016 FINRA Discip. LEXIS 38, at *49 (NAC Aug. 3, 2016), *aff'd*, *KCD Fin. Inc.*, Exchange Act Release No. 80340, slip op. at 5-6 & nn.8-13 (SEC Mar. 29, 2017).

states, the purpose of the Act is "[t]o provide full and fair disclosure of the character of securities ... and to prevent frauds." [428]

### 2. Sales Are Not Exempt If They Involve A Distribution By An "Underwriter"

A sale of securities is not exempt from registration if it involves a distribution of securities to the public. The Securities Act distinguishes between a distribution—which requires registration—and ordinary trading, which does not. In general, a distribution involves the sale of a substantial block of securities that is accompanied by sales solicitations, recommendations and other promotional activities that may induce investors to make investment decisions without the benefit of accurate information concerning the issuer, its management, and its plans and prospects. That is the reason registration is required. In contrast, ordinary trading by an individual investor who has little or no influence over the issuer is not accompanied by the same promotional pressures, and, consequently, the same protections are less necessary.[429]

The distinction between a distribution and ordinary trading is reflected in Section 4(a)(1) of the Securities Act, which exempts a securities transaction from registration if it does not involve "an issuer, underwriter, or dealer."[430] In this case, the term "underwriter" is critical. The term is not limited to financial industry professionals. It encompasses individual investors "if they act as links in a chain of transactions through which securities move from an issuer to the public."[431] Section 2(a)(11) of the Securities Act broadly defines the term to include "any person" who has purchased from an issuer "with a view to ... the distribution of any security."[432]

Because it is difficult to know whether a person acquired securities "with a view to" distributing them to the public, the surrounding circumstances and the investor's actions after acquiring the securities must be analyzed. For example, when a person acquires securities from the issuer in a non-public transaction and shortly thereafter resells, the circumstances suggest that the person acquired the securities with a view to distribution, which would make that person an underwriter. The transactions function like a two-step indirect distribution and may be a public offering in disguise.[433]

---

[428] Securities Act of 1933, Pub. L. No. 22, § 1, 48 Stat. 74, ch. 38.

[429] *See* the Preliminary Note to Rule 144 ("If any person sells a non-exempt security to any other person, the sale must be registered unless an exemption can be found for the transaction.").

[430] *See generally* Hicks, *Resales of Restricted Securities* at § 2.4, 12-13, § 2:10, 22-23, § 2.11, 23-24 (2015 ed.). *See* the Preliminary Note to Rule 144 ("Section 4(1) of the Securities Act provides one such exemption for a transaction 'by a person other than an issuer, underwriter, or dealer.'").

[431] Preliminary Note to Rule 144.

[432] 15 U.S.C. § 77b(a)(11). *See also SEC v. McNamee*, 481 F.3d 451, 455 (7th Cir. 2007).

[433] *See generally* Hicks, *Resales of Restricted Securities* at § 4:101, 250 (2015 ed.). *See* the Preliminary Note to Rule 144.

### 3.   Broker-Dealer Has The Burden Of Showing A Reasonable Basis For An Exemption

Once a *prima facie* case is made out, as it was here,[434] a broker-dealer has the burden of showing that it had a reasonable basis at the time it sold the securities for concluding that an exemption from registration existed.[435] Exemptions from the registration requirements are affirmative defenses that must be established by the person claiming the exemption.[436] The Securities Act requires a broker-dealer and its associated persons to act as gatekeepers to prevent unlawful distributions, and the responsibility rests on them to take all steps reasonable in the circumstances to assure themselves that an exemption applies before they sell securities without registration.[437]

A broker-dealer's duty to investigate is not satisfied by simply checking boxes on a checklist. Rather, a firm must examine the information it receives with a skeptical eye because the interested parties have an incentive to mislead and deceive a firm in order to facilitate their sale of securities. A broker-dealer must independently investigate suspicious facts to satisfy itself that an exemption exists. As the SEC has explained,

> A dealer who offers to sell, or is asked to sell a substantial amount of securities must take whatever steps are necessary to be sure that this is a transaction not involving an issuer, person in a control relationship with an issuer[,] or an underwriter. For this purpose, it is not sufficient for him merely to accept "self-serving statements of his sellers and their counsel without reasonably exploring the possibility of contrary facts."[438]

Exemptions from registration requirements are construed narrowly.[439] Accordingly, evidence in support of an exemption must be "explicit, exact, and not built on mere conclusory statements."[440]

It is important to bear in mind that there are two distinct burdens in this case. While it was Enforcement's burden to prove the elements of its claims, it was the Firm's burden before

---

[434] *See infra* p. 80.

[435] *Bloomfield*, 2014 SEC LEXIS 698, at *23; *ACAP*, 2013 SEC LEXIS 2156, at *29 (citations omitted); *Dep't of Enforcement v. Midas Sec., LLC*, No. 2005000075703, 2011 FINRA Discip. LEXIS 62, at *11 & n.8 (NAC Mar. 3, 2011), *aff'd*, 2012 SEC LEXIS 199, at *28 & n.36.

[436] *Midas Sec.*, 2011 FINRA Discip. LEXIS 62, at *28 & n.36, *38.

[437] *Padilla*, 2012 FINRA Discip. LEXIS 46, at *29.

[438] *Laser Arms Corp.*, 50 S.E.C. 489, 503 (Feb. 14, 1991) (quoting *Distribution by Broker-Dealers of Unregistered Securities*, Exchange Act Release No. 4445, 1962 SEC LEXIS 74 (Feb. 2, 1962)).

[439] *Midas Sec.*, 2011 FINRA Discip. LEXIS at *11-12 (quoting *SEC v Blazon*, 609 F. 2d 960, 968 (9th Cir 1979).

[440] *Midas Sec.*, 2011 FINRA Discip. LEXIS at *12 (quoting *Robert G. Weeks*, Exchange Act Release No. 48684, 2003 SEC LEXIS 2572, at *42 n.34 (Oct. 23, 2003).

selling the securities to establish a reasonable basis for the existence of an exemption from registration.

### 4.   Respondents Claim Two Exemptions

With respect to the transactions at issue, Respondents claim that Rule 144 applied to the transactions, or, failing that, the so-called "broker's exemption" in Section 4(a)(4) of the Securities Act for ordinary unsolicited trading.[441]

#### a.   Securities Act Rule 144

The SEC adopted Rule 144 both to provide a "safe harbor" for certain transactions and to protect against transactions by non-professionals as a means of circumventing the registration requirements. Among other things, Rule 144 restricts the resale of securities acquired directly or indirectly from the issuer or an affiliate in a transaction not involving a public offering. The SEC defines such securities as "restricted securities," and requires an owner of restricted securities to hold them for a length of time before reselling them in another transaction without registration. The holding period and other conditions for resale differ if the holder of the restricted securities is an affiliate or non-affiliate.[442] Thus, the identity of the person selling the securities and the nature of any relationship that person might have to the issuer become important to the exemption analysis.

Rule 144 defines an affiliate of an issuer as a person who directly or indirectly controls or is controlled by or is under common control with the issuer. Although Rule 144 does not define control, it is commonly understood that the definition in SEC Rule 405 of Regulation C applies. It defines control as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person whether through the ownership of voting securities, by contract, or otherwise." Control depends on the totality of the circumstances and does not turn simply on whether a person is an officer of a company or the holder of a certain amount of stock.[443]

The identity of the issuer is important, too. The Rule 144 safe harbor is not available for shell companies. A shell company is defined as an issuer "with no or nominal operations and no or nominal non-cash assets."[444]

A person who satisfies the applicable conditions of Rule 144 is deemed not to be engaged in a distribution of the securities and therefore not to be an underwriter for purposes of the

---

[441] Resp. PH Br. at 2-5.

[442] 17 C.F.R. § 230.144. *See generally* Hicks, *Resales of Restricted Securities* at § 2.4, 12-13, § 2:10, 22-23, § 2.11, 23-24 (2015 ed.).

[443] *SEC v. Zenergy Int'l, Inc.*, 141 F. Supp. 3d 846, 853-54 (N.D. Ill. 2015).

[444] *Id.* at 853.

Securities Act.[445] The burden is on the person claiming an exemption under Rule 144 to prove that all the applicable conditions have been met.[446]

The provisions of Rule 144(d)(3) relating to tacking are important here because tacking was the only way that the sellers in the transactions at issue could satisfy the required holding period. There are two categories of tacking. One category applies where a person who acquires restricted securities cannot personally meet the applicable holding requirement, but he is able to tack the holding period of another person to his. The other category applies where a person seeks to tack the period of time he has held restricted securities to the time he held other securities of the same issuer.[447]

Both categories are relevant in this case. *First*, to establish the requisite holding period, the purported beneficial owners needed to tack their holding period to that of the prior holders. Their ability to tack depended on the prior holders not being affiliates of the issuer. *Second*, in connection with the transactions charged in the Complaint, the prior holders needed to tack their acquisition of the securities to the earlier inception of the debt obligation exchanged for the securities. In order to do that, the debt obligation had to be a security. Rule 144 permits tacking based on the exchange of a security for another security of the same issuer (as long as no additional consideration is involved).[448]

In this case, Respondents claim that they had sufficient evidence that the sellers of the securities at issue were not affiliates of the issuers, the issuers were not shell companies, and the sellers had met the applicable holding period for the securities. We conclude that they did not.

### b.   Broker's Exemption Under Section 4(4)

Respondents argue they were entitled to the so-called broker's exemption under Section 4(4) of the Securities Act even if the transactions at issue were not exempt under Rule 144.[449]

---

[445] *See generally* Hicks, *Resales of Restricted Securities* at § 4:1, 86 (2015 ed.).

[446] *See* Rule 144(b).

[447] *See generally* Hicks, *Resales of Restricted Securities* at § 4:139, 318 (2015 ed.).

[448] *See generally* Hicks, *Resales of Restricted Securities* at § 4:139, 318-19 (2015 ed.). Rule 144(d)(3) contains the provisions governing tacking. Two provisions are relevant here. Rule 144(d)(3)(iv) provides that securities that are acquired as a result of a default on a bona fide pledge of the securities shall be deemed to have been acquired when they were acquired by the pledger. However, if the securities were pledged without recourse they shall be deemed to have been acquired by the pledgee at the time of the pledge. Rule 144(d)(3)(ii) permits a person to tack the period of time he has held certain restricted securities to the period of time he has held related securities of the same issuer. It provides for tacking where the securities to be sold were acquired from the issuer solely in exchange for other securities of the same issuer.

[449] Resp. PH Br. 4-5.

Section 4(4) is intended to exempt ordinary trading transactions that a broker may be asked to execute.[450]

As discussed above, a person can be an underwriter within the meaning of the Securities Act if he acquires the securities from an issuer or affiliate of the issuer with a view to distribution. In order to ensure that the person offering restricted securities for resale is not acting as an underwriter, it is necessary for a broker to evaluate the circumstances in which that person acquired restricted securities and offers them for resale. A broker cannot be a mere order taker. It must make whatever inquiries are necessary under the circumstances to ensure that its customer is not an underwriter.[451]

This exemption is not available when the broker "knows or has reasonable ground[s] to believe" that his customer is an underwriter, since in that event the broker would also violate Section 5 by participating in a non-exempt transaction.[452] As FINRA has stated, "[T]his exemption is available only if a broker is not aware, after a reasonable inquiry, of circumstances indicating that the selling customer is participating in a distribution of securities."[453]

Contrary to Respondents' arguments, we conclude that Respondents were confronted by abundant evidence that they were likely participating in unlawful distributions of securities. They cannot claim that they were unaware of facts signifying that possibility or the need to conduct further inquiry.

