UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Scottsdale Capital Advisors
Corp. and John Hurry

     v.                                Civil No. 16-cv-545-JL
                                         Opinion No. 2017 DNH 186

The Deal, LLC and William
Meagher

**MEMORANDUM ORDER**

This defamation action turns on whether this court has
specific personal jurisdiction over the defendants on the basis
of articles written by one and published by the other.  The
plaintiffs, Scottsdale Capital Advisors Corp. and one of its
executive officers, John Hurry (collectively "Scottsdale"), have
brought this action based on an alleged injury wrought by a
publication, The Deal, LLC, and one of its writers, William
Meagher, through dissemination of three articles that,
plaintiffs allege, paint them in a false light.  The plaintiffs
raise four state-law claims:  defamation, invasion of privacy,
intentional interference with contractual relations, and
tortious interference with prospective economic advantage.

This court has subject-matter jurisdiction under 28 U.S.C.
§ 1332(a) (diversity).  The defendants challenge this court's
personal jurisdiction over them, however, and move to dismiss
the case on that basis.  See Fed. R. Civ. P. 12(b)(2).  After

holding oral argument, permitting jurisdictional discovery, and considering the parties' supplemental briefing based on that discovery, the court grants the defendants' motion.  Scottsdale has failed to establish that defendants have the minimum contacts with New Hampshire required for this court to exercise personal jurisdiction over them in this action consistent with the Fourteenth Amendment's due process clause.  Specifically, the plaintiffs have not demonstrated that their claims are related to the defendants' forum-based activities or that the defendants purposefully contacted New Hampshire such that they could expect to answer for their actions here.

## I.    Applicable legal standard

"Personal jurisdiction implicates the power of a court over a defendant . . . . [B]oth its source and its outer limits are defined exclusively by the Constitution," namely, the due process clause of the Fourteenth Amendment.  Foster–Miller, Inc. v. Babcock & Wilcox Can., 46 F.3d 138, 143–44 (1st Cir. 1995) (citing Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702 (1982)); U.S. Const. amend. XIV.  "To establish personal jurisdiction in a diversity case, a plaintiff must satisfy both the forum state's long-arm statute and the Due Process Clause of the Fourteenth Amendment."  C.W. Downer & Co. v. Bioriginal Food & Sci. Corp., 771 F.3d 59, 65 (1st Cir.

2014).  New Hampshire's applicable long-arm statute is coextensive with federal due process limitations, allowing the court to proceed directly to the due process inquiry.  See Phillips Exeter Acad. v. Howard Phillips Fund, 196 F.3d 284, 287 (1st Cir. 1999).

To satisfy the requirements of due process, the defendants must have sufficient "minimum contacts" with the forum "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (internal quotations omitted).  A court may exercise either general or specific jurisdiction over the defendants.  Scottsdale asserts that the court has only specific jurisdiction over the defendants.[1] Specific jurisdiction "is confined to adjudication of issues

---

[1] Compl. (doc. no. 1-1) ¶¶ 6-8; Opp. to Mot. to Dismiss (doc. no. 18) at 6.  Even had they asserted it, the plaintiffs have not demonstrated, and could not demonstrate, that this court has general jurisdiction over the defendants.  "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home."  Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 924 (2011).  A corporation is "fairly regarded at home" for general jurisdiction purposes in its "place of incorporation and principal place of business." Daimler AG v. Bauman, 134 S. Ct. 746, 760 (2014).  The defendants -- a resident of California and limited liability company which, like its sole member, is incorporated in Delaware and headquartered in New York -- have no such ties to New Hampshire.

deriving from, or connected with, the very controversy that
establishes jurisdiction." Goodyear, 564 U.S. at 919 (internal
quotations omitted).  "[T]he constitutional test for determining
specific jurisdiction . . . has three distinct components,
namely, relatedness, purposeful availment (sometimes called
'minimum contacts'), and reasonableness." Adelson v. Hananel,
652 F.3d 75, 80–81 (1st Cir. 2011) (internal quotations and
citations omitted).

