# United States Court of Appeals
## For the First Circuit

---

No. 17-1968

SCOTTSDALE CAPITAL ADVISORS CORP.; JOHN HURRY,

Plaintiffs, Appellants,

v.

THE DEAL, LLC; WILLIAM MEAGHER,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph Laplante, Chief U.S. District Judge]

---

Before

Lynch, Circuit Judge,
Souter, Associate Justice,[*]
and Kayatta, Circuit Judge.

---

Dilan Esper, with whom Douglas E. Mirell, Jordan D. Susman, Harder Mirell & Abrams, LLP, Christopher D. Hawkins, and Devine, Millimet & Branch, P.A., were on brief, for appellants.
Elizabeth A. McNamara, with whom John M. Browning and Davis Wright Tremaine LLP were on brief, for appellees.

---

April 3, 2018

---

[*] Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**KAYATTA**, **Circuit Judge**.  Defendant The Deal, LLC posted to a subscriber-only website and attached to email newsletters three articles written by defendant William Meagher that allegedly defamed plaintiffs Scottsdale Capital Advisors Corporation and John Hurry.  Plaintiffs eventually filed suit in New Hampshire.  None of the four parties has anything to do with New Hampshire except that one of The Deal's institutional subscribers, Dartmouth College, is located there.  After discovery indicated that plaintiffs would have no reasonable basis upon which to establish that anyone in New Hampshire ever saw any of the three articles as a result of the Dartmouth subscription, the district court dismissed the complaint for lack of personal jurisdiction.  For the following reasons, we affirm.

## I.  Background

The Deal is a Delaware limited liability company with its principal place of business in New York.  It reports primarily on financial matters relevant to small cap and microcap securities markets.  It has approximately 700 subscribers.  While this number may seem small in absolute terms, virtually all of these subscribers are large institutions, many of which apparently pay substantial amounts for a subscription.  Individuals affiliated with the subscribing institution gain the ability to access The Deal's web portal, on which The Deal posts its articles.  These

individuals can also sign up to receive email newsletters from The Deal containing PDF copies of The Deal's articles.

In late 2013 and early 2014 The Deal posted on its subscriber-only web portal three articles written by Meagher concerning plaintiffs. The Deal also sent each article as a PDF attachment by email to newsletter subscribers. The articles stated -- falsely, allege plaintiffs -- that plaintiffs were under investigation by law enforcement and securities regulators.

Plaintiff Scottsdale is an Arizona corporation with its principal place of business in Arizona. Plaintiff Hurry is an executive officer of Scottsdale and a citizen of Nevada. Neither plaintiff had any particular connection to New Hampshire before they decided to file this suit in New Hampshire state court, from which defendants removed it to federal court. The parties devote some effort to debating plaintiffs' motives for choosing to file this case in New Hampshire, but we find no need to get to issues of motive in order to decide this appeal.

Defendants moved to dismiss the claims under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. Plaintiffs requested that should the district court be inclined to grant the motion, it first allow for jurisdictional discovery. In May 2017, the district court did as plaintiffs asked, issuing an order permitting jurisdictional discovery. The order limited the forms of discovery to interrogatories and

requests for production. Plaintiffs never suggested that they needed any other forms of discovery.

The jurisdictional discovery revealed that for at least five years (including the years at issue here) The Deal successfully recruited and retained Dartmouth's business by sending targeted communications to school officials explaining why Dartmouth should pay the substantial costs of becoming a subscriber. The Deal also telephoned Dartmouth directly in the course of actively soliciting Dartmouth's renewal of its subscription. The Dartmouth subscription granted to Dartmouth's 7,000 students and faculty members the ability to sign up for access to the web portal on which one could read The Deal's articles. Dartmouth bore the cost of the subscription and did not charge its users for access. The Deal affirmatively contacted thirty to forty individuals on campus to elicit interest in The Deal. Thirty members of the Dartmouth community signed up for access to the web portal, and two members also signed up to receive the emailed newsletter during the relevant period. The Deal had no other New Hampshire subscribers or contacts. Meagher has never set foot in the state, nor did he have any other relevant contact to which plaintiffs point.

The additional information produced in jurisdictional discovery trained on whether anyone actually looked at any of the three articles at issue here. Analytic tools, the accuracy of

- 4 -

which the parties do not dispute,[1] revealed that no one at Dartmouth (or elsewhere in New Hampshire) accessed the allegedly defamatory articles available on The Deal's web portal. The parties also learned that the second and third articles sent in PDF format were never opened, but because The Deal was not set up to collect the necessary data when the first article was sent in 2013, discovery did not reveal whether either recipient opened the PDF file containing the first article.