### 5. Both Exemptions Required A "Searching Inquiry" To Ensure That No Underwriter Was Involved

Neither the Rule 144 exemption nor the broker's exemption is available if the person selling the securities is an underwriter within the meaning of the Securities Act. Accordingly, where there are red flags indicating the possibility that a person may be acting as an underwriter, both exemptions require that a broker make a "searching inquiry" to satisfy itself that an exemption applies. Only then can a broker ensure that it does not participate in an unlawful distribution of unregistered securities.[454]

The SEC observed over half a century ago, "[W]here the surrounding circumstances raise a question as to whether or not the ostensible sellers may be merely intermediaries for controlling persons or statutory underwriters, then searching inquiry is called for."[455]

---

[450] *World Trade Fin. Corp.*, Exchange Act Release No. 66114, 2012 SEC LEXIS 56, at *26 (Jan. 6, 2012).

[451] *Bloomfield*, 2014 SEC LEXIS 698, at *24-25 & nn.35-36.

[452] *Bloomfield*, 2014 SEC LEXIS 698, at *24; *World Trade Financial Corp.*, 2012 SEC LEXIS 56, at *26 & n.31.

[453] CX-197 at 2 (emphasis supplied).

[454] CX-197.

[455] *Bloomfield*, 2014 SEC LEXIS 698, at *26-27.

### 6. FINRA Guidance On Red Flags Signaling That Underwriter May Be Involved

In Regulatory Notice 09-05, FINRA published guidance on the specific kinds of facts that give rise to the duty of conducting a searching inquiry.[456] In that guidance, FINRA made plain that "[a]ll firms must have procedures reasonably designed to avoid becoming participants in the potential unregistered distribution of securities."[457] It further explained, "Before selling securities in reliance on an exemption, a firm must take reasonable steps to ensure that the transaction qualifies for the exemption …."[458]

Regulatory Notice 09-05 identifies a non-exhaustive list of red flags that signal the "possibility of an illegal, unregistered distribution."[459] These red flags are by no means comprehensive. They are merely illustrative. The generally recognized red flags in the Notice include the following: [460]

1. A customer opens a new account and delivers physical certificates that represent a large block of thinly traded or low-priced securities.

2. A customer has a pattern of depositing physical share certificates, immediately selling the shares, and then wiring out the proceeds of the resale.

3. A customer deposits share certificates that are recently issued or represent a large percentage of the float for the security.

4. Share certificates reference a company or customer name that has been changed or that does not match the name on the account.

5. The lack of a restrictive legend on deposited shares seems inconsistent with the date the customer acquired them or the nature of the transaction in which they were acquired.

6. There is a sudden spike in investor demand for a thinly traded or low-priced security, coupled with a rising price.

7. The company was a shell company when it issued the shares.

8. A customer with little or no assets at the firm receives an electronic transfer or journal transactions of large amounts of low-priced unlisted securities.

---

[456] CX-197.

[457] CX-197, at 2.

[458] CX-197, at 2.

[459] CX-197, at 1.

[460] CX-197, at 3-4.

9. The issuer has been through several recent name changes, business combinations or recapitalizations, or the company's officers are also officers of numerous similar companies.

10. The issuer's SEC filings are not current, are incomplete, or are nonexistent.

## G.  Ethical Violations (First Cause Of Action—Scottsdale And Hurry)

The First Cause of Action charges that Scottsdale and Hurry violated FINRA Rule 2010 by acting in contravention of Section 5 of the Securities Act. It alleges that during the relevant period, Scottsdale sold millions of shares of securities without registration and without an exemption. It further alleges that Hurry was a necessary participant and substantial factor in the unlawful transactions through his close management and control of all the entities involved in the process of depositing, approving, and reselling the securities, and through his prospecting for CSCT customers. The Complaint alleges that Hurry took actions to evade regulatory scrutiny and enable the Firm to make the unlawful sales.

### 1.  Rule 2010

FINRA Rule 2010 requires FINRA members and their associated persons to "observe high standards of commercial honor and just and equitable principles of trade" in the conduct of their business. The Rule requires members of the securities industry not merely to conform to legal and regulatory requirements, but to conduct themselves with integrity, fairness, and honesty.[461]

Scienter is not required for a Rule 2010 violation. Rather, the SEC has established a disjunctive test for a Rule 2010 violation that applies either (i) to intentional or conscious bad conduct or (ii) to a failure to meet ethical norms, regardless of intention. The SEC has held that Rule 2010 may be violated if the respondent has acted either in bad faith or unethically.[462] In the context of a Rule 2010 violation, the SEC has defined bad faith as a dishonest belief or purpose,

---

[461] *Robert Marcus Lane*, Exchange Act Release No. 74269, 2015 SEC LEXIS 558, at *22 n.20 (Feb. 13, 2015) (discussing NASD predecessor to FINRA Rule 2010: "[T]his general ethical standard . . . is broader and provides more flexibility than prescriptive regulations and legal requirements. [FINRA Rule 2010] protects investors and the securities industry from dishonest practices that are unfair to investors or hinder the functioning of a free and open market, even though those practices may not be illegal or violate a specific rule or regulation.") (internal quotations omitted).

[462] *Blair Alexander West*, Exchange Act Release No. 74030, 2015 SEC LEXIS 102, at *20 (Jan. 9, 2015); *Thomas W. Heath, III*, Exchange Act Release No. 59223, 2009 SEC LEXIS 14, at *13-17 & nn.9-16 (Jan. 9, 2009), *aff'd*, 586 F.3d 122, 130 (2d Cir. 2009), *cert denied*, 2010 U.S. LEXIS 3029 (Apr. 5, 2010) (discussing NYSE predecessor of Rule 2010); *Dep't of Enforcement v. Shvarts*, No. CAF980029, 2000 NASD Discip. LEXIS 6, at *11-18 (NAC June 2, 2000).

and unethical conduct as conduct inconsistent with the moral norms or standards of professional conduct.[463]

Because the securities industry is built on trust, any ethical failure damages the industry generally by casting doubt on the integrity of its participants. An ethical failure also casts doubt on the ability of the particular miscreant to conform to ethical norms in the future. Enforcement of FINRA Rule 2010 is therefore fundamental to FINRA's regulatory mission, which, as expressed in FINRA's Sanction Guidelines, "is the building of public confidence in the financial markets."[464]

### 2.   Enforcement Established A *Prima Facie* Case Of A Section 5 Violation

The elements of a *prima facie* case for violation of Section 5 are the following: (i) respondents sold or offered to sell securities; (ii) through use of interstate facilities or the mails (the jurisdictional means); and (iii) when no registration statement was filed or in effect as to those securities. Scienter is not an element.[465] A Section 5 violation does not require a showing that the sale actually facilitated a fraud. A sale without registration and without an exemption is an unlawful distribution of securities regardless of whether it is proven to be connected to a fraud.

Enforcement established a *prima facie* case. It proved that from December 1, 2013, through June 30, 2014, Scottsdale sold shares of three issuers, NHPI, VPLM, and ORFG, using the jurisdictional means and without registration.[466]

Respondents do not dispute these facts. They argue only that the transactions were exempt from registration.[467]

### 3.   The Firm Lacked A Reasonable Basis For An Exemption

Scottsdale failed to have a reasonable basis for an exemption at the time that it sold the securities in the transactions at issue.

---

[463] *Edward S. Brokaw*, Exchange Act Release No. 70883, 2013 SEC LEXIS 3583, at *33 (Nov. 15, 2013). *See also Simpson v. Bear, Stearns & Co.*, No. C07950030, 1997 NASD Discip. LEXIS 13, at *27 n.9 (NAC Jan. 29, 1997) ("Term 'bad faith' is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity....").

[464] FINRA Sanction Guidelines at 1 (2016) (Overview), https://www.finra.org/industry/sanction-guidelines.

[465] *Bloomfield*, 2014 SEC LEXIS 698, at *22 & n.29. *See also SEC v. Cavanagh*, 445 F.3d 105, 111 n.13 (2d Cir. 2006); *SEC v. Calvo*, 378 F.3d 1211, 1214-15 (11th Cir. 2004).

[466] RX-1; RX-2; RX-3; JX-268; JX-281; JX-310.

[467] Resp. PH Br. 2-5.

*First*, in its due diligence the Firm did not even address the question whether the debt obligation was a security, despite having lawyers on its Rule 144 review team and despite Respondent Cruz being a lawyer with significant experience in the securities laws. It had no foundation for the tacking necessary to achieve the required holding period because the promissory notes and lines of credit on which the tacking was based were not securities.

*Second*, the documentation to support the Rule 144 exemption was rife with discrepancies and suspicious circumstances—all of which raised red flags strongly suggesting that the chain of transactions leading to deposits at Scottsdale were sham transactions using false documents and nominees to conceal the identity of the beneficial owners.

Although the Firm compiled thick due diligence packages for the transactions, it did so with a "check-the-box" attitude. It did not appropriately evaluate the information in the due diligence packages, did not investigate the many red flags, and did not independently verify the information received from the interested parties. The due diligence packages created only the false appearance of due diligence.

The Firm's conduct was unethical and did not meet the industry norms. The persons involved in the Rule 144 review did not obtain any meaningful information about the individuals and entities involved in the transactions. Diekmann confessed that he knew nothing about the purported beneficial owner of one of the deposits other than that the person was a client of CSCT's client. Scottsdale knew little more about any of them. It failed to perform its gatekeeping function. The testimony of Enforcement's expert only confirms our conclusion that the Firm failed to conduct itself in a manner consistent with industry norms.

        a.      **The Prior Holders' Debt Obligations Were Not Securities Available For Tacking**

        i.    *Reves* **Governs Whether Note Is A Security**

Not every note or debt obligation is a security.[468] The Supreme Court's decision in *Reves* governs the analysis.[469] Any note with a term of more than nine months is presumed to be a security unless it resembles one of the judicially enumerated instruments that are not securities, such as a note delivered in connection with consumer finance or a mortgage. In *Reves*, the Court set the analytic framework for determining whether a note bears a resemblance to one of the enumerated instruments or should be held to be a security. Four factors may be considered in deciding whether a note is a security:

    (i)     whether the seller's purpose is to raise money for general use of business or to finance substantial investments, and the buyer is motivated by the profit to be

---

[468] *Reves v. Ernst & Young*, 494 U.S. 56, 65-67 (1990).

[469] *Id.*

generated, in contrast to a note to facilitate a minor purchase or sale or to correct for cash-flow difficulties;

(ii)    whether the note involves an individual transaction or common trading for speculation or investment;

(iii)   whether there is a reasonable public expectation that the note would be viewed as security; and

(iv)    whether another regulatory scheme applies that would reduce risk of the instrument.[470]

In another case, the Court later summed up the distinguishing characteristic of a security as "any instrument that might be sold as an investment."[471]

As we explain below, we conclude that none of the debt obligations held by the prior holders were securities. That includes the NHPI note in payment for consulting services, the oral line of credit to VPLM, and the outstanding balance on the ORFG line of credit. As a result, when the prior holder accepted stock in satisfaction of the debt, it was not an exchange of securities that would support tacking.

### ii. NHPI

It is plain that the note written by NHPI to Collins, the prior holder in the chain of holders, was not a security. We observe at the outset that the note's term was much shorter than the nine months required to presume a note to be a security—roughly two months. But it also fails the test set forth in *Reves*. NHPI did not enter into the note agreement in order to finance its general business or to make a substantial investment. Nor was Collins motivated by some profit to be generated from the note. According to documents in the due diligence package, the note was no more than a promise to pay Collins $10,000 for consulting services. Furthermore, the note was issued in a single transaction. A note that "merely reflects a single transaction" and is "not offered to the public" is not a security.[472] Nor could there be any public expectation that an individual note promising to pay for services was a security. The fourth factor, whether another regulatory scheme applied and diminished the need for treating the instrument as a security, is inapplicable where no other factor supports labeling the note a security.