　　　Scottsdale bears the burden of demonstrating that these
three components are satisfied by "proffer[ing] evidence which,
if credited, is sufficient to support findings of all facts
essential to personal jurisdiction."[2] A Corp. v. All Am.
Plumbing, Inc., 812 F.3d 54, 58 (1st Cir. 2016) (quoting
Phillips v. Prairie Eye Ctr., 530 F.3d 22, 26 (1st Cir. 2008)).
"To satisfy the prima facie standard in a specific jurisdiction
case, a plaintiff may not rest on mere allegations but, rather,
must submit competent evidence showing sufficient dispute-

---

[2] A district court may evaluate personal jurisdiction under one
of three standards.  See A Corp. v. All Am. Plumbing, Inc., 812
F.3d 54, 58 & n.5 (1st Cir. 2016).  The parties agree that the
prima facie standard is appropriate here, and the defendants
have not requested an evidentiary hearing.  Under that standard,
the plaintiffs need make only a prima facie showing that
defendants are subject to personal jurisdiction.  This is "the
least taxing of these standards from a plaintiff's standpoint,
and the one most commonly employed in the early stages of
litigation." Id. (quoting Rodriguez v. Fullerton Tires Corp.,
115 F.3d 81, 83–84 (1st Cir. 1997)).

related contacts between the defendant and the forum." Carreras v. PMG Collins, LLC, 660 F.3d 549, 552 (1st Cir. 2011). The court "view[s] this evidence, together with any evidence proffered by the defendant[s], in the light most favorable to the plaintiff and draw[s] all reasonable inferences therefrom in the plaintiff's favor," albeit without "credit[ing] bald allegations or unsupported conclusions." Id. This approach informs the following factual summary.

## II.  Background

### A.  Genesis of the action

This dispute stems from a series of three articles written by defendant Meagher and published by defendant The Deal in its online business journal, *The Deal Pipeline*, on December 6, 2013, March 20, 2014, and April 16, 2014.[3]  In these articles, Meagher reported on an investigation by federal authorities, including the Financial Industry Regulatory Authority (FINRA), into the involvement of Scottsdale, a securities broker-dealer, in the trading of stock in Biozoom Inc.[4]

---

[3] Compl. (doc. no. 1-1) ¶¶ 9-11; Meagher Decl. Exs. A, B, C (doc. nos. 16-4, 16-5, 16-6).

[4] In 2013, Scottsdale sued FINRA in Arizona, contending that FINRA's investigations amounted to harassment.  Scottsdale cited Meagher's articles, and alleged their falsity, in its complaint in that action.  See Meagher Decl. Ex. E (doc. no. 16-8) ¶¶ 192-200, 208-209, 216.

The articles follow the course of the alleged investigation
and a related lawsuit, which Meagher characterized as a "pump-
and-dump case."[5]  Meagher reported that individuals who traded in
Biozoom stock through Scottsdale "enjoyed perks that were not
available to other Scottsdale clients," such as paying a lower
percentage per transaction than typical clients, placing orders
through instant messaging, and wiring funds to institutions
located outside the United States and Argentina, where the
clients were located.[6]  He cited a source familiar with the
investigations as indicating that "several red flags were raised
regarding the Biozoom trades at Scottsdale," but that "no
follow-up occurred at the broker-dealer . . . ."[7]

Scottsdale filed this action on November 18, 2016, within
New Hampshire's three-year statute of limitations for defamation
claims.  See N.H. Rev. Stat. Ann. § 508:4, II.  Scottsdale
alleges that all three articles contain false statements about
the plaintiffs.[8]  Specifically, it contends that the plaintiffs
"had not been under any criminal or regulatory investigation at
the time Mr. Meagher's articles were published . . . . were not

---

[5] Meagher Decl. Ex. B (doc. no. 16-5).