Discovery also showed that twenty-one individuals in New Hampshire viewed one of the articles on a free, unrestricted website operated by The Deal's parent corporation. Plaintiffs did not sue the parent company, and they make no effort to ground jurisdiction on those viewings of the parent's website, so neither shall we. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (restating the "settled appellate rule" that issues not properly raised are waived).

---

[1] At oral argument, plaintiffs' counsel stated in passing that: "I am not entirely sure of how the process of determining whether someone opened an email attachment works." To the extent that one could read this as an argument questioning the facts found in jurisdictional discovery, such an argument comes too late. Of course, a plaintiff need not blindly accept all of a defendant's claims concerning what the evidence shows. But the proper time and place for plaintiffs to argue about what factual conclusions should be drawn from information revealed in discovery was in the district court prior to its ruling, or, at the very least, in their opening brief to this court. See Remington v. United States, 872 F.3d 72, 77-78 (1st Cir. 2017).

Based upon the information revealed through discovery and post-discovery supplemental briefing, the district court granted defendants' motion to dismiss. First, it concluded that because plaintiffs had not proffered evidence that the articles in suit were ever read by anyone via the Dartmouth subscription, plaintiffs' claim could not be said to "arise out of, or relate to" defendants' New Hampshire contacts. Scottsdale Capital Advisors Corp. v. The Deal, LLC, 2017 WL 3981243, at *5 (D.N.H. Sept. 8, 2017). Second, it determined that because the evidence of circulation in the forum was "negligible," defendants could not be said to have purposefully availed themselves of the privilege of doing business in New Hampshire. Id. at *6. Finally, the district court found that under the so-called "gestalt" factors, the exercise of jurisdiction over defendants in New Hampshire would not be reasonable. Id. at *7-8. This appeal followed.

## II. Analysis

Because neither party requested an evidentiary hearing and the district court did not conduct one, the district court used the prima facie method to assess the jurisdictional question. See Foster-Miller, Inc. v. Babcock & Wilcox Can., 46 F.3d 138, 145-48 (1st Cir. 1995). Under this method, a plaintiff must "proffer[] evidence which, if credited, is sufficient to support findings of all facts essential to personal jurisdiction" and may not "rely on unsupported allegations." A Corp. v. All Am.

Plumbing, Inc., 812 F.3d 54, 58 (1st Cir. 2016). We review de novo the district court's conclusion that plaintiffs failed to meet this burden. See Foster-Miller, Inc., 46 F.3d at 147.

Plaintiffs understandably make no claim that either defendant is subject to general personal jurisdiction. See, e.g., Daimler AG v. Bauman, 134 S. Ct. 746, 754–56 (2014). Rather, they assert specific personal jurisdiction, i.e., jurisdiction over these defendants for the purpose of this specific lawsuit. Id. at 754 (citing Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) and distinguishing between specific and general personal jurisdiction). As we recently explained in A Corp., plaintiffs seeking to establish that a court has specific personal jurisdiction over a defendant must show that: (1) their claim directly arises out of or relates to the defendant's forum-state activities; (2) the defendant's contacts with the forum state represent a purposeful availment of the privilege of conducting activities in that state, thus invoking the benefits and protections of that state's laws and rendering the defendant's involuntary presence in that state's courts foreseeable; and (3) the exercise of jurisdiction is ultimately reasonable. 812 F.3d at 59. Failure to make any one of these showings dooms any effort to establish specific personal jurisdiction. See id.

**A.**

We begin (and ultimately end) by analyzing whether plaintiffs have proffered evidence that would support a finding that their claims arise out of or relate to defendants' forum-state activities. See id. Here, plaintiffs' claims all sound in tort, so to assess relatedness we "look to whether the plaintiff has established cause in fact (i.e., the injury would not have occurred 'but for' the defendant's forum-state activity) and legal cause (i.e., the defendant's in-state conduct gave birth to the cause of action)." Mass. School of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 35 (1st Cir. 1998) (internal quotation marks omitted) (quoting United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp., 960 F.2d 1080, 1089 (1st Cir. 1992)).

Each tort as alleged in this case relies on the allegation that defendants published defamatory material, so for the purpose of defining plaintiffs' injury, we can simply describe the cause of action as one for defamation. In defining the elements of defamation, New Hampshire courts look to the Restatement (Second) of Torts. See Duchesnaye v. Munro Enter., Inc., 480 A.2d 123, 127-28 (N.H. 1984). The elements of defamation as enumerated in the Restatement are:

> (a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting to at least negligence on the part of the publisher; and (d) either actionability

>     of the statement irrespective of special harm
>     or the existence of special harm caused by the
>     publication.