---

[470] *Id.* at 65-67. *See also Bass v. Janney Montgomery Scott, Inc.*, 210 F.3d 577, 583-86 (6th Cir. 2000).

[471] *SEC v. Edwards*, 540 U.S. 389, 393 (2004). *See also Frankfurt v. Mega Entertainment Group II*, 2016 U.S. Dist. LEXIS 73613, at *11 (N.D. Ill. June 7, 2016) (stating that "only those notes that were issued in an investment context" are securities).

[472] *New Earthshell Corp. v. Jobookit Holdings Ltd*, 2015 U.S. Dist. LEXIS 27141, at *10-11 (S.D.N.Y. Mar. 5, 2015)

As another similar note was aptly described by a federal district court, the note held by Collins was "akin to an 'IOU' for services rendered."[473]

### iii. VPLM

With respect to the issue of whether the oral line of credit extended by Locksmith to VPLM was a security, the focus at the hearing was on whether there is any distinction between an oral agreement and a written agreement. Diekmann maintained that there is no difference between an oral line of credit and a written line of credit for purposes of Rule 144 and tacking. He understood that in either case the successor holder could tack back to an advance on the line of credit. He based his understanding on his experience with the treatment of written lines of credit and discussions with legal counsel—who exactly he could not recall.[474]

In their post-hearing brief,[475] Respondents relied on a Seventh Circuit Court of Appeals decision, *Canadian Imperial Bank*.[476] Their reliance is misplaced. The issue in *Canadian Imperial Bank* was whether a private plaintiff had sufficiently pleaded the existence of a security for purposes of establishing subject matter jurisdiction. The plaintiff alleged that a certificate of deposit from a Bahama bank was a security, but no document was attached that could be analyzed for purposes of jurisdiction. The Court held that the complaint did not allege sufficient facts to establish jurisdiction, but it hastened to say that its decision did not mean that only written instruments can be securities, noting that oral promises of participation in a profit sharing plan have been held to be investment contracts even where not evidenced in writing.[477] The Court's remarks regarding oral promises as investment contracts provide no basis for concluding that the oral credit line here was a security.

The oral line of credit, unlike an oral promise of participation in a profit sharing plan, was not represented to be an investment. Nor was it easily tradeable as an investment. There was no means of being certain of the terms, confident of the effective transfer of rights, or sure that those rights might later be enforced. Accordingly, the oral line of credit was not a security.

Moreover, even if written, the line of credit did not meet the *Reves* test. The line of credit was a loan to the issuer by a single individual. Such an individual transaction would not be viewed as a security by the public and would not ordinarily be traded as an investment.

---

[473] *SEC v. Garber*, 959 F. Supp. 2d 374, 377 (S.D.N.Y. 2013).

[474] Hearing Tr. (Diekmann) 1711-17.

[475] Resp. PH Br. 22 n.114.

[476] *Canadian Imperial Bank of Commerce Trust Co. v. Fingland*, 615 F. 2d 465 (7th Cir. 1980).

[477] *Id.* at 466-67 & n.5.

### iv. ORFG

The open-ended line of credit extended by Forward to ORFG for $600,000 was not a security. As discussed above in connection with the other debt conversion transactions, it did not meet the *Reves* test. It was an individual transaction that was not designed to trade as an investment. Nor would the public view it as a security.[478]

### b.    The Firm Ignored Red Flags

Even if the notes had been securities, the transactions were not entitled to the safe harbor of Rule 144. Many of the red flags set forth in Regulatory Notice 09-05[479] existed in the transactions at issue. The following red flags are examples:

- All the stock deposits in the transactions at issue consisted of large blocks of thinly traded, low-priced stocks issued by obscure companies. (Reg. Notice 09-05 Red Flag 1).

- CSCT had a pattern of making large deposits of thinly traded microcap stocks, selling the securities, and immediately wiring out the proceeds. Respondents knew that CSCT was acting on behalf of its FFI customers involved in the transactions and that the FFIs also engaged in the same pattern while acting on behalf of other entities and individuals. Despite the pattern, Scottsdale did nothing to investigate who actually was receiving the funds from the securities sales. Because the only account at Scottsdale was in the name of CSCT, Scottsdale could not and did not track where the proceeds ultimately went. It could not tell if the proceeds went to the different purported beneficial owners or to other persons who were repeatedly engaging in the deposit and immediate resale of securities. (Reg. Notice 09-05 Red Flag 2).

- The deposited shares were recently issued, which suggested that the issuer or its control persons could be initiating a distribution. Nothing in the due diligence packages indicates that Scottsdale took any note of that fact. (Reg. Notice 09-05 Red Flag 3).

- Although the issuer claimed not to be a shell corporation, there was little evidence of ongoing business operations. The Firm mainly relied on a representation by a principal of the issuer that the entity was not a shell. (Reg. Notice 09-05 Red Flag 7).

- Two of the issuers involved in this case had business histories that suggested shell status. Only a few months before the deposit of NHPI securities at Scottsdale, NHPI, a pharmaceutical company, announced it was going into the oil and gas business. ORFG,

---

[478] Furthermore, even if the note had been a security, Forward did not transfer the ORFG note for securities of ORFG. He transferred a portion of the note for securities of a different entity, Anything Media. He also did so in connection with an agreement by ORFG to modify the terms of the original line of credit. His exchange involved securities of a different issuer and different consideration. Accordingly, Media Central was not entitled to tack back to Forward's original note.

[479] *See supra* pp. 78-79.

which described itself as an automotive detailing company that used casual part-time labor as required, similarly indicated it was considering going into mineral exploration and set forth an anticipated payment schedule for three unspecified mining concessions. In both cases, the new business venture was radically different from the old line of business, the information regarding either line of business was scant, and the company's purported resources did not appear sufficient to engage in the new line of business. (Reg. Notice 09-05 Red Flags 7 and 9).

Finally, we note that it is critical in a Rule 144 transaction to know the identity of the purported beneficial owners and any relationship they might have to the issuers or affiliates of the issuers of the shares they seek to sell. Even after collecting voluminous documents, the Firm in fact knew nothing about the purported beneficial owners or about the businesses through which they held the securities except their names. Diekmann, who headed the Rule 144 team at the time of the transactions at issue, admitted that he knew nothing about the purported beneficial owner of one of the NHPI deposits other than that the person was a customer of Unicorn.[480] The Firm knew little more than that about any of the other purported beneficial owners involved in the transactions at issue. Diekmann's testimony is a stark confession that the Firm did not perform its gatekeeping function and did not adhere to high standards of commercial honor and just and equitable principles of trade.

### c.   Respondents' Arguments Are Unavailing

### i.   NHPI

Respondents' arguments relating to the NHPI deposits rest on treating the representations by the interested parties in the documentation for the NHPI deposits as though they were true. For example, Scottsdale asserts that Collins was not an affiliate of NHPI, and therefore he could freely sell the stock derived from his note in the fall of 2013 regardless of any tacking to the inception of the May 2012 note.[481] Respondents then reason that Collins' transactions with Sky Walker, Ireland Offshore, and Swiss National could not be fake loan transactions, as Enforcement portrays them, because, as a non-affiliate holder for more than a year, Collins could simply have sold the shares to the three depositors. Respondents conclude that there could be no reason to fake the loan transactions. Respondents likewise assert that the beneficial owners of Sky Walker, Ireland Offshore, and Swiss National were not affiliates of NHPI based on the representations to that effect by the interested parties.[482]

In making arguments that depend upon the truth of the representations made by the interested parties, Respondents only demonstrate their continuing lack of appropriate response to

---

[480] Hearing Tr. (Diekmann) 911-13, 919.

[481] In so arguing, the Firm abandons the basis on which the deposit was justified at the time Scottsdale sold the shares. On its Checklist for the transaction, the Firm relied on tacking back to the inception of the May 2012 note. RX-1, at 1.

[482] Resp. PH Br. 13-15.

the suspicious circumstances and glaring red flags raised by the NHPI deposits. As the SEC has noted, a broker-dealer may not rely on representations by interested parties because those interested parties have an incentive to make misrepresentations.[483]

### ii.  VPLM

Again, Scottsdale's arguments largely assume the truth of the representations by the interested parties. They assert that they reasonably relied on those representations.[484] We reject Respondents' position. Red flags signaled that the transaction could be a scheme to evade the registration requirements while distributing securities to the public. The Firm could not sell the securities unless it investigated further and obtained better support for an exemption.

Scottsdale also argues that Enforcement failed to prove that any proceeds of the sales of VPLM flowed back to the issuer or that there were any links between the issuer and the persons involved in selling VPLM stock through CSCT and Scottsdale.[485] As discussed above, the Firm misunderstands the law. It was not Enforcement's burden to prove who was behind the transactions; rather, it was Respondents' burden to probe the suspicious circumstances and establish that the transaction was entitled to the Rule 144 exemption before the Firm sold the securities.

### iii.  ORFG

As with the other transactions, Respondents' arguments assume the truth of the representations in the transaction documents. For instance, they argue that the Firm obtained satisfactory evidence that the transaction met the requirements of Rule 144 because the Firm obtained a letter from ORFG's Chairman and CEO dated May 19, 2014, confirming that Media Central and its purported owner were not affiliates of the company.

Given that the underlying transaction—the $600,000 open-ended credit line giving the holder discretion to convert stock at will—made no sense, it was unreasonable to rely on that letter as the only evidence that the seller was not an affiliate. If the chain of transactions were really a series of steps in a distribution for the ultimate benefit of the issuer or those persons controlling the issuer, then such a representation by the issuer's Chairman and CEO would be in service of the unlawful distribution of securities without registration.

### 4.  Hurry's Violation

The First Cause of Action also charges that Hurry was a necessary participant and substantial factor in the unlawful transactions, through his close management and control of all the entities involved in the process of depositing, approving, and reselling the securities, and

---

[483] *Laser Arms*, 1991 SEC LEXIS 257, at *36.

[484] Resp. PH Br. 21.

[485] Resp. PH Br. 22.

through his prospecting for CSCT customers. It expressly alleges that Hurry purposely established CSCT as a means of evading regulatory scrutiny and enabling the Firm to make the unlawful sales. Enforcement proved the charges.

a.    **Hurry Was A Necessary Participant And Substantial Factor**

Section 5 makes it unlawful for a person to offer or sell securities without registration. Liability, however, is not limited to the person or entity that ultimately passes title to the security. Courts have developed the "necessary participant/substantial factor" test as a way of holding other persons involved with the transactions accountable under Section 5 as offerors or sellers.[486] The "necessary participant/substantial factor" test is based on statutory language in Section 5, which imposes liability on persons who "directly or indirectly" offer or sell securities in violation of Section 5.[487]

The "necessary participant/substantial factor" test distinguishes between those persons who have only a *de minimis* or insubstantial role in securities sales in violation of Section 5 and those who should be liable. The test is more than a "but for" test. Even if a person is necessary to the completion of the transaction, such as a transfer agent might be, that does not necessarily mean the person was a substantial factor in the violation. Determining whether someone was a substantial factor in the unlawful sales is a fact issue requiring extensive analysis.[488]

It is not clear that the "necessary participant/substantial factor" test is appropriate here. Hurry is not charged with offering or selling securities in violation of Section 5. He is charged with an ethical violation under Rule 2010. He does not have to be proven to be an offeror or seller in order to be proven to have violated Rule 2010.

The parties briefed Hurry's liability using the "necessary participant/substantial factor" test, however, and we use it to assist in determining whether Hurry was sufficiently linked to the transactions at issue to hold him liable for violating Rule 2010 in connection with them. We also separately apply the more familiar standard for Rule 2010 violations, which we discuss below.