[6] Meagher Decl. Ex. A (doc. no. 16-4).

[7] Id.

[8] Compl. (doc. no. 1-1) ¶¶ 9-12.

involved in any 'pump and dump scheme' and never gave special treatment to Biozoom shareholders."[9]

### B.   The parties' contacts with the forum

Though not dispositive of the personal jurisdiction question for the reasons discussed _infra_, the court notes, as an initial matter, that none of the parties to this action possesses substantial connections to this state.  Meagher resides in California and, by his own account, has never visited New Hampshire.[10]  The Deal is a limited liability company formed under the laws of Delaware, with offices in New York, California, and Washington DC.[11]  It employs no New Hampshire residents.[12]  Its sole member, The Street, Inc., likewise organized under Delaware law, maintains its principal place of business in New York, and has no New Hampshire office.[13]

Nor do the plaintiffs have any connections to New Hampshire.  Scottsdale is an Arizona corporation with its principal place of business in that state.[14]  Hurry, one of its

---

[9] _Id._ ¶ 12.

[10] Meagher Decl. (doc. no. 16-3) ¶ 2.

[11] Lundberg Decl. (doc. no. 16-2) ¶ 2-3.

[12] _Id._ ¶ 4.

[13] _Id._ ¶ 5; Aff't of Jurisdictional Facts (doc. no. 15-1) ¶ 2.

[14] Compl. (doc. no. 1-1) ¶ 1.

executive officers, resides and does business in Nevada.[15]  The
plaintiffs do not allege that they conduct any business in New
Hampshire or on behalf of any New Hampshire-based clients.
Simply put, as the plaintiffs conceded at oral argument, they
sued in New Hampshire because its statute of limitations does
not time-bar their claims.[16]

The parties agree, therefore, that the court's analysis
must turn on the defendants' business-related contacts with the
forum.  The parties do not dispute that those contacts -- to the
extent they exist -- would arise out of The Deal's publication
of its online business journal, *The Deal Pipeline*, and
specifically its publication of the three allegedly defamatory
articles, to any residents of New Hampshire.  The jurisdictional
discovery conducted by the parties sketches the contours of that
publication in this state.

*The Deal Pipeline* is an online business journal.[17]
Institutional organizations and individuals (though
predominantly the former) must subscribe to *The Deal Pipeline* to
access its full content through The Deal's online portal or to

---

[15] Id. ¶ 2.

[16] See Hrg. Tr. (doc. no. 22) at 27-29.  This bears little
relevance to the personal-jurisdictional analysis, of course,
though does merit consideration under the reasonableness
factors, as discussed infra Part III.C.3.

[17] Lundburg Decl. (doc. no. 16-2) ¶ 6.

receive email newsletters[18] containing links to articles published in *The Deal Pipeline*.[19]  Because content on *The Deal Pipeline* sits behind a pay wall, it is accessible only to those with whom The Deal has entered into a subscriber agreement.

 At the time it published Meagher's articles, and in the time since, The Deal has had only one subscriber in New Hampshire -- Dartmouth College.[20]  According to The Deal's records, no user accessed these three articles through the Dartmouth subscription.[21]  Nor did either of the two users of the Dartmouth subscription who had signed up to receive "The DealFlow Report" at the time the articles were published open the attachments containing links to the March 25 or April 22 articles; and no evidence suggests either opened the attachment containing a link to the December 10 article.[22]  Indeed,

---

[18] The Deal's email newsletter, "The DealFlow Report," is circulated as an attachment to emails sent only to registered users of The Deal who have also signed up to receive this specific newsletter.

[19] Id.  ¶¶ 11-12.

[20] Id.  ¶ 14; Susman Aff't Ex. 1 (doc. no. 29-2) at 10.  The plaintiffs focused their request for jurisdictional discovery on the subscriber agreement between The Deal and Dartmouth.

[21] Lundburg Decl. (doc. no. 16-2) ¶¶ 18-22.