Restatement (Second) of Torts § 558. The second element, publication, does not mean merely uttering or writing. Rather, "publication" as used in this context means to communicate the defamatory material to a third party (that is, a party who is not the subject of the defamatory material) where that third party understands the defamatory significance of the material. See id. § 558 cmt. c ("Since publication requires that the defamatory matter be communicated to a third person, it is necessary . . . that the defamatory matter be brought to the attention of a third person [and] that [this third person] understand its defamatory significance."). Logically, then, when the only third party exposed to a defamatory writing does not read that writing, a defendant is not liable for defamation. See Walden v. Fiore, 134 S. Ct. 1115, 1124 (2014) (noting, in the context of an inquiry into specific personal jurisdiction, that "[h]owever scandalous a newspaper article might be, it can lead to a loss of reputation only if communicated to (and read and understood by) third persons" (emphasis added) (citing Restatement (Second) of Torts § 577 cmt. b)); Griffin v. Pinkerton's, Inc., 173 F.3d 661, 665 (8th Cir. 1999) (holding the publication requirement unmet because no third party had read the allegedly defamatory material).

- 9 -

The record reflects that this is what happened (or, to be more precise, did not happen) here, at least as far as the web portal and the second and third emails. The Deal made the articles available through the subscriber portal and by email, but no one looked. Notionally, a tree fell in New York but no one heard it in New Hampshire.

That leaves only the first article emailed to the two newsletter subscribers. The record is silent as to whether either of those subscribers opened the attached article. This silence leaves a hole in plaintiffs' prima facie case for maintaining jurisdiction. Plaintiffs do not claim that they were refused any further discovery that might have helped them fill this hole. They also do not suggest that the litigation is likely to produce any evidence that either subscriber opened the attachment emailed over four years ago. Nor do plaintiffs advance any principle of law that might generate a presumption that the email attachments were opened. Individuals often receive many emails every day, attachments to which may well go unopened. And while in other cases circumstantial evidence -- such as a higher number of email recipients -- might be sufficient to create a presumption of publication, no such circumstantial evidence is present here. The number of recipients in this case -- two -- is too small to generate on its own a reasonable assumption that at least one recipient must have opened the attachment.

All of this means that even on a prima facie basis, plaintiffs have not established either "cause in fact (i.e., the injury would not have occurred 'but for' the defendant's forum-state activity) [or] legal cause (i.e., the defendant's in-state conduct gave birth to the cause of action)." Mass. School of Law at Andover, 142 F.3d at 35 (quoting United Elec. Radio & Mach Workers, 960 F.2d at 1089). Put another way, plaintiffs' reputation would not differ had Dartmouth never subscribed to The Deal. There is thus no nexus between the claims and defendants' forum-based activities, as the relatedness prong of the jurisdictional analysis requires. A. Corp., 812 F.3d at 59.

Plaintiffs' only rejoinder to this conclusion is to point to the Supreme Court's opinion in Keeton v. Hustler Magazine, Inc., 465 U.S. 770 (1984). As plaintiffs correctly observe, the Court in Keeton found personal jurisdiction over a defamation claim by a non-New Hampshire plaintiff against a non-New Hampshire defendant based on the circulation of the allegedly defamatory article in the state, without mentioning whether anyone within the state actually read the article. Therefore, argue plaintiffs, proof of circulation within the state is enough to establish relatedness.

In Keeton, though, the "circulation" consisted of copies of a paper magazine delivered to over 10,000 paying customers. Id. at 772. One can reasonably presume that some of those 10,000-

plus persons read the article. Plaintiffs sheepishly suggest that it is "well known" that the articles in a magazine like that at issue in Keeton ("Hustler") are less likely to be read because people buy the magazine for the photographs. We venture no opinion concerning this speculation beyond saying that it seems quite certain that at least some of the 10,000-plus purchasers read the articles that were central to Keeton. We therefore decline to infer from Keeton any suggestion that proving defamation does not require evidence that a third party apprehended the defamatory communication, or that relatedness does not require at least some actionable defamation within the state.

**B.**

In finding that plaintiffs failed to establish specific personal jurisdiction over defendants, the district court helpfully analyzed all three requirements for establishing such jurisdiction, thereby finding three reasons for declining to assert jurisdiction. Because we find compelling reasons to agree with the district court's cogent conclusion as to the lack of relatedness, and because we have reservations about its view that the intentional and ongoing recruitment of Dartmouth as an institutional subscriber did not constitute purposeful availment, we restrict our analysis to the issue of relatedness. We express no impressions concerning the district court's analysis of the gestalt factors.

### III. Conclusion

In this case, plaintiffs' only injury was reputational harm allegedly suffered as a result of the publication of certain articles. However, nothing in the record indicates that this injury arose in any way from defendants' only contacts with plaintiffs' chosen forum. The offending articles appear to have never been read by anyone using the Dartmouth subscription, and to the extent that there is any doubt concerning that conclusion, plaintiffs have given us no reason to find within that doubt a prima facie basis for ruling in their favor. The judgment of the district court is affirmed.