Based on the above factual record and analysis, which we do not repeat in detail here, we conclude that Hurry was a necessary participant and a substantial factor in the transactions. He was sufficiently linked to the transactions to hold him accountable for his conduct in connection with them. His role was not *de minimis* or insubstantial.

We reject Hurry's argument that he cannot be linked to the transactions at issue. He asserts that there is "not a single document relating to the stocks in question with [his] name

---

[486] *SEC v. CMKM Diamonds, Inc.*, 729 F.3d 1248, 1255 (9th Cir. 2013).

[487] *SEC v. Boock*, 2011 U.S. Dist. LEXIS 95363, at *47 & n.17 (S.D.N.Y. Aug. 25, 2011).

[488] *CMKM Diamonds*, 729 F.3d at 1255-57; *SEC v. Blackburn*, 2015 U.S. Dist. LEXIS 178325, *8-9 (E.D. La. Sept. 11, 2015).

87

anywhere on it."[489] While there was little in the way of a paper trail directly linking Hurry to the particular transactions at issue, the absence of such a direct link was the result of Hurry's own demonstrated obsession with secrecy. He purposely concealed his involvement in CSCT's business. It is not surprising that there is not a single document relating to the deposits at issue with his name on it, because he made sure of it.

In fact, Hurry was the master puppeteer for all the FFI business that flowed through CSCT to Scottsdale and, ultimately, to public investors. CSCT existed only because he established and closely managed it. Given Ruzicka's lack of experience, qualifications, and contacts, CSCT could not have survived without Hurry's active involvement. We reject Hurry's assertion that, because Ruzicka had decades of experience as a real estate lawyer who ran his own law firm, hiring Ruzicka to run CSCT was a reasonable and logical decision.[490]

With respect to the particular transactions at issue, there is sufficient evidence of a link between Hurry and the FFIs that made the deposits. Hurry developed CSCT's business with the three FFIs that engaged in those transactions, Montage, Titan, and Unicorn. As set forth more fully above, Hurry admits that he flew to Panama to see Montage and to Belize to see Unicorn and that he discussed with Unicorn doing its business through CSCT. He admits to talking to the principals of Montage, Titan, and Unicorn multiple times using FaceTime. He admits to creating the spreadsheet that tracked CSCT deposits, including those by Montage, Titan, and Unicorn. D'Mura testified that he and Ruzicka talked about deposits with Hurry, and an email shows that Hurry specifically discussed trading in NHPI and VPLM with Ruzicka. Ruzicka testified that Hurry specifically told him to deal with Frank Gray at Montage. Both Ruzicka and D'Mura said they disliked dealing with Cem Can at Unicorn, but that they knew that they had no authority to decline his business without Hurry's consent.

Hurry's direct contact with the three FFIs involved in the transactions at issue made him a substantial factor in their transactions. He did not take Ruzicka with him when he flew to Panama and Belize to talk to Montage and Unicorn, and Ruzicka testified in his OTR that he did not participate in Hurry's FaceTime calls with customers. Hurry was the critical link between CSCT and the three FFIs. Hurry's importance was reflected in Unicorn's demand for Hurry to join a telephone call with Miller, Diekmann, and Ruzicka to discuss the processes and procedures to be used in connection with Unicorn's business with Scottsdale through CSCT. Whenever something beyond paper-pushing was involved, Hurry's input was necessary. We reject Hurry's argument that he merely displayed the normal interest of an owner in the overall financial performance of his firm.[491] His involvement in CSCT's business was intense and pervasive.

---

[489] Resp. PH Br. 45.

[490] Resp. PH Br. 43-44.

[491] Resp. PH Br. 46-47.

Hurry further argues that the case law only imposes liability under Section 5 where the defendant has either sold the unregistered securities himself or has taken concrete steps necessary to effectuate those sales, such as negotiating transactions, issuing opinion letters, or directing the issuance of shares. He contends that he engaged in no such activities here.[492]

We reject the argument. As noted above, Hurry is not charged with a Section 5 violation, but, rather, a Rule 2010 violation. Unethical conduct in violation of Rule 2010 is not constrained by case law defining who is liable as a statutory seller under Section 5. In any event, substantial participation is a broad concept without precise bounds. One who conceives of and plans a scheme, or one who is a substantial motivating factor behind it, can be liable under Section 5.[493] To hold otherwise would allow a person to mastermind a Section 5 violation, and, by directing others to perform the mechanical tasks necessary to effect the sale of securities without registration, escape liability.

### b.    Hurry Acted In Bad Faith

FINRA Rule 2010 is a broad ethical principle that may be violated either by conduct that fails to meet ethical norms, regardless of intention, or conduct that is undertaken in bad faith. We find here that, in connection with the business he routed through CSCT, Hurry acted in bad faith and violated FINRA Rule 2010. We conclude that he was engaged in a scheme to evade the securities laws, in particular the registration requirements of Section 5.

Hurry claimed that he established CSCT because Alpine wanted to shed its IRS tax withholding obligations, but there was no evidence that it made business sense to set up an office in the Cayman Islands to do that. In fact, the insertion of CSCT into the process of preparing stock certificates for resale to the public made no business sense because, due to the discounts Scottsdale extended to CSCT, Hurry's enterprises as a collective group made no more money than when Scottsdale was handling the business directly—but CSCT imposed additional costs.

That Hurry had no legitimate business reason for setting up CSCT is further apparent from the way the Firm handled the business purportedly routed through CSCT. The Firm, through Miller and Noiman, continued to deal directly with the FFIs and often handled issues that arose with the deposits without involving Ruzicka or CSCT. Rather than independently preparing deposits for submission to Scottsdale, Ruzicka also sought guidance from Diekmann as to what deposits he should consider.

Further casting doubt on the legitimacy of Hurry's reasons for setting up CSCT, Diekmann testified that an individual in Belize or Panama could have a direct account with

---

[492] Resp. PH Br. 46 and n.261.

[493] *SEC v. Elliott*, 2011 U.S. Dist. LEXIS 91946, at *20 (S.D.N.Y. Aug. 17, 2011). *See also SEC v. Holschuh*, 694 F. 2d 130, 139-40 (7th Cir. 1982); *SEC v. Friendly Power Co.*, 49 F. Supp. 2d 1363, 1372 (S.D. Fla. 1999) (a person has indirectly sold a security to the public if he has "employed or directed others to sell … or has conceived of and planned the scheme by which the unregistered securities were offered or sold").

Scottsdale without going through an FFI like Unicorn or CSCT.[494] Cruz admitted that it would be easier to conduct due diligence on a direct customer of the Firm than a customer who came through an FFI such as CSCT or Unicorn.[495] In fact, the creation of CSCT diminished Scottsdale's access to information about the purported beneficial owners, and neither Scottsdale nor Alpine, Hurry's clearing firm, knew where the proceeds from sales of the securities were flowing.[496] This testimony raises the question of the purpose served by the multiple layers of entities— if not to conceal the identity of the true beneficial owners of the securities.

Hurry's bad faith was amply proven by his elaborate stratagems for concealing his involvement in CSCT's business, including his use of the "x" email address at CSCT, his insistence on using the attorney-client privilege in inappropriate circumstances, and his use of FaceTime to conceal his contacts with customers. He specifically wrote to Ruzicka in an email that there should be no written record of Hurry's involvement, which is powerful evidence of Hurry's scheme to avoid regulatory scrutiny. Ruzicka testified in his OTR that Hurry told him he was going to the Cayman Islands so that he would not have to "give anything to anyone."

Hurry's actions betray an attitude antithetical to the public interest, and his attempt to evade regulatory scrutiny is inconsistent with his duties as a securities professional. He failed to adhere to high standards of commercial honor and just and equitable principles of trade, thereby violating FINRA Rule 2010.

### H.   Supervisory Violations (Second And Third Causes Of Action—DiBlasi And Cruz)

#### 1.   NASD Rule 3010 Imposes Supervisory Duties

NASD Rule 3010(a) mandates that each member firm "shall establish and maintain a system to supervise" the activities of its associated persons. It further mandates that a firm's supervisory system be "reasonably designed to achieve compliance with the applicable securities laws and regulations, and with applicable NASD Rules."

Rule 3010(a)(1) provides that a firm's supervisory system "shall provide, at a minimum," for the "establishment and maintenance of written procedures." Rule 3010(b) details requirements for WSPs. Rule 3010(b)(1) requires that a member firm "shall establish, maintain, and enforce written procedures to supervise the types of business in which it engages." Those WSPs must be "reasonably designed to achieve compliance with applicable securities laws and regulations, and with the applicable Rules of NASD."

Rule 3010(b)(3) further requires that the WSPs set forth the titles, registration status, locations and responsibilities of each of its supervisory personnel, and that assignments be made

---

[494] Hearing Tr. (Diekmann) 1675.

[495] Hearing Tr. (Cruz) 220.

[496] Hearing Tr. (Cruz) 661-62; Hearing Tr. (Frankel) 2349-50.

covering all relevant areas of the firm's business and the applicable securities laws and FINRA
Rules. Firms are required to preserve a record of these designations and their effective dates for
at least three years. Under Rule 3010(b)(4), a firm is required to amend its WSPs as changes
occur in its supervisory system.

Broadly speaking, WSPs are a written set of policies and procedures that describe
concrete steps to supervise a firm's activities. They identify who is responsible for taking those
steps and set up a system of documentation to allow for review and ensure proper
implementation. Every broker-dealer firm must create, maintain, update, and adhere to those
policies and procedures.[497] Those policies and procedures contribute to the establishment and
maintenance of a supervisory system that is reasonably designed to achieve compliance with the
laws, regulations, and rules applicable to the firm's business. To achieve accountability and
ensure compliance, the WSPs must be clear and accurate regarding the allocation of supervisory
responsibilities.

### 2.   DiBlasi's Violation

#### a.   Charge

The Second Cause of Action charges that Scottsdale and DiBlasi, the Firm's CCO,
violated NASD Rules 3010(a) and (b) and FINRA Rule 2010. The Complaint alleges that
DiBlasi failed to establish a supervisory system, including WSPs, reasonably designed to ensure
compliance with Section 5. This failure occurred even though DiBlasi knew that the Firm had
been sanctioned once before in settling prior charges of selling unregistered nonexempt
securities. Among other things, the Complaint charges that the Firm's WSPs were deficient
because they did not set forth clear responsibilities for its personnel and did not provide for a
reasonable inquiry into beneficial ownership. The Complaint alleges that the WSPs did not
require that the Firm's personnel take steps to independently verify the self-serving
representations made by parties interested in the transactions and did not address the possible use
of nominees to obscure the identity of the true beneficial owners of unregistered securities
deposited at the Firm for resale. Enforcement proved the charge.

#### b.   DiBlasi Had Responsibility For The Firm's WSPs

Throughout the relevant period, DiBlasi was the Firm's CCO; and he is still the Firm's
CCO. DiBlasi contends, however, that he has never had responsibility for the Firm's Rule 144
business. He asserts that he does only what he calls "broker-dealer compliance," and not Rule
144 compliance.[498] According to DiBlasi, the Firm's former president, Cruz, had responsibility

---

[497] *Dep't of Enforcement v. Ranni*, No. 20080117243, 2012 FINRA Discip. LEXIS 6, at *15-16 (OHO Mar. 9,
2012).

[498] Hearing Tr. (DiBlasi) 1921-22, 1927, 1952-53, 1976-77. DiBlasi described what he meant by broker-dealer
compliance. He makes sure that the Firm's filings, such as the Form BD and the Forms U4 and U5, are done. He
maintains records and makes sure correspondence and emails are reviewed. He summed up his work as taking care
of all the "back office" tasks. Hearing Tr. (DiBlasi) 1976-77.

for Rule 144 procedures and everyone deferred to him.[499] DiBlasi agreed that Cruz had a longstanding practice regarding responsibilities for Rule 144 compliance.[500]

We reject DiBlasi's assertion that he had no responsibility for the Firm's procedures in connection with the Firm's Rule 144 business for two reasons. First, in the circumstances of this case, the assertion is inconsistent with his designation as the Firm's Chief Compliance Officer; and, second, the assertion is inconsistent with the WSPs themselves, as is plain from reading them.