[22] Links to the articles also appeared in editions of The Deal's email newsletter, "The DealFlow Report," on December 10, 2013, March 25, 2014, and April 22, 2014.  Susman Aff't Ex. 1 (doc. no. 29-2) at 7-8.

according to data collected through Google Analytics,[23] not a single user who read these articles through The Deal's online portal was located in New Hampshire.[24]

Because no evidence suggests that anyone in New Hampshire -- Dartmouth-affiliated or otherwise -- viewed the three allegedly-defamatory articles, the plaintiffs focus on other contacts between The Deal and Dartmouth.  For example, The Deal solicited Dartmouth's subscription, and renewals thereof, through emails and telephone calls specifically directed at Dartmouth.[25]  Furthermore, during the time period between January 1, 2013 and June 2017, 81 individuals were registered to use The Deal's online portal under Dartmouth's subscription.[26] Approximately 30 to 40 students each year were permitted to access The Deal's online portal via IP authentication (that is,

---

[23] Google Analytics is a service, offered by Google, that assists a website owner in tracking, reporting, and analyzing its website traffic.  See Google Analytics Solutions - Analytics Features, https://www.google.com/analytics/analytics/features/ (last visited Sept. 5, 2017).

[24] Susman Aff't Ex. 1 (doc. no. 29-2) at 9.

[25] See, e.g., Susman Aff't Ex. 3 (doc. nos. 29-4 and 29-5); id. Ex. 1 (doc. no. 29-2) at 4-5.

[26] Susman Aff't Ex. 1 (doc. no. 29-2) at 5.  There were only "30 active users" registered to access The Deal through Dartmouth's subscription "[d]uring the time in which the [a]rticles were published," however.  Id.

without entering a log-in name or password).[27]   The Deal
registered a total of 7,232 "sessions" by Dartmouth users
visiting its online portal during this time period.[28]   The Deal
also communicated directly with between 32 and 48 individuals at
Dartmouth by email during this time,[29] including regular
circulation of "The DealFlow Report" to the two Dartmouth-
affiliated individuals who had signed up for it.

## III. __Analysis__

"[T]he constitutional test for determining specific
jurisdiction . . . has three distinct components, namely,
relatedness, purposeful availment (sometimes called 'minimum
contacts') and reasonableness."   Adelson, 652 F.3d at 80–81
(internal quotations and citations omitted).   The court
addresses these components in that order, see United States v.
Swiss Am. Bank, Ltd., 274 F.3d 610, 621 (1st Cir. 2001) (quoting
Phillips Exeter Acad., 196 F.3d at 288), and concludes that the

---

[27] Id. at 5–6.

[28] The Deal defines a "session" as "an interchange of information
between the user's machine and The Deal's online portal."   Id.
at 6.   As such, each "session" does not necessarily correspond
to a unique view of a published article, and certainly does not
correspond to a unique viewer.

[29] See Susman Aff't Ex. 4 (doc. nos. 29–6, 29–7, and 29–8).
Plaintiffs explain that The Deal sent one email to "more than 32
members of the Dartmouth community," and another "to more than
16 members" thereof.   Susman Aff't (doc. no. 29–1) ¶ 5.   It is
unclear to what extent those recipient lists overlapped.

plaintiffs have not made a prima facie showing that this court may exercise personal jurisdiction over the defendants.

### A.   Relatedness

To satisfy the relatedness requirement, a suit must "arise out of, or be related to, the defendant's in-forum activities . . . ." Ticketmaster-N.Y., Inc. v. Alioto, 26 F.3d 201, 206 (1st Cir. 1994).  The burden is on the plaintiffs to "show a nexus between [his] claims and the defendants' forum-based activities.  Although this is a 'relaxed standard,' it nevertheless requires [the court] to hone in 'on the relationship between the defendant and the forum.'" A Corp., 812 F.3d 54, 59 (1st Cir. 2016).  This requirement "ensures that the element of causation remains in the forefront of the due process investigation" and "authorizes the court to take into account the strength (or weakness) of the plaintiff's relatedness showing in passing upon the fundamental fairness of allowing the suit to proceed." Ticketmaster-N.Y., 26 F.3d at 207.