*First*, DiBlasi is the sole person disclosed on the Firm's Form BD as CCO. There is no co-CCO.[501] That means that DiBlasi has been identified to the Firm's regulator as the one person responsible for establishing and maintaining the Firm's WSPs.

The Firm's WSPs were required to cover its Rule 144 business, since the Firm's business is almost entirely the liquidation of unregistered microcap stocks. DiBlasi acknowledged in his testimony that during the relevant period 95% of the transactions Scottsdale did for its customers involved penny stocks, and penny stocks accounted for most of the Firm's revenue.[502] That business required heightened attention to compliance issues, as DiBlasi knew. The Firm had previously settled regulatory charges that it had improperly sold unregistered securities without an applicable exemption.[503]

In these circumstances, the designation CCO carried with it responsibility for the WSPs relating to the Firm's Rule 144 business. DiBlasi's abdication of responsibility as to that business is fundamentally incompatible with what it means to be the Firm's CCO.

We reject DiBlasi's assertion that Enforcement is trying to hold him liable by virtue of his title alone.[504] Rule 3010 requires the designation and disclosure of a person responsible for establishing and maintaining a firm's procedures. By definition under the Rule, the person disclosed as the CCO has responsibility for the Firm's WSPs. The Rule further sets a standard for the design of those procedures, which must be reasonably designed to achieve compliance with the laws and regulations applicable to the firm's business. The designation and disclosure of a firm's CCO is more than a meaningless title. It is one of the building blocks of a supervisory system reasonably designed to achieve compliance, and the CCO designation carries with it

---

[499] Hearing Tr. (DiBlasi) 1944-47, 1952-53, 1965-66.

[500] Hearing Tr. (DiBlasi) 1970. According to DiBlasi, his predecessor as CCO had no responsibility for Rule 144 compliance either. *Id.*

[501] Hearing Tr. (DiBlasi) 1981.

[502] Hearing Tr. (DiBlasi) 1923, 1946.

[503] Hearing Tr. (DiBlasi) 1923-24; CX-12.

[504] Resp. PH Br. 38 n.220.

responsibilities. If DiBlasi is not carrying out those responsibilities, then the disclosure on the Firm's Form BD is false and misleading.[505]

*Second*, throughout the relevant period the Firm's WSPs expressly provided that the CCO—DiBlasi—had the duty to establish, maintain, and enforce all of the Firm's WSPs. There were two sets of WSPs during the relevant period, the May 2013 WSPs that were in effect in October 2013 when DiBlasi became CCO, and the modified WSPs that became effective in May 2014. The main body of both sets of WSPs expressly assigned to the CCO responsibility to "[e]stablish, maintain and update, as required the firm rules and procedures" and specified that that responsibility included Appendix A and Appendix B to the WSPs.[506] Appendix A to both sets of WSPs listed principals and branches.[507] Appendix B to both sets of WSPs expressly assigned to DiBlasi, by name, the responsibility to "[e]stablish, maintain and update, as required, the firm rules and procedures."[508] Appendix B assigned to Cruz, Diekmann, and others various operational tasks in conducting Rule 144 due diligence, but it did not assign them responsibility for the WSPs.[509]

DiBlasi conceded that there was no written delegation in the 2013 WSPs that gave responsibility for Rule 144 policies and procedures to anyone other than the CCO.[510] Moreover, the 2013 WSPs expressly imposed certain specific responsibilities on the CCO in connection with sales of unregistered securities. The main body of the WSPs included a specific section dealing with Rule 144 stock that was headed "Rule 144 Restricted and Control Stock Sales."[511] In that section, the 2013 WSPs stated that the CCO was responsible for establishing procedures reasonably designed to ensure that a stock certificate was validly issued and owned by the customer.[512] Importantly, the 2013 WSPs also provided that the CCO should establish

---

[505] The cases cited by Respondents are not relevant here. The cases did not involve the issue of whether a CCO was responsible for a firm's WSPs. *Dep't of Enforcement v. Mutual Serv. Corp.*, No. EAF0400630001, 2008 FINRA Discip. LEXIS 62, at *90-93 (OHO Dec. 16, 2008) (compliance department subordinates who were told to abandon red flag blotter review did not have supervisory responsibility for that review); *Dep't of Enforcement v. Kernweis*, No. C02980024, 2000 NASD Discip. LEXIS 49, at *67-70 (OHO Feb. 16, 2000) (Director of Compliance held not to have line responsibility for unsuitable trading by registered representatives).

[506] CX-179, at 6 ("The Chief Compliance Officer ('CCO') is responsible for the establishment and maintenance [of Scottsdale's] policies and procedures."); CX-180, at 6 (same).

[507] CX-179, at 158; CX-180, at 151.

[508] Hearing Tr. (DiBlasi) 1930; CX-181, at 2 (DiBlasi assigned to "[e]stablish, maintain and update, as required the firm rules and procedures, includes Appendices A and B"); CX-182, at 2 (same). It appears that Appendix B to the May 2013 WSPs were modified on November 13, 2013, to identify DiBlasi by name as responsible for the WSPs. CX-181, footer bearing date of "11/13/2013."

[509] CX-181, at 8-9; CX-182, at 8-9. For example, Appendix B assigned to Diekmann responsibility for Rule 144 stock deposit due diligence and approval. CX-181, at 9; CX-182, at 9.

[510] Hearing Tr. (DiBlasi) 1933, 1945, 1955-56.

[511] CX-179, at 63-65 (Rule 144 Restricted and Control Stock Sales, 8.18 through 8.18.11).

[512] CX-179, at 64 (8.18.2).

procedures to ensure that the resale of such a security was made in reasonable reliance on an exemption from registration.[513] The 2013 WSPs further provided that the CCO should be notified and consulted regarding the processing of Rule 144 sales.[514] They also specified that the CCO was responsible for "developing and implementing policies and procedures that provide for the review, approval and resale of Rule 144 transactions."[515]

Nevertheless, DiBlasi argues that he was not responsible for the 2013 WSPs because he inherited them.[516] The fact that the 2013 WSPs already existed when DiBlasi became CCO, however, does not absolve him of responsibility to examine them, and, if necessary, to amend them.[517] As noted above, Rule 3010 contemplates that amendments should be made to WSPs if there are changes in a firm's supervisory processes, so that the WSPs accurately reflect what the firm is doing. Indeed, shortly after DiBlasi became the Firm's CCO, in November 2013, the Firm modified Appendix B to identify DiBlasi by name as the person responsible for establishing, maintaining, and updating the Firm's WSPs, including Appendices A and B.[518] If Cruz had responsibility for WSPs to the extent that they related to its Rule 144 business, the correction could and should have been made in November 2013.

DiBlasi also attempts to explain away aspects of the 2013 WSPs that contradict his position—such as the specific assignment of Rule 144 compliance tasks to the CCO. He testified that the 2013 WSPs "didn't accurately reflect how the division of responsibility was set up throughout the company. And it needed to be corrected."[519] The 2013 WSPs, however, clearly stated that DiBlasi was responsible for the Firm's policies and procedures and made him specifically responsible for policies and procedures relating to the Firm's Rule 144 business. His disclaimer of responsibility cannot override that plain statement.

Approximately six months after DiBlasi became CCO, in May 2014, the WSPs were modified.[520] Even then, however, the WSPs did not clearly reflect the division of responsibility that DiBlasi described in his testimony. The WSPs did not say that Cruz had responsibility for all aspects of Rule 144 compliance, including the WSPs relating to Rule 144.

In place of the CCO, the main body of the modified WSPs designated the "General Principal" as responsible for developing procedures to ensure that a stock certificate was validly issued and owned by the customer, and that the resale of such a security was made in reasonable

---

[513] Hearing Tr. (DiBlasi) 1940-41; CX-179, at 64 (8.18.2).

[514] CX-179, at 64 (8.18.3).

[515] CX-179, at 64 (8.18.3).

[516] Hearing Tr. (DiBlasi) 1932-33. See Resp. PH Br. 38-39.

[517] *Ranni*, 2012 FINRA Discip. LEXIS 6, at *27 & n.93.

[518] CX-182, at 2.

[519] Hearing Tr. (DiBlasi) 1969.

[520] Hearing Tr. (DiBlasi) 1921, 1932-33, 1939-42.

reliance on an exemption.[521] Similarly, the modified WSPs instructed that the General Principal should be consulted in connection with Rule 144 transactions. Under the modified WSPs, the General Principal was responsible for developing and implementing Rule 144 policies and procedures.[522]

Although the title "General Principal" might appear to refer to a single person, the term General Principal was defined in the modified WSPs as the "Management Committee."[523] The WSPs declared that the Management Committee had been set up to serve in the role of president of the Firm.[524] The Management Committee was defined in yet another location to consist of four persons—including DiBlasi.[525] Accordingly, even under the modified WSPs, as a member of the Management Committee, DiBlasi still retained some vaguely defined responsibility for Rule 144 transactions.

DiBlasi relies on the delegation to the Management Committee in arguing that he had no responsibility for compliance matters related to the Firm's Rule 144 business. He maintains that the specific assignment of responsibility for the WSPs to him by name in Appendix B did not "overwrite" the provision in the main body of the WSPs referring to the Management Committee.[526]

Given the ambiguity of the delegation of responsibility in the main body of the WSPs—ostensibly to the General Principal but actually to a committee that included DiBlasi—we think the clear, explicit assignment of responsibility for the WSPs to DiBlasi by name contained in Appendix B forecloses DiBlasi's argument. That conclusion is bolstered by the description in the main body of the WSPs of the CCO's duties, which include responsibility for the Firm's policies and procedures.

DiBlasi's argument also is undermined by the fact that he took actions in connection with certificate deposits. For example, he signed a foreign account application by Unicorn under the label "Compliance Approval."[527] Furthermore, others at the Firm reached out to him in connection with issues regarding certificate deposits. For example, Diekmann had concerns about a deposit because Ruzicka said that the customer was pressing to start trading a stock when

---

[521] CX-180, at 64 (8.18.2).

[522] CX-180, at 64 (8.18.3).

[523] CX-180, at 7 (Compliance and Supervision 1.1.2).

[524] Hearing Tr. (DiBlasi) 1972; CX-180, at 7.

[525] Hearing Tr. (DiBlasi) 1933-34, 1939-40, 1942-43. The other members of the Management Committee were Cruz, Jay Noiman, and Elizabeth Arndt. Hearing Tr. (Noiman) 1065-66; Hearing Tr. (DiBlasi) 1972.

[526] Hearing Tr. (DiBlasi) 1974-75.