Scottsdale focuses its relatedness argument on The Deal's ongoing business relationship in New Hampshire through its subscription agreement with Dartmouth.[30]  If this action arose

---

[30] See Opp. to Mot. to Dismiss (doc. no. 18) at 13-14; Supp. Opp. (doc. no. 29) at 8-9.

out of that agreement itself -- that is, if this were an action for breach of contract -- the court would evaluate the parties' "'prior negotiations and contemplated future consequences, along with . . . the parties' actual course of dealing . . . in determining whether the defendant' has minimum contacts with the forum" arising from that contract. Swiss Am. Bank, 274 F.3d at 621 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 478 (1985)). The existence of the contract, "by itself, cannot automatically establish" the defendants' contacts with the forum giving rise to relatedness, however. Id. It is "but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." Id. (quoting Burger King, 471 U.S. at 479) (analyzing minimum contacts in the relatedness context)).

The contract and The Deal's efforts to obtain it are less relevant in this instance because the plaintiffs' cause of action does not arise from the contract itself. It lies in tort -- specifically, defamation arising from the publication of purportedly defamatory news articles. "The tort of libel is generally held to occur wherever the offending material is circulated," because the "reputation of the libel victim may suffer harm even in a state where he has hitherto been anonymous." Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 777

(1984).  The evidence establishes that the particular articles
at issue in this case -- the "offending material" -- though
theoretically accessible to Dartmouth-affiliated individuals
because of the subscription agreement, were never accessed by
any such individuals via that agreement, or by any other
individual in New Hampshire.  Absent any viewing of the
allegedly-libelous statements in New Hampshire, the plaintiffs'
reputations in New Hampshire cannot have been blemished by the
articles' publication.

The plaintiffs therefore have not met their burden of
demonstrating that their claims "directly arise out of, or
relate to" the defendants' New Hampshire activity.  See Sawtelle
v. Farrell, 70 F.3d 1381, 1389 (1st Cir. 1995); see also
Christian v. Barricade Books, Inc., 2003 DNH 78, 8-9 (Barbadoro,
J.) (relatedness requirement not satisfied where book sold into
New Hampshire was returned to the defendant, uncirculated).
Even had the plaintiffs carried that burden, their personal
jurisdiction argument would fail at the next step.

### B.   Purposeful availment

The purposeful availment element "is only satisfied when
the defendant purposefully and voluntarily directs his
activities toward the forum so that he should expect, by virtue
of the benefit he receives, to be subject to the court's

jurisdiction based on these contacts." Swiss Am. Bank, 274 F.3d at 624.  The Supreme Court has adopted, and the First Circuit Court of Appeals has employed, "an effects test for determining purposeful availment in the context of defamation cases." Noonan v. Winston Co., 135 F.3d 85, 90 (1st Cir. 1998) (citing Calder v. Jones, 465 U.S. 783, 789 (1984)).  This test, unlike that for relatedness, focuses on the location at which the effects of the alleged defamation are directed and where they are felt.  Id.  It is ordinarily "to be applied only after the relatedness prong has already been satisfied." Swiss Am. Bank, 274 F.3d at 623.  While the plaintiffs have not made that showing here, the court addresses the purposeful availment element in the interest of completeness.

Scottsdale argues that the analysis outlined in Calder v. Jones is inapposite here because, unlike the plaintiff in that case, Scottsdale is not a resident of the forum.[31]  It argues, instead, that the court should analyze this requirement under a different defamation case, Keeton v. Hustler Magazine, Inc., 465 U.S. 770 (1984), which dealt with a non-forum plaintiff's libel claim.