[527] Hearing Tr. (DiBlasi) 1956-57. DiBlasi maintained that his signature meant nothing more than that a foreign financial institution was involved. Hearing Tr. (DiBlasi) 1957. Whatever it meant, DiBlasi's signature appeared under the heading "Compliance Approval," and it demonstrated that he was involved in some type of compliance review in connection with the Firm's penny stock accounts.

there was zero market for it, so Diekmann forwarded the correspondence to DiBlasi. Diekmann said that he did so because he thought Ruzicka's comment called into question whether the deposit should have been approved by Scottsdale in the first place. He sent the email to DiBlasi because DiBlasi was the CCO.[528]

**c.   The Firm's WSPs Were Not Reasonably Designed To Ensure Compliance With Section 5**

**i.   The WSPs Did Not Accurately Reflect The Way The Firm Conducted Its Rule 144 Business**

The Firm's WSPs were not reasonably designed to ensure compliance with Section 5 because they did not accurately reflect the way the Firm conducted its Rule 144 business. DiBlasi testified that Cruz was the principal responsible for Rule 144 compliance and the establishment of policies and procedures relating to that business. Cruz testified that DiBlasi never had any role in the Rule 144 review process.[529] Cruz created the procedures for Rule 144 transactions that were in effect during the relevant period, the Firm's OTC Restricted Stock Deposit Procedures, dated November 2012.[530] He testified, however, that during the relevant period DiBlasi had responsibility for updating them.[531]

Accepting Respondents' testimony about the allocation of responsibilities, during the relevant period the WSPs should have clearly said which aspects of the WSPs were Cruz's responsibility and which were DiBlasi's. Neither the 2013 WSPs nor the modified WSPs had any clear indication of who was responsible for what.

DiBlasi admitted that the 2013 WSPs did not accurately reflect the way the Firm was operating its Rule 144 business.[532] We further find that the modified WSPs also did not accurately reflect the way the Firm operated its business.

DiBlasi's testimony revealed that the modified WSPs allocated responsibility to a committee that no longer existed. DiBlasi testified that in January 2014 the Management Committee disbanded. He said that Justine Hurry took on the Committee's responsibilities in February 2014. Then, in March 2014, Cruz officially became president of the Firm and took on

---

[528] Hearing Tr. (Diekmann) 782-87; CX-222a.

[529] Hearing Tr. (Cruz) 563-64.

[530] Hearing Tr. (Cruz) 582; RX-27.

[531] Hearing Tr. (Cruz) 665-66; RX-27.

Confusion over who had responsibility for the WSPs apparently is nothing new at the Firm. Cruz did not remember who the CCO was at the time he created the Rule 144 procedures, and he did not recall anyone specifically delegating to him the responsibility for creating the procedures. Hearing Tr. (Cruz) 665-66. When asked who now has responsibility to update the Rule 144 procedures, Cruz testified, "I believe that responsibility now falls on Henry Diekmann as president and also as head of the 144 cert team." Hearing Tr. (Cruz) 584.

[532] Hearing Tr. (Diekmann) 783-86; CX-222a.

96

the responsibilities of the Management Committee. The Committee never reconstituted itself again- and yet in May 2014 the Firm put in place the modified WSPs that supposedly gave Rule 144 compliance responsibility to the Management Committee.[533]

Even if the Management Committee had been functioning in May 2014, we find that the modified WSPs were misleading regarding the allocation of responsibilities, and, therefore, not reasonably designed to achieve compliance. They purported to designate a registered principal as responsible for compliance with Rule 144. Rule 3010 requires that supervisory responsibilities be delegated to an appropriately registered principal. But, in fact, the WSPs delegated responsibility for Rule 144 procedures to a group of people. In so doing, the WSPs obscured who had responsibility, making it more difficult to hold anyone accountable for compliance oversight over the bulk of the Firm's business.

This failure to clearly indicate who was responsible for Rule 144 compliance is particularly egregious here. It would have been relatively simple to designate Cruz the responsible principal, since everyone agreed that he was.

It is fundamental that a firm's WSPs must clearly designate responsibilities to appropriately registered persons and must accurately reflect the way a member firm conducts its business. That is why Rule 3010 specifies that supervisory responsibilities be assigned to an appropriately registered principal. The person responsible for supervising a particular line of business must have the appropriate background to do it. That is also why a firm's WSPs must address the particular business and the particular circumstances of a firm. Only then will the WSPs be well designed to reasonably ensure compliance.[534]

### ii.  The WSPs Did Not Require A Reasonable Inquiry Into Beneficial Ownership

We also find that Scottsdale's WSPs were not reasonably designed to achieve compliance with Section 5 because the WSPs failed to require a reasonable inquiry into the identity of the purported beneficial owners of the stock the Firm was selling. The WSPs do not discuss the concept of nominees, and the Firm's principals responsible for approval of stock deposits did not focus on the potential problem of nominees in conducting their review. The due diligence files for the transactions at issue demonstrate that the Firm's general practice for reviewing stock deposits was inadequate to identify and investigate situations in which nominees might be concealing the identity of the true beneficial owners of securities. Diekmann testified that he knew nothing about the purported beneficial owner of Sky Walker but that the person was a

---

[533] Hearing Tr. (DiBlasi) 1973. DiBlasi's testimony that Justine Hurry briefly served as president of the Firm in February 2014 is corroborated by the Firm's Form BD Amendment dated February 13, 2014, which lists Justine Hurry as president, as well as a director, of the Firm. CX-17, at 3. That document identifies Cruz as legal counsel since May 2008. CX-17, at 3.

[534] *See* NASD Notice to Members 99-45 (June 1999), http://www.finra.org/sites/default/files/NoticeDocument/p004311.pdf.

customer of Unicorn. The lack of focus on the potential use of nominees to conceal the identity of the true beneficial owners is particularly egregious in light of the four prior SEC actions charging that nominees had been used to facilitate fraud and manipulation.

The Firm's listing of every FFI on its red flag list was not sufficient to address beneficial ownership or to ensure that an unlawful distribution was not occurring. The WSPs did not indicate why or what should be done in response to the red flag designation. When asked what additional scrutiny comes from the red flag designation, Diekmann could not think of any. He said that the designation "just reflects the heightened risk."[535] To recognize a heightened risk but provide no guidance for dealing with it is not reasonable. WSPs must provide a "reliable mechanism" for identifying securities sales that should be investigated or halted.[536]

### 3. Cruz's Violation

The Third Cause of Action charges that Cruz failed to adequately and meaningfully analyze the collected documents and information. Consequently, he and the staff he supervised failed to respond appropriately to red flags strongly indicating that the transactions were not entitled to an exemption. He approved the deposits for resale based on a cursory collection and verification effort. Enforcement proved the charges.

There is no dispute that Cruz supervised the processing of deposits for resale pursuant to Rule 144. He drafted the Firm's procedures for handling restricted stock sold pursuant to Rule 144 and other forms used to process deposits. For each transaction, he also met with the person who had put together the due diligence file to support the Rule 144 exemption. After talking with the person, he gave the final approval that allowed Scottsdale to trade the securities without registration. He was critical to the transactions, and, even though the WSPs did not identify him as the responsible person, everyone at the Firm looked to Cruz as the person responsible for Rule 144 compliance.

Cruz violated his responsibility in two ways.

*First*, Cruz failed to analyze whether the debt obligations that formed the foundation for tacking were securities. In light of the circumstances, this failure was egregious. Diekmann, who is not a lawyer, was incapable of recognizing and correcting Cruz's error. The members of the Rule 144 team who were lawyers did not have experience with penny stocks before they came to the Firm and were trained by Cruz and the Firm's personnel. Everyone depended on Cruz's analysis and expertise. As an experienced securities lawyer, Cruz should have recognized the problem. But he failed to meaningfully analyze the information in the due diligence packages.

*Second*, Cruz failed to react appropriately to myriad red flags. As set forth above in connection with each transaction, the stock deposits were rife with discrepancies and suspicious

---

[535] Hearing Tr. (Diekmann) 990.

[536] *Midas Sec.*, 2012 SEC LEXIS 199, at *51.

circumstances that constituted red flags. However, Cruz and his staff did not make the required "searching inquiry" or obtain independent verification.

Cruz's failure is egregious because he knew that the Firm was acting as a gatekeeper,[537] and that broker-dealer firms play a critical role in helping to prevent illegal unregistered resales of restricted securities into the public markets.[538] He also acknowledged that at the time of the events at issue he was aware of the red flags in Regulatory Notice 09-05.[539] It is well established that the "duty of supervision includes the responsibility to investigate 'red flags' that suggest that misconduct may be occurring and to act upon the results."[540]

Cruz argues, however, that he was an effective supervisor. He notes that he created the Rule 144 manual, the due diligence questionnaire, and beneficial ownership declaration, and that the Firm dedicated one-third of its staff to performing due diligence reviews on stock deposits. He states that he inserted himself into the review process as a second set of eyes and additional resource when Scottsdale began accepting stock deposits from customers of sub-FFIs. He also asserts that the due diligence packages at issue contained all the required paperwork and that there is no instance of an issue being brought to Cruz's attention and him ignoring it. Finally, he maintains that the "rigor" of the stock deposit reviews under his leadership is demonstrated by the fact that Scottsdale frequently rejected stock deposits.[541]

All of this is beside the point. Cruz is charged with failing to respond appropriately to specific red flags identified in connection with the transactions at issue. The mere creation of paperwork does not qualify as effective supervision. As FINRA noted in conjunction with Regulatory Notice 09-05, in Rule 144 transactions, representations made by the interested parties have to be evaluated with a skeptical eye. Independent verification may be required. Instead, Cruz guided the staff through a check-the-box exercise.

Even when Cruz acknowledged that something might be a red flag, he indicated that his response would not be to obtain independent verification. Rather, his response would be merely to remind the interested parties of the information that needed to be disclosed. This is a totally inadequate response to a red flag.

Cruz's testimony regarding language on Unicorn's website illustrates the problem. The language on the website indicated that Unicorn would appoint nominees for its customers so that their names would not appear as an officer or director of the company on their account at

---

[537] Hearing Tr. (Cruz) 86.

[538] Hearing Tr. (Cruz) 89.

[539] Hearing Tr. (Cruz) 84-90.

[540] *KCD Fin. Inc.*, 2016 FINRA Discip. LEXIS 38, at *70 (quoting *Michael T. Studer*, 57 S.E.C. 1011, 1023-24 (2004), *aff'd*, 260 F. App'x 342 (2d Cir. 2008)). *See also Ronald Pellegrino*, Exchange Act Release No. 59125, 2008 SEC LEXIS 2843, at *33 (Dec. 19, 2008).

[541] Resp. PH Br. 40-41.

Unicorn. Cruz said he did not recall seeing that language at the time he reviewed Unicorn's deposits, but he agreed that if he had it "could have been" a red flag. In response to that red flag, however, he did not say that he would have sought independent verification of the identity of Unicorn's customers. Rather, he indicated that Scottsdale would merely emphasize to the interested parties that "they needed to – to disclose the underlying beneficial owner."[542] In other words, he would continue to rely on the representations of the interested parties.

Cruz argues that he supervised more actively than did respondents in other disciplinary proceedings in which supervisory violations were found.[543] Even if that were true (which we are not persuaded it is), the fact that other supervisors in other cases did even less than Cruz to respond to red flags is no excuse. The standard for reasonable supervision is not merely something marginally better than bad. Moreover, whether supervision is reasonable depends on the particular circumstances of each case.[544]

Cruz also argues that Enforcement is improperly second-guessing Cruz's exercise of reasoned business judgment, and that Enforcement has failed to provide affirmative evidence that his judgments were incorrect.[545] This argument is erroneous in two regards.

*First*, the argument ignores the record. The transactions at issue were rife with red flags that could not be ignored, but Cruz did ignore them.

*Second*, the argument confuses the burden on the Firm when it determined that an exemption existed with the burden of proof in litigation. Cruz, acting on behalf of the Firm, had the burden of developing a reasonable basis for believing that an exemption existed before the securities could be sold without registration. Enforcement proved that he and the Firm did not have a reasonable basis for believing that an exemption existed, but nevertheless Cruz approved the sale of the securities at issue without registration. That is all that Enforcement had to prove for the supervisory violation.

In sum, Cruz did not make sure that the transactions met the legal requirements for an exchange of securities, and he was oblivious to numerous red flags strongly suggesting that the transactions at issue were sham transactions using nominees to effect unlawful distributions of securities without registration. He violated his supervisory duties.