---

[31] Opp. to Mot. to Dismiss (doc. no. 18) at 8 n.3.  Scottsdale has offered no authority for this proposition, however.  It distinguishes a recent decision by this court, Reynolds v. InVivo Therapeutics Holdings Corp., 2016 DNH 214, on the same grounds.

The court notes at the outset that the plaintiff's residence does not appear to be dispositive under either Calder or Keeton.[32]  Rather, in finding personal jurisdiction, both cases focus on the extent of the activities that an out-of-state defendant intentionally directs toward the forum state and the extent to which effects of that conduct were felt in the forum state.  Whether the plaintiff resides in the forum is only one factor in that analysis.

The plaintiff in Calder, a libel action, resided in California, where she bought suit against two reporters based in Florida.  465 U.S. at 785.  The Supreme Court found personal jurisdiction over the defendants in California because "California [was] the focal point both of the story and of the harm suffered."  Id. at 789.  The Court drew that conclusion from the extent of the reporters' Florida-based conduct directed toward California and the extent of the effects of that conduct on the plaintiff's reputation in that state.  Id. at 789.

In Keeton, the Supreme Court likewise focused on the extent of the defendant's contacts with the forum -- specifically, the thousands of magazines containing the allegedly-libelous statements that it circulated in New Hampshire -- and the

---

[32] It is worth noting that Calder and Keeton, both written by then-Justice Rehnquist, issued on the same day.

effects of those contacts on the plaintiff's reputation in New
Hampshire.  465 U.S. at 773–74 ("Respondent's regular
circulation of magazines in the forum State is sufficient to
support an assertion of jurisdiction in a libel action based on
the contents of the magazine.").  The plaintiff's residence in
New York did not prevent her reputation from being harmed in New
Hampshire when the defendant purposefully circulated a large
number of magazines in this state, regardless of whether the
defendant also circulated the magazines (and thus harmed the
plaintiff) in other states.  Id.

     Applying the same analysis here, the court finds that the
plaintiffs have not satisfied the purposeful availment prong.
First, the circulation of the allegedly-defamatory articles in
New Hampshire is negligible.  See Noonan, 135 F.3d at 91 ("The
size of a distribution of offending material helps determine
whether a defendant acted intentionally.").  Though some 7,000
members of the Dartmouth community theoretically had access to
The Deal Pipeline, the plaintiffs do not dispute the defendants'
representation that only 30 users were signed up to use that
subscription to access The Deal's online portal at the time the
articles were published, and that only two users actually
received an email newsletter containing active links to the
articles.  Such "thin distribution may indicate a lack of
purposeful contact," and it appears to do so here.  Id.

Regardless of the number of individuals who <u>could</u> have accessed the offending articles through Dartmouth's subscription to *The Deal Pipeline*, the evidence presented suggests that none <u>did</u>.  Unlike in Keeton and Calder, where New Hampshire residents read the allegedly libelous statements, presumably, damaging the plaintiffs' reputations, Scottsdale's reputation in New Hampshire cannot be impacted by the statements allegedly published in New Hampshire if no one in New Hampshire <u>saw</u> the statements.  Though this fact is most relevant to the relatedness analysis, it also supports the defendants' position that they did not purposefully direct the effects of the allegedly-defamatory statements toward New Hampshire, and that, in fact, those statements <u>had</u> no effect on the plaintiffs' reputations in New Hampshire.

Setting the effects test aside,[33] plaintiffs suggest that the defendants purposefully availed themselves of the forum under the analysis set forth in Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F. Supp. 1119, 1127 (W.D. Pa. 1997).  In light of the clear precedent from the Supreme Court and First Circuit Court of Appeals setting forth the analysis for determining purposeful availment in defamation actions, the court is disinclined to

---

[33] <u>See</u> Supp. Obj. (doc. no. 29) at 4-7 (failing to discuss this standard).

import a new or different standard applied, in Zippo, to determine whether a defendant conducted business in the forum in the context of a trademark infringement action. Even if the court were so inclined, Zippo is distinguishable because the defendant had "sold passwords to approximately 3,000 subscribers in Pennsylvania and entered into seven contracts with Internet access providers to furnish its services to their customers in Pennsylvania." Zippo, 952 F. Supp. 1126. No such evidence of extensive, purposeful contact with New Hampshire exists here.