## IV.   SANCTIONS

In considering the appropriate sanction for a violation, adjudicators in FINRA disciplinary proceedings look to FINRA's Sanction Guidelines ("Guidelines"). The Guidelines

---

[542] Hearing Tr. (Cruz) 307-08.

[543] Resp. PH Br. 41 n.236.

[544] *E.g., Dep't of Enforcement v. Wedbush Sec., Inc.*, No. 20070094044, 2014 FINRA Discip. LEXIS 40, at *27-28 (NAC Dec. 11, 2014).

[545] Resp. PH Br. 41.

contain recommendations for sanctions for many specific violations, depending on the circumstances. They also contain overarching Principal Considerations and General Principles, both of which are applicable in all cases.[546]

The Guidelines are intended to be applied with attention to the regulatory mission of FINRA —to protect investors and strengthen market integrity.[547] The Guidelines caution that sanctions must be significant enough to prevent and discourage future misconduct by a respondent and to deter others from similar misconduct. Sanctions also should encourage improved business practices.[548]

Applying the Guidelines, we first discuss below the appropriate sanctions for the Firm, DiBlasi, and Cruz. We separately discuss the sanction for Hurry.

### A.    Scottsdale

As authorized by the Guidelines, we aggregate all the Firm's violations.[549] The violations are inextricably intertwined and are the result of a systemic failure at the Firm—the Firm's failure to have procedures in place that would reasonably ensure compliance and the Firm's failure to respond appropriately to red flags led to the Firm's failure to have a reasonable basis for an exemption before selling the securities. Furthermore, as discussed below, the Panel believes stringent sanctions are warranted here, and separately sanctioning the Firm for the different violations, even at the high end of the range of recommended sanctions, would not adequately remediate the Firm's misconduct. We view the Firm's systemic failure to perform its gatekeeping function better addressed as a whole, rather than in piecemeal fashion.

The Firm violated FINRA Rule 2010 because, in connection with the transactions at issue, it did not have a reasonable basis for an exemption. Selling securities without registration and without an exemption violated Section 5. The Guidelines contain specific recommendations for this type of violation. The Guidelines recommend a fine of $2,500 to $73,000, but in egregious cases the fine may be higher. In egregious cases, a firm may also be suspended with respect to any or all activities or functions for up to 30 business days or until procedural deficiencies are remedied.[550]

The Firm, through DiBlasi, failed to have in place WSPs reasonably designed to achieve compliance with Section 5. For deficient WSPs, the Guidelines recommend a fine ranging from $1,000 to $37,000. They also suggest that adjudicators consider suspending a firm with respect

---

[546] FINRA Sanction Guidelines (2016) ("Guidelines"), http://www.finra.org/industry/sanction-guidelines.

[547] Guidelines at 1, Overview.

[548] Guidelines at 2, General Principle No. 1.

[549] Guidelines at 4, General Principle No. 4.

[550] Guidelines at 24.

to any or all relevant activities or functions for up to 30 business days or until the supervisory procedures are amended to conform to the rule requirements.[551]

The Firm, through Cruz, failed to supervise its Rule 144 process appropriately. The Firm, through Cruz, failed to adequately and meaningfully analyze the information collected and thus failed to respond appropriately to red flags that the transactions were unlawful distributions. For a failure to supervise, the Guidelines recommend a fine of $5,000 to $73,000. In egregious cases, they suggest that adjudicators consider suspending a firm with respect to any or all relevant activities or functions for up to 30 business days. An even longer suspension may be imposed, up to two years, or the firm may be expelled, where the case involves systemic supervision failures.[552]

We find the Firm's violations to be egregious. We also find that there are a large number of aggravating factors that increase the need for stringent sanctions. There are no mitigating factors.

### 1.    Aggravating Factors

#### a.    Specific Principal Considerations Related To Section 5 Violations

One of the specific Principal Considerations in a case involving a Section 5 violation is whether the respondent attempted to comply with an exemption.[553] We conclude here that the Firm did not truly attempt to comply. Rather, it created the appearance of compliance. Although the Firm created thick due diligence packages, it did not meaningfully evaluate the information in those packages. If it had, it would have known it could not sell the securities without further investigation and the development of a reasonable basis for an exemption. We further find it aggravating that the Firm expended its resources on creating the appearance of compliance, rather than true compliance, because such conduct is deceptive and displays a lack of regard for the applicable law and regulatory requirements. This aggravating factor applies not only to the Firm but to Cruz, on whom everyone at the Firm depended for Rule 144 compliance.

Another specific Principal Consideration is the share volume and dollar amount of the transactions involved.[554] The transactions at issue involved millions of shares and resulted in

---

[551] Guidelines at 103.

[552] Guidelines at 102.

[553] Guidelines at 24.

[554] Guidelines at 24. See also Guidelines at 7, General Principal Consideration 18.

proceeds of more than $1.75 million.[555] The amounts involved are substantial and constitute an aggravating factor.

A third specific Principal Consideration is whether the respondent implemented reasonable procedures to ensure that it did not participate in an unregistered distribution.[556] The Firm's procedures were not reasonable. To the contrary, they seemed designed to obscure who was responsible for Rule 144 compliance and they failed to require specific, reliable evidence to support the application of an exemption. Nor did the Firm implement good practices. Scottsdale's staff uncritically relied on the self-serving representations of the interested parties. When they did notice a discrepancy, the staff assumed an innocent explanation or accepted a plainly unreliable representation from the interested parties, rather than pursuing the "searching inquiry" that was required. This aggravating factor applies to DiBlasi, as the CCO, and to Cruz, as the person ultimately responsible for Rule 144 compliance, as well as the Firm.

A fourth specific Principal Consideration is whether the respondent disregarded red flags suggesting the presence of an unregistered distribution.[557] As discussed above, the Firm repeatedly failed to identify and disregarded numerous red flags indicating that the transactions were unlawful distributions of securities. The multiplicity of red flags is another aggravating factor. This aggravating factor applies to Cruz as well as the Firm.

### b.   Specific Principal Considerations Related To Deficient WSPs

One of the specific Principal Considerations relating to deficient WSPs is whether those deficiencies allowed violative conduct to occur or to escape detection. We find here that the WSPs allowed violations to occur. The failure to provide guidance on dealing with discrepancies and suspicious circumstances allowed those involved with Rule 144 review to proceed in a rote fashion, without analyzing the information they collected. This aggravating factor applies to both the Firm and DiBlasi.

Another specific Principal Consideration is whether the deficiencies made it difficult to determine the individuals responsible for specific areas of supervision or compliance. We find that the failure to clearly and accurately delineate responsibility lessened transparency and accountability, making regulatory oversight more difficult. It is particularly aggravating that the person designated CCO should disclaim responsibility for the vast majority of the Firm's business. This aggravating factor applies to both the Firm and DiBlasi.

---

[555] JX-268 (NHPI-Related Activity in CSCT Account: Total Net Proceeds of $264,711.70); JX-281 (VPLM-Related Activity in CSCT Account: Total Net Proceeds of $1,408,173.39); JX-310 (ORFG-Related Activity in CSCT Account: Total Net Proceeds of $91,408.43).

[556] Guidelines at 24. See also Guidelines at 6, General Principal Consideration 5.

[557] Guidelines at 24.

c. **Specific Principal Considerations Related To Failure To Supervise**

One of the specific Principal Considerations in connection with a failure to supervise is whether the respondent ignored red flags warning of the need for additional supervisory scrutiny. Another is the nature, extent, size, and character of the underlying misconduct. Both of these are aggravating factors in this case. The Firm, through Cruz, ignored multiple red flags that the transactions required additional scrutiny. The transactions were substantial and were typical of the bulk of the Firm's business. The supervisory failure was in fact built into the Firm's standard practice for processing Rule 144 stock deposits, which is an aggravating factor. These aggravating factors apply to both the Firm and Cruz.

d. **General Principal Considerations**

Several general Principal Considerations are relevant to this case.[558] Principal Consideration 1 is a respondent's relevant disciplinary history.[559] Scottsdale has a disciplinary history, and some of that history involves misconduct like the misconduct here. As noted above, in the 2011 AWC the Firm settled charges that it had sold unregistered securities and that it had inadequate supervisory procedures and WSPs to detect and prevent the sale of unregistered securities. The Firm resolved other charges in the 2009, 2012, and 2015 AWCs. Finally, although the Firm was not charged in connection with the four SEC cases, *Ruettiger*, *Gibraltar I*, *Gibraltar II*, and *Tavella*, those cases did involve alleged misconduct through accounts at the Firm. These cases put the Firm on notice of the risk of sham transactions and the use of nominees to conceal beneficial ownership and facilitate unlawful distributions of securities. They heightened the need for the Firm to be alert to red flags. In light of this history, it is aggravating that Scottsdale performed its gatekeeping function so poorly.

Principal Consideration 2 concerns whether a respondent has accepted responsibility for and acknowledged the misconduct prior to detection and intervention. The Firm here has not. It maintains that its procedures are "market-leading" and create an "unfriendly environment" for stock manipulation.[560] The facts do not support that characterization.

Furthermore, in light of the fact that the transactions at issue involved persons who have been indicted for engaging in securities fraud and other crimes, it is particularly aggravating that the Firm's current president, Diekmann, testified that if any of the three deposits at issue were presented to him today—NHPI, VPLM, or ORFG—he would approve it. He expressed no qualms.[561] This means that the person in charge of approving stock deposits as satisfying the Rule 144 exemption is likely to commit the same violations again.

---

[558] Guidelines at 6-7.

[559] Guidelines at 6, General Principal Consideration 1.

[560] Resp. PH Br. 37-38.

[561] Hearing Tr. (Diekmann) 1799-80.

104

Adding to our concerns in this regard, Cruz echoed Diekmann. Cruz said that, despite the evidence presented to him during his testimony relating to the five certificate deposits charged in the Complaint (three NHPI, one VPLM, and one ORFG), he believed that the Rule 144 exemption applied and the transactions complied with Section 5.[562]

Principal Consideration 8 is whether a respondent engaged in numerous acts or a pattern of misconduct.[563] Principal Consideration 16 is whether the misconduct is aberrant behavior.[564] Scottsdale engaged in a pattern of misconduct and it was not aberrant behavior. Indeed, the Firm institutionalized its misconduct, by papering its files with documents that it did not meaningfully analyze. It is aggravating that the misconduct is actually the standard way the Firm conducts all its business. Moreover, Cruz testified that the pattern of deposits based on buying loan notes and exchanging them for stock was a typical transaction for the Firm. Because it was typical he saw nothing suspicious in it. These aspects of the misconduct are aggravating as to both the Firm and Cruz.

Principal Consideration 13 is whether the misconduct was the result of an intentional act, recklessness or negligence.[565] The Firm's misconduct was not the product of negligence. It acted intentionally when it created and implemented the procedures for reviewing deposits of stock certificates for resale that created a false appearance of compliance. This aggravating factor applies not only to the Firm but to both DiBlasi and Cruz.

Principal Consideration 18 focuses on the number, size, and character of the transactions.[566] The transactions at issue had many red flags indicating that they were schemes to evade the securities laws and the scrutiny that comes with registration. Given that character, it is aggravating that, as a result of Scottsdale's failure to perform its gatekeeping function, millions of dollars of securities were sold to the investing public without the safeguards that accompany registration.

###### e.    General Principles

The Guidelines instruct adjudicators to take into account certain General Principles applicable to all sanction determinations.[567] One of those General Principles is that disciplinary sanctions should be designed to deter misconduct, both by the respondent and by others, and should uphold high standards of business conduct. Adjudicators should impose sanctions that are

---

[562] Hearing Tr. (Cruz) 555.

[563] Guidelines at 6, General Principal Consideration 8.