In light of the undisputed evidence of limited activity directed by Meagher and The Deal at New Hampshire, and the absence of any evidence that such activity had any effect on the plaintiffs' reputations in New Hampshire, the plaintiffs have not satisfied the purposeful availment element.[34]

## C.   Reasonableness

The final variable in the specific jurisdiction calculus is "whether the exercise of jurisdiction is reasonable . . . ." Noonan, 135 F.3d at 89. In assessing reasonableness, the court takes into account the following considerations:

---

[34] Because the plaintiffs have not demonstrated that circulation of *The Deal Pipeline* in New Hampshire amounts to purposeful availment by The Deal, the court need not address whether such circulation can be imputed to Meagher, as the plaintiffs contend. See Opp. to Mot. to Dismiss (doc. no. 18) at 4 n.2; Reply (doc. no. 20) at 5 n.6.

> (1) the defendant's burden of appearing [in the forum state], (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

A Corp., 812 F.3d at 61 (quoting Downer, 771 F.3d at 69).

Where, as here, the plaintiffs fail to satisfy the first two elements of the due process inquiry -- relatedness and purposeful availment -- the court "need not dwell on these so-called 'gestalt' factors." Id.; see also Ticketmaster-N.Y., 26 F.3d at 210 ("[T]he reasonableness prong of the due process inquiry evokes a sliding scale:  the weaker the plaintiff's showing on the first two prongs (relatedness and purposeful availment), the less a defendant need show in terms of unreasonableness to defeat jurisdiction.").  On balance, these factors weigh against finding jurisdiction, particularly in light of the plaintiffs' history of serial litigation invoking these claims.[35]

---

[35] Neither party addresses the last two factors -- "the judicial system's interest in obtaining the most effective resolution of the controversy, and the common interests of all sovereigns in promoting substantive social policies." A Corp., 812 F.3d at 61.  The court would consider them neutral in any case.

### 1.   The defendants' burdens of appearance

The defendants' burdens of appearing in New Hampshire and the inconvenience to the plaintiffs weigh somewhat against finding jurisdiction here.  While that burden on The Deal, a corporate defendant located in New York, is not heavy, the burden on Meagher, an individual residing in California, may be. Ticketmaster-N.Y., 26 F.3d at 210 ("The burden associated with forcing a California resident to appear in a Massachusetts court is onerous in terms of distance . . . ."); but see Sawtelle, 70 F.3d at 1395 ("this factor becomes meaningful only where a party can demonstrate a 'special or unusual burden'").

"As the First Circuit has explained, however, the 'burden of appearance' factor is important primarily because 'it provides a mechanism through which courts may guard against harassment.'"  R&R Auction Co., LLC v. Johnson, 2016 DNH 40, 23 (Barbadoro, J.) (quoting Ticketmaster-N.Y., 26 F.3d at 211). This is not the first action that Scottsdale has brought against the defendants for defamation.  In May 2016, Scottsdale sued the defendants in New York, where The Deal is located.  It withdrew that action on the eve of the deadline for defendants' motion to dismiss, forcing the defendants to incur the expense of drafting that motion unnecessarily, and then filed this action in New

Hampshire.[36]  Scottsdale also sued FINRA in Arizona over its investigations of Scottsdale.[37]  The defendants here suggest that "the Plaintiffs' primary strategic purpose" for bringing both the New York and New Hampshire actions "was to coerce Defendants into revealing the identity of Mr. Meagher's confidential source in the hopes that this information would bolster their case against FINRA in Arizona."[38]  Scottsdale does not deny -- nor even address -- this allegation in its objection and did not do so at oral argument.  This factor, therefore, weighs heavily against the reasonableness of this court finding personal jurisdiction.