[564] Guidelines at 7, General Principal Consideration 16.

[565] Guidelines at 7, General Principal Consideration 13.

[566] Guidelines at 7, General Principal Consideration 18.

[567] Guidelines at 2-5.

meaningful and significant enough to accomplish these goals, and the sanctions should reflect the seriousness of the misconduct at issue.[568]

The Firm's business is almost entirely the processing of penny stock deposits for resale into the public marketplace. In light of that fact, it is aggravating that the Firm had a check-the-box approach to its review of the deposits, without meaningful analysis of the multitude of red flags. The confession by Diekmann, the current president of the Firm, that, even after compiling a thick due diligence book, he knew nothing about the beneficial owner of one of the NHPI deposits is disturbing. It suggests that the person who now has authority to give final approval to stock deposits for resale has no understanding of what is required to ensure that the Firm does not participate in an unlawful distribution of securities without registration. The sanctions here must be stringent to deal with the seriousness of the misconduct and to show the Firm that it cannot simply continue with its business in its usual fashion. We believe that only a substantial sanction will deter the Firm from future misconduct.

Another General Principle is that disciplinary sanctions should be more severe for recidivists in order to deter and prevent future misconduct. The imposition of more severe sanctions emphasizes the need for corrective action.[569] As noted above, the Firm has a disciplinary history. It has been disciplined for selling unregistered securities and for other violations. In light of this history, it is appropriate to impose more severe sanctions.

### f.     Overview

The mission of FINRA's regulatory and disciplinary process is to protect investors and promote market integrity. In fulfilling that mission, adjudicators are not limited to the sanctions recommended in the Guidelines. Based on the facts and circumstances presented in each case, adjudicators may impose sanctions that fall outside the ranges recommended and may consider aggravating and mitigating factors in addition to those listed in the Guidelines.[570]

### 2.     Potential Mitigating Factor

Principal Consideration 3, which is applicable to all sanctions determinations, concerns whether, prior to detection or intervention by a regulator, a firm voluntarily employed corrective measures to avoid recurrence of misconduct. This might be argued to be a mitigating factor.

The Firm maintains that it enhanced its procedures after the SEC filed the complaints in the four cases involving nominees. In particular, it claims that it enhanced its reviews of stock promotions and notes that it ended all commissioned representatives at the Firm. It asserts that its requirement of a beneficial ownership declaration is a "market-leading practice" that has been

---

[568] Guidelines at 2, General Principle 1.

[569] Guidelines at 2, General Principle 2.

[570] Guidelines at 1.

adopted as a recommended method for determining beneficial ownership. It also points to its use of a Red Flag List and a Stock Watch List as enhancements to its reviews.[571]

We find that whatever changes the Firm made in its procedures were insufficient to be mitigating. To some degree, they appear to be more of the same. They created the appearance of compliance without actual compliance. Even with the so-called enhancements, the Firm's procedures were woefully lacking. The record is replete with red flags that the Firm and Cruz ignored.

### 3. Sanction

In light of the egregious nature of the Firm's violation, the Firm's institutionalization of the misconduct as its standard way of doing business, and the other aggravating factors set forth above, we believe that a stringent sanction is appropriate. Only such a sanction will serve the remedial purposes of the disciplinary process. The Firm must be deterred from similar misconduct in the future. We impose on Scottsdale a fine of $1.5 million.

### B. Hurry

Hurry's violation of his duty to observe high standards of commercial honor and just and equitable principles of trade was purposeful and egregious. These two qualities lead us to conclude that Hurry is a threat to investors and the integrity of the markets. Our concern is compounded by our credibility findings. We found that he repeatedly testified falsely, and that there was a pattern of doing so when he thought no contradictory evidence would come to light.

When misconduct is intentional, General Principle 1 provides that adjudicators should assess sanctions that exceed the recommended range in the Guidelines.[572] Principal Consideration 13 also focuses on whether a respondent's misconduct is the result of an intentional act, recklessness, or negligence.[573] When a violation is egregious, the Guidelines often suggest more severe sanctions. In egregious cases in connection with violations of Rule 2010 and Section 5, the specific Guidelines recommend that an individual be suspended for up to two years or barred.

Even though he has no disciplinary history, the devious nature of Hurry's violation evidences disregard for regulatory requirements, an aggravating factor under General Principle 2 and Principal Consideration 10.[574] We have no confidence that if he remained in the securities industry he would not again devise a way to evade the law and regulatory requirements. For this reason also, we believe Hurry is a threat to the investing public.

---

[571] Resp. PH Br. 37-38.

[572] Guidelines at 2, General Principle 2.

[573] Guidelines at 7, General Principal Consideration 13.

[574] Guidelines at 2, General Principle 2; Guidelines at 6, General Principal Consideration 10.

As discussed in connection with the Firm's violation and sanction, the scheme enabled large amounts of stock certificates to be sold in a number of transactions without the protections of registration and without an exemption. Under Principal Consideration 18, the size of the transactions is an aggravating factor.

Finally, we note that Hurry had by far the most to gain financially from setting up CSCT and enabling shares deposited from offshore customers to be shielded from scrutiny. He and his wife own all three entities involved in the process: CSCT, Scottsdale, and Alpine. And although Respondents emphasize that the particular transactions at issue did not generate a huge amount of money, the microcap securities liquidation business as a whole was highly remunerative for Hurry and his wife. We earlier noted that, from Scottsdale alone, in 2014 they received approximately $6.2 million in directors' fees and $1.45 million in net income. The compensation for all other employees and for professional and consulting fees for that year totaled less than half that—approximately $2.7 million. It was to Hurry's financial advantage to facilitate the processing of FFI deposits and to minimize regulatory oversight. The misconduct added to his financial gain and is an aggravating factor under Principal Consideration 17.[575]

We bar Hurry from associating with any FINRA member in any capacity and believe it appropriately remedial to fine him $100,000. In light of the bar, however, we do not impose the fine.

### C.   DiBlasi

The Guidelines provide with respect to an individual who is responsible for deficient WSPs that in egregious cases he may be suspended in any or all capacities for up to one year. The Guidelines also provide for a fine ranging from $1,000 to $37,000.

In this case we find more stringent sanctions appropriately remedial. DiBlasi's violation was egregious, and there are aggravating factors. The WSPs created the appearance of a set of procedures designed to achieve compliance, but they did not accurately reflect the way the Firm actually handled its Rule 144 deposits. They did not even reflect DiBlasi's true role. Even though he was purportedly the CCO, he claimed that he had nothing to do with the vast majority of the Firm's business. Essentially, he performed back-office functions for the Firm. The result of the deficiencies in the WSPs was that violations occurred and regulatory efforts to determine the persons responsible were hindered.

We suspend DiBlasi from associating with any FINRA member firm in any capacity for two years and fine him $50,000.

### D.   Cruz

The Guidelines provide with respect to an individual supervisor who fails to respond to red flags that, in egregious cases, an adjudicator should consider suspending the person in any or

---

[575] Guidelines at 7, General Principal Consideration 17.

all capacities for up to two years or barring him. A fine of $5,000 to $73,000 also may be imposed.

Cruz's violation was egregious. As a lawyer with considerable background in the securities laws, he had the background that others did not to scrutinize the due diligence packages and identify red flags. Furthermore, as the person at the Firm everyone else depended upon for Rule 144 compliance, he knew that he was critical to the Firm's performance of its gatekeeping duty. He was the principal at the Firm who gave final approval to the sales of deposited securities, signing under a certification that the transactions, to his knowledge, were lawful. In light of these circumstances and the many aggravating factors identified above, Cruz's failure to recognize and appropriately address multiple red flags was inexcusable.

We suspend Cruz from associating with any FINRA member firm in any capacity for two years and fine him $50,000.

### E.    Respondents' Arguments For Lesser Sanctions Rejected

We reject Respondents' arguments for lesser sanctions. They assert that the relief requested by Enforcement cannot be reconciled with the Guidelines because the sanctions are more stringent than the recommended range.[576] However, the Guidelines are not absolute. They are recommendations. As provided in the Overview, adjudicators may impose sanctions outside the recommended range where the particular facts and circumstances make that appropriate.[577]

We are concerned that the misconduct here is the Firm's standard approach to processing deposits of stock certificates for sale. As long as the Firm continues with that check-the-box approach, without a meaningful evaluation of the information it collects, it is a risk to public investors. More stringent sanctions are necessary to emphasize the necessity for corrective action and to remediate the violation.

Respondents also compare their case to other cases involving Section 5 and supervisory violations, asserting that in those other cases the misconduct was worse and the sanctions less.[578] The appropriateness of sanctions, however, depends on the facts and circumstances of the particular case and cannot be determined by comparison to sanctions in other cases that involve different facts and circumstances.[579] Furthermore, Respondents' misconduct was far more egregious than Respondents acknowledge.

---

[576] Resp. PH Br. 47.

[577] Guidelines at 1.

[578] Resp. PH Br. 47-49.

[579] *See, e.g., William Scholander*, Exchange Act Release No. 77492, 2016 SEC LEXIS 1209, at *42 & n.65 (Mar. 31, 2016).

With respect to disciplinary history, Respondents argue that the individual Respondents have no disciplinary history.[580] It is well established that the absence of a disciplinary history is not mitigating as to sanctions. A wrongdoer should not be rewarded for acting in accord with his duties as a securities professional.[581]

In sum, we find that the sanctions we impose here are necessary, appropriate and remedial. They serve the twin goals of protecting public investors and contributing to market integrity.[582]

## V.    CONCLUSION

The Firm, Scottsdale Capital Advisors, violated FINRA Rule 2010. Accordingly, it is ordered to pay a fine of $1.5 million. John J. Hurry violated FINRA Rule 2010. For his misconduct he is barred from association with any FINRA member in any capacity. He would be fined $100,000, but, in light of the bar, the fine is not imposed. Timothy B. DiBlasi violated NASD Rules 3010(a) and (b) and FINRA Rule 2010. For his misconduct, he is suspended for two years from association with any FINRA member in any capacity and fined $50,000. D. Michael Cruz violated NASD Rule 3010(b) and FINRA Rule 2010. For his misconduct, he is suspended for two years from association with any FINRA member in any capacity and fined $50,000.

Respondents are also ordered to pay costs in the amount of $22,124.29, which includes a $750 administrative fee and $21,374.29 for the cost of the transcript. If this decision becomes FINRA's final disciplinary action, Hurry's bar will take immediate effect. DiBlasi's and Cruz's suspension will begin with the opening of business on June 5, 2017 The fines and assessed costs shall be due on a date set by FINRA, but not sooner than 30 days after this decision becomes FINRA's final disciplinary action in this proceeding.

Lucinda O. McConathy
Hearing Officer
For the Extended Hearing Panel

---

[580] Resp. PH Br. 47.

[581] *See, e.g., Kenny A. Akindemowo*, Exchange Act Release No. 78352, 2016 SEC LEXIS 2522, at *5 & n.5 (July 18, 2016). *See also* Guidelines at 6 and n.2.

[582] The Hearing Panel has considered and rejects without discussion any other arguments made by the Parties that are inconsistent with this decision.

Copies to:    Scottsdale Capital Advisors (via overnight and first-class mail)
John J. Hurry (via overnight and first-class mail)
Timothy B. DiBlasi (via overnight and first-class mail)
D. Michael Cruz (via overnight and first-class mail)
Kevin J. Harnisch, Esq. (via electronic and first-class mail)
Ryan E. Meltzer, Esq. (via electronic mail)
Michael Edney, Esq. (via electronic mail)
Jeffrey D. Pariser, Esq. (via electronic and first-class mail)
Gregory R. Firehock, Esq. (via electronic mail)
Laura Blackston, Esq. (via electronic mail)
Heather Freiburger, Esq. (via electronic mail)