### 2.  The forum state's adjudicatory interest

Nor does New Hampshire have a strong interest in exercising jurisdiction here.  "The forum state has a demonstrable interest

---

[36] Mem. in Supp. of Mot. to Dismiss (doc. no. 16-1) at 7-8.  At oral argument, plaintiffs' counsel explained that he withdrew the New York case and refiled in New Hampshire because plaintiffs "had given [defendants] multiple months and months and months of extensions to file their motion [to dismiss], and in fact we were on the verge of giving them another one, and at that point we decided it was better to just dismiss the case and refile it here . . . [b]ased on the statute of limitations." Hrg. Tr. (doc. no. 22) at 28-29.  The purported connection between extensions of deadlines and a decision to withdraw a case on statute of limitations grounds after such grants escapes the court.

[37] Mem. in Supp. of Mot. to Dismiss (doc. no. 16-1) at 7-8.

[38] Id. at 8-9.  Plaintiffs filed their Arizona suit in November 2014.  Meagher Decl. Ex. E (doc. no. 16-8).

in exercising jurisdiction over one who causes tortious injury within its borders." Ticketmaster-N.Y., 26 F.3d at 211.   That interest is "far less compelling," however, where, as here, "the acts comprising the defendants'" allegedly culpable conduct "occurred almost entirely outside of New Hampshire." Sawtelle, 70 F.3d at 1395; see also R&R Auction, 2016 DNH 195, 24-25 (assigning little weight to this factor where tort occurred outside New Hampshire).   This factor thus also weighs against finding jurisdiction or, at best, is neutral.

### 3.   The plaintiffs' interest in obtaining relief

Scottsdale argues that its "interest in obtaining convenient and effective relief" is "the most important of the gestalt factors" and weighs in its favor because the statutes of limitations have run in other potential fora.[39]   This factor does weigh in the plaintiffs' favor, but not as heavily as the plaintiffs contend.

Their complaint in the Arizona action demonstrates that the plaintiffs were aware, and asserted the falsity, of the allegedly defamatory statements by November 2014.[40]   As of that date, even "New York's draconian one-year statute of limitations

---

[39] Obj. to Mot. to Dismiss (doc. no. 18) at 16-17.

[40] Meagher Decl. Ex. E (doc. no. 16-8) ¶¶ 192-200, 208-209, 216.

for libel,"[41] as the plaintiffs describe it, had not yet run. The plaintiffs' decision to wait two years before suing in New Hampshire under identical facts as those asserted in their Arizona complaint undermines their reliance on this factor.

## IV.  **Conclusion**

Scottsdale has not satisfied any of the elements of the personal jurisdiction inquiry.  They have not shown relatedness because their claim for defamation did not arise from, and was not related to, the defendants' meagre connections with New Hampshire.  Nor does The Deal's subscription contract with Dartmouth, representing a minimal distribution of that online business journal in New Hampshire, amount to a purposeful availment of the forum on the defendants' part, especially when that account never accessed the allegedly defamatory articles. The reasonableness factors, weighing on balance against a finding of jurisdiction, are not grounds for personal jurisdiction where the plaintiffs have not demonstrated reasonableness and purposeful availment.  The defendants' motion to dismiss for lack of personal jurisdiction[42] is, therefore, GRANTED.  The clerk shall enter judgment accordingly and close the case.

---

[41] Obj. to Mot. to Dismiss (doc. no. 18) at 16.

[42] Document no. 16.

**SO ORDERED.**

Joseph N. Laplante
United States District Judge


Dated:     September 8, 2017

cc:   George R. Moore, Esq.
      Steven H. Frackman, Esq.
      Charles J. Harder, Esq.
      Christopher D. Hawkins, Esq.
      Jordan Susman, Esq.
      Elizabeth A. McNamara, Esq.
      John M. Browning, Esq.
      Steven M. Gordon, Esq.